**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **COLLINS & AIKMAN CORPORATION** ) <br> **and COLLINS & AIKMAN PRODUCTS CO.,** ) <br> **as Debtors in Possession,** ) <br> ) <br> Plaintiffs, ) <br> ) <br> **DAVID A. STOCKMAN,** *et al.***,** ) <br> ) <br> Defendants. ) <br> ) | C.A. No. 07-265-SLR-LPS <br><br> *Electronically Filed* |

**APPENDIX TO**
**OPENING BRIEF IN SUPPORT OF DEFENDANT**
**PAUL C. BARNABA'S MOTION TO DISMISS**
**PLAINTIFFS' FIRST AMENDED COMPLAINT**

Thomas G. Macauley (ID No. 3411)
ZUCKERMAN SPAEDER LLP
919 Market Street, Suite 990
Wilmington, DE 19801
(302) 427-0400  Telephone
(302) 427-8242  Fax

Laura Neish, Esq. (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
1540 Broadway, Suite 1604
New York, NY 10036
(212) 704-9600 Telephone
(212) 704-4256 Fax

Carl S. Kravitz, Esq. (admitted *pro hac vice*)
Lenora Miles Rigby, Esq. (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
(202) 778-1800 Telephone
(202) 822-8106 Fax

*Attorneys for Defendant Paul Barnaba*

Dated: April 28, 2008
        Wilmington, Delaware

# TABLE OF CONTENTS

Exhibit A:      Amended Class Action Complaint in *Mainstay High Yield Corporate Bond Fund v. Heartland Indus. Partners, LP*, Case No. 2:07-cv-10542 (E.D. Mich. May 4, 2007)      A-1

Exhibit B:      Order in *Mainstay* (Mar. 19, 2008)      A-115

Exhibit C:      Collins & Aikman Corporation Form 10-Q/A, Sept. 20, 2004      A-119

Exhibit D:      Collins & Aikman Corporation Form 14A, Apr. 25, 2002      A-193

Exhibit E:      Collins & Aikman Corporation Form 10-K, Dec. 31, 2003      A-209

Exhibit F:      Collins & Aikman Form 14A, Sept. 30, 2004      A-217

Exhibit G:      Statement of Financial Affairs, *In re Collins & Aikman Corp., et al.*, No. 05-55927-swr (Bankr. E.D. Mich. August 12, 2005).      A-228

Exhibit H:      Excerpt from Transcript of Hearing on Motions to Dismiss Complaint, *Mainstay* (Mar. 18, 2008)      A-243

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAINSTAY HIGH YIELD
CORPORATE BOND FUND,
on behalf of itself and all others
similarly situated,

          Plaintiff,               Case No. 2:07-cv-10542-AJT-SDP

v

HEARTLAND INDUSTRIAL PARTNERS, L.P.,
a Delaware limited liability partnership,
HEARTLAND INDUSTRIAL ASSOCIATES, L.L.C.,
a Delaware limited company, DAVID A. STOCKMAN,
J. MICHAEL STEPP, TIMOTHY D. LEULIETTE,
DANIEL P. TREDWELL, W. GERALD MCCONNELL,
SAMUEL VALENTI, III, JOHN A. GALANTE,
BRYCE M. KOTH, ROBERT A. KRAUSE,
GERALD E. JONES, DAVID R. COSGROVE,
ELKIN B. MCCALLUM, PAUL C. BARNABA,
THOMAS V. GOUGHERTY and
CHRISTOPHER M. WILLIAMS

          Defendants.

—————————————————————————————————/

| | |
|---|---|
| MAX W. BERGER | MAYER MORGANROTH (P17966) |
| STEVEN B. SINGER | JEFFREY B. MORGANROTH (P41670) |
| JOHN C. BROWNE | MORGANROTH & MORGANROTH, |
| JEREMY P. ROBINSON | PLLC |
| BERNSTEIN LITOWITZ BERGER & | *Local Counsel for Plaintiff* |
| GROSSMANN, LLP | 3000 Town Center, Suite 1500 |
| *Counsel for Plaintiff* | Southfield, MI 48075 |
| 1285 Avenue of the Americas | (248) 355-3084 |
| New York, New York 10019 | |
| (212) 554-1400 | |

—————————————————————————————————/

## AMENDED CLASS ACTION
## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff MainStay High Yield Corporate Bond Fund ("Plaintiff") brings this case as a

class action, individually and on behalf of all other persons and entities who purchased or

otherwise acquired Collins & Aikman Corporation ("C&A" or the "Company") 12.875% Notes

and 10.75% Notes (together, "C&A Notes") through their duly authorized investment adviser,

MacKay Shields LLC ("MacKay Shields"), during the period between August 11, 2004 through

and including May 17, 2005 ("the Class Period").[1]  Plaintiff alleges the following upon

knowledge, with respect to its own acts, and upon other facts obtained through an investigation

conducted by counsel, which included, *inter alia*, review of the Indictment filed in *United States*

*of America v. David A. Stockman et al.*, 07 Crim. 0220 (SDNY) (the "Criminal Indictment"), the

complaint filed by the United States Securities and Exchange Commission (the "SEC") action

captioned *Securities and Exchange Commission v. Collins & Aikman Corp., et al.*, 07-CV-2419

(SDNY) (the "SEC Complaint"), filings with the SEC made by C&A and Heartland; press

releases and other public statements; media reports; interviews with former C&A employees; and

a review of documents Defendants provided MacKay Shields to induce MacKay Shields to

---

[1]    Defendants in this Action are the individuals and entities that owned and operated C&A during the Class
Period: (i) Heartland Industrial Partners, L.P.; (ii) Heartland Industrial Associates, L.L.C. (together with Heartland
Industrial Partners, L.P., "Heartland"); (iii) David A. Stockman ("Stockman"), Chairman and Chief Executive
Officer of C&A and Senior Managing Director of Heartland; (iv) J. Michael Stepp ("Stepp"), Chief Financial
Officer of C&A and Senior Managing Director of Heartland; (v) John A. Galante ("Galante"), Vice President and
Treasurer of C&A and Vice President of Heartland; (vi) Bryce M. Koth ("Koth"), Senior Vice President and Chief
Financial Officer of C&A; Robert A. Krause ("Krause"), Senior Vice President, Finance and Administration of
C&A; (vii) Timothy D. Leuliette ("Leuliette"), Director of C&A and Senior Managing Director of Heartland; (viii)
Daniel P. Tredwell ("Tredwell"), Director of C&A and Senior Managing Director of Heartland; (ix) W. Gerald
McConnell ("McConnell"), Director of C&A and Senior Managing Director of Heartland; (x) Samuel Valenti, III
("Valenti"), Director of C&A and Senior Managing Director of Heartland; (xi) Gerald E. Jones ("Jones"), Chief
Operating Officer and Executive Vice President of C&A's Fabrics Division; (xii) David R. Cosgrove ("Cosgrove"),
C&A's Vice President of Finance, Vice President for Financial Planning and Analysis and, as of October 2004,
C&A's Senior Vice President, Financial Planning and Controller; (xiii) Elkin B. McCallum ("McCallum"), Director
of C&A and the Chief Executive officer and owner of Joan Fabrics; (xiv) Paul C. Barnaba ("Barnaba"), Director of
Financial analysis for C&A's Purchasing Department and, eventually, vice president and the Director of Purchasing
for the Plastics Division (xv) Thomas V. Gougherty ("Gougherty"), Controller of C&A's International Plastics
Division and subsequently Vice President of Finance and CFO of C&A's Global Plastics Division; and (xvi)
Christopher M. Williams ("Williams"), Executive Vice President of C&A's Business Development and Specialty
Products groups from November 2004 through May 2005 (collectively, the "Defendants").

purchase approximately $153 million worth of C&A Notes on behalf of Plaintiff and other members of the Class (as defined below).

## NATURE OF THE ACTION

1.      Plaintiff brings this class action on behalf of a class of institutional investors who purchased, through their investment adviser, MacKay Shields, more than $153 million face value of C&A Notes (the "Class") during the Class Period. The Class asserts claims under the Securities Exchange Act of 1934 (the "Exchange Act") against the individuals and entities that owned and operated C&A, a now-bankrupt automotive parts manufacturer located in Michigan. The Defendants include David Stockman, C&A's former CEO and Chairman, and his investment fund, Heartland, which owned a controlling stake in C&A and employed the Company's Chairman and CEO, Vice Chairman and CFO, Treasurer, and a majority of its Board.

2.      Between August 2004 and May 2005, Defendants conducted several face-to-face meetings with MacKay Shields' representatives for the sole purpose of inducing MacKay Shields to purchase C&A Notes on behalf of Plaintiff and the Class. In marketing C&A Notes to MacKay Shields and in public filings on which MacKay Shields relied, Defendants touted C&A as one of the world's foremost designers, manufacturers and suppliers of automotive interior components, and highlighted the Company's supposedly improving financial results. MacKay Shields reasonably relied upon this information and purchased tens of millions of dollars worth of C&A Notes on behalf of Plaintiff and the Class.

3.      As would later become clear, Defendants' statements were materially false and misleading. From at least 2001 through May 2005, Defendants were engaged in a pervasive fraud designed to conceal from MacKay Shields and others the true state of C&A's business and operations. Indeed, four of the Defendants—including Defendant Stockman, C&A's CEO and the founding partner of Heartland—have been criminally indicted for, among other things, lying

2

to MacKay Shields. Specifically, in August 2004, an investment banker acting at the request of

Defendant Stockman contacted MacKay Shields regarding a $415 million Private Placement of

C&A Notes. At Defendant Stockman's request, representatives of MacKay Shields agreed to a

face-to-face meeting, which took place on or about August 11, 2004. At that meeting, Defendant

Stockman—with the knowledge and approval of the other Defendants—made a presentation

about C&A's financial condition, and also provided MacKay Shields with a Private Placement

Memorandum dated August 3, 2004 (the "PPM"), and an "August 2004 Presentation to Potential

Bond Investors" (the "August 2004 Presentation").

4.    Both the PPM and the August 2004 Presentation Defendants provided to MacKay

Shields contained numerous materially false and misleading statements about C&A's financial

results and business operations. Indeed, as stated in the Criminal Indictment:

> In or about August 2004, C&A offered, and the public purchased,
> approximately $415 million in [C&A Notes] based, in part, on offering
> materials that were false and fraudulent in that they included results of
> operations that had been falsely and materially inflated.

Criminal Indictment¶48 (emphasis added). At the August 11, 2004 meeting, Defendants also

misrepresented and concealed from MacKay Shields a number of serious business and

operational problems facing the Company. These problems were diminishing C&A's ability to

obtain new business and severely straining the Company's working capital. In fact, C&A's

liquidity problems were so severe that it could not afford to pay for the supplies it needed to

manufacture parts for its customers. None of this was disclosed to MacKay Shields.

5.    In reliance on Defendants' misrepresentations about C&A, between August 12,

2004 and August 20, 2004, MacKay Shields purchased on behalf of Plaintiff and the other

members of the Class approximately $83 million face value of C&A's 12.875% Notes offered in

the Private Placement. Between October 15, 2004 and March 2, 2005, MacKay Shields

3

purchased on behalf of Plaintiff and the other Class members an additional $45 million face value of C&A Notes.

6.     Defendants continued to lie to Plaintiff and C&A's other investors. On March 17, 2005, the Company announced that: (i) it would restate its reported financial results for the first three quarters of 2004 and perhaps 2003 as a result of accounting irregularities; (ii) it was going to take a $500 million goodwill impairment charge and a $177 million charge to write off certain deferred tax assets; and (iii) the Audit Committee of the Board had undertaken an internal investigation of the accounting improprieties. However, these disclosures were also materially false and misleading and failed to disclose the true disastrous state of C&A's financial and business situation. Indeed, as stated in the Criminal Indictment, the Company's March 17, 2005 announcement was "materially misleading" and "intended to mislead investors." Criminal Indictment ¶ 74.

7.     Following the materially misleading March 17, 2005 announcement, Defendants arranged another face-to-face meeting with MacKay Shields where they, once again, lied about C&A's true financial and operational condition. On March 23, 2005, Defendants Stockman, Koth and Galante—with the knowledge and approval of the other Defendants—met with MacKay Shields. The Criminal Indictment confirms that, at this meeting, Defendants made false statements directly to MacKay Shields in order to induce MacKay Shields to purchase C&A Notes on behalf of the Class. As stated in the Criminal Indictment:

> On March 23, 2005, C&A made a presentation to MacKay Shields, holders of C&A's bonds. Defendant Stockman presented the same slides he had used during the March 17, 2005 earnings call, which contained the material misrepresentations regarding EBITDA and capital expenditures described above. In addition, defendant Stockman sought to assure the MacKay Shields investors that C&A had sufficient liquidity to meet its needs, when he knew that it did not.

Criminal Indictment ¶ 76 (emphasis added).

4

8.     As a direct result of these false statements, between April 6, 2005 and May 11, 2005, MacKay Shields, on behalf of the Class, reasonably relied on Defendants' misrepresentations and purchased on behalf of Plaintiff and the other Class members approximately $17 million face value of the 12.875% C&A Notes and $4.5 million face value of other C&A Notes.

9.     On May 12, 2005—just one day after MacKay Shields made its final purchase of C&A debt—C&A stunned the market by announcing that the restatement would likely be larger than previously announced, the Company was now investigating "other matters that have arisen in the course of its investigation," and Defendant Stockman had resigned from the Company. The price of C&A's Notes dropped dramatically as a result of this disclosure.

10.     On May 16, 2005—only nine months after C&A successfully completed the Private Placement—C&A filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of Michigan. The price of the Company's 12.875% Notes dropped from an offering price of $96.416 down to approximately $3.00, and the price of the 10.75% Notes, which were trading above $90 before the truth about C&A was revealed, dropped to approximately $23.00.

11.     On or about March 26, 2007, after investigating the circumstances surrounding C&A's collapse for nearly two years, the United States Attorney for the Southern District of New York released the detailed sixty-four page Criminal Indictment against Defendants Stockman, Stepp, Cosgrove and Barnaba, charging them with, among other things, securities fraud, conspiracy to commit securities fraud, and wire fraud. On the same day, the United States Attorney announced that Defendants Galante, Williams, Jones and Gougherty had pled guilty to criminal violations of the securities laws. Also on March 26, 2007, the SEC filed the SEC

Complaint against Defendants Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Galante, Williams and Gougherty, charging each of them with, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

12.    As described below, the wide-ranging accounting fraud perpetrated by Defendants is staggering in its scope and audacity.  For more than three years (from at least the fourth quarter of 2001 until May 2005), Defendants—including the highest ranking officers and directors of C&A and Heartland—caused the Company to artificially inflate its earnings by (i) conducting numerous fraudulent "round-trip" transactions; (ii) improperly recognizing income from supplier rebates; (iii) improperly booking price discounts on purchases of capital equipment as "income" in violation of Generally Accepted Accounting Principles ("GAAP"); (iv) manipulating EBITDA by improperly categorizing operating expenses as restructuring and impairment charges; and (v) reporting artificially inflated carrying values for goodwill.

13.    This fraudulent scheme was designed to conceal from investors the Company's deteriorating financial condition, secure additional financing for the Company, and allow C&A to maintain the appearance of financial viability.  The fraud also permitted Defendant Heartland to collect approximately $45 million in management fees and other payments from C&A (which, in turn enriched the Defendants who were partners of Heartland).  Further, as the Criminal Indictment acknowledges, the scheme allowed C&A to avoid filing for bankruptcy, "which would have acknowledged the failure of Stockman's leadership and resulted in the loss of Stockman's and [Heartland's] investment in C&A."  Criminal Indictment¶49.

14.    On March 26, 2007, in commenting on the Criminal Indictment and the Guilty Pleas, the United States Attorney for the Southern District of New York confirmed the following:

6

A-8

> In the years that Stockman and his co-conspirators forestalled bankruptcy
> through lies and fraud, Collins & Aikman sold hundreds of millions of new
> bonds to public investors [...] <u>Those bond [] holders are now left with
> nothing as a direct result of the fraud we have charged today.</u>

(Emphasis added).  The bondholders that the United States Attorney described as being

"left with nothing" include Plaintiff and other members of the Class.  This Action has been

commenced to recover the substantial damages that Plaintiff and the other Class members

suffered as a result of Defendants' materially false and misleading statements during the

Class Period.

## JURISDICTION AND VENUE

15.    The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange

Act, 15 U.S.C.§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R.§240.10b-5 promulgated thereunder.

16.    The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15

U.S.C.§78aa, and 28 U.S.C.§1331 and 1337.

17.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28

U.S.C.§1391(b).

18.    In connection with the acts, transactions and conduct alleged herein, the

Defendants used the means and instrumentalities of interstate commerce, including the United

States mails, interstate telephone communications and the facilities of national securities

exchanges and markets.

## PARTIES

### I.    PLAINTIFF AND RELATED NON-PARTY MACKAY SHIELDS

19.    Plaintiff MainStay High Yield Corporate Bond Fund is a separate investment

series of The Mainstay Funds, a Massachusetts business trust that is registered with the

Securities and Exchange Commission as an open-end investment company under the Investment

A-9

Company Act of 1940, as amended (the "1940 Act"). Plaintiff is a mutual fund having its own investment objectives and policies. MacKay Shields is the duly authorized investment adviser for Plaintiff and has full discretionary authority to make investment decisions on its behalf. MacKay Shields is an "investment adviser" of Plaintiff, as defined in Section 2(a)(20) of the 1940 Act. As set forth in the certification attached hereto as Exhibit A, Plaintiff purchased C&A 12.875% Notes and 10.75% Notes through MacKay Shields during the Class Period as follows: (a) $33,645,000 in face value of the 12.875% Notes; and (b) $6,430,000 in face value of the 10.75% Notes.

20.    Non-party MacKay Shields is a multi-product investment advisory firm that manages assets across the capital markets on behalf of a wide range of institutional clients, including state and local pension systems. As investment adviser for Plaintiff and the Class, MacKay Shields had full investment discretion to make all investment decisions with respect to the Plaintiff's and the Class's transactions in C&A Notes. As set forth below, beginning in August 2004, MacKay Shields purchased for the benefit of Plaintiff and the Class approximately $129 million face value of C&A's 12.875% Notes for approximately $107 million, and more than $24 million face value of C&A's 10.75% Notes for approximately $21 million.

## II.    DEFENDANTS

### A.    The Heartland Entities

21.    **Heartland Industrial Partners, L.P.:** Heartland LP is a limited partnership organized under the laws of Delaware. Heartland LP is a $1 billion private equity firm purportedly established for the purpose of acquiring and expanding industrial companies operating in various sectors of the North American economy that are well positioned for global consolidation and growth. During the relevant period, Defendant Stockman was the founding partner and a Senior Managing Director of Heartland LP, and also during the relevant period,

8

Defendants Leuliette, Tredwell, McConnell, and Valenti, III were all Senior Managing Directors of Heartland LP. The managing general partner of Heartland LP was Heartland LLC. C&A was one of Heartland LP's largest investments, representing at least 30% of Heartland LP's total investments.

22.    **Heartland Industrial Associates, L.L.C.:**  Heartland LLC is a limited liability company organized under the laws of Delaware. As of July 1, 2004, Heartland LLC beneficially owned 33,574,772 shares of C&A (34,314,147 shares as of January 1, 2005, and 32,714,147 shares as of March 17, 2005) as the general partner of each of the following limited partnerships, which hold the indicated shares directly:  Heartland Industrial Partners (FF), L.P., a Delaware limited partnership; HIP Side-by-Side Partners L.P., a Delaware limited partnership; HIP Side-By-Side I-A, LLC, a Delaware limited liability company; Heartland Industrial Partners (C1), L.P., a Delaware limited partnership; and Heartland LP. At the time MacKay Shields first purchased C&A Notes on behalf of Plaintiff and other members of the Class and thereafter, Defendant Stockman was the Managing Member of Heartland LLC; and Defendant Stepp, a Director of C&A and the Company's Vice Chairman and CFO, and Defendants Tredwell, Leuliette and McConnell, each a Director of C&A, were members of Heartland LLC.

23.    During the time period relevant to this Action, Heartland owned a controlling stake in C&A and controlled and operated the Company. As of January 1, 2005, Heartland owned approximately 41% of C&A's outstanding common stock. As the PPM stated:

> Heartland and its affiliates are able to strongly influence or effectively control actions to be taken by our stockholders or directors . . . In addition, Mr. Stockman, the Chairman of the C&A Board and our Chief Executive Officer, and Mr. Stepp, our Chief Financial Officer, are both Senior Managing Directors of Heartland.

9

A-11

According to the Criminal Indictment, from at least February 2001 through May 2005, Heartland had a "controlling share of C&A's equity," and Stockman and Heartland "were in control of C&A" and had "operating control of C&A." Criminal Indictment¶8, 11, 18.

24.     Indeed, a majority of C&A's Board (six of eleven directors) were affiliated with Heartland. Further, the Company's most senior officers, Defendants Stockman and Stepp were Senior Managing Directors of Heartland LP, and Defendant Galante, C&A's Treasurer since October 2004, was a Vice President of Heartland LP. Stockman was not paid any compensation by C&A for serving as CEO and Chairman; rather, his salary was paid directly by Heartland.

25.     C&A and Heartland entered into a services agreement under which Heartland provided advisory and consulting services in return for a $4.0 million annual advisory fee and additional fees of 1% of the total enterprise value of certain acquisitions. According to the PPM, Heartland provided C&A with strategic, operational and financial guidance, and the loss of such guidance could have a material adverse effect upon the Company. Heartland, in turn, benefited significantly from its relationship with C&A. During 2001, 2002, 2003 and 2004, Heartland received total advisory fees from C&A of $24.5, $5.7 million, $4.0 million, and $10.6 million, respectively—a total of more than $44 million. According to the SEC Complaint, over $22 million of this amount was eventually paid directly to Defendant Stockman.

26.     During the relevant period, Heartland LP and Heartland LLC were effectively one entity for purposes of exercising control over C&A. Heartland LLC was the managing general partner of Heartland LP, and as such exercised complete control over Heartland LP, and beneficially owned and exercised control over all of the C&A common stock held by Heartland LP. Heartland LP employed as Senior Managing Directors Defendants Stockman, Tredwell, Leuliette, and McConnell, all of whom were members of Heartland LLC and directors of C&A.

In addition, Defendant Stockman, a founding partner, Senior Managing Director and "Buyout Partner" of Heartland LP, was the Managing Member of Heartland LLC, and as such had and exercised the authority to act on behalf of Heartland LLC and Heartland LP, as demonstrated by, among other things, signing SEC filings on behalf of Heartland LLC and Heartland LP.

27.    C&A, which is headquartered in Troy, Michigan, is not named as a defendant in this action because it filed a petition for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code on May 16, 2005.

28.    According to a March 26, 2007 press release issued by the United States Attorney's Office for the Southern District of New York ("USAO"), the Government has entered into a non-prosecution agreement with C&A. In that press release, United States Attorney Michael J. Garcia stated that the USAO had:

> reached a non-prosecution agreement with the Collins & Aikman corporation [sic]. While the fraud at Collins & Aikman went to the highest levels of the company . . . , the extensive cooperation provided by Collins & Aikman to date, as well as its current financial circumstances, prompted our conclusion that the public interest did not require that the company be charged.

(Emphasis added.) The SEC named C&A as a defendant in the SEC Complaint. According to a March 26, 2007 press release issued by the SEC, C&A has consented to the entry of a final judgment permanently enjoining the Company from violating the anti-fraud, reporting, record-keeping, and internal controls provisions of the federal securities laws.

**B.    The Individual Defendants**

29.    **David A. Stockman.** Defendant Stockman is a resident of Greenwich, Connecticut. Until his resignation in May 2005, Stockman was C&A's CEO (appointed in August 2003), was a Director of C&A (beginning in February 2001), and was Chairman of C&A's Board of Directors (beginning in August 2002). Stockman served on C&A's

11

compensation committee from April 2002 through at least September 2004. According to the SEC Complaint, "Stockman played a hands-on role in C&A's day-to-day operations before he became CEO in August 2003." Stockman did not receive any compensation from C&A for serving as the Company's CEO; instead, his services were provided by Heartland under a services agreement which obligated the Company to pay Heartland a multi-million annual advisory fee and reimburse Heartland's out-of-pocket expenses related to the services it provided. According to the PPM, Stockman was central to C&A's operations, and the loss of his services could have a material adverse effect on the Company.

30.     Stockman was formerly a senior managing director of The Blackstone Group, L.P. a highly successful private equity group. Prior to joining Blackstone, Stockman was a managing director in the corporate finance department of Salomon Brothers, Inc. Before Salomon Brothers, Stockman served as the director of the Office of Management and Budget in the Reagan Administration. During the relevant period, Stockman was also the Managing Member of Heartland LLC, and was a founding partner and a Senior Managing Director of Heartland LP, which listed him as its "Buyout Partner."

31.     Stockman personally participated in C&A's "road shows" to sell C&A's 12.875% Notes, met with senior portfolio managers of MacKay Shields in August of 2004, and was the Company's main spokesman to the financial media. In face-to-face meetings with representatives of MacKay Shields, Stockman personally made statements concerning C&A's operations, income, liquidity and financial performance, including EBITDA, on which MacKay Shields relied in connection with its purchases of the C&A Notes on behalf of Plaintiff and the other members of the Class. As of January 1, 2005, Stockman personally owned 331,000 shares of C&A common stock. On May 12, 2005, Stockman was forced to resign as Chairman and

CEO of C&A for withholding information from C&A's Board. Stockman signed C&A's Forms 10-K for the Fiscal Years ended December 31, 2001, December 31, 2002 and December 31, 2003 and C&A's Form 10-K/A for the Fiscal Year ended December 31, 2001. Stockman also signed C&A's Form S-4 dated April 16, 2002, Form S-4 dated January 27, 2005 (which incorporated each of C&A's previous documents filed with the SEC, including the Company's previous-filed From 10-Qs and Form 10-Ks, and attached C&A's financial statements for the years ended December 31, 2003, 2002 and 2001 and for the quarters ended September 30, 2004 and 2003), Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and Form S-3 dated June 24, 2002. In addition, Stockman provided certifications pursuant to Sections 302 and 906 of the Sarbanes Oxley Act attesting to the accuracy of C&A's Forms 10-Q for the Periods Ended June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004 and September 30, 2004; C&A's Forms 10-Q/A for the Periods Ended June 30, 2003, September 30, 2003 and September 30, 2004, and C&A's Form 10-K for the Fiscal Year Ended December 31, 2003.

32.    **J. Michael Stepp.** Defendant Stepp is a resident of Charlotte, North Carolina. From February 2001 until his resignation on April 27, 2006, Stepp was a Director of the Company, and was Vice Chairman of the Board of Directors. From 1995 through 1999 Stepp was C&A's CFO, and served as a consultant and Executive Vice President to the Company from 1999 through 2002. In May 2002, Stepp returned as the Company's CFO and remained in that position until he left the Company in October 2004. He previously served as interim CFO from January 2002 through April 2002, and as Executive Vice President and CFO from April 1995 through December 1999. Stepp was also a Senior Managing Director of Heartland (from March 2001).

13

33.     Stepp signed C&A's Forms 10-Q for the Periods Ended March 31, 2002, June 30,

2002, September 30, 2002, March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004

and June 30, 2004; C&A's Forms 10-Q/A for the Periods Ended March 31, 2002, June 30, 2003

and September 30, 2003.  Stepp also signed C&A's Form 10-K for the Fiscal Years Ended

December 31, 2001, December 31, 2002 and December 31, 2003 and C&A's 10-K/A for the

Fiscal Year ended December 31, 2001.  Stepp signed C&A's Form S-4 dated January 27, 2005,

Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002,

Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17,

2002, Form S-3 dated June 24, 2002 and Form 8-K dated August 5, 2002.  Moreover, Stepp

provided certifications pursuant to Sections 302 and 906 of the Sarbanes Oxley Act attesting to

the accuracy of C&A's Forms 10-Q for the Periods Ended March 31, 2003, June 30, 2003,

September 30, 2003, March 31, 2004 and June 30, 2004, C&A's Forms 10-Q/A for the Periods

Ended June 30, 2003 and September 30, 2003, and C&A's Form 10-K for the Fiscal Year Ended

December 31, 2003.

34.     **Timothy D. Leuliette.**  Defendant Leuliette is a resident of Michigan.  During the

relevant period, Leuliette was a Director of C&A (beginning in February 2001).  Leuliette was

also a Senior Managing Director and one of the co-founders of Heartland LP, and a Member of

Heartland LLC.  Leuliette signed C&A's Forms 10-K for the Fiscal Years ended, December 31,

2001, December 31, 2002 and December 31, 2003, and C&A's 10-K/A for the Fiscal Year ended

December 31, 2001.  Leuliette also signed C&A's Form S-4 dated January 27, 2005m Form S-4

dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-

3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and

Form S-3 dated June 24, 2002.

14

35.    **Daniel P. Tredwell.** Defendant Tredwell is a resident of Connecticut. From February 2001 until he resigned on May 10, 2006, Tredwell was a Director of C&A. From April 2002 through at least September 2004, Tredwell served on C&A's Compensation Committee. Tredwell was also a Senior Managing Director and a co-founder of Heartland LP and a member of Heartland LLC. Tredwell signed C&A's Forms 10-K for the Fiscal Years ended, December 31, 2001, December 31, 2002 and December 31, 2003, and C&A's 10-K/A for the Fiscal Year ended December 31, 2001. Tredwell also signed C&A's Form S-4 dated January 27, 2005, Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and Form S-3 dated June 24, 2002.

36.    **W. Gerald McConnell.** Defendant McConnell is a resident of New York. From February 2001 until his resignation on May 10, 2006, McConnell served as a Director of C&A. McConnell was also a Senior Managing Director of Heartland LP throughout the relevant period (and had been since its founding). At all relevant times, he was also a member of Heartland LLC. McConnell signed C&A's Forms 10-K for the Fiscal Years ended, December 31, 2001, December 31, 2002 and December 31, 2003, and C&A's 10-K/A for the Fiscal Year ended December 31, 2001. McConnell also signed C&A's Form S-4 dated January 27, 2005, Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and Form S-3 dated June 24, 2002.

37.    **Samuel Valenti, III.** Defendant Valenti is a resident of Michigan. Valenti was a Director of C&A from February 2001 through September 30, 2004. During the relevant period, Valenti was also a Senior Managing Director of Heartland LP. Valenti signed C&A's Forms 10-

15

K for the Fiscal Years ended, December 31, 2001, December 31, 2002 and December 31, 2003,

and C&A's 10-K/A for the Fiscal Year ended December 31, 2001. Valenti also signed C&A's

Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002,

Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17,

2002 and Form S-3 dated June 24, 2002.

38.    **John A. Galante.** Defendant Galante is a resident Frisco, Texas. From October

2004 until his employment terminated on July 29, 2005, Galante was Vice President and

Treasurer, and an Executive Officer, of the Company. He was previously Director, Strategic

Planning from October 2002 to October 2004. At all relevant times, Galante was also a Vice

President of Heartland LP, which he joined in October 2002. According to a March 26, 2007

press release issued by the USAO, Defendant Galante has "entered a plea of guilty to a three-

count Information charging him with conspiracy, securities fraud, and bank fraud." Galante is

also a named defendant in the SEC Complaint and is charged with, among other things,

violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

Galante signed C&A's Form S-4 dated January 27, 2005.

39.    **Bryce M. Koth.** Defendant Koth is a resident of Michigan. During the relevant

period, Koth was Senior Vice President and CFO of the Company (beginning in October 2004).

He was previously Vice President, Finance & Controller, and head of Tax of the Company since

May 2004. He joined the Company in December 2002 as Vice President, Tax. Koth signed

C&A's Form 10-Q for the Period Ended September 30, 2004 and C&A's Form 10-Q/A for the

Period Ended September 30, 2004, C&A's Form S-4 dated January 27, 2005, and certain Form

8-K's as specified below. Koth also provided certifications pursuant to Sections 302 and 906 of

the Sarbanes Oxley Act of the accuracy of C&A's Form 10-Q for the Period Ended September 30, 2004 and C&A's Form 10-Q/A for the period Ended September 30, 2004.

40.    **Robert A. Krause.**  Defendant Krause is a resident of Michigan.  During the relevant period, Krause was Senior Vice President, Finance and Administration of the Company (beginning in October 2004).  He was previously Vice President and Treasurer of the Company (beginning in October 2002).  Krause was also a director of Collins & Aikman Products Co., a wholly-owned subsidiary of C&A.

41.    **Gerald E. Jones.**  Defendant Jones is a resident of Bahama, North Carolina. From 2000 through the end of 2006, he served as Chief Operating Officer and Executive Vice President of C&A's Fabrics Division.  According to a March 26, 2007 press release issued by the USAO, Defendant Jones has "entered a plea of guilty to a one-count Information charging him with obstruction of an agency proceeding."  Jones is also a named defendant in the SEC Complaint and is charged with, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Jones signed C&A's Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002 and Form S-4/A dated June 17, 2002 (each of which contained C&A's publicly reported financial information for previous quarters).

42.    **David R. Cosgrove.**  Defendant Cosgrove is a resident of Rochester, Michigan. Cosgrove was C&A's Vice President of Finance from February to August 2002, and Vice President for Financial Planning and Analysis from August 2002 until October 2004.  In October 2004, Cosgrove became C&A's Senior Vice President, Financial Planning and Controller, remaining in that position through May 2005.  Cosgrove resides in Rochester, Michigan. Cosgrove is a named defendant in the Criminal Indictment, in which he is charged with, among

other things, conspiracy, securities fraud, and wire fraud. Cosgrove is also a named defendant in

the SEC Complaint and is charged with, among other things, violations of Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder. Cosgrove signed C&A's Form S-4 dated

January 27, 2005.

43.    **Elkin B. McCallum.** Defendant McCallum is a resident of Tyngsboro,

Massachusetts. McCallum is the Chief Executive officer and owner of Joan Fabrics, a supplier

to C&A. From September 2001 through May 2004, McCallum served on C&A's Board of

Directors. McCallum also sold businesses to C&A during the relevant period. According to the

SEC Complaint, McCallum was a significant shareholder in C&A during the relevant period.

Cosgrove is also a named defendant in the SEC Complaint and is charged with, among other

things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

McCallum signed C&A's Forms 10-K for the Fiscal Years ended, December 31, 2001,

December 31, 2002 and December 31, 2003, and C&A's 10-K/A for the Fiscal Year ended

December 31, 2001. McConnell also signed C&A's Form S-4 dated April 16, 2002, Form S-3

dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form

S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and Form S-3 dated June 24, 2002.

44.    **Paul C. Barnaba.** Defendant Barnaba is a resident of Orion, Michigan. Barnaba

was the Director of Financial analysis for C&A's Purchasing Department from April 2002 until

December 2004. In December 2004, Barnaba became a vice president and the Director of

Purchasing for the Plastics Division. Barnaba left C&A in April 2005. Barnaba is a named

defendant in the Criminal Indictment, in which he is charged with, among other things,

conspiracy, securities fraud, and wire fraud. Barnaba is also a named defendant in the SEC

18

Complaint and is charged with, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

45.    **Thomas V. Gougherty.** Defendant Gougherty is a resident of Gosslie, Michigan. Gougherty was Controller of C&A's International Plastics Division from July 2003 until September 2004, when he became Vice President of Finance and CFO of C&A's Global Plastics Division. He remained at C&A through at least May 2005. According to a March 26, 2007 press release issued by the USAO, Defendant Gougherty has "a plea of guilty to a two-count Information charging him with conspiracy and securities fraud." Gougherty is also a named defendant in the SEC Complaint and is charged with, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

46.    **Christopher M. Williams.** Defendant Williams is a resident of Troy, Michigan. Williams joined C&A in 2000 as Director of Commercial Management for its contracts with Ford Motor Company. He was the Executive Vice President of the Business Development and Specialty Products groups from November 2004 through May 2005. Williams left C&A in January 2006. According to a March 26, 2007 press release issued by the USAO, Defendant Williams has "a plea of guilty to a one-count Information charging him with conspiracy." Gougherty is also a named defendant in the SEC Complaint and is charged with, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

47.    Defendants Stockman, Stepp, Galante, Barnaba, Cosgrove, Gougherty, Jones, Williams, McCallum, Krause, and Koth, as a result of their senior operating and financial employment positions with C&A; their role as directors of C&A; and/or their employment with Heartland LP, which controlled C&A; their membership in Heartland LLC, which controlled Heartland LP as its managing general partner, possessed the power and authority to control the

19

contents of the oral and written statements that were made to MacKay Shields' representatives in connection with their one-on-one meetings with the C&A Defendants, as well as the contents of C&A's quarterly reports, annual reports and press releases, all of which MacKay Shields reviewed and relied upon when deciding to purchase C&A Notes on behalf of Plaintiff and the other Class members. Further, on information and belief, these Defendants were provided with copies of the presentations, SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

48.    Because of their positions and access to material non-public information, these Defendants each knew that the material facts described herein had not been disclosed to MacKay Shields and, in fact, were being concealed from MacKay Shields, and that numerous representations made to MacKay Shields during its representatives' one-on-one meetings with Defendants Stockman, Stepp, Galante, Krause and Koth were materially false and misleading at the time they were made. Pursuant to the "group pleading" doctrine, these Defendants are liable for each of the false and misleading statements alleged herein, for each of those statements constituted "group published" information and, thus, were the result of the collective actions of these defendants in connection with their direct involvement and participation in the one-on-one meetings with MacKay Shields, as well as the day-to-day business of the Company.

49.    Defendants Tredwell, Leuliette, McConnell and Valenti, through their positions as Senior Managing Directors at Heartland and members of the C&A Board of Directors, had the power to, and did, directly and indirectly exercise control over C&A, including the content and dissemination of statements to representatives of MacKay Shields that Plaintiff alleges were false and misleading. Indeed, as alleged herein, these Defendants regularly certified the accuracy of

C&A's (materially false and misleading) financial statements and other statements that were filed with SEC and disseminated to the public.

### C. Defendants' Knowledge of C&A's Financial Results and Operations

50.    Defendants were intimately familiar with C&A's operating results. As described above, Heartland was C&A's largest shareholder and exercised complete control over C&A. Further, Defendants Stockman, Stepp, Leuliette, Tredwell, McConnell, Valenti, and Galante were closely affiliated with Heartland as employees or partners, as well as having senior roles at C&A. As C&A's majority shareholder, Heartland placed each of these Defendants on C&A's Board of Directors, and/or made him an officer of C&A, so that Heartland could exercise control over C&A. Defendants Stockman, Stepp, Galante, Barnaba, Cosgrove, Gougherty, Jones, Williams, McCallum, Krause, and Koth were senior officers of C&A with intimate knowledge of C&A's financial and operational condition. Defendant McCallum was a Director of C&A and, as described in more detail below, was directly involved in efforts to manipulate C&A's reported financial results.

51.    Each of these Defendants reviewed, approved, and, by operation of applicable laws and regulations, had a duty to know and understand the representations about C&A's financial and business condition made in C&A's public disclosures and in the materials that Defendants provided to MacKay Shields. Further, each of these Defendants knew or should have known that MacKay Shields would rely on C&A's publicly filed financial statements, its public disclosures, and on the information provided to MacKay Shields by Defendants, when deciding whether to purchase C&A Notes on behalf of its clients.

52.    According to the Criminal Indictment, at all relevant times, C&A tracked its sales, EBITDA, operating income, capital expenditures and other financial metrics on a monthly basis through a series of internal reports. These internal reports were generated at each C&A plant,

which would update an internal computer system with that plant's monthly or quarterly forecasts as compared to actual results. The results from each plant were then "rolled-up" to the corresponding divisions, which then consolidated the results into divisional reports. The divisional reports, in turn, were sent to the Financial Planning and Analysis group (which was headed by Defendant Cosgrove) and were consolidated into a company-wide reports that tracked actual results as compared to forecasted results. According to the Criminal Indictment, Defendant Stockman led periodic meetings to discuss C&A's operating results and, in connection with those meetings, Defendants "Stockman, Stepp, Cosgrove, and others reviewed documents that summarized information, including sales, expenses, and other anticipated accounting entries that would affect C&A's revenues in the current quarter and in following months." Criminal Indictment¶17 (emphasis added).

53.    Defendant Stockman, acting on behalf of Heartland, was particularly familiar with C&A's finances and operations. According to Confidential Informant Number 1 ("CI 1"), a former Quality Manager at a Collins & Aikman plant in Canton, Ohio from March 2000 through September 2003, the carpet and acoustics division held Financial Business Operating Systems meetings, commonly known within the Company as BOSS meetings, approximately once a month with Stockman. Those meetings would address the financial operations of twelve plants. CI 1 attended those meetings along with Millard King, the President of the Global Soft Trim operating unit, Michael Geaghan, the Canton Plant's Vice President of Operations, and Daniel Bednarz, Divisional Controller. CI 1 described Stockman as smart and numbers-oriented, with a comprehensive knowledge of each plant's financial results. Specifically, Stockman carried large binders of each plant's financial data, and was intimately familiar with each plant's operations and finances.

22

54.    Confidential Informant No. 2 ("CI 2"), a former Vice President and General Manager at a C&A facility in Troy, Michigan, who was with the Company from February 2000 through December 2004, and who had direct interaction with Stockman from mid-2003 through the end of 2004, also said that Stockman had complete mastery over C&A's finances, and that at every quarterly management meeting Stockman recited financial information down to single digit thousands on each line of a plant's financial statements, at times even questioning CI 2 about matters as small as the potential cost savings of replacing two security guards with cameras.

55.    The information provided by CI 1 and CI 2 is confirmed and corroborated by the Criminal Indictment. As stated in the Criminal Indictment, Defendant Stockman "regularly met with C&A employees to discuss the financial results and projections reflected in [] various documents." Criminal Indictment¶17.

56.    Defendants Stockman, Stepp, Leuliette, Tredwell, McConnell, Valenti and Galanti also familiarized themselves with C&A's operations in order to monitor and preserve Heartland's huge equity stake in C&A's business. As Senior Managing Directors of Heartland, these defendants had an incentive to (and did) closely monitor Heartland's huge investment of 33,574,772 shares of C&A (which was approximately 30% of Heartland's total fund). It was critically important to each of these defendants that C&A remain solvent in order to ensure the value of Heartland's investment. Moreover, as of August 2004, defendants Stockman and Stepp personally owned tens of thousands of shares of C&A, respectively. Defendant Stepp also received a "special recognition" bonus of $112,500.00 in 2003, which was in addition to his salary and other compensation at C&A. If C&A failed, Heartland would suffer disastrous losses, and these Defendants' own personal fortunes would be significantly impacted.

23

57.    In addition, on information and belief, Defendants Stockman, Stepp, Galante, Barnaba, Cosgrove, Gougherty, Jones, Williams, McCallum, Krause, and Koth personally owned shares of C&A stock and participated in C&A's employee stock option plan, pursuant to which 68,218 options to purchase shares of restricted C&A stock were issued to Company employees and executive officers on June 29, 2004. These options were scheduled to vest in three equal annual installments on June 29, 2005, June 29, 2006 and June 29, 2007. Accordingly, these Defendants knew that a bankruptcy filing by C&A would render their stock holdings and restricted stock options essentially worthless, imperil their own lucrative positions at the Company, and expose them to personal liability for previous public statements they had made about C&A's financial condition.

58.    As described below, Defendant McCallum knowingly participated and helped to engineer a series of fraudulent "round-trip" transactions that had no legitimate business purpose and were designed to artificially inflate C&A's reported financial results. McCallum benefited directly from these arrangements through, among other things, sales of McCallum-owned business to C&A for amounts worth millions of dollars more than the actual value of the business.

59.    Additional allegations regarding Defendants' knowledge of C&A's financial results and operations, as well as allegations regarding their involvement in the fraudulent scheme set forth herein, are described below.

## CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all other persons and entities for whom MacKay Shields, acting as their investment adviser, purchased or otherwise acquired C&A 12.875%

24

Notes and 10.75% Notes during the period August 11, 2004 through and including May 17, 2005.

61.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, MacKay Shields purchased C&A Notes on behalf of more than sixty persons, including Plaintiff.

62.    There is a well-defined community of interest in the questions of law and fact involved in this case. MacKay Shields was authorized to invest in securities on behalf of each member of the Class, and each member of the Class purchased or otherwise acquired C&A Notes through MacKay Shields. In addition, questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

- Whether Defendants violated the Exchange Act;

- Whether Defendants omitted and/or misrepresented material facts;

- Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- Whether Defendants knew or deliberately disregarded that their statements were false and misleading;

- Whether the prices of C&A Notes were artificially inflated; and

- The extent of damages sustained by Class members and the appropriate measure of damages.

63.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

64.     Plaintiff will adequately protect the interests of the other members of the Class

and have retained counsel competent and experienced in class action securities litigation.

Plaintiff has no interests which may conflict with other members of the Class.

65.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.

## SUBSTANTIVE ALLEGATIONS

### I.     C&A'S BUSINESS AND OPERATIONS

66.     Prior to filing for bankruptcy, C&A held itself out as one of the world's foremost

designers, manufacturers and suppliers of automotive interior components.  C&A sold its

products to automotive original equipment manufacturers ("OEMs") such as GM, Ford and

Chrysler, and others.  As the PPM that Defendants provided to MacKay Shields stated:

> We are a global leader in the design, engineering and manufacturing of
> automotive interior components, including instrument panels, fully
> assembled cockpit modules, floor and acoustic systems, automotive fabric,
> interior trim and convertible top systems.
>
> * * *
>
> Our customers include all North American automotive original equipment
> manufacturers (or OEMs), transplants (such as Toyota, Honda and Nissan)
> and certain Tier I auto suppliers.

67.     C&A supplied its products through three operating segments: (i) U.S. and Mexico

Plastics, (ii) International Plastics, and (iii) Global Soft Trim.  Through its U.S. and Mexico

Plastics and International Plastics segments, C&A manufactured "nearly every kind of

component of the plastic interior trim within a vehicle," including cockpit modules, automotive

instrument panels, door panels, sidewall trim, airflow systems, consol systems, headrests, and

cupholders.  C&A's Global Soft Trim segment produced carpet, acoustic management products,

fabric and convertible top systems, including floor carpets and mats, trunk trim, seat fabrics and

headliner fabrics.

26

68.    Because the automotive supply industry is very competitive, maintaining sufficient liquidity and working capital was critical to C&A's success. In securing new business from OEMs, C&A typically was forced to expend significant amounts of capital for engineering, development, tooling and other costs that generally were not recouped until the launch of a vehicle line, or over time based upon projected build levels. Accordingly, any decline in liquidity and/or working capital materially impacted C&A's ability obtain to achieve new business and fulfill its existing contracts.

## II.    DEFENDANTS' FRAUDULENT SCHEME

69.    As discussed above, in or about February 2001, Heartland acquired a controlling stake in C&A. Soon thereafter, in accordance with Heartland's stated investment strategy, Defendants Stockman, Heartland and others caused C&A to embark on a series of acquisitions designed to transform C&A into a "Mega Tier II" supplier of fabrics and other automotive components. First, in or about July 2001, C&A acquired Becker Group L.L.C., a company that manufactured plastic parts for automobiles. Second, in or about September 2001, C&A acquired Joan Automotive Fabrics, which was part of Joan Fabrics—a supplier to C&A that was owned by Defendant McCallum. In December 2001, C&A made its largest acquisition by purchasing the trim division of Textron Automotive Company—known as "TAC-trim," for approximately $1.3 billion. According to a press release issued by C&A on December 2001:

> David Stockman, founder of Collins & Aikman's largest shareholder, Heartland Industrial Partners, stated, "It is extremely gratifying to have completed this acquisition. When Heartland was formed nearly two years ago, my vision was to do exactly this - take advantage of industry cyclicality to buy premier automotive properties, like TAC-Trim, at attractive prices. This vision, in tandem with the support of Heartland's investors . . . have enabled us to rapidly build and grow Collins & Aikman into a global leader in the automotive interiors industry."

27

70.    These acquisitions were an important part of the overall financial plan and investment story that Defendants Stockman, Heartland and others had developed for C&A. However, it soon became apparent to Defendants that the financial climate was declining, and C&A began to face increasing pressures in its business operations (which represented C&A's major expense).  The Company was squeezed between cost-reduction mandates from its OEM clients and increases to the price of raw materials the Company needed to make its products. C&A's operating results faced further negative pressures from the high costs of integrating the businesses acquired during 2001 into the existing C&A operations.  By December 2001, these severe operational pressures, among other issues, placed C&A in danger of violating a series of financial covenants in its credit facilities.

71.    A failure to satisfy its covenants would have been catastrophic to C&A and devastating to Defendants' personal reputations and fortunes.  At the time, C&A had between $575 million and $675 million in outstanding revolving credit facilities and term loans, which required that C&A satisfy certain financial covenants.  For example, C&A was required to satisfy a "leverage covenant," which was computed by dividing C&A's net debt by its EBITDA. If C&A failed to satisfy the "leverage covenant" or other covenants, it would be deemed to be in default under its credit facilities.  According to the Criminal Indictment, C&A's financial covenants became more stringent over time, such that C&A was expected to meet more rigorous performance targets and/or reduce its overall debt levels in order to remain in compliance with its covenants.  Failure to satisfy these covenants would not only place C&A in default on its credit facilities with its lenders, but due to a series of cross-default provisions in the Company's agreements with its bondholders, a default on the credit facilities would also trigger a default on

C&A's Notes. In essence, a default on its covenants would place C&A in danger of immediate collapse and bankruptcy.

72.     Consequently, Defendants faced significant pressure to keep C&A's financial performance at a level that would (a) satisfy investors that Heartland's financial plan for C&A was successful; and (b) enable C&A to comply with the covenants in its credit facilities.

73.     As described below, rather than face the dire consequences of C&A's failing business, Defendants embarked on a massive fraudulent scheme designed to misstate C&A's publicly-reported financial results and raise hundreds of millions of dollars from unsuspecting investors, including the clients for whom MacKay Shields acted as investment adviser. This fraudulent scheme involved (1) fraudulent "round-trip" transactions designed to artificially inflate C&A's reported financial results; (2) improper recognition of supplier and other rebates; and (3) improper treatment of discounts on capital equipment purchases as "income" in violation of GAAP.

A.      **The Fraudulent "Round Trip" Transactions With Defendant McCallum**

74.     In response to the operational pressures outlined above, starting in late 2001, Defendants orchestrated a series of "round-trip" transactions between C&A and Defendant McCallum for the purpose of misrepresenting C&A's financial condition. In September 2001, at Stockman's direction, C&A acquired a company called Joan Automotive Fabrics, which was a supplier of automotive fabrics and a division of Joan Fabrics. Following that acquisition, Defendant McCallum, the CEO of Joan Fabrics, became a member of C&A's Board of Directors.

75.     Starting in or about late 2001, Defendants caused C&A to enter into numerous improper "round-trip" transactions with Defendant McCallum. These sham transactions had no legitimate business purpose and were designed solely to falsify C&A's publicly-reported

29

financial statements. Specifically, in a series of meetings over the course of several years,

Defendants Stockman, Stepp and Jones agreed with Defendant McCallum that McCallum would

make approximately $14.8 million in cash payments to C&A on a quarterly basis starting in the

fourth quarter 2001 and continuing through the first quarter of 2003. At the same time each of

these agreements was reached, these Defendants agreed that C&A and McCallum would arrange

a series of sham transactions to surreptitiously repay McCallum, with the net result being that

these payments were simply transfers of cash from McCallum to C&A and then from C&A back

to McCallum. Despite the round-trip nature of these transfers, C&A improperly recorded the

payments received from McCallum as supplier "rebates" that increased C&A's reported income

and artificially inflated its EBITDA and other financial results. Under GAAP and other relevant

accounting rules and regulations, these round-trip transactions should have had no impact on

C&A's income statement.

      76.    The Criminal Indictment describes the "round-trip" transactions between C&A

and Joan Fabrics as follows:

> In the fourth quarter of 2001, Stockman, Stepp, and others realized that
> C&A's fourth quarter results were going to fall short of expectations.
> Therefore, Stepp, with Stockman's knowledge and approval, asked
> [Defendant McCallum] for a $3 million payment from Joan Fabrics to C&A
> that would be used to boost C&A's EBITDA for the fourth quarter of 2001.
> In return, Stockman, Stepp, and others promised to repay Joan Fabrics in
> the future. As Stockman and Stepp intended, this $3 million payment was
> characterized as a supplier rebate to allow C&A to account for it as a
> reduction in cost for the fourth quarter of 2001, and therefore increase
> C&A's EBITDA for that period. This characterization was false, as
> Stockman and Stepp had agreed that C&A would make Joan Fabrics
> "whole" for the payment at some point in the future. Therefore the
> transaction was a round trip of cash, not a supplier rebate, and should not
> have factored into C&A's EBITDA.

> After this first "rebate," Stockman negotiated additional payments from
> Joan Fabrics in order to boost C&A's EBITDA. Stockman negotiated these
> payments personally with [Defendant McCallum], which totaled nearly $15
> million in "rebates" between the fourth quarter of 2001 and the first quarter

of 2003.  As with the first "rebate," C&A booked each payment as a reduction in cost, and increased its EBITDA.  Neither Joan Fabrics nor entities controlled by [Defendant McCallum] had a contractual obligation to make these payments, and they in fact only agreed to do so with the understanding that Joan Fabrics would be repaid.

Criminal Indictment¶¶28, 29 (emphasis added).

77.     C&A falsely characterized the payments received from Defendant McCallum as "supplier rebates," so that C&A could account for them as a reduction in costs, which would artificially increase the Company's reported operating income and EBITDA for the corresponding quarter.  This characterization, however, was a blatant violation of GAAP and other relevant accounting rules and regulations because Defendants had agreed that C&A would "repay" McCallum for the full amounts of the so-called "rebates."  Thus the transactions were simply sham round-trip transactions of cash, not supplier rebates, and should not have impacted C&A's financial results or reported EBITDA.  *See* Criminal Indictment¶28.

78.     According to the Criminal Indictment and the SEC Complaint, Defendants Stockman and Stepp agreed to repay the approximately $14.8 million in total "rebate" payments that McCallum extended to C&A by structuring additional sham transactions with McCallum.  Each of these sham transactions lacked any legitimate business purpose and was designed solely to allow C&A to repay the "rebates" extracted from McCallum.  These sham transactions included:

        a.      On or about April 19, 2002, C&A returned to Joan Fabrics certain looms that C&A had obtained as part of the original purchase of Joan Automotive.  While these looms were worth approximately $3.1 million, they were returned by C&A for no consideration to Joan Fabrics in order to "repay" McCallum for the $3 million received for the fourth quarter of 2002.

b.    In March 2002, Stockman caused C&A to purchase one of McCallum's businesses, Southwest Laminates, Inc., for approximately $17 million, at least $7 million more than it was worth.

c.    In late 2002, Stockman and McCallum agreed that C&A would overpay for additional businesses and assets owned by McCallum, in order to repay additional "rebate" payments received from Joan Fabrics.  Soon thereafter, Stockman caused C&A to pay McCallum $4.2 million for Dutton Yarns (which had just been appraised at approximately $2 million), and $4.7 million for furniture looms that were worth only about $2 million.

79.    The sham "round-trip" transactions resulted in C&A falsely reporting its pre-tax operating income for each of the fourth quarter 2001 through the first quarter 2003 (as discussed herein, this information was publicly-filed with the SEC and set forth in the PPM that Defendants provided to MacKay Shields to induce MacKay Shields to purchase C&A Notes on behalf of the Class).  The impact of these misrepresentations are reflected in the following chart:

|  | 4Q 2001 | 1Q 2002 | 2Q 2002 | 3Q 2002 | 4Q 2002 | 1Q 2003 |
|---|---|---|---|---|---|---|
| C&A's reported Operating Income | ($13.5) | $54.4 | $81.5 | ($4.3) | $36.1 | $19.2 |
| C&A's actual Operating Income (not including improper McCallum payments) | ($16.3) | $49.4 | $79.7 | ($6.3) | $34.1 | $18.0 |
| Percent impact due to McCallum payments | 17% | 10% | 2% | 32% | 6% | 7% |

80.    According to the SEC Complaint, Defendants Stockman, Stepp, McCallum and Jones were directly involved in each of these fraudulent round-trip transactions.  Specifically, Stockman personally negotiated the transactions with McCallum, Stepp arranged and collected

the payments from McCallum, while Jones helped collect the payments from McCallum and

assisted in the transactions through which McCallum was repaid. As stated in the SEC

Complaint, "Stockman, McCallum, Stepp, and Jones knew, or were reckless in not knowing, that

the McCallum payments were actually improper round-trip transactions intended to inflate

C&A's earnings and that the false earnings figures would materially affect C&A's financial

statements and the reports . . . C&A filed with the SEC." SEC Complaint¶25.

**B.    Improper Accounting for Supplier And Purchaser Rebates**

81.    It is commonplace in the automotive industry for customers who consume raw

materials (such as C&A) to negotiate rebate payments from their suppliers in return for specified

volume purchases or guarantees of future business. Under relevant accounting rules, customers

such as C&A are permitted to record those rebates as reductions in cost (which, in turn, increase

income) in certain circumstances. However, because the customer is not permitted to receive the

rebate until the promised volume of purchases is made, or the promised future business is

provided, it is a violation of GAAP for the customer to immediately recognize the entire amount

of the future rebate.

82.    During the Class Period, C&A sought to negotiate rebates from its suppliers.

Thus, when C&A was awarded a contract from an OEM—for instance, a contract to make

interior components for the Ford Fusion—C&A would attempt to negotiate long-term contracts

with its own suppliers who would be providing the raw materials for the components that C&A

would construct for the OEM. As part of these efforts, C&A often negotiated certain price

reductions in the contracts so that C&A would be entitled to either volume discounts or an

upfront lump sum payment. According to the Criminal Indictment, Defendant Stockman

referred to these lump sum payments as, among other things, "pay-to-play," or "slotting fees."

*See* Criminal Indictment¶36. C&A's suppliers advanced these "pay-to-play" lump sum

payments in return from a commitment from C&A to provide the supplier with future business.

In the case of either volume discounts or lump-sum payments, the "rebates" due to C&A were

contingent on C&A either purchasing larger amounts of product from the supplier in the future

(in the case of volume discounts), or entering into future business arrangements with the supplier

(in the case of lump-sum payments). Pursuant to GAAP and other relevant accounting

principles, these "rebates" could not be recognized on C&A's books (and thus reduce C&A's

costs and increase its income) until C&A had "earned" the rebate by satisfying all of its

contractual obligations to its supplier. For example, in the case of volume discounts, C&A

would have to purchase the required amount of product from the supplier, while in the case of

lump-sum payments, C&A would have to provide the supplier with the contractually-guaranteed

amount of future business (which would entitle C&A to retain the lump-sum payment).

83.    According to the Criminal Indictment and the SEC Complaint, for each financial

quarter beginning in early 2002 and continuing through March 2005, Defendants Stockman,

Stepp, Galante, Cosgrove, Barnaba, Jones and Gougherty participated in a fraudulent scheme

designed to recognize the cost reductions from the "rebate" transactions before the rebates had

been earned by C&A. In blatant violation of GAAP, these "rebates" were recognized so that

C&A could artificially lower its costs in each quarter and thereby inflate its earnings and

EBITDA for that period. The Criminal Indictment describes this scheme as follows:

> Defendants Stockman, Stepp, and Cosgrove routinely attended meetings
> with members of the C&A Purchasing Department, including Barnaba, and
> knew that Barnaba and other employees from the C&A Purchasing
> Department were promising future business to suppliers in order to obtain
> up-front "rebates." In many cases, Stockman directed C&A employees to
> get rebates from specific suppliers; Stockman would specify the amount of
> the rebate to be requested and the specific future business to be promised to
> the supplier. Once Stockman identified a rebate, it became part of the C&A
> Purchasing Department's target goal for the quarter. At times relevant to
> this Indictment, Stockman, Stepp, and Cosgrove received weekly written

34

> reports from the C&A Purchasing Department which included updated information concerning rebate transactions. These weekly updates often referred to the fact that future business was being promised to suppliers in exchange for rebates being booked immediately.
>
> Beginning at least as early as in or about March 2002, defendants Stockman and Cosgrove directed employees in C&A's Purchasing Department to pull income forward into the current reporting period and thereby falsely pad C&A's reported income. Defendants Stockman and Cosgrove understood that C&A's employees were therefore soliciting false documentation from suppliers to allow C&A to account for rebates improperly, using a template letter approved by Cosgrove. In particular, defendants Stockman and Cosgrove directed C&A's employees, when documenting supplier rebates that were contingent on future business, to obtain side letters or separate documents that falsely attributed the supplier rebate to past purchases. . . . . Stockman, Stepp, Cosgrove and Barnaba used the false documents to justify immediate recognition of the supplier rebates in C&A's books and records and in its financial reports filed with the SEC.

Criminal Indictment¶40.

84.    The Criminal Indictment sets out in detail the role Defendants Stockman, Stepp,

Barnaba and Cosgrove played in this aspect of the fraudulent scheme, stating:

> Stockman specifically approved various contingent supplier rebates that were improperly booked in the current quarter. For example, Stockman approved the following rebates, with the knowledge and approval of Stepp and Cosgrove, each of which, as they each well knew, was contingent on future business, each of which was falsely documented to hide the contingency, and each of which was recognized in whole or in part in the current quarter:
>
>> a. Third quarter 2003: $1 million rebate from a plastic parts supplier;
>>
>> b. Fourth quarter 2003: $250,000 rebate from a tooling supplier.
>
> Stockman directed employees, such as Barnaba, to seek Cosgrove's guidance in "booking" the "rebates" in the current quarter, despite knowing that it would be improper to book the "rebates" in the current quarter because they were contingent on future events. Cosgrove reviewed false side letters obtained or prepared by Barnaba and C&A's Purchasing Department, with knowledge that they did not accurately reflect the true nature of the "rebates," and edited false side letters for the purpose of removing references to future business.

Criminal Indictment¶¶41-42.

85.    The SEC Complaint confirms the allegations above and sets forth additional information regarding the fraudulent rebate transactions effected by Defendants. *See* SEC Complaint ¶¶26-42. These fraudulent transactions included the following:

a.    On April 2002, PPG Industries, Inc. ("PPG") agreed to pay C&A a $500,000 rebate in exchange for a specified volume of new business. Defendant Barnaba solicited a side letter from PPG that falsely stated that the rebate was based on past purchases. Barnaba knew that the purpose of obtaining the side letter was to give C&A a pretext to improperly recognize the full amount of the $500,000 "rebate" in the second quarter of 2002.

b.    Defendants Stockman, Stepp, Cosgrove and Barnaba used the PPG side-letter as a template to improperly recognize income from "rebate" payments received from a number of other suppliers throughout 2002, including a $900,000 rebate paid by Brown Corporation and improperly recognized in the third quarter 2002, a $138,750 rebate paid by Jackson Plastics, Inc. and improperly recognized in the third quarter 2002, a $123,470 rebate paid by ATC, Inc. and improperly recognized in the fourth quarter 2002, a $67,000 rebate paid by Pine River Plastics, Inc. and improperly recognized in the fourth quarter 2002, and another $46,250 rebate paid by Jackson Plastics, Inc. and improperly recognized by C&A in the fourth quarter 2002.

c.    In the second quarter of 2003, C&A improperly recognized rebates paid from Brown Corporation (in the amount of $500,000), Dow (in the amount of $400,000), and Manufacturer's Products (in the amount of $150,000). In addition, in the second quarter 2003, C&A improperly recognized a $1.2 million "rebate" from DuPont Textiles

36

& Interiors ("DuPont") even though the "rebate" was actually a loan from DuPont to C&A.

      d.      In the third quarter of 2003, C&A improperly recognized a $1.56 million "rebate" from Exxon Mobil Corp. ("Exxon"), even though the agreement with Exxon provided that the rebate was not due until the fourth quarter of 2003 and was contingent on purchases by C&A in that next quarter, and C&A was obligated to refund part of the "rebate" if the Company did not make additional purchases from Exxon in 2004.  In the third quarter of 2003, C&A also improperly booked a $1 million "rebate" from Flambeau Corporation ("Flambeau") by promising future business to Flambeau.

      e.      In the fourth quarter of 2003, C&A improperly recognized a $250,000 "rebate" payment received from Reko International Group, Inc. ("Reko"), even though the payment was contingent on C&A providing Reko with a guarantee of future business.

      f.      In the second quarter of 2004, C&A improperly recognized a $1.5 million "rebate" payment received from GE Advanced Materials ("GE"), even though the rebate was negotiated such that it would be contingent on future purchases by C&A from G&E, and the deal between G&E and C&A never materialized and the rebate was never paid by G&E.  Also in the second quarter of 2004, C&A's Fabric Division (headed by Defendant Jones) was directly involved in improperly recognizing "rebate" payments in the amounts of $200,000 (from Unifi), $150,000 (from M. Dohmen, U.S.A.), $150,000 (Allied Waste), and $49,000 (from Clariant Corp).  In addition, during the second quarter of 2004, C&A improperly recognized a "rebate" payment from LVM in the amount of $430,000 even though the contract was not signed until February 2005.

g.      In the third quarter of 2004, C&A improperly recognized "rebate"

payments from Angell Manufacturing ($97,197), Exxon ($44,000), and Trim Stamping

($227,850).

h.      While C&A did not file a report with the SEC reflecting its results for the

fourth quarter of 2004, the Company released fraudulent earnings figures for this quarter

on March 17, 2005 (as described in more detail below).  For this period, C&A improperly

recognized "rebate" payments in the amount of $40,000 (from Aerotex), $75,000 (from

Vichem) and $69,000 (from Meurdter).

*See* SEC Complaint¶¶28-29, 32-41.

86.     Defendants Stockman, Stepp, Cosgrove, Barnaba, Galante, Jones, and Gougherty

directly participated in these rebate schemes and knew, or were reckless in not knowing, that

C&A's recognition of the rebate payments was improper and resulted in the overstatement of

C&A's publicly-reported financial results.

87.     According to the SEC Complaint, Stockman was aware of, approved, and directed

the scheme to increase income by prematurely recognizing rebates on supply contracts . . .

Stockman knew, or was reckless in not knowing, that C&A was not entitled to the rebates . . .and

that C&A's immediate recognition of the rebates in income was improper."  SEC Complaint¶42.

From at least the second quarter of 2003, Stockman himself met quarterly with employees of

C&A's Purchasing Department and emphasized the importance of negotiating supplier rebates.

For instance, in one meeting, held on May 27, 2003, Defendant Stockman spoke on a conference

call with employees of three C&A divisions.  During that call, Defendant Stockman instructed

C&A employees to increase income for the second quarter of 2003 by "pulling ahead" rebates

that should have properly been recognized, if at all, in future quarters.  In addition, during all

38

relevant times, Stockman identified the suppliers most likely to extend rebates, chose the amount

of rebates to be sought and the incentives to offer the suppliers in order to induce the "rebate"

payments. Further, Stockman personally directed that the rebates be used to artificially inflate

income in the quarter in which the rebate was negotiated, even though he knew or should have

known that such recognition was improper. *See* SEC Complaint¶31. Stockman also

participated personally in the Exxon rebate transaction (indeed, he personally negotiated the

rebate agreement, was regularly briefed on the status of the negations and knew the terms of the

final rebate agreement), as well as the Flambeau and Reko transactions, and approved of

recording the GE rebate on C&A's books. *Id.*¶¶36, 42. Defendant Stockman and Defendant

Stepp were also directly involved in C&A's fraudulent accounting for the DuPont transaction.

88.     Defendant Stepp was directly involved, along with Defendants Stockman and

Galante in the negotiation of the Reko rebate and also participated in internal meetings of C&A's

purchasing department employees at which the rebate scheme was discussed (along with

Defendants Stockman, Cosgrove and Barnaba). Further, Stepp was aware that the Flambeau

rebate was improper. *See* SEC Complaint¶42; Criminal Indictment¶38-40. In addition,

Defendant Stepp, along with Defendants Stockman and Cosgrove "received weekly written

reports from the C&A Purchasing Department which included information concerning rebate

transactions . . . these weekly updates often referred to the fact that future business was being

promised to suppliers in exchange for rebates being booked immediately." Criminal Indictment¶

39.

89.     Defendants Cosgrove and Barnaba were directly involved with the rebate scheme

from its inception through the end of the Class Period. Defendant Cosgrove obtained the side

letters and provided the language for those letters, while Defendant Barnaba ensured that C&A

39

employees obtained the side letters and that the letters provided an apparent basis for C&A's improper accounting. Defendant Cosgrove obtained the side letters and provided the language for those letters, while Defendant Barnaba ensured that C&A employees obtained the side letters and that the letters provided an apparent basis for C&A's improper accounting. *See* SEC Complaint¶42.

90.    Defendant Galante was directly involved in the Reko transaction and personally arranged for that "rebate" payment to be described in one letter and the guarantee of future business to be set forth in a separate letter. *Id.*

91.    Defendant Jones was involved in the "rebate" transactions that were conducted through the Fabrics Division and, according to the SEC Complaint, Jones "knew that employees in his division were carrying out Stockman's instructions and therefore knew, or was reckless in not knowing, that the rebates were accounted for improperly." SEC Complaint¶37.

92.    Defendant Gougherty instructed employees in C&A's International Plastics Division to improperly recognize the $430,000 "rebate" payment from LVM booked in the second quarter of 2004 (as described above). *See* SEC Complaint¶42.

93.    As stated in the SEC Complaint, Defendants "Stockman, Stepp, Jones, Cosgrove, Barnaba, and Gougherty knew, or were reckless in not knowing, that C&A's treatment of the rebates . . . was intended to falsely inflate C&A's reported current earnings." SEC Complaint¶ 42. The Criminal Indictment similarly confirms that Defendants "Stockman, Stepp, Cosgrove, and Barnaba schemed to inflate C&A's income by systematically recognizing 'rebates' from C&A's suppliers before those cost reductions had in fact been earned by C&A." Criminal Indictment¶34.

### C.     Improper Recognition of Rebates on Purchases of Capital Equipment

94.     By the beginning of 2004, Defendants realized that the "rebate" scheme described above was coming to an end. The Company had obtained or tried to obtain volume purchase rebates from the vast majority of its suppliers, and had already leveraged most of its new business opportunities in order to obtain up-front lump some payments. As the costs of raw materials continued to rise, suppliers were becoming more and more reluctant to make lump sum payments to customers such as C&A. In the face of these circumstances, it became obvious to Defendants that C&A needed to find a new source of "rebates" in order to continue to misstate the Company's financial condition and continue to perpetrate their fraudulent scheme. Thus, Defendants Stockman, Stepp, Cosgrove, Barnaba and Gougherty expanded the rebate scheme to capital equipment being purchased by C&A. *See* Criminal Indictment ¶¶ 43-45; SEC Complaint ¶ 43-48.

95.     As Defendants knew, under GAAP, any discounts on the purchase of capital equipment are reflected in the cost basis of the asset and would have no impact whatsoever on EBITDA. Defendants were also aware that C&A had historically accounted for any discounts it received on capital equipment by reflecting those discounts in the cost basis of the equipment. By 2004, however, Defendants Stockman, Stepp, Cosgrove, Barnaba and Gougherty decided to inflate C&A's reported EBITDA and operating income by negotiating discounts on C&A's purchases of capital equipment and falsely documenting those discounts as "rebates" for past purchases of non-capital items.

96.     These Defendants convinced C&A's suppliers to provide documentation falsely showing that price discounts C&A negotiated on capital equipment were "rebates" received for past purchases of non-capital goods and services. C&A would then improperly recognize the rebates in income. Defendants convinced the Company's suppliers to agree to pay—and falsely

41

document—these "rebates" by having C&A offer to pay a higher price for the equipment than originally requested by the supplier, in return for a "rebate" for the difference (or a part of the difference) and false documentation attributing the rebate to non-capital items (such as the purchase of spare parts), which would appear to justify booking the rebate as income.

97.      According to the Criminal Indictment and the SEC Complaint, Defendants engaged in the following improper transactions relating to recognition of income on discounts negotiated for purchases of capital equipment:

a.      In February and April 2004, C&A negotiated a $1 million "rebate" in the cost of new machines the Company purchased through its Hermosillo plant.  These machines were purchased from Demag Plastics Group ("Demag").  Defendant Stockman instructed Defendant Cosgrove (through Defendant Barnaba) to ensure that the rebate was falsely documented by requiring Demag to submit paperwork saying that the rebate was for the purchase of spare parts and other services.  C&A improperly recognized the $1 million in "income" from this transaction in the second and third quarters of 2004. *See* SEC Complaint¶44; Criminal Indictment¶44.

b.      Later in 2004, C&A obtained a $1 million discount on machinery purchased from a company called Cincinnati Milacron.  Stockman against instructed Defendants Cosgrove and Barnaba to prepare paperwork that could be used to falsely characterize the "rebate," this time as "implementation of training services technical support and continuous improvements."  This $1 million was recognized in the third quarter of 2004, with at least $600,000 being recognized by Defendant Gougherty. *See* SEC Complaint¶45; Criminal Indictment¶44.

A-44

    c.    In the fourth quarter of 2004, at the direction of Defendant Gougherty, C&A engaged in additional transactions similar to the ones described above, including a $224,000 transaction with Krauss Maffei, another $92,000 transaction from Demag, a $100,000 transaction from RPT and a $38,000 transaction from Conair. *See* SEC Complaint¶47.

98.    Each of these transactions were reviewed and approved by Defendants Stockman, Stepp and Cosgrove, each of whom knew or should have known that they were fraudulent, and lacked any legitimate business purpose. Criminal Indictment¶44. Indeed, Stockman directed and participated in this scheme with full knowledge that it would improperly inflate C&A's income. Cosgrove instructed C&A's purchasing department employees to obtain the false documents relating to the rebates, and Defendant Barnaba directed employees in implementing the false transactions. Defendant Gougherty instructed employees under his supervision and control to recognize the Cincinnait Milacron rebate as income and to solicit false documentation for the Krauss Maffei rebate. *See* Sec Complaint¶48.

**D.**    **Impact on Financial Statements**

99.    By engaging in improper round-trip transactions and improperly accelerating the recognition of rebates in violation of GAAP, Defendants artificially increased the Company's operating results and EBITDA. As stated in the Criminal Indictment, the fraudulent scheme set forth above "made C&A's reported revenue and EBITDA materially misleading in reporting periods between the first quarter of 2002 and the first quarter of 2005." Criminal Indictment ¶46. As stated in the SEC Complaint, "[a]s a result of the round-trip transactions with McCallum and the fraudulent rebate scheme, C&A materially overstated its income, or reduced its losses, in its quarterly reports (Form 10-Q) and annual reports (Form 10-K) for each reporting period from

the fourth quarter of 2001 through the third quarter of 2004." SEC Complaint¶51. The impact

of these misstatements on C&A's operating income are set forth in the following chart:

| Period | Operating Income (reported) | Operating Income (actual) | Percentage Impact |
|--------|------------------------------|----------------------------|--------------------|
| 4Q01 | ($13.5) | ($16.3) | 17% |
| 1Q02 | $54.4 | $49.4 | 10% |
| 2Q02 | $81.5 | $79.2 | 3% |
| 3Q02 | ($4.3) | ($7.6) | 43% |
| 4Q02 | $36.1 | $33.9 | 6% |
| 1Q03 | $19.2 | $17.5 | 10% |
| 2Q03 | $44.1 | $41.1 | 7% |
| 3Q03 | $8.3 | $4.1 | 102% |
| 4Q03 | $30.4 | $25.7 | 18% |
| 1Q04 | $29.9 | $28.8 | 4% |
| 2Q04 | $26.1 | $20.7 | 26% |
| 3Q04 | $9.5 | $1.6 | 494% |

100.    As discussed below, C&A has admitted that it improperly accounted for tens of

millions of dollars worth of vendor rebates in 2004 and possibly 2003, and that it will be forced

to restate its financial statements for certain of those periods as a result.

101.    In addition, as described in more detail below, while C&A did not file a 10-Q for

the fourth quarter of 2004 or the first quarter 2005, Defendants issued numerous materially false

and misleading statements regarding the Company's financial performance for those periods.

44

III.   **DEFENDANTS ADDITIONAL MISREPRESENTANTATIONS MADE IN CONNECTION WITH MARKETING C&A NOTES TO MACKAY SHIELDS**

102.   In addition to the fraudulent scheme set forth above, Defendants made numerous additional material misstatements in the course of marketing the C&A Notes to MacKay Shields and for the purpose of inducing MacKay Shields to purchase the C&A Notes on behalf of Plaintiff and the other members of the Class. These include (1) misrepresentations and distortions of C&A's EBITDA; (2) misrepresentations concerning C&A's business and operations; (3) misrepresentations concerning C&A's carrying value for goodwill; and (4) misrepresentations concerning C&A's internal controls over financial reporting.

A.   **Defendants' Additional Misrepresentations of C&A's EBITDA**

103.   EBITDA is an important consideration for debt investors because it measures a company's ability to generate sufficient operating cash to service and ultimately repay its debt – a fact which Defendants readily acknowledged. Indeed, in C&A's Form 10-Q for 2Q04 (the "2Q04 10-Q"), which was filed with the SEC on or about August 3, 2004, C&A emphasized the importance of EBITDA, calling it a "Key Indicator[s] of Performance." As the 2Q04 10-Q stated:

> [M]anagement . . . considers EBITDA to be a useful proxy for measuring the cash generated by our business and it is commonly used in the industry to analyze operating performance, liquidity and entity valuation . . . Management believes EBITDA to be a good measure of operating performance because cash generation is necessary for the Company to achieve many of the critical success factors outlined above, including investment in cost reduction activities, reducing leverage and improving liquidity.

104.   Accordingly, in the months leading up to the August 2004 Private Placement, Defendants repeatedly emphasized C&A's purportedly improving financial results and EBITDA in public filings, press releases, conference calls, and marketing materials provided to MacKay Shields and other investors.

45

105.    For example, on August 2, 2004, in a press release carried over *PR Newswire*, Defendants reported C&A's earnings for the second quarter of 2004 and the six months ended June 30, 2004 (the "August 2, 2004 Press Release").  That same day, the Company filed a Form 8-K with the SEC, signed by Defendant Stepp, which attached the August 2, 2004 Press Release. On information and belief, all of the Defendants reviewed, approved and authorized the press release before it was issued to the public.

106.    The August 2, 2004 Press Release reported "record second quarter 2004 net sales of $1.036 billion" and highlighted the Company's fourth consecutive quarter of improved EBITDA performance.  Defendant Stockman was quoted in the August 2, 2004 Press Release as follows:

> [f]or the fourth consecutive quarter [C&A's] EBITDA performance, excluding restructuring and impairment charges was up significantly from the prior year on a comparable basis.

107.    That same day, C&A held a conference call for institutional investors, which MacKay Shields participated in.  During the conference call, Defendant Stockman again emphasized C&A's EBITDA and represented that C&A was succeeding in spite of difficult market factors:

> I am pleased to report that we have now had our fourth straight quarter of very strong EBITDA gains in both dollars and margins. . . [W]e came in at [$]100.4 million before restructuring and impairment charges, in line with our expectations. This represents a 20 percent increase over the prior year, so we are making demonstrable progress. This also comes in light of some of the headwinds that we've had to push against, such as upward pressure on commodity costs and downward pressure on our selling prices. But since August 2003, when we made a change in our top management, we have accelerated the pace and the intensity of our consolidation cost-cutting and platform growth strategy, and have been able to overcome these adverse forces.

108.    Shortly after the Company announced its purportedly strong second quarter results, Defendant Stockman and other representatives of C&A contacted MacKay Shields—an

entity which Defendants knew was an investment adviser—and asked to set up a meeting to market C&A Notes to MacKay Shields, for a potential investment on behalf of its clients. MacKay Shields agreed to the meeting.

109.    Before meeting with C&A, MacKay Shields reviewed the Company's most recent prior filings with the SEC, including the Company's 2003 Form 10-K and its 2Q04 10-Q. Note 2 to the Condensed Consolidated Financial Statements in the 2Q04 10-Q included the following representation from C&A management:

> The consolidated financial statements include the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments necessary for a fair presentation of financial position and results of operations.

Further, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, defendants Stockman and Stepp certified that:

> the Report on Form 10-Q for the period ended June 30, 2004 of Collins & Aikman Corporation (the "Company") fully complies with the requirements of Section 13(a) or a Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

110.    On or about August 11, 2004, MacKay Shields met with Defendants Stockman and Stepp. At this meeting, Defendants Stockman and Stepp represented that they had authority to speak on behalf of Heartland, C&A and the other Defendants, and provided MacKay Shields with the August 2004 Presentation and the PPM. The PPM included C&A's materially misleading financial statements for the fourth quarter 2001 through the second quarter of 2004. The PPM also included a section entitled "Selected Historical Financial Data", which included the Company's financial results for the fiscal years 2001, 2002, 2003 and the three months ended March 31, 2004. The PPM also attached C&A's consolidated financial statements for the years ended 2003 and 2002, and expressly incorporated each of C&A's previous filings with the SEC,

including the Company's Forms 10-Q for the fourth quarter 2001 through the second quarter of

2004, and its Form 10-K's for the fiscal years ended 2001, 2002, and 2003. MacKay Shields

reviewed and relied on the information in the PPM in making its decision to purchase C&A

Notes on behalf of Plaintiff and the Class. Both the SEC Complaint and the Criminal Indictment

state that the offering materials by which Defendants marketed C&A Notes in August 2004 were

"false and fraudulent" and "materially false or misleading." *See* Criminal Indictment¶48; SEC

Complaint¶49.

111.    Like the PPM, the August 2004 Presentation—which was created for the sole

purpose of marketing C&A Notes to debt investors such as MacKay Shields—was designed to

create the impression that C&A was a healthy company with strong financials and good future

prospects. For example, the August 2004 Presentation highlighted C&A's "2003 North

American Interior Revenue", noting that it was more than double its next closest competitor. It

also repeatedly focused on the Company's EBITDA for the second quarter of 2004. Among

other things, the August 2004 Presentation stated that C&A's 2Q04 EBITDA, adjusted to

exclude so-called non-operating restructuring and impairment charges, was $100.4 million,

which (i) represented a "20% increase over prior year Q2"; (ii) was the "4th consecutive quarter

of EBITDA improvement"; (iii) the "Best margin in last 8 quarters"; and (iv) "LTM EBITDA

performance has rebounded significantly since the management change in August 2003,

improving 15% from the Q2 2003 trough." Further, in a section entitled "2004 Guidance

Update", the August 2004 Presentation confirmed that the Company was on track to achieve its

EBITDA guidance for 2004 stating, among other things, "Our March guidance projected 2004

EBITDA before restructuring and impairment at levels between $355-$370 million . . . [d]uring

48

the second half we expect comparable results and to achieve the lower end of our range for the year."

112.    The August 2004 Presentation also favorably compared C&A's reported EBITDA for the first and second quarters of 2003 against those same quarters for 2004. It stated that EBITDA for the first quarter of 2003 was $70.7, compared to $79.4 for the first quarter of 2004, a 12% increase. Similarly, the presentation stated that EBITDA for the second quarter of 2003 was $70.7, compared to $79.4 for the second quarter of 2004, for a 20% gain.

113.    Based on these EBITDA numbers, the August 2004 presentation calculated the Company's "net leverage" (calculated by dividing C&A's last twelve months [LTM] EBITDA by its net outstanding debt) and its "pro forma credit statistics" (calculated based on C&A's reported $333.6 LTM [Last Twelve Months] EBITDA). The presentation stated that the Company had a net leverage ratio of 4.3x for 2Q04, and that this net leverage ratio was an improvement from the 4.5x net leverage ratio for 1Q04. According to the August 2004 Presentation, C&A's "pro forma credit statistics" were as follows:

| Senior Secured Debt/ Adjusted EBITDA | 1.7x |
|---|---|
| Senior Debt/Adjusted EBITDA | 3.2x |
| Total Debt/Adjusted EBITDA | 4.4x |
| Adjusted EBITDA/Pr Forma Cash Interest | 2.4x |
| (Adjusted EBITDA-Capex)/Pro Forma Cash Interest | 1.2x |

114.    Defendants' statements regarding C&A's EBITDA were materially false and misleading as a result of the fraudulent scheme described above. Defendants' statements

49

regarding C&A's EBITDA were also materially false and misleading for the following additional reasons.

115.    *First*, Defendants were improperly classifying tens of millions of dollars of actual operating costs as "restructuring" or "impairment" charges.  When reporting EBITDA, Defendants repeatedly emphasized EBITDA <u>before</u> any extraordinary or unusual charges (such as restructuring or impairment charges) were incurred.  Defendants did so because they understood that investors would largely ignore these restructuring and impairment charges when making their investment decisions, because investors considered them to be "non-operating" or "nonrecurring" charges which did not impact the Company's core operations or future cash flow. Debt investors are not concerned with "non-operating" charges because they do not have an impact on EBITDA in subsequent periods and thus have little if any impact on the Company's ability to make its interest payments.

116.    Unbeknownst to MacKay Shields or Plaintiff, however, Defendants manipulated EBITDA before restructuring and impairment charges by improperly classifying ordinary operating costs as "restructuring" and "impairment" charges.  These manipulations were confirmed by CI 2, who said that he and his staff were always under pressure to categorize ordinary expenses as capital expenditures or non-operating expenses to avoid an immediate impact to EBITDA.  In fact, CI 2 said that C&A frequently tried to interpret routine operating expenses as "restructuring expenses," and that Stockman was always creative in the way he transformed expenses into capital outlays.

117.    CI 2 also said it was the Company's "standard mode of business" to evaluate every expenditure in an attempt to classify it as either capital or non-operating, and that during every quarter from at least mid-2003 through the end of 2004, Stockman encouraged C&A

facilities to classify operating expenses as non-operating, in a Company-wide effort to increase EBITDA. CI 2 even noted that when the President of his division, Reed White, retired in the third quarter of 2004, C&A recorded White's salary through the end of 2004, which is a classic example of a normal operating expense, as a restructuring expense.

118.    Had MacKay Shields known that the Company's EBITDA was materially overstated because Defendants were classifying routine operating expenses as "restructuring" and "impairment" charges, MacKay Shields would have known that the Company's financial condition was far worse than represented and, therefore, would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

119.    *Second*, on information and belief, the Company's reported revenues and EBITDA were materially misrepresented because C&A artificially inflated its reported sales and receivables. As described in the Criminal Indictment (and discussed in more detail below), C&A "pre-billed" millions of dollars of receivables, and fabricated the documentation needed to support those receivables. On or about June 22, 2005, General Electric Capital Corporation ("GECC") filed a motion in the United States Bankruptcy Court for the Eastern District of Michigan seeking relief from the automatic stay imposed by the Bankruptcy Code. According to that motion, at the time of C&A's bankruptcy filing C&A owed GECC at least $78 million and GECC held a security interest in C&A's accounts receivables. The parties' agreements required C&A to deposit any collections in a lockbox for the benefit of GECC. However, C&A was instead converting such collections for its own use, rather than providing them to GECC. As a result, GECC was asking the Court to allow it to seize records maintained by C&A regarding its receivables and collections, and to receive the collections directly.

120.    According to exhibits filed in support of that motion, C&A was also pre-billing receivables, and was repeatedly unable to provide information GECC had requested to verify that the Company's receivables were valid.  Specifically, on June 3, 2005, GECC sent a letter to C&A stating that "this morning, we were advised by KZC Services, LLC, the financial consultants to C&A Products, that a potentially material portion of the Receivables owned by [C&A] may constitute pre-billed tooling Receivables which had been incorrectly identified as Eligible Receivables in various reports" provided to GECC.  The letter noted that GECC was "gravely concerned" about this revelation and "expected to receive a comprehensive accounting of the nature and amount" of the Company's receivables.  The letter further stated that C&A and its financial consultant "will be working over this weekend [i.e., June 4-5, 2005] to obtain detailed information concerning these Receivables," and would report their findings to GECC on Monday, June 6.

121.    Significantly, C&A was unable to provide the information requested by GECC. On June 13, 2005, GECC sent another letter to C&A, reiterating its concerns and stating that while "we have received copies of invoices and purchase orders for the 50 largest tooling Receivables as of April 30, 2005, we have yet to receive a full accounting of current balances nor, despite our repeated requests, have we received copies of source documentation such as customer acceptances, written consents to billing, or evidence that tooling is in volume production."  As a result, GECC demanded to exercise its right under its agreement with C&A to conduct an "onsite audit" on June 14 to verify C&A's receivables, which would include "reconciliation of account receivable balances, recent customer remittances and recent payments from the [customers], as well as review of the purchase orders, invoices and other documentation relating to the Receivables."  Ultimately, GECC did not receive or obtain this information.

According to GECC's motion, which was filed on June 22, 2005, as of that date "GECC had been provided virtually no information by C&A."

122.    The information relating to C&A's accounts receivables that GECC requested are the fundamental records supporting outstanding accounts receivable which companies typically and routinely maintain, and such information should have been readily available from the records of C&A, specifically, within C&A's accounts receivables department. Indeed, C&A's contract with GECC specifically required C&A to "keep and maintain all documents, books, records and other information reasonably necessary or advisable for the collection of all Receivables (including, without limitation, records adequate to permit the daily identification of each new Receivable and all Collections of and adjustments to each existing Receivable)", and as set forth above also allowed GECC to review such documents upon request. Had this information existed, and C&A's accounts receivables been in order, C&A would have had no reason not to provide it to GECC, and in fact would have readily provided it to GECC.

123.    C&A's fraudulent manipulations of its sales and receivables and the falsification of the Company's documentation of its outstanding receivables is described in more detail below.

124.    Defendants' misrepresentations concerning C&A's EBITDA were material. While C&A's reported financial results and EBITDA showed a company with ample liquidity and strong future prospects, C&A's true operating results would have depicted a company on the brink of financial ruin. Had MacKay Shields known the truth about C&A's reported EBITDA, MacKay Shields would not have purchased C&A Notes on behalf of Plaintiff and the other members of the Class.

B.   **Defendants' Misrepresentations Concerning C&A's Business and Operations**

125.    In addition to misstating the Company's financial results, Defendants also made a series of material false statements regarding C&A's business.  In the months leading up to C&A's private placement in August 2004, Defendants consistently touted C&A's supposedly "world-class" business facilities and operations, including its purported "new business wins," "unique and unusually attractive competitive position" and "superior business model."  These statements were designed to convince investors that C&A was a leader in its industry that was overcoming difficult market conditions, and was a healthy company with bright future prospects.

126.    For example, in the August 2, 2004 Press Release, Defendants highlighted the supposedly superior quality of C&A's business, and touted the Company's "high-quality products," which it described as "the most effective in the industry."  The press release also touted C&A's "New Business Wins," stating that "during the second quarter of 2004, Collins & Aikman continued to achieve good progress on increasing new business by adding $450 million of annual newly booked business."  Defendants expanded on these statements on the August 2, 2004 conference call, where Defendant Stockman stated, among other things, that "we are continuing to be awarded new business at a very healthy pace that will sustain our growth trajectory that we have talked to you about previously."

127.    Defendant Stockman also emphasized the importance to C&A of being positioned "green" by the Company's major customers (*i.e.,* in the view of its customers, C&A was able to honor its contracts by consistently delivering conforming parts on a timely basis), stating "Now in order to take advantage of these opportunities—the long-term awards in a regular way and transfer or capture of business in the short run—we need to be positioned green, to quote, in the eyes of our major customers."

54

128.    The August 2004 Presentation and the PPM—the documents provided to MacKay Shields in connection with the August 11, 2004 meeting—likewise made unduly positive and misleading statements about C&A's business. For example, among other things, the August 2004 Presentation stated that "C&A occupies a unique and unusually attractive competitive position," and stressed C&A's high-quality services and "competitive advantages," including an "extensive production footprint that can efficiently service nearly every OEM assembly plant." According to the August 2004 Presentation, C&A had recently achieved "Seven New World-Class Facility Launches" and had a "World class 'lean' manufacturing culture."

129.    The August 2004 Presentation also specifically highlighted C&A's new facility located in Hermosillo, Mexico. C&A had designed and constructed the Hermosillo facility to build the interiors for the Ford Fusion, which was the largest and most important project in C&A's history. The presentation called the Hermosillo project a "World Class Facility" with state-of-the-art equipment, and further noted that the facility was a "Strong Validation of C&A's Business Model." These statements, as well as the others set forth herein, were designed to convince MacKay Shields that C&A had a bright future and a strong relationship with its customers.

130.    Defendants' statements regarding C&A's business and operations were materially false and misleading for several reasons.

131.    *First*, unbeknownst to MacKay Shields, C&A was not properly staffing and tooling its projects. These problems were causing C&A's customers to cancel contracts and withhold payments, which, in turn, had a devastating effect on the Company's available cash and credit, two factors that were critical to MacKay Shields' determination to purchase the C&A Notes on behalf of Plaintiff and the other members of the Class.

A-57

132.     According to CI 1 and CI 2, OEMs required C&A to assign specific numbers of appropriate personnel to construction projects. However, because of C&A's deteriorating financial condition, during the summer of 2004 the Company did not have anywhere near the number of staff required to service its existing projects, let alone the number needed to service any new business.

133.     According to CI 2, when a particular OEM demanded to meet with a project team it was not unusual for C&A to "play a shell game" by pulling design and engineering staff from other projects in order to show the OEM the required number of personnel. These personnel were not actually assigned to these projects, however, and usually within a week, the counterfeit staff was back manning their original projects until the next time the OEM required a meeting. For instance, CI 2 recounted occasions when Ford, which had required twenty-two designers and engineers to staff a project for the Mustang, called meetings of the C&A staff. At the direction of his superiors, CI 2 first combed through C&A organization charts to try to dig up the required number of personnel. When he failed to find enough people, Stockman appeared at two meetings with Ford to explain why C&A could not have all of the personnel in attendance.

134.     The problems experienced by C&A in staffing projects were confirmed by a former C&A executive, who was quoted in press reports in May 2005. The former C&A executive, who left C&A in 2004, stated that C&A often cut back engineering, design and manpower for automaker programs, even though the Company had promised certain levels of engineering, or a certain number of people on a program.

135.     Another striking example of C&A's inability to properly staff its projects was the Hermosillo facility. According to the former C&A executive, the Hermosillo project was severely understaffed. This executive stated that while C&A had committed to Ford that it

56

would have a certain number of people for this project, it only had half that number of employees involved. This situation put the entire project at risk. According to a May 18, 2005 article in the Detroit Free Press:

> We committed to a certain number of people for Ford on the Fusion, but we had half as many as we said we did . . . Ford wanted regular meetings with us on the Fusion, so we'd send people to Dearborn who were managers that knew nothing about design or about the Fusion and tell Ford they were a designer to make it look like we had X number of bodies for Ford. They were just placeholders. Had Ford asked them a question about the Fusion it would have been ugly. It was outright deceit.

136.    Moreover, C&A was not properly supplying the Hermosillo facility with high-quality, modern equipment. Even though C&A represented that the facility would be a "world class" facility with all new equipment, C&A was actually stocking it with secondhand machinery. According to the May 17, 2005 article in the Detroit Free Press, after Ford learned of this it became "frustrated that C&A [had] sent secondhand machinery to the plant" and was "worried that, among other things, C&A's angry vendors could disrupt production and not deliver parts on time."

137.    *Second*, unbeknownst to MacKay Shields, C&A was increasingly producing non-conforming parts that did not meet its customers' specifications. This, in turn, led the Company to burn through its available cash and revolving credit.

138.    According to CI 2, the Company had a regularly recurring problem with the Production Part Approval Process, or "PPAP." Under PPAP, when C&A was ready to finally produce a part, the Company provided its customer with a prototype part for the customer's inspection. This normally occurred thirty days before the OEM's scheduled start of production. However, by the summer of 2004, the Company's production had become so poor that, according to CI 2, it increasingly had "bad launches" of components, and was frequently unable to pass PPAP on a timely basis. As set forth below, this created significant liquidity issues for

C&A, and seriously undermined C&A's relationships with OEMs, because those OEMS could not start production until C&A's parts passed PPAP.

139.    For example, CI 2 described how C&A's production issues created significant problems with General Motors, which accounted for approximately 22% of the Company's revenue in 2003.  During the early summer of 2004, C&A had six companywide "bad launches" of GM components.  The problems were so severe and pervasive that GM warned C&A that one more "bad launch" would automatically result in GM putting the Company on "new business hold," also known as "going red."  This meant that, in GM's view, C&A was unable to consistently deliver conforming parts and did not have a plan to remedy the problem.

140.    The seventh bad launch occurred in October 2004, while C&A was in position to be awarded contracts for GM's Hummer HX Mini Van and Theta Platform.  As a result, C&A lost both contracts.

141.    *Third*, unbeknownst to MacKay Shields, C&A's increasingly substandard production was draining the Company's available cash and credit, which was critical to MacKay Shields' decision to purchase the C&A Notes on behalf of Plaintiff and the other members of the Class.

142.    For a company such as C&A, manufacturing substandard products which do not conform to customer specifications or requirements often results in liquidity issues.  That is because automotive parts companies like C&A have to pay their vendors in order to keep supplies coming in, but do not get paid themselves until the parts they deliver are approved under PPAP by their OEM customers.  Indeed, C&A customarily advanced all costs incurred in connection with tool and design projects, and was only paid when the parts passed PPAP.  This meant that C&A was forced to front what was often millions of dollars in costs until PPAP

58

occurred. PPAP was supposed to occur thirty days before an OEM's start of production. However, according to CI 2, because of C&A's increasing incidents of production failure, C&A often did not pass PPAP until ninety days or more <u>after</u> the OEM's scheduled start of production. Thus, instead of being paid thirty days before the start of production, the Company was not being paid in many instances until ninety days or more after the start of production. This had a significantly negative effect on the Company's cash flow and liquidity.

143.    During the early summer of 2004, the cash and credit drain caused by the PPAP situation became so bad that, according to CI 2, C&A became what is known in the automotive parts industry as a "distressed supplier." C&A's manufacturing difficulties were so pervasive that it essentially had to beg OEMs to pay at least some portion of the contract price for those components that were close to conforming.

144.    By the time Defendants solicited MacKay Shields to purchase C&A Notes on behalf of its clients, these problems had already caused a substantial adverse effect on C&A's relationship with its own suppliers. According to CI 1, C&A routinely held its accounts payable until the Company started to receive collection notices from suppliers in a desperate measure to conserve cash. And CI 2 stated that C&A's practice of delaying payments to suppliers became so prevalent that, beginning no later than the second quarter of 2004, C&A's Treasurer, Defendant Galante, established an unwritten "rule" that no supplier would be paid unless that supplier first sent C&A a written threat to shut down delivery. The statements of CI 1 and CI2 are corroborated and confirmed by the Criminal Indictment. As stated in the Criminal Indictment, by no later than at least January 2005, "at Stockman's direction, C&A delayed paying its bills as long as possible, and many of C&A's suppliers were being paid only when they threatened to stop supplying C&A with goods." Criminal Indictment ¶ 54.

145.    Defendants' misrepresentations concerning C&A's business and operating condition were material.  The materials Defendants provided to MacKay Shields and disclosed to the markets described a "world-class" company with sufficient staff, top-of-the-line equipment, good relationships with its customers, significant "new business wins," and ample liquidity.  The truth, however, was that C&A's business was in chaos; its relationships with its suppliers were deteriorating; it was unable to properly staff and tool its projects; and its cash and credit were quickly evaporating.

146.    Had MacKay Shields known the truth about C&A's business and operating condition, MacKay Shields would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

### C.    Defendants' Misrepresentations Concerning C&A's Carrying Values for Goodwill and Deferred Tax Assets

147.    Defendants also misrepresented C&A's goodwill and deferred tax assets.

148.    At the time Defendants were marketing the C&A Notes to MacKay Shields, the goodwill and intangible assets reported by C&A were approximately 45% of the Company's assets.  For instance, the 2Q04 10-Q reported goodwill of $1.361 billion and other intangible assets of $47.8 billion.  In C&A's financial statements for the year ended December 31, 2003, which were attached to the PPM provided to MacKay Shields in connection with the August 11, 2004 meeting, C&A stated that it had net deferred tax assets of $203.3 million.  These materials further stated:

> Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $203.3 million at December 31, 2003 will be realized.

149.    These statements were false.  As discussed in more detail below, on March 17, 2005, Defendants announced that C&A would write off $500 million of goodwill for the

Company's U.S./Mexico Plastics and Global Fabrics reporting units, and $177 million of deferred tax assets related to the U.S. and Italy. Under relevant generally accepted accounting principles, Statement of Financial Account Standards No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142"), those write-offs mean that (a) the present value of the discounted cash flow from those two reporting units was insufficient to support the carrying value of goodwill, and (b) the anticipated taxable income in the U.S. and Italy was insufficient to support carrying the deferred tax assets.

150.    At the time they were marketing C&A Notes to MacKay Shields, Defendants knew or recklessly disregarded that C&A's operating results and industry conditions existing at the time Defendants offered C&A debt to MacKay Shields required Defendants to undertake an impairment analysis. Such an analysis would have revealed that the carrying values of the goodwill and deferred tax assets were materially overstated and would have required C&A to record a substantial impairment charge. Moreover, an impairment charge would have indicated to MacKay Shields that C&A's underlying business was not nearly as healthy as it was portrayed, and that the Company's liquidity and creditworthiness was not nearly as MacKay Shields had been lead to believe.

151.    Had MacKay Shields known about the insufficiency of C&A's operating cash flow to support the carrying values of the Company's goodwill or deferred tax assets, MacKay Shields would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

D.    **Defendants' Misrepresentations Concerning C&A's Substantial Material Weaknesses in Internal Controls**

152.    Defendants also made public statements about the quality of C&A's internal controls over its financial reporting. Defendants knew that an important consideration for

investors is whether the company has sufficient internal controls in order to provide accurate financial information to investors.  Internal controls are critical safeguards for investors because they provide comfort that the Company keeps accurate financial information and can meaningfully evaluate operating performance.  Internal controls are particularly important in a large and diverse company such as C&A, which had operations and employees all over the world.

153.    In connection with filing C&A's 2Q04 10-Q, Defendants Stockman and Stepp executed a certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. Specifically, Stockman and Stepp certified that they were "responsible" for establishing and maintaining C&A's disclosure controls and procedures, and that they had:

a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under their supervision, to ensure that material information relating to C&A, including its consolidated subsidiaries, was made known to them by others within those entities;

b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; and

c.      Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in the 2Q04 10-Q their conclusions about the effectiveness of the disclosure controls and procedures.

154.    Likewise, each of the Company's SEC filings for previous periods contained similar Section 302 certifications regarding C&A's internal controls: (i) C&A's Form 10-Q for the First Quarter of 2003 was certified by defendant Stepp; (ii) its Form 10-Q for the Second Quarter of 2003 was certified by defendants Stockman and Stepp; (iii) its Form 10-Q for the Third Quarter of 2003 was certified by defendants Stockman and Stepp; (iv) its Form 10-K for the fiscal year ended December 31, 2003 was certified by defendants Stockman and Stepp; and (v) its Form 10-Q for the First Quarter of 2004 was certified by defendants Stockman and Stepp.

155.    These statements were materially false and misleading.  According to CI 2, at the time Defendants were marketing and selling C&A Notes to MacKay Shields, C&A was suffering from a variety of material weaknesses over its internal controls that were well known inside the Company.  Indeed, C&A's internal control weaknesses were reported to C&A management by PricewaterhouseCoopers in December 2003, but never disclosed to investors.  CI 2 stated that C&A failed in seven out of eight categories in the PricewaterhouseCoopers review, and these failures, which included basic internal controls over things like accounts receivables and payables recognition, were not rectified.

156.    Defendants knew about or recklessly disregarded C&A's substantial material weaknesses in internal controls and Defendants' failure to correct them.  Had MacKay Shields known these facts, it would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

## III.    IN RELIANCE ON DEFENDANTS' STATEMENTS ABOUT C&A, MACKAY SHIELDS PURCHASED ON BEHALF OF CLASS MEMBERS ROUGHLY $83 MILLION FACE VALUE OF THE C&A NOTES IN AUGUST 2004

157.    Based on the materially false and misleading representations outlined above, and without knowledge of their falsity, MacKay Shields purchased on behalf of Plaintiff and the other Class members $75,820,000 face amount of the 12.875% Notes on the offering on August

63

12, 2004 for over $73.1 million, and another $6,960,000 face amount of those C&A Notes on

August 20, 2005 for approximately $5.9 million, for a total purchase of $82,780,000 face amount

of 12.875% Notes for approximately $79 million.

158.    As described above, Defendants knew or recklessly disregarded that the

statements made to MacKay Shields and publicly disclosed to the market concerning C&A's

financial health, business and operating condition, goodwill and deferred tax assets, and internal

controls were materially false and misleading.  Defendants also knew or should have known that

MacKay Shields would rely on these statements in making their decision whether to purchase

C&A Notes on behalf of its clients.

159.    The Criminal Indictment confirms that:

> In or about August 2004, C&A offered, and the public [including MacKay
> Shields on behalf of Plaintiff and other Class members] purchased,
> approximately $415 million in 12.875% Senior Subordinated Notes due
> 2012 based, in part, on offering materials that <u>were false and fraudulent in
> that they included results of operations that had been falsely and materially
> inflated by the rebate schemes described above.</u>

Criminal Indictment¶48 (emphasis added).

160.    Had MacKay Shields known the truth about C&A's financial and operating

condition, MacKay Shields would not have purchased the C&A Notes on behalf of Plaintiff and

the other members of the Class.

**IV.     DEFENDANTS' SUBSEQUENT MATERIAL MISREPRESENTATIONS
INDUCE MACKAY SHIELDS TO PURCHASE MORE C&A NOTES ON
BEHALF OF PLAINTIFF AND THE CLASS**

161.    Following the August 2004 Private Placement, Defendants continued to issue

false statements about the Company.  Indeed, Defendant Stockman periodically made phone

calls directly to representatives of MacKay Shields to assure it that C&A's financial information

was accurate and that C&A's business and financial condition enabled it to continue paying

interest on its debt, and would allow it to redeem the debt at maturity.

**October 7, 2004 Presentation**

162.    On October 7, 2004, Defendants Stockman, Stepp and Krause participated in the

Deutsche Bank 12th Annual Global High Yield Conference.  The presentation materials

Defendants provided to MacKay Shields (the "October 7, 2004 Presentation") at this conference

were substantially the same as the August 2004 Presentation, but added the fact that C&A had

completed the private placement of the 12.875% Notes.  Based on statements made by

Defendants Stockman, Stepp and Krause, MacKay Shields understood that all Defendants had

reviewed and approved the October 7, 2004 Presentation before it was provided to MacKay

Shields.

163.    The October 7, 2004 Presentation materially misrepresented C&A's EBITDA,

financial performance and business prospects, and was materially false and misleading for the

reasons described herein.  Among others, the false statements included in the October 7, 2004

Presentation included that (1) "for the LTM period ended June 30, 2004, C&A has an EBITDA

margin of 8.4%, 130 bps higher than the next best performer", (2) "Free Cash from operations

was positive $26 million during Q1/Q2004," (3) the Company had "Improving Operating Free

Cash Flow", and (4) the Company had $4,018 million in sales for LTM ended June 30, 2004.

The presentation also falsely stated the Company's EBITDA for prior quarters as $55.6 (3Q02),

$82.3 (4Q02), $70.7 (1Q03, $84.0 (2Q03), $66.0 (3Q03), $90.5 (4Q 03), $79.4 (1Q04), $100.4

(2Q04).

164.    Defendants knew or recklessly disregarded that these statements were materially

false and misleading.  Defendants also knew that MacKay Shields and other investors would rely

65

on these statements in making their decision whether to purchase the C&A Notes. Had MacKay

Shields known that these statements were materially false and misleading, it would not have

purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

165.     In reliance on Defendants' materially false and misleading representations, and

without knowledge of their falsity, MacKay Shields purchased on behalf of Plaintiff and the

other members of the Class another $2,000,000 face amount of the 12.875% Notes on October

15, 2004 for over $1.6 million.

**November 9, 2004 Press Release**

166.     On November 9, 2004, in a press release carried over *PR Newswire*, Defendants

published C&A's earnings for 3Q04 and the nine months ended September 30, 2004. The

November 9, 2004 Press Release was attached to a Form 8-K filed with the SEC, which was

signed by Defendant Koth. On information and belief, all Defendants reviewed, approved and

authorized the November 9, 2004 Press Release before it was issued. The November 9, 2004

press release included the following statement by Defendant Stockman:

> For the fifth consecutive quarter our EBITDA performance, excluding
> restructuring and impairment charges, was up from the prior year on a
> comparable basis.

167.     This statement was materially false and misleading for the reasons described

herein, including that C&A's EBITDA for 3Q04 did not represent the "fifth consecutive quarter"

of increasing EBITDA. Further, the November 9, 2004 press release materially misrepresented

C&A's EBITDA, financial performance and business prospects, and was materially false and

misleading for the reasons described herein

~~168.     Defendants knew or recklessly disregarded that these statements were materially~~

false and misleading. Defendants also knew or should have known that MacKay Shields and

other investors would rely on these statements in making their decision whether to purchase

66

C&A Notes.  Had MacKay Shields known that these statements were materially false and

misleading, it would not have purchased the C&A Notes on behalf of Plaintiff and the other

members of the Class.

### November 9, 2004 Conference Call and 3Q04 Presentation

169.    Also on November 9, 2004, Defendants, through Stockman, Krause and Koth,

held an earnings call, and provided a presentation (the "3Q04 Earnings Presentation") to

MacKay Shields.  On information and belief, all Defendants approved and authorized the

statements made on the conference call and in the 3Q04 Earnings Presentation.

170.    On the call, Defendant Stockman spoke positively about the Company's

continuing "EBITDA improvement," stating:

> We are pleased to announce that this marks the fifth consecutive quarter of
> EBITDA improvement for C&A.  Our Q3 EBITDA was 68 million before
> restructuring and impairment.  That's up 3% over prior year.  We achieved
> these gains despite a [$]37 million, or 4%, decline in sales versus Q3'03,
> principally due to lower Big 3 volume as all of you are aware.  Our
> resulting EBITDA margin with sales down and EBITDA up was 7.9%, a
> 60-basis point improvement over Q3, 2003

171.    Similarly, Defendant Koth stated:

> the Company also has—had ample liquidity at September 30, with
> approximately [$]175 million of availability under its existing credit
> facilities.

172.    The 3Q04 Earnings Presentation Defendants provided to MacKay Shields was

similar in form to the August 2004 Presentation and the October 7, 2004 Presentation.  Among

other things, it stated that C&A's 3Q04 EBITDA for the quarter, adjusted to exclude so-called

non-operating restructuring and impairment charges, was $68 million, and that this represented a

7.9% 3Q04 lagging twelve-month EBITDA margin; the Company's lagging twelve-month

EBITDA was $338 million and had improved 15% since 2Q03, and that there was a trend since

2Q03 of five straight quarters with increasing lagging twelve-month EBITDA; and C&A's

lagging twelve-month EBITDA margin for 2Q04 was 8.4%, or was 130 basis points (1.3%)

higher than the next best performer in the Company's peer group, and 300 basis points (3.0%)

higher than the 5.7% average margin for the entire peer group.

173.    These statements were materially false and misleading for the reasons set forth

herein. The Defendants knew or recklessly disregarded that the statements made on the

conference call and in the 3Q04 Earnings Presentation were materially false and misleading.

The Defendants also knew that investors like MacKay Shields would rely on these statements in

making their decision whether to purchase the C&A Notes. Had MacKay Shields known that

these statements were materially false and misleading, it would not have purchased the C&A

Notes on behalf of Plaintiff and the other members of the Class.

### The Company's 3Q04 10-Q

174.    On or about November 9, 2004, Defendants filed with the SEC C&A's Form 10-

Q for 3Q04 (the "3Q04 10-Q"), and on or about November 17, 2004 filed with the SEC C&A's

amended Form 10-Q for 3Q04 (the "3Q04 10-Q/A"). The 3Q04 10-Q was signed by Defendant

Koth and, as discussed below, certified by Defendants Stockman and Koth. On information and

belief, all Defendants reviewed, approved and authorized the 3Q04 10-Q before it was filed with

the SEC.

175.    The 3Q04 10-Q and 3Q04 10-Q/A repeated the materially misleading financial

information contained in the November 9, 2004 3Q04 earnings release, and was materially false

and misleading for the reasons described herein. Defendants Stockman and Koth represented

that "in the opinion of management, contain all adjustments necessary for a fair presentation of

financial position and results of operations." Moreover, pursuant to Section 906 of the Sarbanes-

Oxley Act of 2002, Defendants Stockman and Koth certified that these documents "fairly

present[], in all material respects, the financial condition and results of operations of the Company." Stockman and Koth also certified, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that C&A's internal controls over financial reporting "provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles."

176.    These statements were materially false and misleading. As discussed above, Defendants improperly classified operating expenses as non-operating "restructuring" and "impairment" charges, failed to properly account for supplier rebates, failed to perform an impairment analysis of the carrying values of C&A's goodwill and deferred tax assets, and concealed C&A's material weaknesses in its internal controls over financial reporting.

177.    The Defendants knew or recklessly disregarded that the statements made in the 3Q04 10-Q were materially false and misleading. The Defendants also knew that investors such as MacKay Shields would rely on the 3Q04 10-Q in making their decision whether to purchase the C&A Notes. Had MacKay Shields known that the 3Q04 10-Q was materially false and misleading, it would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

**January 12, 2005 Presentation**

178.    On January 12, 2005, Defendants provided another presentation to MacKay Shields (the "January 12, 2005 Presentation), and encouraged MacKay Shields to purchase additional C&A Notes on behalf of its clients. On information and belief, all Defendants reviewed and approved the January 12, 2005 Presentation before it was provided to MacKay Shields.

179.    Among other things, the January 12, 2005 Presentation misleadingly highlighted the Ford Fusion and the Hermosillo facility. For example, it touted the Fusion project as a "Multi-Billion $ Ford Mid-Sized Vehicle Award"; devoted an entire page to showcasing the organization of the Hermosillo factory; and referred to it as one of the Company's "2005 Launch Highlights." As discussed herein, Defendants knew or recklessly disregarded that C&A had substantially understaffed the Fusion project, and tooled the "world class" Hermosillo facility with secondhand machinery. The January 12, 2005 Presentation also misrepresented the Company's "Interior & Exterior Trim" sales for 2003 as $2.5 billion.

180.    Based on Defendants' materially false and misleading representations, and without knowledge of their falsity, MacKay Shields purchased on behalf of Plaintiff and the Class another $26,559,000 face amount of the 12.875% Notes between January 31, 2005 and March 2, 2005 for over $17.8 million, and purchased on behalf of Plaintiff and the Class $19,635,000 face amount of the 10.75% Notes on March 2, 2005 and March 4, 2005 for approximately $18 million.

181.    Defendants knew or recklessly disregarded that the statements made in the January 12, 2005 Presentation were materially false and misleading. Defendants also knew that MacKay Shields would rely on the statements set forth in the January 12, 2005 Presentation in making their decision whether to purchase C&A Notes. Had MacKay Shields known that the January 12, 2005 Presentation was materially false and misleading, it would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

## V.    THE FIRST QUARTER 2005 LIQUIDITY CRISES

182.    Unbeknownst to investors, By January 2005, the problems at C&A had reached crisis proportions. The Company was fully drawn on its revolving credit facilities and was lacking sufficient liquidity to pay its bills. Rather than face reality and admit that they could no

longer conceal C&A's problems from the market, Defendants hatched yet another fraudulent

scheme designed to prolong C&A's survival. As the Criminal Indictment puts it, the motivation

behind this scheme was to "avoid filing for bankruptcy, which would have acknowledged the

failure of Stockman's leadership and resulted in the loss of Stockman's and [Heartland's]

investment in C&A." Criminal Indictment¶49. This scheme involved falsification of invoices in

order to increase available liquidity under C&A's accounts receivable securitization facility. The

scheme also involved making false statements to C&A's investors. *See* Criminal Indictment¶49-

61.

 183.  As discussed above, C&A was party to a credit facility with GECC, pursuant to

which GECC extended a line of credit to C&A that was secured by the Company's outstanding

accounts receivable. C&A's accounts receivables often consisted of millions of dollars because

there was a delay between the time that C&A would send an invoice for payment to its OEM

customers and when the OEM would actually pay the invoice (typically, this delay was between

60 and 120 days). Under C&A's credit agreement with GECC, GECC agreed to provide C&A a

"borrowing base" calculated by reference to the amount of "eligible receivables" the Company

had outstanding on any given day. In order to constitute an "eligible receivable" (and thus be

included in the calculation of the borrowing base), C&A was required to have sent an invoice

that an OEM had *agreed* to pay.

 184.  C&A was required to send daily reports to GECC that updated the status of the

outstanding invoices and payment agreements and thus the current amount of the borrowing

base. These reports were prepared by employees in the Treasury Department, acting under the

supervision and direction of, among others, Defendant Galante. It typically took C&A two days

to prepare the daily reports, such that each report that GECC received actually reflected the state

of play from two business days earlier. The reports included a calculation of the level of eligible receivables and also stated whether C&A was able to borrow more money from GECC (if the borrowing base had increased) or whether C&A had to make a payment to GECC (if the borrowing base had decreased). Because the cost of financing was lower under C&A's agreement with GECC than it was with C&A's other lenders, Defendants typically sought to borrow the maximum amount from GECC that was supported by the pool of eligible receivables and the borrowing base available each day.

185.    On or about January 6, 2005, C&A prepared a daily report showing that the eligible receivables had decreased (thus diminishing the borrowing base) and that C&A had to make an immediate payment to GECC of $21.8 million. Defendants realized that C&A did not have sufficient liquidity to make the payment to GECC. With the knowledge and approval of Defendant Stockman, Defendant Galante and others in C&A's treasury department concealed the fact that the Company owed $21.8 million to GECC and falsely stated to GECC that a computer malfunction had delayed their ability to provide the required daily reports until the following Monday, January 10, 2005.

186.    At the same time, and with the knowledge and approval of Defendant Stockman, C&A employees began a systematic effort to send out invoices by January 10, 2005 such that the pool of eligible receivables (and the borrowing base) would be artificially increased (and the payment owed to GECC artificially decreased). At Defendants' direction, C&A employees worked throughout the weekend to manually invoice millions of dollars of receivables for the sole purpose of inflating the borrowing base and avoiding the $21.8 million payment due to GECC—a payment that C&A lacked the liquidity to make. Because these invoices were just being sent out, C&A's OEM customers had obviously not yet *agreed* to pay these invoices, and

72

therefore they could not be properly included in the pool of eligible receivables. Nonetheless, on January 10, 2005—just two days before the meeting with MacKay Shields described above—Defendants submitted a report to GECC that falsely stated that C&A owed GECC only $11.8 million.

187.    Following this narrowly-averted crises, Defendant Stockman began to personally review C&A's liquidity situation on a daily based and choose himself which of C&A's suppliers and creditors would get paid.

188.    As discussed above, following the January 2005 liquidity crises, Defendants also began to fraudulently "pre-bill" GECC for "tooling" receivables relating to payment for tools and other machines used to make auto parts. In the automotive industry, OEMs typically agree to pay for tooling receivables only after certifying that the equipment is performing to specifications (through a process called the Production Part Approval Process, or "PPAP"). While target dates for completion of the PPAP process are typically agreed upon, it was common industry knowledge, shared by Defendants, that the PPAP process often was not complete until after the target date, and OEMs usually withheld an agreement to make a payment until after the PPAP process was *actually* complete.

189.    Nonetheless, in January 2005, C&A began to include tooling receivables in the calculation of the borrowing base under its agreement with GECC even though the PPAP approval had not been completed and the OEM had not agreed to pay the invoice. Defendants knew or should have known that there was no agreement to pay the invoices and that the invoices were therefore not eligible for inclusion in the calculation of borrowing base. Nonetheless, Defendants included these invoices for "the sole purpose of improperly inflating the GECC borrowing base, thus generating cash and liquidity for C&A." Criminal Indictment¶

73

A-75

60 (C&A added more than $100 million in ineligible receivables to the borrowing base between

January 2005 and April 2005); *see* SEC Complaint¶71 (Defendants Stockman, Williams and

Galante knew of, and participated, in the fraudulent scheme to misrepresent C&A's liquidity to

investors).

## VI.   ON MARCH 17, 2005, C&A ANNOUNCES THAT IT IS UNABLE TO FILE ITS FORM 10-K FOR FISCAL YEAR 2004

190.    On March 17, 2005, C&A announced that the filing of its 2004 Form 10-K was

going to be delayed because, among other things, the Company had to restate its previously

reported financial results for 2004 and potentially 2003 as a result of improper accounting.  The

Form 8-K filed with the SEC and attaching the March 17, 2005 press release was signed by

Defendant Koth.  On information and belief, all Defendants had reviewed and approved the

March 17, 2005 press release before it was issued.

191.    The press release disclosed for the first time that the Company had improperly

accounted for its supplier rebates, which would impact its previously reported EBITDA.  Among

other things, the press release stated:

> During the course of finalizing its financial statements for its fiscal year
> ended December 31, 2004, the Company identified certain accounting for
> supplier rebates that led to premature or inappropriate revenue recognition
> or that was inconsistent with relevant accounting standards and the
> Company's policies and practices.

192.    With respect to C&A's previously reported amounts for goodwill, the press

release stated:

> The Company determined that the fair values of its U.S. and Mexico
> Plastics reporting unit and its Global Fabrics reporting unit were less than
> the respective units' carrying values.  As a result, the Company expects to
> recognize an impairment charge of approximately $500 million, which will
> reduce U.S. and Mexico Plastics' goodwill by approximately $325 million
> and Global Fabrics' goodwill by $175 million.

193.    With respect to C&A's previously reported amounts for deferred tax assets, the

press release stated:

> The Company has also performed an analysis of future taxable income and
> believes that there is now sufficient negative evidence and uncertainty as to
> the timing of when the appropriate level of taxable income will be generated
> in the U.S. to recover the deferred tax assets, necessitating a full valuation
> allowance against those deferred tax assets.  As a result, the Company's
> provision for income taxes for the fourth quarter of 2004 includes a write
> down of the U.S. and Italian net deferred tax assets of $175 million.  In
> addition, the impact of the valuation allowance on the 2004 operating
> results for the U.S. and Italy was approximately $25 million.

194.    In the March 17, 2005 press release, C&A also announced a series of material

weaknesses reported by its auditor:

> The Company is working towards completion of its assessment of internal
> controls over financial reporting required under Section 404 of the
> Sarbanes-Oxley Act and has concluded that certain material weaknesses, in
> addition to the matters leading to the restatement described above, existed at
> December 31, 2004, but its assessment of the effectiveness of the
> Company's control over financial reporting is ongoing and the extent of
> those material weaknesses remains under review.  The Company's outside
> auditor is in the process of completing its audit of internal controls over
> financial reporting and has communicated the existence of material
> weaknesses.  The potential material weaknesses identified include the
> following: (i) the adequacy of the Company's resources with appropriate
> accounting expertise to address accounting and reporting matters in certain
> areas, including revenue recognition, vendor arrangements and post-
> retirement benefits, and to supervise the Company's decentralized and
> disparate accounting environment and ensure an appropriate segregation of
> duties; (ii) the adequacy of the Company's internal audit function's
> resources and ability to monitor compliance with established policies and
> procedures; (iii) the effectiveness of certain information technology controls
> and the sufficiency of documentation to assess the effectiveness of such
> controls including embedded system application controls; (iv) the adequacy
> of procedures to consistently identify and reconcile fixed assets and
> periodically review assets for impairment; and (v) the completeness and
> consistent adherence to Company policies and procedures.  These issues
> include a range of documentation-related issues and reconciliation issues.
> Other material weaknesses may be identified as a result of further
> investigation of the circumstances surrounding the expected restatement
> arising from vendor rebates.  Our review and the audit is [sic] ongoing.

195.    As discussed below (and recognized in the Criminal Indictment and the SEC

Complaint), these statements were materially false and misleading.

## VII.    DEFENDANTS CONTINUE TO LIE TO MACKAY SHIELDS AND OTHERS ABOUT C&A'S FINANCIAL AND OPERATION PERFORMANCE

196.    Defendants immediately tried to downplay the probable impact of the issues

raised in the press release on C&A's financial results and business operations. Just a few hours

after issuing the March 17, 2005 press release, C&A held a conference call with investors (the

"March 17, 2005 Conference Call"). On that call, Defendant Stockman made a series of

statements designed to allay investor concerns over the scope and size of the accounting issues

and internal investigation disclosed in the March 17, 2005 press release, and to reassure investors

that C&A was a healthy company with ample liquidity and strong future prospects.

197.    For example, Stockman stressed that C&A would obtain waivers from its lenders

and would continue to have access to its credit facilities, stating "flatly, clearly, and

unequivocally, we will remain in compliance with our covenants . . . ." Stockman also reassured

investors that the Company had thoroughly investigated the supplier rebate issues identified in

the press release. In defendant Stockman's words, "the prudent thing to do, the right thing to do,

and the proactive thing to do" was to "look at every entry" relating to supplier rebates made

since January 2002. Stockman characterized this as an "around-the-clock effort" involving "a

large group of people," and that it represented "management's best effort." According to

Stockman, "it was comprehensive, it was intensive, it covered everything, <u>it left no stone</u>

<u>unturned</u> . . . it is our assessment at the moment and, as we indicated, that [the investigation]

may lead to a restatement of a – <u>of a modest magnitude</u> in '04."

198.    Moreover, Defendant Stockman reassured investors that the Company's

"restructuring" program was completed, stating: "we have taken a million dollar restructuring

charge. We expect to this quarter, <u>and that will be it</u>." As discussed above, Stockman knew that

debt investors such as MacKay Shields would be reassured by this statement, because it

confirmed that C&A's restructuring charges were limited, one-time "non-operating" charges that

would not impact the Company's EBITDA results in future periods.

199.    In connection with the conference call, C&A prepared and distributed a

presentation entitled "Fourth Quarter and Full Year 2004 Results" (the "March 17, 2005

Presentation"). The March 17, 2005 Presentation repeated many of the points addressed by

Stockman on the conference call, and was similarly designed to minimize investor concerns

about the overall scope and impact of the issues disclosed in the March 17, 2005 press release.

For example, the presentation stated that C&A expected "2005 sales will be modestly up from

2004 level," and "Full year EBITDA before restructuring and impairment is expected to <u>meet or</u>

<u>exceed comparable 2004 levels</u>." The presentation further boasted about the EBITDA

performance of the Company in the period since Defendants Stockman and Heartland had taken

over, stating that "LTM EBITDA performance has rebounded significantly since the

management change in August 2003, improving 10% from the Q2 2003 trough."

200.    In addition, the March 17, 2005 Presentation devoted an entire section to

addressing—and minimizing—the issues relating to the Company's improper accounting for

supplier rebates. In a section titled "Results of Comprehensive Internal Review of 2002-2004

Supplier Rebates," the presentation made statements designed to lead investors to believe that the

Company had thoroughly investigated this issue and determined that it would not have any

further impact on C&A's financial results. Among other things, the presentation stated that

C&A had reviewed "more than 350 supplier rebate entries . . . for 12 quarter period (2002-

77

2004)", and that "approximately 315 <u>or about 90%</u> were found to conform to relevant accounting standards (EITF 02-16) and the Company's internal policies and practices regarding rebates."

201.    The Criminal Indictment has confirmed that Defendants' statements in the March 17, 2005 Press Release and in the accompanying earnings call and investor presentation were false and misleading.  Criminal Indictment¶64.  For instance, as stated in the Criminal Indictment:

a.    "Stockman's description of the internal investigation of the improper accounting for supplier rebates in the March 17, 2005 press releases was intended to mislead investors and the public by minimizing the size of the restatement of C&A's financial statements, and exaggerating the degree to which management had explored, quantified and rectified the situation."

b.    Contrary to the statements in the press release, "no meaningful review of 2002 rebates was conducted, and 2002 rebates, including those negotiated with Joan Fabrics . . . were not restated even though Stockman knew they were clearly accounted for improperly."

c.    "the figures included in the press release regarding the proposed amount to be restated did not accurately reflect the true income earned for prior periods."

d.    "the press release understated the degree to which previous financial statements needed to be restated based on 2003 and 2004 rebates, because the internal investigation upon which the press release was designed to justify C&A's previous accounting, rather than account for rebates properly."

e.    "the press release attributed the improper accounting to a failure of 'controls' and 'procedures' and to 'other circumstances.'  This description was intended

to give the impression that the improper accounting was inadvertent and at worst the result of negligence. As described above, however, the truth was that the improper accounting was intentional and the result of a concerted scheme by Stockman, Stepp, Cosgrove, Barnaba, and other C&A employees."

     f.      During the March 17, 2005 earnings call "Stockman provided a forecast for EBITDA for the first quarter of 2005 that he knew would not be attained. He stated that EBITDA would be between $65-75 million for the first quarter of 2005, even though the most current financial information for the company, including the actual results for January and February, showed that EBITDA for the first quarter would only be roughly half that figure."

     g.      "Stockman highlighted a slide representing that capital expenditures in 2005 would be limited to $30 million quarterly as a sign that C&A was conserving cash. This statement was misleading because Stockman knew that his projections showed that C&A would spend more than $50 million in the first quarter of 2005 and knew that C&A had actually already spent more than $30 million in capital expenditures during January and February 2005. This misrepresentation was material because, among other reasons, Stockman emphasized this limitation on capital expenditures to reassure investors and the public that C&A was preserving cash and holding down its costs."

     h.      Stockman concealed C&A's liquidity crises by responding to a question 'intra quarter are you tapping out your liquidity?' with the answer 'no.' . . . this statement was a lie designed to hide the fact, well known to Stockman, that C&A was suffering a major liquidity crises."

Criminal Indictment¶¶66-75; *see also* SEC Complaint¶56 (the March 17, 2005 Press Release stated that fourth quarter 2004 EBITDA was $72-73 million, which "included at least $5.8 million in improperly recorded rebates, making the press release false or misleading.")

202.    All Defendants knew, or were reckless in not knowing, that the statements in the March 17, 2005 Press Release, earnings call and accompanying investor presentation were false and misleading, and Defendants had a duty to correct those statements. *See* SEC Complaint¶66 (Defendant Cosgrove reviewed the charts that Stockman used on the call and Cosgrove "knew, or was reckless in not knowing, that these charts contained false or misleading statements regarding EBITDA and capital expenditures.")

203.    In a further effort to convince investors that the issues identified in the March 17, 2005 press release would not have a materially negative impact on C&A's future performance, Defendants announced that Heartland had entered into an agreement to purchase approximately $300 million face value of C&A preferred stock from Textron Inc. ("Textron"). This announcement was designed to convince debt investors that Defendants continued to have complete confidence in C&A's financial health and viability. Indeed, during the March 17, 2005 conference call, defendant Stockman stated:

> We remain convinced … that we have a business model that can work, and
> that we have a place in the industry where we can thrive economically and
> in terms of our earnings and cash flow over time. For that reason,
> Heartland Industrial Partners, of — of which I am the founding partner, as
> you know, has reached an agreement in recent days with Textron, that owns
> all of our preferred stock, that it got at the time of the original transaction.
> Face value today is around $300 million. We've reached an agreement to
> buy a majority of that stock, and an option on the rest, at a total price of
> around $45 million. So we will be able to take control of all of the equity,
> the preferred equity, and our position in the common, but the preferred
> equity for about $45 million, or 15, 16 percent of its liquidation value. We
> see that as a very strong vote of confidence in our future as a company, and
> in the strategies and initiatives we're going to talk about now that we're

> undertaking to deal with some very unprecedented and some very unusual
> circumstances. (Emphasis added.)

This agreement was also highlighted in the March 17, 2005 Presentation, which stated that

"Heartland has committed to purchase a majority of the Preferred Stock for cash and an

exchange of various securities and rights." [Emphasis added]

204.    Defendants knew that investors such as MacKay Shields would rely on these

statements because, if Heartland was willing to purchase C&A's stock, investors would

reasonably believe that Defendants, including Heartland, believed that there was still ample

liquidity and significant value in C&A's business.

205.    In reality, however, Heartland's so-called "commitment" to purchase C&A

preferred stock from Textron was a ruse designed to bolster investor confidence in C&A without

actually obligating Heartland to purchase any shares of the Company. Defendants did not

disclose that, under the terms of the agreement between Textron and Heartland, Heartland had no

obligation to purchase Textron's shares until C&A filed a Form 10-K for 2004 (which it still has

not done). Moreover, Heartland could unilaterally terminate the agreement if C&A did not file a

Form 10-K for 2004 by December 31, 2005, or if C&A experienced an event of bankruptcy or

insolvency. In other words, unbeknownst to MacKay Shields and the market, rather than show

"confidence" in C&A, Heartland was deliberately misrepresenting its supposed "commitment" to

purchase C&A preferred stock.

### March 23, 2005 Presentation

206.    In furtherance of their fraudulent scheme to mislead investors about the true scope

of C&A's financial and business problems, Defendants met with MacKay Shields on March 23,

2005 and encouraged MacKay Shields to purchase additional C&A Notes on behalf of its clients.

At this meeting, Defendants Stockman, Koth and Galante reiterated the positive statements

81

regarding C&A's future prospects and the status of the accounting investigation that were made

in the March 17, 2005 Conference Call and in the accompanying March 17, 2005 Presentation.

These Defendants assured MacKay Shields that the disclosures in the March 17, 2005 press

release were complete and accurate, and that there was no additional materially negative

information about C&A that was yet to be disclosed. Further, they assured MacKay Shields that

C&A had ample liquidity and a strong business and financial outlook, and repeatedly referenced

the supposed agreement by Heartland to purchase Textron's holdings of C&A preferred stock as

proof that Heartland and the other Defendants continued to believe in the financial viability of

C&A. Based on the statements that these defendants made at this meeting, MacKay Shields

understood that they were speaking with the authority and approval of Heartland, C&A and the

other Defendants.

     207.    Defendants knew or recklessly disregarded that these statements were materially

false and misleading. Defendants also knew that MacKay Shields and other investors would rely

on these statements in making their decision whether to purchase C&A Notes. Had MacKay

Shields known that these statements were materially false and misleading, it would not have

purchased C&A Notes on behalf of Plaintiff and the other members of the Class.

     208.    The Criminal Indictment confirms that Defendants' March 23, 2005 presentation

to MacKay Shields was materially false and misleading:

> On March 23, 2005, C&A made a presentation to MacKay Shields, holders
> of C&A's bonds. Defendant Stockman presented the same slides he had
> used during the March 17, 2005 earnings call, which contained the material
> misrepresentations regarding EBITDA and capital expenditures described
> above. In addition, defendant Stockman sought to assure the MacKay
> Shields investors that C&A had sufficient liquidity to meet its needs, when
> he knew that it did not.

Criminal Indictment¶76 (emphasis added).  As explained above, Defendants Koth and

Galante also participated in this presentation and presented to MacKay Shields the

materially false information set forth above.

### March 24, 2005 Press Release

209.    On March 24, 2005, C&A issued a press release (the "March 24, 2005 Press

Release"), which was attached to a Form 8-K filed with the SEC and signed by Defendant Koth.

As stated in the Criminal Indictment, in this press release "C&A repeated its earlier disclosures

concerning the scope of the rebate accounting problem, with the intent of minimizing investors'

concerns about the size of the restatement to C&A's financial statements."  Criminal Indictment¶

81.

### April 4, 2005 Press Release

210.    On April 4, 2005, C&A issued a press release (the "April 4, 2005 Press Release"),

which was attached to a Form 8-K filed with the SEC and signed by Defendant Koth.  The press

release stated "The Company's available liquidity (cash and unutilized commitments under

revolving credit and account receivables facilities) was approximately $81 million at March 31,

2005, as compared with approximately $86 million at December 31, 2004."

211.    This statement was materially false and misleading because (1) C&A had no more

than $12 million in available liquidity as of December 31, 2004; (2) C&A had less than $9

million of available liquidity on March 31, 2005; and (3) it did not disclose that any liquidity

C&A did have was a result of the fraudulent scheme described above.  *See* Criminal Indictment¶

87-88 (explaining that the April 4, 2005 Press Release was materially false and misleading).

212.    In reliance on the materially false and misleading statements set forth above

(including the Company's Form S-4 that was filed on January 27, 2005), MacKay Shields

83

purchased $17,511,000 face value of the 12.875% Notes between April 6, 2005 and May 10, 2005 for over $8.5 million, and $4,455,000 face value of the 10.75% Notes May 10, 2005 and May 11, 2005 for approximately $3 million, for total purchases of $21,966,000 face value of the C&A Notes for over $11.5 million on behalf of Plaintiff and the other members of the Class.

## VIII.  C&A FILES FOR BANKRUPTCY PROTECTION ON MAY 17, 2005

213.    Defendants' scheme finally unraveled just weeks after their last face-to-face meeting with MacKay Shields.

214.    On May 12, 2005—just *one day* after MacKay Shields' final purchase of C&A Notes on behalf of Plaintiff and the Class—the C&A Board unanimously sought Stockman's resignation over concerns that he was misleading the Board.  According to a May 13, 2005 article in the *Detroit Free Press*, a C&A source stated that:

> It was unanimous and it was fast.  Go.  Now.  There seemed to be a pattern of not sharing all of the information with his financial staff and with the board.  The first quarter was worse than he said it would be and the board got hot.

215.    C&A also announced on May 12, 2005 that the Company had effectively burned through its available cash and credit, with just $13.4 million left, that the investigation into the accounting matters was continuing, that the previously disclosed amounts necessary to restate previously reported financial results were likely understated, and that the continuing investigation also was looking into whether the Company issued misleading forecasts for 1Q05 and related matters, as well as other matters that had arisen in the course of the investigation.

216.    The May 12, 2005 announcement confirmed that the March 17, 2005 press release was materially false and misleading and, for the first time, exposed just how severe the problems facing C&A were.  The May 12, 2005 announcement stated:

> The company further commented on the status of the ongoing investigation by the Board's audit committee into the company's accounting for certain

supplier rebates. The company previously reported that it had identified certain accounting for supplier rebates that led to premature or inappropriate revenue recognition or that was inconsistent with relevant accounting standards and the company's policies and practices. <u>While the investigation is ongoing, the audit committee has preliminarily indicated that it believes that the company's previously announced estimated adjustments to reported periods to correct the accounting for these rebates will likely be understated, but it has not yet quantified the extent of this and has not submitted its findings to management for review at this time.</u> In addition to vendor rebates, the audit committee's investigation also is reviewing the company's forecasts for the first quarter of 2005 and related matters, as well as other matters that have arisen in the course of its investigation. The company cannot currently comment upon the timing for completion of, or the ultimate scope or outcome of, the audit committee investigation, the audit or any necessary restatements. As previously discussed, the company has not yet filed its annual report on Form 10-K for 2004 due to this accounting matter and the need for additional time for completion of the 2004 audit and the review of internal controls over financial reporting under Section 404 under Sarbanes-Oxley, and it does not expect to make its first quarter 2005 filing on a timely basis. (Emphasis added.)

217. Five days later, on May 17, 2005, C&A announced that it had sought Chapter 11 bankruptcy protection the previous day in the United States Bankruptcy Court for the Eastern District of Michigan, and warned of significant near-term liquidity problems. On May 25, 2005, the *New York Times* reported in an article entitled "A Reagan Budget Czar Grapples With Investment Woes," that Stockman had turned over control of Heartland to two of his partners, Defendants Leuliette and Tredwell.

218. The market's reaction to this news was dramatic. The value of the C&A Notes dropped precipitously. The price of the 12.875% Notes nose-dived from an offering price of $96.416 down to $3.00, and the price of the 10.75% Notes, which was trading above $90 before the truth about C&A was revealed, dropped to $23.00. Had Defendants been truthful about C&A's operations, finances and financial condition, MacKay Shields would not have purchased the C&A Notes. As a result of Defendants' fraudulent misrepresentations, MacKay Shields' clients, including Plaintiff and the other members of the Class, suffered substantial damages.

## GAAP VIOLATIONS

219.    GAAP are the generally accepted accounting principles recognized by the

accounting profession as the conventions, rules, and procedures necessary to define accepted

accounting practices at a particular time.  GAAP principles are the official standards accepted by

the SEC and promulgated in part by the American Institute of Certified Public Accountants

("AICPA").  GAAP consists of a hierarchy of authoritative literature.  The highest authority is

comprised of Financial Accounting Standards Board ("FASB") Statements of Financial

Accounting Statements ("SFAS"), followed by FASB Interpretations ("FIN"), Accounting

Principles Board Opinions ("APB Opinion"), and AICPA Accounting Research Bulletins

("ARB").  GAAP provides other authoritative pronouncements including, among others, the

FASB Concept Statements ("FASCON").

220.    SEC Regulation S-X (17 C.F.R.§210.4-01(a)(1)) provides that financial

statements filed with the SEC which are not prepared in accordance with GAAP will be

presumed to be false or misleading, despite footnote or other disclosures.

221.    As detailed above, C&A issued materially false financial statements from at least

the fourth quarter 2001 through the third quarter 2003, and made further false statements

regarding its financial performance through May 2005.

222.    By failing to disclose the recurring, "round-trip" transactions between the

Company and Defendant McCallum, described above, C&A violated SFAS No. 57, Related

Party Transactions, which states in relevant part:

> Financial statements shall include disclosures of material related party
> transactions, other than compensation arrangements, expense allowances,
> and other similar items in the ordinary course of business. However,
> disclosure of transactions that are eliminated in the preparation of
> consolidated or combined financial statements is not required in those
> statements.  The disclosures shall include:

a. The nature of the relationship(s) involved;

b. A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;

c. The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; [and]

d. Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

223. C&A's financial statements also violated several general principles of GAAP,

including:

- FASCON No. 1 ¶ 34: "Financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions."

- FASCON No. 1 ¶ 40: "Financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources."

- FASCON No. 1 ¶ 50: "Financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it . . . . To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general."

- FASCON No. 2 ¶ 58-59: "That information should be reliable as well as relevant is a notion that is central to accounting . . . . The reliability of a measure rests on the faithfulness with which it represents what it purports to represent . . . ."

- FASCON No. 2 ¶ 79, 80: Financial statements should be complete and contain all material information necessary for investors and creditors to make informed economic decisions.

- FASCON No. 2¶95, 97: Conservatism in financial reporting should be used as a prudent reaction to uncertainty to ensure that risk is adequately considered. "The best way to avoid the injury to investors that imprudent reporting creates is to try to ensure that what is reported represents what it purports to represent."

- FASCON No. 6¶145: "[R]ecognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities-including matching of costs and revenues, allocation, and amortization is the essence of using accrual accounting to measure performance of entities."

224. The Company's financial statements were not prepared in accordance with these general principles of GAAP because, as described above, the Company had engaged in fraudulent round-trip transactions that served no legitimate business purpose, improperly recognized supplier "rebates" as income, improperly recognized discounts on purchases of capital equipment as "income," manipulated the Company's reported EBITDA, and overstated the Company's carrying values for goodwill.

225. SEC Staff Accounting Bulletin No. 101 ("SAB 101"), <u>Revenue Recognition in Financial Statements</u>, drawing from Regulation S-K, Article 303, and Financial Reporting Release 36, also reiterated the importance of MD&A in financial statements:

> Management's Discussion & Analysis (MD&A) requires a discussion of liquidity, capita] resources, results of operations and other information necessary of a registrant's financial condition, changes in financial condition and results of operations. This includes unusual or infrequent transactions, known trends, or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in Financial Reporting Release 36 that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."

226.    Item 7 of Form 10-K and Item 2 of Form 10-Q, requires the issuer to furnish

information required by Item 303 of Regulation S-K [17 C.F.R. § 229.303]. In discussing

results of operations, Item 303 of Regulation S-K requires the registrant to "[d]escribe any

known trends or uncertainties that have had or that the registrant reasonably expects will have a

material favorable or unfavorable or unfavorable impact on net sales or revenues or income from

continuing operations."

227.    The Instructions to Paragraph 303(a) further state, "[t]he discussion and analysis

shall focus specifically on material events and uncertainties known to management that would

cause reported financial information not to be necessarily indicative of future operating results."

Thus, under these standards, the management of a public corporation must disclose in its periodic

reports filed with the SEC, "known trends or any known demands, commitments, events or

uncertainties" that are reasonably likely to have a material impact on a company's sales

revenues, income or liquidity, or cause previously reported financial information not to be

indicative of future operating results. 17 C.F.R. § 229.303(a)(l)-(3) and Instruction 3.

228.    As described herein, C&A's filings with the SEC during the Class Period failed to

comply with applicable MD&A disclosure requirements because the MD&A in each of these

filings was materially false and misleading as a result of the fraudulent scheme described herein.

## LOSS CAUSATION

229.    Throughout the Class Period, as detailed above, the prices of the C&A Notes were

artificially inflated as a result of Defendants' misrepresentations and omissions regarding the

Company. Following the Company's March 17, 2005 disclosure that the Company would need

to restate its financial results for 2004 and potentially 2003 as a result of improper accounting,

the price of C&A 12.875% Notes fell from $68.75 to $44.50—a decline of 35.3%—and the price

of C&A 10.75% Notes dropped 7.5%. Then, at the time of C&A's announcement on May 12,

2005 that (i) the Company had effectively burned through its available cash and credit, (ii) the

investigation into the accounting was continuing, and (iii) the previously disclosed amounts

necessary to restate previously reported financial results were likely understated, the price of

C&A's 12.875% Notes fell from $28.25 to $7.00—a 75% decline in value—while C&A's

10.75% Notes dropped from $70.5 on May 10, 2005 to $32.875 on May 16, 2005—a decline of

more than 53% over a six day period.

      230.    The declines in the value of C&A Notes following the Company's incomplete and

misleading disclosure in March 2005 and the Company's subsequent announcement in May

2005, and the resulting damages suffered by Plaintiff and the other members of the Class, are

directly attributable to the market's reaction to the disclosure of information that had been

previously misrepresented or concealed by Defendants, and to the market's adjustment of the

Company's securities prices to reflect the newly emerging truth about the Company's financial

condition. Had MacKay Shields known of the material adverse information not disclosed by

Defendants, or been aware of the truth behind Defendants' material misstatements, it would not

have purchased the C&A Notes on behalf of Plaintiff and the other Class members at artificially

inflated prices.

## INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

      231.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false or misleading statements pleaded in

this Complaint. The statements alleged to be false or misleading herein all relate to then-existing

facts and conditions. In addition, to the extent certain of the statements alleged to be false or

misleading may be characterized as forward-looking, they were not adequately identified as

forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and defendants failed to update the those statements which later became inaccurate.

## STATUTE OF LIMITATIONS

232.    The claims asserted herein were properly asserted within the applicable statute of limitations. Specifically, the claims were brought within two years after the discovery of the fraud and within five years of the making of the statements alleged herein to be materially false and misleading. Moreover, the claims asserted herein have been tolled by, and relate back to the date of, the filing of the initial class action complaint in this action on February 5, 2007, as well as the filing of the complaint in *MacKay Shields LLC v. Heartland Industrial Partners, LP., et. al.*, Case No. 05-520229-CZ (State of Michigan, Circuit Court for Wayne County) on July 8, 2005 (the "State Court Action"). Further, following C&A's disclosures stated above, proposed lead counsel for the class conducted a diligent investigation into the facts and circumstances surrounding the fraudulent activity (which investigation included contacting knowledgeable witnesses and drafting and filing the complaint in the State Court Action and the initial class complaint in this action). To the extent that new information regarding the fraud is included in this Complaint, that information was not discovered—and could not have been discovered

through a diligent investigation—until the Criminal Indictment and the SEC Complaint were
released on or about March 26, 2007.

## COUNT I

**Against Defendants Stockman, Stepp, Leuliette, Tredwell, McConnell, Valenti, Galante,
Koth, Krause, Jones, Cosgrove, McCallum, Barnaba, Gougherty and Williams For
Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

233.    Plaintiff repeats and realleges each and every allegation contained above as if
fully set forth herein.

234.    Throughout the Class Period, Stockman, Stepp, Leuliette, Tredwell, McConnell,
Valenti, Galante, Koth, Krause, Jones, Cosgrove, McCallum, Barnaba, Gougherty and Williams
(the "Section 10(b) Defendants"), directly and indirectly, by the use of means and
instrumentalities of interstate commerce, the United States mails and a national securities
exchange, employed a device, scheme and artifice to defraud, made untrue statements of material
fact and omitted to state material facts necessary in order to make the statements made, in the
light of the circumstances under which they were made, not misleading, and engaged in acts,
practices and a course of business which operated as a fraud and deceit upon Plaintiff and the
members of the Class.  The materially false statements and omissions made by the Section 10(b)
Defendants, and/or their role in the fraudulent schemes are set forth above.  The fraudulent
statements alleged above include statements made in face-to-face meetings with MacKay Shields
(including the PPM), statements made in documents provided directly to MacKay Shields,
statements made in documents publicly filed with the SEC (including Form S-3's, Form S-3/A's,
Form S-4's, Form 10-Q's, Form 10-Q/A's, Form 8-K's and accompanying press releases, and
Form 10-K's), statements made on earnings conference calls and other statements as set forth
above, which MacKay Shields relied upon in deciding to purchase C&A Notes on behalf of the
Class.  With respect to the documents filed with the SEC, each of these documents contained

92

materially false and misleading financial information relating to C&A's earnings, revenue,

income, sales and other measures of financial performance, as set forth above. As set forth in the

SEC Complaint "C&A materially overstated its income, or reduced its losses, in its quarterly

reports (Form 10-Q) and annual reports (Form 10-K) for each reporting period from the fourth

quarter of 2001 through the third quarter of 2004." SEC Complaint¶51. The Criminal

Indictment also confirms that "the quarterly and annual reports filed by C&A for the fourth

quarter of 2001 through the third quarter of 2004 included financial statements that reflected . . .

fraudulent adjustments to C&A's expenses and revenue." Criminal Indictment¶92. MacKay

Shields reasonably relied, on behalf of Plaintiff and the Class, on these materially false and

misleading statements.

235.    The Section 10(b) Defendants, as the most senior officers of C&A during the time

when the false and misleading statements were made, are liable as direct participants in all of the

wrongs complained of herein. As described above, during numerous one-on-one meetings with

MacKay Shields' representatives, many of the Section 10(b) Defendants personally made false

and misleading statements regarding C&A's finances and operations, which MacKay Shields

reasonably relied upon when deciding whether to purchase C&A Notes for Plaintiff and the

Class. Moreover, through their positions of control and authority, the Section 10(b) Defendants

were in a position to and did control all of the Company's false and misleading statements and

omissions, including the false and misleading statements contained in C&A's public filings and

press releases as more particularly set forth above. In addition, the false and misleading

statements made in the Company's published documents (including its press releases and

publicly issued financial statements) constitute "group published information," which the Section

10(b) Defendants were responsible for creating. Each of the Section 10(b) Defendants had direct

93

involvement in the daily business of the Company and participated in the preparation and
dissemination of the Company's "group published documents."

236.    As detailed above, the Section 10(b) Defendants had actual knowledge of the
misrepresentations and omissions of material facts set forth herein, or acted with reckless
disregard for the truth in that they failed to ascertain and to disclose such facts, even though such
facts were readily available to them.  The material misrepresentations and/or omissions detailed
above were made knowingly or recklessly and for the purpose and effect of concealing C&A's
operating condition and future business prospects from investors such as MacKay Shields and
supporting the artificially inflated price of the Company's securities.  In addition to the
information set forth above, the scienter of the Section 10(b) Defendants is further established by
the following facts:

      a.    The Criminal Indictment charges Defendants Stockman, Stepp, Cosgrove
and Barnaba with, among other things, securities fraud and violations of Section 10(b)
and Rule 10b-5 in connection with the activities alleged above.

      b.    The SEC Complaint charges Defendants Stockman, Stepp, Jones,
Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams with, among other
things, securities fraud and violations of Section 10(b) and Rule 10b-5 in connection with
the activities alleged above.

      c.    Defendants Galante, Jones, Williams and Gougherty have pled guilty to
criminal violations of various laws arising out of the activities alleged above.  For
instance:

         (i)    Galante pled guilty to, among other things, conspiracy to commit fraud in
the connection with the purchase and sale of securities, making false and

misleading statements to the SEC, and falsifying books and records of C&A. In so doing, Galante, among other things, admitted that he was "aware of the false and misleading statements concerning, among other things, Collins & Aikman's earnings and liquidity being presented to the investing public," and that he "prepared documents in support of the misleading statements that were made to the public investors." Galante Guilty Plea at 14-15.

(ii) Jones pled guilty to conspiracy and obstruction of justice. In so doing, Jones admitted, among other things, that "beginning in approximately 2003 . . . I learned of illegal conduct by [C&A] corporate executives the purpose of which was to disguise the company's true operating performance and financial results. I learned that certain figures for EBITDA, operating income and other financial information had been falsely inflated on the company's books by improperly recognizing cost reductions. . . I and other executives knew that the effect of these transactions . . . was to present a false and misleading picture of the company's true operating performance and financial results." Jones Guilty Plea at 10-11.

(iii) Williams pled guilty to conspiracy. In so doing, Williams admitted, among other things, that he was involved in the falsification of invoices and other records as they related to the fraudulent scheme surrounding GECC's accounts receivables securitization facility, as described above. *See generally* Williams Guilty Plea.

(iv) Gougherty pled guilty to securities fraud, conspiracy to commit securities fraud, and making false statements in SEC filings. In so doing, Gougherty

admitted, among other things, "During 2004 and 2005 I, along with others, engaged in conduct by which Collins & Aikman wrongly included certain supplier rebates as income . . . for certain SEC reporting periods, even though these rebates were contingent on future events or actually for capital equipment purchases and, therefore, they could not be properly included as income for those periods" and that he was "involved in the making of false financial statements that [he] knew would go into documents that were going to be filed with the SEC." Gougherty Guilty Plea at 10-12.

d.     As described above, Defendant McCallum was directly involved with numerous blatantly fraudulent "round-trip" transactions with C&A. McCallum knew or was reckless in not knowing that these transactions were fraudulent and rendered C&A's publicly-filed financial statements materially false and misleading (including the SEC filings that he signed). Nonetheless, McCallum participated in these fraudulent transactions because it enabled him to profit through lucrative business deals with C&A, as described above. Indeed, McCallum had a long history of profiting through his deals with Defendants Stockman and Heartland. According to a March 11, 2004 press release, McCallum was "directly or indirectly" a limited partner in Heartland. Indeed, McCallum and his affiliates received approximately $100.0 million from C&A in 2001 in connection with C&A's purchases of Joan Automotive Industries, Inc. and Western Avenue Dyers, L.P., businesses in which McCallum had a substantial ownership interest. As a result of his close ties to Defendants Stockman and Heartland, as well as his status as a Director of C&A (with whom he conducted numerous business transactions), McCallum had a

special relationship with the Company and had the same access to information as the other corporate insiders.

     e.     According to former employees who worked closely with the Defendants, Stockman and Stepp had "a comprehensive knowledge of each plant's financial results" and were "intimately familiar with each plant's operations and finances."

     f.     According to a press release issued on March 26, 2007 by the USAO:

> Stockman did not have only money at stake: his reputation was on the line as well. In 2003 he told a reporter with the *New York Times* "[C&A's business plan] was my idea; I'm going to stick with it. I'm going to make it happen and make sure it becomes a success." Stockman stuck with it at the cost of the investing public, the financial integrity of the company and the truth.

     g.     CI 1 also stated that C&A management (including Stockman and Stepp) exerted constant pressure on the executives at certain facilities to report financial results that were better than they actually were.

     h.     CI 1 stated that C&A management was "cooking the books" in order to show improving results to the Company's lenders.

     i.     CI 2 stated that Stockman did everything in his power to make C&A's financial results appear better than they actually were. Indeed, CI 2 stated that Stockman improperly manipulated all of the accurate data that plant management provided to him to achieve whatever results he wanted to show to outsiders.

     j.     CI 2 also stated that Stockman participated in the fraud by, among other things, encouraging C&A facilities to classify operating expenses as non-operating for the purpose of increasing the Company's EBITDA.

k.    CI 1 and CI 2 further stated that, by the summer of 2004, Stockman knew

that C&A could not adequately staff its projects, and appeared at two meetings with Ford

to explain why C&A could not have sufficient personnel in attendance.

l.    Stockman and Stepp regularly certified C&A's internal controls pursuant

to Section 302 of the Sarbanes-Oxley Act of 2002.  According to CI 2, however,

PricewaterhouseCoopers reported internal control weaknesses to C&A management

(including Stockman and Stepp) in December 2003.  Further, CI 2 stated that C&A failed

in seven out of eight categories in PricewaterhouseCoopers' review, and these failures,

which included basic internal controls over things like accounts receivables and payables

recognition, were not rectified.

m.    In June 2005, the Section 10(b) Defendants knew or should have known

that GECC had informed C&A's management that it was "gravely concerned" that C&A

was pre-billing certain receivables.  Moreover, the Section 10(b) Defendants knew or

should have known that, when C&A could not find any documentation to verify that

these receivables were valid, GECC demanded an on-site audit of C&A's receivables.

n.    The Section 10(b) Defendants' scienter is further demonstrated by the fact

that, after auditing C&A for only one year, PricewaterhouseCoopers withdrew in the

Summer of 2003 after sending a letter to the Company's management describing certain

"reportable conditions."

o.    Defendants Stockman, Galante, Leuliette, Valenti, Tredwell, McConnell

and Koth also misled investors like MacKay Shields in March 2005 regarding

Heartland's so-called "commitment" to purchase approximately $300 million face value

of C&A's preferred stock from Textron.  In reality, these Defendants knew or should

have known that, under this "commitment," Heartland was under no obligation to

purchase these preferred shares until C&A filed a Form 10-K for 2004 (which it still has

not done), and that Heartland could unilaterally terminate the agreement if C&A

experienced an event of bankruptcy or insolvency.

p.      As detailed above, the Section 10(b) Defendants also had a motive and

opportunity to commit fraud. The fraudulent scheme allowed C&A to avoid bankruptcy

for years and thus preserve the massive investment made by Heartland (of which

Defendants Stockman, Stepp, Galanti, Tredwell, McConnell, Leuliette and Valenti were

senior directors, partners and/or employees). Accordingly, if these Defendants were to

reveal C&A's problems, they stood to lose tens of millions of dollars in connection with

their personal ownership of C&A stock, as well as Heartland's ownership of

approximately 41% of C&A.

q.      These Defendants' senior positions at Heartland also provided them with a

motive and opportunity to commit fraud, as Heartland received lucrative consulting fees,

totaling more than $44 million between 2001 and 2004. Moreover, approximately 30%

of Heartland's investment portfolio was dedicated to C&A.

r.      The remaining Section 10(b) Defendants also had a motive and

opportunity to commit fraud, as, on information and belief, they personally owned shares

of C&A stock and/or participated in C&A's employee stock option plan, pursuant to

which 68,218 options to purchase shares of restricted C&A stock were issued to

Company employees and executive officers on June 29, 2004. These options were

scheduled to vest in three equal annual installments on June 29, 2005, June 29, 2006 and

June 29, 2007. Accordingly, the Section 10(b) Defendants knew that a bankruptcy filing

by C&A would render these stock holdings and restricted stock options essentially

worthless, endanger their lucrative positions at C&A (and, for certain Section 10(b)

Defendants, endanger their lucrative positions at Heartland—which was heavily invested

in C&A), and subject them to personal liability regarding the false and misleading

financial statements that he signed and certified.

237.    The scienter of Defendants Leuliette, Tredwell, McConnell and Valenti is further

demonstrated by the fact that they were each Senior Members and Directors of Heartland, as well

as Directors of C&A. As Directors of both Heartland and C&A, these Defendants were part of a

small group of insiders who effectively owned and controlled C&A. They worked closely with

Defendants Stockman, Stepp and Galante (also members of Heartland) both at Heartland and in

connection with the management of C&A. By virtue of their status as directors of both C&A and

Heartland, these Defendants had a special relationship with the Company, which enabled them to

have access to the same information as other corporate insiders. Indeed, as the consummate

insiders, these Defendants had unfettered access to C&A's books and records and an undisputed

duty to monitor the information within their control in order to ensure that the Company's

financial statements were accurate.

238.    Despite their positions of seniority and control, Defendants Leuliette, Tredwell,

McConnell and Valenti knowingly or recklessly permitted the fraudulent scheme to continue

unabated for years. In doing so, each of these insiders either knew about, or was willfully blind

toward, a host of red flags concerning the fraudulent scheme. Indeed, as the Criminal Indictment

and the SEC Complaint make clear, the fraudulent scheme could have been discovered from a

review of the most basic Company documents—documents which these Defendants had access

to and a duty to monitor. The Criminal Indictment explains that:

at the close of each month and each quarter of C&A's fiscal year, employees in C&A's finance and accounting departments collected and summarized information reflecting C&A's operating performance and financial results for the particular period in question. This information was reflected in various financial statements and reports . . .

at all times relevant to this Indictment, C&A tracked its sales, EBITDA, operating income, capital expenditures and other financial metrics on a monthly basis through the use of internal reports . . .

At the corporate level, the results from each division were aggregated and combined with the home office results . . . the consolidated reports tracked actual results and compared them to forecasted results.

Criminal Indictment¶15-17 (emphasis added). The Criminal Indictment also confirms that

certain Defendants "received weekly written reports . . . which included updated information

concerning rebate transactions. These weekly updates often referred to the fact that future

business was being promised to suppliers in exchange for rebates being booked immediately

[*i.e.,* the fraudulent "rebate" scheme described above]." *Id.*¶39.

239.    Thus, readily-available internal C&A reports tracked on a weekly, monthly and

quarterly basis C&A's most critical financial metrics—including the EBITDA, operating income

and capital expenditure numbers that MacKay Shields and other investors relied upon (and

which were falsely stated in C&A's public filings). These reports also compared C&A's actual

results to its forecasted results. Had any of Defendants Leuliette, Tredwell, McConnell and

Valenti (or the other Defendants) bothered to review these reports, it would have been readily

apparent to them that C&A's publicly reported financial information was materially false and

misleading. For instance, it would have been readily apparent from the face of the reports that

C&A's actual results were falling so far behind its forecasted results that C&A's financial

statements were obviously falsified. Moreover, the Criminal Indictment makes clear that these

documents were available to the Defendants and that Defendant Stockman held numerous

meetings where these reports were discussed: "Stockman regularly met with C&A employees to discuss the financial results and projections reflected in the various documents presented during these meetings." Defendants Leuliette, Tredwell, McConnell and Valenti either reviewed these reports and/or attended these meetings (which would have alerted them to the fraud) or recklessly failed to do so in abdication of their duties.

240.    Defendants Leuliette, Tredwell, McConnell and Valenti also either knew, or were reckless in not knowing, that Defendant Stockman's statements on March 17, 2005 were materially false and misleading. As stated in the Criminal Indictment, on March 17, 2005, Stockman told investors that C&A's "EBITDA would be between $65-75 million for the first quarter of 2005, even though the most current financial information for the company, including the actual results for January and February, showed that EBITDA for the first quarter would only be roughly half that figure." *Id.* ¶71 (emphasis added). Had these Defendants bothered to consult the Company's actual results for January and February, as they should have done, it would have been obvious to them that Stockman's statements on March 17, 2005 were false and misleading. The failure of these Defendants (who were also partners in Heartland) to review these most basic Company document was egregiously reckless, particularly given that, Stockman also disclosed on March 17, 2005 that Heartland (of which these Defendants were Directors) was purportedly "committed" to purchase $300 million in additional C&A stock. As set forth above, this statement of Heartland's "commitment" was itself materially misleading (as each of Defendants Leuliette, Tredwell, McConnell and Valenti also knew or should have known).

241.    Plaintiff and the other members of the Class, through MacKay Shields, relied upon the false and misleading statements alleged above in purchasing C&A Notes at artificially inflated prices.

102

242.    As a direct and proximate cause of the wrongful conduct described herein, Plaintiff and the other members of the Class suffered damages in connection with their purchases of C&A Notes through MacKay Shields.  Had MacKay Shields known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, it would not have purchased C&A Notes at artificially inflated prices on behalf of Plaintiff and the other members of the Class.

243.    By virtue of the foregoing, the Section 10(b) Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and, therefore, are liable to Plaintiff and the members of the Class, each of whom has been damaged as a result of such violations.

### COUNT II

**For Violations of Section 20(a) of the Exchange Act**
**Against Defendants Heartland, Stockman, Stepp, Leuliette, Tredwell,**
**McConnell, Valenti, Galante, Koth, Cosgrove, and McCallum**

244.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

245.    This claim is asserted against Defendants Heartland, Stockman, Stepp, Leuiliette, Tredwell, McConnell, Valenti, Galante, Koth, Cosgrove, and McCallum (collectively, the "Section 20(a) Defendants").  Throughout the Class Period, the Section 20(a) Defendants, by virtue of their positions, stock ownership and/or specific acts described above, were controlling persons of C&A within the meaning of Section 20(a) of the Exchange Act.

246.    As alleged herein, C&A violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase or sale of securities and by participating in a fraudulent scheme and course of business or conduct, all in connection with the purchase or sale of securities.  This fraudulent conduct was undertaken with scienter because C&A is charged with the knowledge and scienter of its senior

103

directors, officers and employees (including Stockman and the Defendants who have entered

Guilty Pleas) who knew of or recklessly disregarded the falsity of the Company's statements and

of the fraudulent nature of its scheme. But for the fact that C&A has filed for bankruptcy

protection, the Company would be named as a Defendant on the Section 10(b) claim alleged

herein.

247.    The Section 20(a) Defendants had the power to, and did, directly and indirectly,

exercise control over C&A, including the content and dissemination of statements which

Plaintiff alleges are false and misleading. The Section 20(a) Defendants were each provided

with and/or had access to reports, filings, press releases and other statements alleged to be

misleading prior to and/or shortly after they were issued and had the ability to prevent the

issuance or correct the statements. Defendants had direct and supervisory involvement in the

day-to-day operations of the Company and induced C&A to engage in the acts constituting

violations of the federal securities laws, as set forth in Count One above.

248.    Defendant Stockman exercised control over the Company through his positions as

Chief Executive and Chairman of the Board of Directors, membership on the Company's

Compensation Committee, and his role as (i) a Managing Member of Heartland, (ii) a Senior

Managing Director of Heartland, and (iii) the "Buyout Partner" of Heartland. In the PPM, C&A

admitted that Stockman was central to C&A's operations, and the loss of his services could

materially and adversely affect the Company. Additionally, as alleged above, Stockman had the

power to control the Company's public statements, and exercised such control throughout the

Class Period, both by personally making false and misleading statements to MacKay Shields

regarding C&A's finances and operations during one-on-one meetings, and by directly

disseminating false information to the market or causing such information to be disseminated

through press releases and analyst conference calls. Finally, Stockman exercised control over C&A's financial reporting through his management responsibilities and his certification of the Company's fraudulent financial statements.

249.    Defendant Stepp exercised control over the Company through his positions as the Vice Chairman of C&A's Board and the Company's CFO until October 2004 and as a Senior Managing Director of Heartland. He controlled the contents of C&A's public financial statements and exercised further influence through his certification of those statements. Additionally, as alleged above, Stepp had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control throughout the Class Period by personally making false and misleading statements to MacKay Shields regarding C&A's finances and operations during one-on-one meetings, and by making and participating in various statements about the Company's performance to the market, both through press releases and analyst conference calls.

250.    Defendant Koth exercised control over the Company through his positions as the Senior Vice President and CFO of the Company since October 2004, and previously was C&A's Vice President, Finance & Controller, and head of tax since May 2004. Additionally, as alleged above, Koth had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control throughout the Class Period by personally making false and misleading statements to MacKay Shields regarding C&A's finances and operations during one-on-one meetings, and by participating in various statements about the Company's performance, both, through press releases and analyst conference calls.

251.    Defendant Krause exercised control over the Company through his position as Senior Vice President, Finance and Administration of the Company since October 2004, and his

position as the Company's Vice President and Treasurer from October 2002 through September 2004. Additionally, as alleged above, Krause had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control during the Class Period through his involvement in preparing the Company's press releases, quarterly reports and annual reports, each of which was relied upon by MacKay Shields.

252.    Defendant Cosgrove exercised control over the Company through his senior positions as Vice President of Finance, Vice President for Financial Planning and Analysis, and Senior Vice President, Financial Planning and control. Additionally, as alleged above, Cosgrove had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control during the Class Period through his involvement in preparing the Company's press releases, quarterly reports and annual reports, each of which was relied upon by MacKay Shields.

253.    Defendant McCallum exercised control over the Company through his position as a Director and significant shareholder of C&A. Further, as alleged above, McCallum was a limited partner in Heartland and had engaged in numerous fraudulent transactions with C&A (which had personally enriched McCallum by many millions of dollars). McCallum's close relationship with Defendants Stockman and Heartland enabled him to exercise dominion and control over C&A for his own personal gain.

254.    Defendant Galante exercised control over the Company through his position as Vice President and Treasurer of C&A since October 2004, and his position as Vice President of Heartland. Additionally, as alleged above, Galante had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control throughout the Class Period by personally making false and misleading statements to MacKay

106

Shields regarding C&A's finances and operations during one-on-one meetings, and through his

involvement in preparing C&A's press releases, quarterly reports and annual reports, each of

which was relied upon by MacKay Shields.

255.    Defendants Tredwell, Leuliette, McConnell and Valenti exercised control over the

Company through their positions as Directors of C&A and Senior Managing Directors of

Heartland, which owned approximately 41% of C&A.  Additionally, as alleged above, Tredwell,

Leuliette, McConnell and Valenti had the power to control the Company's public statements

about C&A's finances and operations, and exercised such control throughout the Class Period by

reviewing and approving the false and misleading information that certain Section 10(b)

Defendants provided to MacKay Shields during face-to-face meetings, and through their

involvement in preparing the Company's press releases, quarterly reports and annual reports,

each of which was relied upon by MacKay Shields.

256.    Defendant Heartland controlled C&A throughout the Class Period.  Specifically,

as of January 1, 2005, Heartland owned approximately 41% of the Company.  In addition to the

facts set forth above, Heartland's control over C&A is demonstrated by the following:

a.      There were six members of C&A's eleven-member Board that were

affiliated with Heartland.

b.      Stockman, the Chairman of the C&A Board and the Company's CEO, and

Stepp, the Vice Chairman of the C&A Board and the Company's CFO, both were Senior

Managing Directors of Heartland LP.

c.      Galante, a Vice President of Heartland, served as C&A's Treasurer.

d.      In the PPM provided directly to MacKay Shields by Defendants and on

which MacKay Shields relied, C&A expressly stated that "[w]e are controlled by

107

Heartland," and further disclosed that Heartland provided C&A with valuable strategic, operational and financial guidance, and that the loss of such guidance also could have a material adverse effect upon the Company.

   e.  When Stockman, Stepp and Galante met with MacKay Shields, they expressly stated that they had authority to speak on behalf of Heartland.

   f.  C&A's Form 10-K for the year ended 2001 stated "During the first quarter of 2001, Heartland acquired a controlling interest in the Company."

   g.  C&A's April 20, 2001 Proxy statement on Form DEF 14A stated "As of March 15, 2001, Heartland . . . beneficially owned or has the right to vote in the aggregate approximately 91% of the outstanding Common Stock."

   h.  Heartland regularly forced C&A to enter into transactions that enriched Heartland. For instance, in addition to the multi-millions of dollars in management fees set forth above, C&A's Form 10-K for the year ended 2001 stated that C&A "has also agreed to pay [to Heartland] a fee of 1% of the total enterprise value of certain acquisitions and dispositions . . . a fee of $12.5 million was paid by the company to Heartland as a result of [Heartland's] advisory services in connection with the TAC-Trim acquisition."

   i.  In 2001, Heartland caused C&A to acquire Becker Group LLC, which was owned directly or indirectly by Thomas Becker, who, according to press reports, was a Heartland limited partner. Becker benefited immensely from this transaction, realizing in excess of $18 million.

   257.  Accordingly, throughout the Class Period, Heartland exercised domination and control over facet of C&A's business and operations.

258.    The Section 20(a) Defendants culpably participated in the matters alleged herein because, among other things, they knew, or were reckless in not knowing, that the statements set forth above were materially false and misleading, or omitted material information.  Facts giving rise to the Section 20(a) Defendants' culpable participation are set forth in detail above.  In addition to those facts, Defendant Heartland culpably participated in the matters alleged herein by virtue of Defendant Stockman (Heartland's founding partner)'s role in designing, orchestrating and carrying out the fraudulent schemes set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

Determining this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

A.    Awarding Plaintiff and the members of the Class compensatory damages;

B.    Awarding Plaintiff and the members of the Class pre-judgment interest and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and costs;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the applicable federal statutory provisions, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure to assure that the Class has an effective remedy; and

E.    Awarding such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
& GROSSMANN, LLP

By: ___/s/ Steven B. Singer_____
MAX W. BERGER
STEVEN B. SINGER
JOHN C. BROWNE
JEREMY P. ROBINSON
*Counsel for Plaintiff*
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

MORGANROTH & MORGANROTH, PLLC
MAYER MORGANROTH (P17966)
JEFFREY B. MORGANROTH (P41670)
*Local Counsel for Plaintiff*
3000 Town Center, Suite 1500
Southfield, MI 48075
(248) 355-3084

Dated: May 4, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2007, I electronically filed Plaintiff's Amended Class Action Complaint and Demand for Jury Trial with the Clerk of the Court using the ECF system, which will send notification of such filings to those parties registered with the ECF system.

In addition, I hereby certify that a copy Plaintiff's Amended Class Action Complaint and Demand for Jury Trial will also be sent by United States Postal Service and email to the parties listed below:

Lea Haber Kuck
Jeffrey S. Geier
**Skadden, Arps, Slate, Meagher & Flom LLP**
Four Times Square
New York, New York 10036
Tel: (212) 735-2978
Fax: (212) 735-2000/1

Michael Joseph
Joseph Click
**Blank Rome LLP**
Watergate
600 New Hampshire Avenue NW
Washington, DC 20037
Tel: (202) 772-5800
Fax: (202) 772-5858

Michael Shapiro
Gerald Griffin
**Carter Ledyard & Milburn LLP**
2 Wall Street
New York, NY 10005
Tel: (212) 238-8676
Fax: (212) 732-3232

Gandolfo V. DiBlasi
David E. Swarts
**Sullivan & Cromwell**
125 Broad Street
New York, NY 10004
Tel: (212) 558-4000
Fax: (212) 558-3588

Andrew B. Weissman
**Wilmer Cutler Pickering Hale and Dorr LLP**
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 663-6612
Fax: (202) 663-6363

Charles A. Stillman
Scott M. Himes
**Stillman, Friedman & Shechtman, P.C.**
425 Park Avenue
New York, NY 10022
Tel: (212) 223-0200
Fax: (212) 223-1942

Thomas G. McNeill (P36895)
**Dickinson Wright, PLLC**
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3500

Further, the following parties will be served pursuant to the Federal Rules of Civil Procedure:

Paul C. Barnaba
David R. Cosgrove
Thomas V. Gougherty
Gerald E. Jones
Elkin B. McCallum
Christopher M. Williams

MAX W. BERGER
STEVEN B. SINGER
GERALD H. SILK
JOHN C. BROWNE
STEPHEN W. TOUNTAS
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
Attorneys for Plaintiff
(Pro Hac Vice Motions To Be Filed)
1285 Avenue of the Americas, 38th Floor
New York, New York  10019
212-554-1400

/s/ Jeffrey B. Morganroth
MAYER MORGANROTH
MORGANROTH & MORGANROTH, PLLC
Local Counsel for Plaintiff
3000 Town Center, Suite 1500
Southfield, MI  48075
(248) 355-3084
Email: jmorganroth@morganrothlaw.com
[P17966]

2

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

K. J. EGELSTON, individually and on behalf
of all others similarly situated,

       Plaintiff,

v.                          Case No.  06-13555

HEARTLAND INDUSTRIAL PARTNERS, L.P., a    Honorable Arthur J. Tarnow
Delaware limited liability partnership,
HEARTLAND INDUSTRIAL ASSOCIATES,
L.L.C., a Delaware limited company, DAVID
A. STOCKMAN, J. MICHAEL STEPP, and
BRYCE M. KOTH,

       Defendants.


MAINSTAY HIGH YIELD CORPORATE BOND
FUND, individually and on behalf of all
others similarly situated,

       Plaintiff,

v.                          Case No.  07-10542

HEARTLAND INDUSTRIAL PARTNERS, L.P.,    Honorable Arthur J. Tarnow
HEARTLAND INDUSTRIAL ASSOCIATES,
L.L.C., DAVID A. STOCKMAN, J. MICHAEL
STEPP, TIMOTHY D. LEULIETTE, DANIEL P.
TREDWELL, W. GERALD MCCONNELL,
SAMUEL VALENTI, III, JOHN A. GALANTE,
BRYCE M. KOTH, ROBERT KRAUSE, GERALD
E. JONES, DAVID R. COSGROVE, ELKIN B.
MCCALLUM, PAUL C. BARNABA, THOMAS
V. GOUGHERTY, and CHRISTOPHER M.
WILLIAMS,

       Defendants.
_____/

**ORDER DENYING MOTIONS TO DISMISS [32 IN 06-13555, 33, 35; 41 IN 07-10542, 43, 45, 48,
51] ;
GRANTING MOTIONS TO DISMISS [36 IN 07-10542, 37, 46];
DENYING IN PART AND GRANTING IN PART MOTIONS TO DISMISS [34 IN 06-13555; 40 IN 07-
10542, 42, 50];
AND DENYING AS MOOT MOTION TO DISMISS [47]**

1

Before the Court are the motions to dismiss filed by all the defendants, except for Galante and Jones. These matters came on for a hearing on March 18, 2008.

For the reasons stated on the record, with regard to 06-13555,

Heartland Industrial Partners and Heartland Industrial Associates' Motion to dismiss is DENIED;

Stepp's Motion to dismiss is DENIED;

Koth's Motion to dismiss is DENIED IN PART as to the primary violation and GRANTED IN PART as to the § 20(a) violation;

And Stockman's Motion to dismiss is DENIED.

With regard to 07-10542,

Williams's Motion to dismiss is GRANTED;

Gougherty's Motion to dismiss is GRANTED;

Leuliette's Motion to dismiss is GRANTED IN PART as to the primary violation and DENIED IN PART as to the § 20(a) violation;

Heartland Industrial Partners and Heartland Industrial Associates' Motion to dismiss is DENIED;

Tredwell, McConnell, and Valenti's Motion to dismiss is GRANTED IN PART as to the primary violation and DENIED IN PART as to the § 20(a)

2

A-117

violation;

McCallum's Motion to dismiss is DENIED;

Cosgrove's Motion to dismiss is DENIED;

Barnaba's Motion to dismiss is GRANTED;

Stepp's Motion to dismiss is DENIED;

Koth and Krause's Motion to dismiss is GRANTED IN PART as to

Krause and as to Koth's § 20(a) violation, and DENIED IN PART as to

Koth's primary violation;

And Stockman's Amended Motion to dismiss is DENIED.  His

originally filed motion to dismiss, docketed as entry 47, is DENIED AS

MOOT.

SO ORDERED.


S/ARTHUR J. TARNOW
Arthur J. Tarnow
United States District Judge

Dated:  March 19, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on
March 19, 2008, by electronic and/or ordinary mail.

S/V. Sims for THERESA E. TAYLOR
Case Manager

A-118

# EXHIBIT C

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington D.C. 20549

---

# Form 10-Q/A

## (Amendment No. 1)

(Mark One)

☑        **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2004**

or

☐        **TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission file number 1-10218**

---

# Collins & Aikman Corporation

*(Exact name of registrant, as specified in its charter)*

| **DELAWARE** | **13-3489233** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |

**250 Stephenson Highway
Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**(248) 824-2500**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☐        No ☑.

A-120

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).    Yes ☑        No ☐.

As of October 31, 2004 the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

### WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins and Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to, the Securities and Exchange Commission.

The Company's Code of Business Conduct is available free of charge through the Company's internet website. Any amendments to the Company's Code of Business Conduct and any waivers of the Code of Business Conduct involving executive officers or directors of the Company will also be made available on the Company's internet website. Printed copies of the Company's Code of Business Conduct are also available free of charge to any shareholder upon request to: Corporate Secretary, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, MI 48083.

Table of Contents

### EXPLANATORY NOTE

This amendment on Form 10-Q/A amends and restates the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2004, as initially filed with the Securities and Exchange Commission on November 9, 2004.

This amendment on Form 10-Q/A amends Item 2 of the original Form 10-Q to correct a typographical error regarding significant amortization requirements in the discussion of the Company's liquidity and capital resources in Item 2 of such Form 10-Q. The following is the corrected version of the sentence in Item 2: *"As a result, the Company has greatly improved its financial flexibility and liquidity and has no significant amortization requirements until June 2010."*

No other information in the original Form 10-Q is hereby amended.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**FORM 10-Q QUARTERLY REPORT INDEX**

|  |  | Page |
|---|---|---|
| **PART I** | **FINANCIAL INFORMATION** |  |
| Item 1. | Financial Statements | 1 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 32 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 45 |
| Item 4. | Controls and Procedures | 46 |
| **PART II** | **OTHER INFORMATION** |  |
| Item 1. | Legal Proceedings | 47 |
| Item 6. | Exhibits and Reports on Form 8-K | 48 |
| Signature |  | 50 |
| Computation of Earnings Per Share |  |  |
| Computation of Ratio of Earnings to Fixed Charges |  |  |
| Section 302 Certification |  |  |
| Section 302 Certification |  |  |
| Section 906 Certification |  |  |

Table of Contents

# PART I — FINANCIAL INFORMATION

Item 1.   *Financial Statements*

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS

| | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2004 | September 30, 2003 | September 30, 2004 | September 30, 2003 |
| | (Unaudited) (in millions, except for per share data) | | | |
| Net sales | $864.8 | $902.2 | $2,967.5 | $2,970.8 |
| Cost of goods sold | 800.8 | 812.1 | 2,687.7 | 2,658.3 |
| Gross profit | 64.0 | 90.1 | 279.8 | 312.5 |
| Selling, general and administrative expenses | 35.2 | 57.7 | 144.7 | 193.0 |
| Restructuring charge | 9.0 | 21.9 | 28.9 | 26.8 |
| Impairment of long-lived assets | 10.3 | 2.2 | 40.7 | 21.1 |
| Operating income | 9.5 | 8.3 | 65.5 | 71.6 |
| Interest expense | 46.9 | 37.8 | 127.4 | 111.3 |
| Interest expense from subsidiary preferred stock dividends | 10.5 | 9.2 | 30.5 | 22.4 |
| Interest expense from subsidiary preferred stock accretion | 0.6 | 0.4 | 1.6 | 4.8 |
| Loss on sale of receivables | 2.4 | 1.8 | 7.2 | 4.5 |
| Loss on early extinguishment of debt | 18.8 | — | 20.3 | — |
| Other expense (income), net | (0.7) | (0.2) | 4.1 | (23.9) |
| Loss from continuing operations before income taxes | (69.0) | (40.7) | (125.6) | (47.5) |
| Income tax expense (benefit) | (13.4) | (8.6) | (17.0) | 0.1 |
| Net loss | $(55.6) | $(32.1) | $ (108.6) | $   (47.6) |
| Net loss per basic and diluted common share | $(0.67) | $(0.38) | $   (1.30) | $   (0.57) |
| Average common shares outstanding: Basic and diluted | 83.6 | 83.6 | 83.6 | 83.6 |

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

1

Table of Contents

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## CONDENSED CONSOLIDATED BALANCE SHEETS

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
|  | (Unaudited) | |
|  | (in millions) | |
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 3.5 | $ 13.2 |
| Accounts and other receivables, net of allowances of $6.4 and $9.2 | 255.1 | 257.3 |
| Inventories | 178.8 | 169.4 |
| Other | 217.1 | 212.2 |
| Total current assets | 654.5 | 652.1 |
| Property, plant and equipment, net | 806.0 | 834.1 |
| Deferred tax assets | 206.0 | 178.1 |
| Goodwill | 1,378.5 | 1,363.1 |
| Intangible assets, net | 45.7 | 66.9 |
| Other assets | 106.0 | 96.9 |
| | $3,196.7 | $3,191.2 |
| **LIABILITIES AND COMMON STOCKHOLDERS' EQUITY** | | |
| Current Liabilities: | | |
| Short-term borrowings | $ 25.3 | $ 16.0 |
| Current maturities of long-term debt and capital lease obligations | 8.5 | 31.5 |
| Accounts payable | 636.3 | 638.9 |
| Accrued expenses | 225.1 | 238.9 |
| Total current liabilities | 895.2 | 925.3 |
| Long-term debt and capital lease obligations | 1,361.2 | 1,237.7 |
| Mandatorily redeemable preferred stock of subsidiary | 193.3 | 161.2 |
| Other, including pensions and postretirement benefit obligation | 404.6 | 423.4 |
| Commitments and contingencies (Note 15) | | |
| Minority interest in consolidated subsidiary | 2.3 | 3.3 |
| Total liabilities | 2,856.6 | 2,750.9 |
| Common stock ($0.01 par value, 300.0 shares authorized, 83.6 shares issued and outstanding at September 30, 2004 and December 31, 2003) | 0.8 | 0.8 |
| Other paid-in capital | 1,282.3 | 1,282.3 |
| Accumulated deficit | (938.7) | (830.1) |
| Accumulated other comprehensive loss | (4.3) | (12.7) |
| Total common stockholders' equity | 340.1 | 440.3 |
| | $3,196.7 | $3,191.2 |

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

2

Table of Contents

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOW

|  | Nine Months Ended September 30, | |
| --- | :---: | :---: |
|  | 2004 | 2003 |
|  | (Unaudited) (in millions) | |
| **OPERATING ACTIVITIES** | | |
| Net loss | $(108.6) | $ (47.6) |
| Adjustments to derive cash flow provided by (used in) operating activities: | | |
| Impairment of long lived assets | 40.7 | 21.1 |
| Deferred income tax benefit | (24.1) | (4.9) |
| Subsidiary preferred stock requirements | 32.1 | 27.2 |
| Depreciation | 101.6 | 83.7 |
| Amortization of other assets | 11.1 | 17.5 |
| Gain on curtailment of postretirement benefit plans other than pensions | (9.4) | — |
| Loss on early extinguishment of debt | 20.3 | — |
| Loss (gain) on sale of property, plant and equipment | 2.5 | (2.6) |
| Changes in assets and liabilities: | | |
| Increase (decrease) in postretirement benefit obligations | (4.6) | 6.6 |
| Decrease (increase) in net customer funded tooling | (9.0) | 7.5 |
| Decrease (increase) in accounts and other receivables | (49.0) | 22.1 |
| Proceeds from (reduction of) participating interests in accounts receivable, net of redemptions | 86.9 | (30.8) |
| Increase (decrease) in accounts receivable factored | (35.7) | 43.0 |
| Increase in inventories | (9.4) | (15.4) |
| Increase (decrease) in accounts payable | (2.6) | 9.5 |
| Increase in interest payable | 9.4 | 28.6 |
| Other, net | (61.1) | (121.5) |
| Net cash provided by (used in) operating activities | (8.9) | 44.0 |
| **INVESTING ACTIVITIES** | | |
| Additions to property, plant and equipment and other non-current assets | (151.3) | (119.9) |
| Sales of property, plant and equipment | 60.4 | 15.2 |
| Payments for acquisitions and related costs, net of cash acquired | (3.2) | (37.8) |
| Net cash used in investing activities | (94.1) | (142.5) |
| **FINANCING ACTIVITIES** | | |
| Issuance of long-term debt | 848.9 | |
| Repayment of long-term debt and capital lease obligations | (802.6) | (22.4) |
| Payments for debt issuance costs | (15.6) | — |
| Net borrowings on revolving credit facilities | 53.1 | 58.5 |
| Increase in short-term borrowings | 8.9 | 2.1 |
| Net cash provided by financing activities | 92.7 | 38.2 |
| Effect of exchange rate changes on cash | 0.6 | 1.5 |
| Net decrease in cash and cash equivalents | (9.7) | (58.8) |

A-127

| | | | | |
|---|---|---|---|---|
| Cash and cash equivalents at beginning of period | | 13.2 | | 81.3 |
| Cash and cash equivalents at end of period | $ | 3.5 | $ | 22.5 |

Supplementary information:

| | | | | |
|---|---|---|---|---|
| Taxes paid | $ | 7.6 | $ | 18.2 |
| Interest paid | $ | 106.6 | $ | 73.1 |
| Capital lease obligations incurred | $ | 1.1 | $ | 1.9 |

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

3

A-128

Table of Contents

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)

**1.  Organization**

Collins & Aikman Corporation (the *"Company"*) is a Delaware corporation, headquartered in Troy, Michigan. The Company conducts all of its operating activities through its wholly owned Collins & Aikman Products Co. (*"Products"*) subsidiary. The Company is a global leader in design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems. The Company changed the composition of its reportable segments beginning January 1, 2003 and further redefined the segments July 1, 2003 to reflect organizational changes and restated prior period segment data to be comparable. The Company operates through three segments: U.S. and Mexico Plastics, International Plastics and Global Soft Trim.

**2.  Summary of Significant Accounting Policies**

**    a.     Basis of Presentation**

The consolidated financial statements include the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments necessary for a fair presentation of financial position and results of operations. All significant intercompany items have been eliminated in the preparation of the consolidated financial statements. Certain prior quarter and prior year items have been reclassified to conform to the current quarter and fiscal 2004 presentation. Specifically, for the third quarter and nine months ending 2004, the Company reclassified $4.2 million from cost of goods sold to selling, general and administrative expense. In addition, for the third quarter and nine months ending 2003, the Company reclassified $5.4 million and $17.1 million, respectively, in facility lease costs from selling, general, and administrative expenses to cost of goods sold. Results of operations for interim periods are not necessarily indicative of results for the full year. The accompanying consolidated financial statements and footnotes should be read in conjunction with the Company's 2003 Annual Report on Form 10-K.

**    b.     Stock-Based Compensation**

Statement of Financial Accounting Standards (*"SFAS"*) No. 148, *"Accounting for Stock-Based Compensation — Transition and Disclosure,"* amended SFAS No. 123, *"Accounting for Stock-Based Compensation,"* to provide alternative methods of transition for a voluntary change to the fair value based method of accounting for stock based employee compensation and amends the required disclosures. SFAS No. 123 encourages companies to adopt the fair value method for compensation expense recognition related to employee stock options. The accounting requirements of Accounting Principles Board Opinion (*"APB"*) No. 25, *"Accounting for Stock Issued to Employees"* use the intrinsic value method in determining compensation expense, which represents the excess of the market price of the stock over the exercise price on the measurement date. The Company has elected to continue to utilize the accounting provisions of APB No. 25 for stock options and is required to provide pro forma disclosures of net income and earnings per share had the Company adopted the fair value method for recognition purposes.

In June 2004, the Compensation Committee of the Board of Directors approved a Voluntary Stock Option Exchange Program (*"Program"*). The Company offered option holders of grants under the 2002 Employee Stock Option Plan (*"Plan"*) the opportunity to participate in the Program and exchange all of their existing $8.00 options for a combination of restricted stock units and stock options. The Program provided one restricted stock unit for every 50 stock options exchanged. Additionally, participants will be provided 98 options for every 100 options exchanged to be priced at the then market closing price no earlier than December 31, 2004. On June 29, 2004, 3.4 million options were exchanged, and the Company awarded 68,218 shares of restricted stock units. The restricted stock units vest in three equal annual installments on June 29, 2005, June 29, 2006 and June 29, 2007. The fair value of the restricted shares is amortized ratably over the vesting period. Compensation expense of $0.03 million was recognized in the restricted stock for the quarter ended September 30, 2004.

**Table of Contents**

If we accounted for all stock-based compensation using the fair value recognition of SFAS No. 123 and related amendments, our net loss and basic and diluted earnings per share would have been as follows (in millions, except per share amounts):

| | Quarter Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | September 30, 2004 | September 30, 2003 | September 30, 2004 | September 30, 2003 |
| Net loss attributable to common shareholders: | | | | |
| As reported | $(55.6) | $(32.1) | $(108.6) | $(47.6) |
| Total employee stock based compensation expense determined under fair value based method for all awards, net of tax | (0.7) | (1.5) | (2.5) | (4.4) |
| Pro forma, net loss | $(56.3) | $(33.6) | $(111.1) | $(52.0) |
| Basic and diluted EPS: | | | | |
| As reported | $(0.67) | $(0.38) | $ (1.30) | $(0.57) |
| Pro forma | $(0.67) | $(0.40) | $ (1.33) | $(0.62) |

For the above information, the fair value of each option grant was estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions used for grants:

| | September 30, 2004 | September 30, 2003 |
| --- | --- | --- |
| Weighted average expected volatility | 81.29% | 77.50% |
| Expected lives | 7 years | 7 years |
| Weighted average risk free interest rate | 4.02% | 3.72% |
| Expected dividend rate | — | — |
| Weighted average grant date fair value of an option granted during the quarter | $  2.77 | $  2.77 |

All shareholder plans have been approved by stockholders. Stock option activity under the plans is as follows for the nine months ended September 30, 2004 and the year ended December 31, 2003:

| | September 30, 2004 | | December 31, 2003 | |
| --- | --- | --- | --- | --- |
| | Number of shares | Weighted Average Exercise Price | Number of shares | Weighted Average Exercise Price |
| Outstanding beginning of year | 5,009,456 | $8.32 | 4,427,248 | $10.12 |
| Awarded | 354,000 | 8.00 | 1,723,000 | 8.00 |
| Exchanged, cancelled or expired | (5,006,256) | 8.23 | (1,140,792) | 8.55 |
| Outstanding at end of year | 357,200 | $9.72 | 5,009,456 | $ 8.32 |

During the first quarter of 2003, the Company repriced 3,559,256 options with an exercise price of $10.00 to an exercise price of $8.00. As a result of repricing the Company's stock options, the options are treated as variable-based awards in accordance with APB No. 25. Because these options are considered to be variable-based awards, the Company will incur future compensation expense if the stock price exceeds the $8.00 exercise price established at the time of the repricing. At September 30, 2004, 293,200 options subject to repricing remain outstanding.

5

Table of Contents

**3.   Acquisitions and Goodwill**

*a.        Acquisitions*

During the third quarter of 2004, the Company acquired an injection molding business and a sequencing business for $3.2 million.

On January 17, 2003, the Company acquired the remaining 50% interest in an Italian automotive joint venture from Textron Inc., a related party, for $15 million, which also terminated a $28 million put-option by Textron Inc., that was exercisable in December 2004. The Company incurred fixed asset impairments of $7.5 million relating to the 50% interest owned previously.

On January 2, 2003, the Company acquired Delphi Corp's plastic injection molding plant and related equipment in Logroño, Spain for $18 million. The 300,000 square foot Logroño facility includes 24 injection molders and one Class-A paint line.

*b.   Goodwill*

In accordance with SFAS No. 142, *"Goodwill and Other Intangible Assets,"* goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS No. 142. The Company employed a discounted cash flow analysis and a market comparable approach in conducting its impairment tests. The Company completed its annual impairment test as of November 1, 2003 indicating that the fair value of the reporting units exceeded the carrying value.

Fair value for all tests was determined based upon the discounted cash flows of the reporting units using discount rates ranging from 11.5% to 14.0% dependent on the reporting unit and a residual growth rate of 2%. The market comparable approach consisted of earnings multiples ranging from 5.2 to 6.5 times current year and forecasted Earnings Before Interest, Taxes, Depreciation and Amortization (*"EBITDA"*) (operating income plus depreciation and amortization) and a control premium on equity. Future cash flows and EBITDA are affected by future operating performance, which will be impacted by economic conditions, car builds, financial, business and other factors, many of which are beyond the Company's control. The U.S. and Mexico Plastics reporting unit can be significantly impacted by an adverse change in assumptions. Considerable judgment is often involved in making these determinations and the use of different assumptions could result in significantly different results. An approximate 50 basis point change in discount rates or an approximate 4% reduction in profit would have resulted in further goodwill impairment analysis as part of the annual impairment test conducted as of November 1, 2003 as required by SFAS No. 142. The U.S. and Mexico Plastics reporting unit achieved expected results for the first quarter of 2004 but lower than expected EBITDA for the second and third quarters. The U.S. and Mexico Plastics unit is expected to return to forecast EBITDA levels for the fourth quarter, however, the Company will closely evaluate this unit's performance for the year and its related goodwill when completing its annual impairment test as of November 1, 2004. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

*c.        Acquired Intangible Assets*

The components of the Company's acquired and other amortizable intangible assets as of September 30, 2004 and December 31, 2003 were as follows (in millions):

|  | September 30, 2004 | | | December 31, 2003 | | |
|---|---|---|---|---|---|---|
|  | Cost | Accumulated Amortization | Net Carrying Amount | Cost | Accumulated Amortization | Net Carrying Amount |
| Customer contracts | $40.0 | $18.2 | $21.8 | $51.0 | $13.1 | $37.9 |
| Patents and other | 36.9 | 13.0 | 23.9 | 39.2 | 10.2 | 29.0 |
|  | $76.9 | $31.2 | $45.7 | $90.2 | $23.3 | $66.9 |

6

Table of Contents

As of September 30, 2004, scheduled amortization expenses for intangible assets are as follows:

|  | Amortization Expenses |
|---|---|
| Remainder of 2004 | $ 2.3 |
| 2005 | 10.3 |
| 2006 | 9.5 |
| 2007 | 7.1 |
| 2008 | 5.2 |
| 2009 and thereafter | 11.3 |

During the second quarter 2004, the Company impaired a $2.7 million Intellimold patent, a finite intangible asset that was acquired as part of the TAC-Trim acquisition. Additionally, in the second quarter 2004, the Company impaired $11.0 million of customer contracts as a result of changes in customer sourcing.

**4. Inventories**

Inventory balances are summarized below (in millions):

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Raw materials | $106.9 | $ 95.0 |
| Work in process | 26.1 | 24.6 |
| Finished goods | 45.8 | 49.8 |
|  | $178.8 | $169.4 |

**5. Customer Engineering and Tooling**

The Company had tooling assets of approximately $161.6 million and $141.7 million as of September 30, 2004 and December 31, 2003, respectively. As of September 30, 2004, $133.5 million, $7.3 million and $20.8 million were classified as current other assets, long term other assets and property, plant and equipment, respectively. As of December 31, 2003, $122.7 million, $10.8 million and $8.2 million were classified as current other assets and long term other assets and property, plant and equipment, respectively. Customer engineering and tooling balances are summarized below (in millions):

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Contractual reimbursement of pre-production design and development costs | $ 16.0 | $ 6.8 |
| Molds, dies and other tools reimbursable by customers | 115.9 | 124.9 |
| Molds, dies and other tools company owned | 29.7 | 10.0 |
|  | $161.6 | $141.7 |

**6. Short-Term Borrowings**

The Company utilizes uncommitted lines of credit to satisfy a portion of its short-term working capital requirements of certain of its foreign affiliates. As of September 30, 2004, the Company had lines of credit from international credit facilities of $44.8 million, of which $25.3 million was outstanding with $19.5 million available. As of December 31, 2003, the Company had lines of credit from international credit facilities of $37.1 million, of which $16.0 million was outstanding with $21.1 million available. The weighted average interest rate on the outstanding borrowings at

September 30, 2004 and December 31, 2003 was approximately 20% and 16%, respectively.

7

Table of Contents

7.  **Long-Term Debt and Capital Lease Obligations**

Long-term debt and capital lease obligations are summarized below (in millions):

| | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Senior Secured Credit Facilities: | | |
| Tranche A Term Loan Facility | $    — | $    62.9 |
| Tranche B Term Loan Facility | — | 287.2 |
| Tranche B-1 Term Loan Facility | 400.0 | — |
| Revolving Credit Facility | 0.5 | 6.3 |
| Supplemental Revolving Credit Facility | 58.9 | — |
| Public Debt: | | |
| 11 1/2% Senior Subordinated Notes, due 2006. | — | 400.0 |
| 10 3/4% Senior Notes, due 2011 | 500.0 | 500.0 |
| 12 7/8% Senior Subordinated Notes, due 2012. | 400.3 | — |
| Other (including capital lease obligations) | 10.0 | 12.8 |
| Total debt | 1,369.7 | 1,269.2 |
| Less current maturities (including current portion of capital lease obligations) | (8.5) | (31.5) |
| Total long-term debt and capital lease obligations | $1,361.2 | $1,237.7 |

During the third quarter of 2004, the Company refinanced its existing Senior Secured Credit Facilities and its 11 1/2 Senior Subordinate Notes in order to extend its debt maturities and enhance financial and operating flexibility.

*Senior Secured Credit Facilities*

In February 2004, the Company entered into the fifth amendment to the Senior Secured Credit Facilities, which allowed the establishment of a new $100 million Supplemental Revolving Credit Facility and the $185 million Tranche A-1 Term Loan. In connection with these new expanded facilities, $181.5 million was used to prepay existing Tranche A and Tranche B Term Loans in direct order of maturity. The Company recognized a $1.5 million loss on early extinguishment of debt in relation to the repayments.

On September 1, 2004, the Company amended and restated its existing Senior Secured Credit Facilities, which are now comprised of a $400.0 million Tranche B-1 term loan that matures on August 31, 2011, a $170.0 million supplemental revolving credit facility that matures on August 31, 2009 and a $105.0 million revolving credit facility that also matures on August 31, 2009. In connection with the amendment and restatement of the credit facilities, proceeds from the Tranche B-1 term loan were used to repay in full the term loans outstanding and to repay, in part, revolving credit facility outstandings, in each case under the original credit agreement. Proceeds from the amended and restated supplemental revolving credit facility were used to repay, in part, revolving credit facility outstandings and to repay in full supplemental revolving credit facility outstandings, in each case under the original credit agreement. The Company recognized a $14.8 million loss on early extinguishment of debt as a result of this transaction.

The Tranche B-1 term loan has scheduled repayments of $1.0 million due each December 1, March 1, June 1 and September 1 prior to the final maturity date when the balance becomes due and payable. Borrowings under the credit facility are secured by all the assets of the Company, Products and certain of Products' subsidiaries, and are unconditionally and irrevocably guaranteed jointly and severally by the Company and substantially all of its existing and subsequently acquired or organized domestic subsidiaries (other than the Company's special purpose receivables subsidiary, captive insurance subsidiaries and charitable subsidiaries).

Table of Contents

At September 1, 2004, interest on borrowings, at the Company's option, were either (a) adjusted LIBOR plus a 4.00% margin in the case of the Tranche B-1 term loan and supplemental revolving credit facility and a 3.00% margin in the case of the revolving credit facility or (b) the highest of (i) JPMorgan Chase Bank's prime rate, (ii) the federal funds effective rate plus 1/2 of 1.00% and (iii) the base CD rate plus 1.00% plus a 3.00% margin in the case of the Tranche B-1 term loan facility and supplemental revolving credit facility and 2.00% margin in the case of the revolving credit facility. A commitment fee on any unused commitments under the revolving credit facility equal to 0.75% per annum is payable quarterly in arrears and is subject to downward adjustment based on attaining certain performance targets. The weighted average rate of interest on the Senior Secured Credit Facilities at September 30, 2004 and December 31, 2003 was 5.79% and 7.60%, respectively.

The amended and restated credit facility requires that the Company meet certain financial tests, including, without limitation, the following tests: a maximum leverage ratio, a minimum interest coverage ratio and certain prescribed limitations on capital expenditures at levels agreed upon between Products and the agents. The amended and restated credit facility also contains covenants and restrictions, including, among others, limitations or prohibitions on declaring dividends and other distributions, redeeming and repurchasing capital stock, prepaying, redeeming and repurchasing other indebtedness, loans and investments, additional indebtedness, liens, sale-leaseback transactions, preferred stock, recapitalizations, mergers, acquisitions, asset sales and transactions with affiliates.

The amended and restated credit facility contains certain customary events of default, including, among others cross-default and cross-acceleration to other indebtedness (including the Company's receivables facility). Upon the occurrence and during the continuation of a non-bankruptcy event of default, all obligations due under the amended and restated credit facilities may be accelerated and become immediately due and payable if the Administrative Agent so directs either at its discretion or at the request of the lenders holding an aggregate of a majority of the outstanding loans and unused commitments under the amended and restated credit facilities. In addition, upon the occurrence and during the continuance of a bankruptcy event of default, all obligations under the amended and restated credit facilities shall automatically accelerate and become immediately due and payable.

### Public Debt

On August 26, 2004, Products issued $415 million aggregate principal amount of 12 7/8% Senior Subordinated Notes due 2012 at a discount of $14.9 million, which is being amortized during the life of the debt using the effective interest method. The gross proceeds of the Notes offering, or approximately $400.1 million, were used to redeem the outstanding $400 million of 11 1/2% Senior Subordinated Notes due 2006. As a result of this transaction, Products incurred a $4.0 million loss on early extinguishment of debt.

The Notes were sold in the United States only to accredited investors pursuant to an exemption from the Securities Act of 1933, as amended, and subsequently resold to qualified institutional buyers pursuant to Rule 144A under the Securities Act and to non-U.S. persons in accordance with Regulation S under the Securities Act. The Notes have not been registered under the Securities Act and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements.

The Notes will mature on August 15, 2012 and will accrue interest at the rate of 12 7/8% per year. Interest on the notes will be payable semi-annually in arrears on each February 15 and August 15, commencing on February 15, 2005. Products may redeem some or all of the Notes at any time at 100% of the principal amount plus a make-whole premium. In addition, prior to August 15, 2007, it may redeem up to 35% of the aggregate principal amount of the Notes with the proceeds of certain equity offerings at a redemption price equal to 112.875% of the principal amount of the Notes, plus accrued and unpaid interest, if any.

If Products experiences a change of control, it may be required to offer to purchase the Notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if any.

The Notes are fully and unconditionally guaranteed on a senior subordinated unsecured basis by the Company and by each of Products' existing wholly owned domestic subsidiaries (other than its special purpose

9

Table of Contents

receivables, insurance and charitable subsidiaries). Future domestic subsidiaries of Products may also be required to guarantee the Notes.

The Notes have been issued under an indenture with BNY Midwest Trust Company, as trustee. The indenture governing the Notes contains covenants that will limit the ability of Products and the ability of its restricted subsidiaries to, among other things: incur or guarantee additional indebtedness; pay dividends or make other distributions or repurchase or redeem its stock; make investments; sell assets; create liens; enter into agreements restricting its restricted subsidiaries' ability to pay dividends; enter into transactions with affiliates; and consolidate, merge or sell all or substantially all of its assets. If an event of default, as specified in the indenture governing the Notes, shall occur and be continuing, either the Trustee or the holders of at least 25% in aggregate principal amount of Notes may accelerate the maturity of all the Notes. The covenants, events of default and acceleration rights described in this paragraph are subject to important exceptions and qualifications, which are described in the indenture.

Under a registration rights agreement, Products and the guarantors have agreed to use their reasonable best efforts to file and cause to become effective a registration statement with respect to an offer to exchange the Notes for other senior subordinated notes issued by Products and guaranteed by the guarantors, which are registered with the SEC and which have substantially identical terms as the Notes. If Products and the guarantors are not able to affect this exchange offer, they will use their reasonable best efforts to file, and cause to become effective, a shelf registration statement relating to resales of the notes and the guarantees. Products will be obligated to pay additional interest on the notes if it does not complete this exchange offer within 270 days after the closing date.

### Other

As of September 30, 2004, the Company believes it is in compliance with all covenants under our various obligations. The Company believes cash flow from operations, together with its revolving credit facility, receivables arrangements and sale and leaseback arrangements will provide adequate sources of liquidity for the Company to fund its operations. The Company continues to seek means to generate additional cash for debt reduction and its growth strategy. Among its potential cash generation projects, the Company seeks to further improve working capital management (including factoring of receivables) and to continue to utilize lease financings.

The Company was recently informed that certain of the accelerated payment collection programs with its larger customers will be discontinued in 2005 and that one of those customers, Ford Motor Company, intends to phase out its accelerated payment collection program from September 2004 through December 2004. At September 30, 2004, the Company had approximately $10.2 million collected under the Ford program. These programs have materially enhanced our liquidity in the past. At September 30, 2004, the Company had approximately $130.9 million collected under these arrangements, including the Ford program. The impact of the discontinuance of these programs is expected to be partially offset by a greater utilization of our existing $250 million accounts receivable securitization facility. The existing receivables facility expires on December 20, 2004, and the Company expects to have a multi-year replacement facility established before that time. The Company will also consider replacement accelerated payment programs offered on behalf of our customers or through other financial intermediaries. However, we may not be able to timely or fully replace these arrangements, and the new terms of any such program may be less advantageous than current arrangements. If the Company is unable to replace these arrangements, it could adversely affect its liquidity under its senior secured credit facilities.

### 8.  Subsidiary Preferred Stock Requirements

In connection with the TAC-Trim acquisition on December 20, 2001, Products issued to Textron Inc. preferred stock with a liquidation preference of $326.4 million and an estimated fair market value of $146.9 million. The difference between the initial recorded value and the initial liquidation preference is being accreted over the life of the stock using the effective interest method. During the third quarter of 2004, interest expense from subsidiary preferred stock accretion and dividend costs were $0.6 million and $10.5 million,

10

Table of Contents

respectively. The third quarter of 2003 interest expense from preferred stock accretion and dividend costs was $0.4 million and $9.2 million, respectively. For the nine months ended September 30, 2004 interest expense from subsidiary preferred stock accretion and dividend costs were $1.6 million and $30.5 million, respectively. For the nine months ended September 30, 2003 interest expense from subsidiary preferred stock accretion and dividend costs were $4.8 million and $22.4 million, respectively.

Effective April 2004, all 20,000 shares of the Series C Preferred Stock, which were held by Textron Inc, were converted to Series B Preferred Stock on an equivalent share basis. The primary difference between the Series C and Series B Preferred Stock is that Series C holders were entitled to participation in distributions of Products common equity tied to the appreciation in the value of Products common equity subsequent to the issuance date of the securities. Each holder received one share of Series B Preferred Stock for each share of Series C Preferred Stock.

9.   Receivables Facility and Non Recourse Factoring Facilities

*Receivables Facility*

As of September 30, 2004 and December 31, 2003, Carcorp, Inc.'s total receivables pool, as defined under the receivables facility, was $225.7 million and $165.4 million, respectively. As of September 30, 2004, the utilization of the Receivables Facility was $160.7 million and was fully drawn. At December 31, 2003, the utilization of the Receivables Facility was $73.7 million, and an additional $9.1 million was available, subject to limitations imposed under the Senior Secured Credit Facilities. The receivables facility expires on December 20, 2004, and the Company expects to have a replacement facility established before that time.

The Company is required to pay a fee of 0.50% on the unused portion of the facility. A discount on the sold receivables is approximately equal to the interest rate paid by the conduits to the holders of the commercial paper plus a usage fee that ranges from 1.50% to 2.25%. The discount rate at September 30, 2004 was 3.37%.

*Non-Recourse Factoring Facilities*

The Company had entered into various agreements with international lenders to sell accounts receivables of certain international operations on a non-recourse basis. As of September 30, 2004, the Company has utilized $90.9 million from these commitments. The funding levels and commitments by the lenders are based on the eligible receivables in the Company's subsidiaries in the various countries, including subsidiaries in Belgium, Brazil, Czech Republic, Germany, Italy, Mexico, Netherlands, Spain and Sweden. As of September 30, 2004, under the agreements, approximately $98.1 million of receivables have been sold, while the Company had retained an interest in $7.2 million of these sold receivables. At December 31, 2003, under the agreements, approximately $132.7 million of receivables had been sold, while the Company had retained an interest in $6.1 million of these sold receivables. The retained interest remains classified on the Company's balance sheet as trade receivables. Under the agreements, the Company usually pays a factoring fee and a discount on the daily utilization of the facility. The expenses related to these agreements are recorded in loss on sale of receivables on the income statement.

For the third quarter and year-to-date ended September 30, 2004, the loss on sale of receivables under the Receivables Facility and the non-recourse factoring facilities totaled $2.4 million and $7.2 million, respectively, compared to $1.8 million and $4.5 million for the third quarter and year-to-date ended September 30, 2003, respectively.

11

Table of Contents

## 10. Employee Benefit Plans

The 2004 and 2003 amounts shown below reflect the defined benefit pension and other postretirement benefit expense for the three and nine months ended September 30 for each year:

| | Quarter ended September 30 | | | | Nine months ended September 30 | | | |
| | Pension Benefits | | Other Postretirement Benefits | | Pension Benefits | | Other Postretirement Benefits | |
| | 2004 | 2003 | 2004 | 2003 | 2004 | 2003 | 2004 | 2003 |
|---|---|---|---|---|---|---|---|---|
| Service cost | $ 3.8 | $ 3.5 | $ 0.2 | $ 0.3 | $ 11.4 | $ 10.5 | $ 0.8 | $ 1.0 |
| Interest cost | 6.7 | 6.5 | 1.3 | 1.4 | 20.1 | 19.5 | 4.1 | 4.3 |
| Expected return on plan assets | (7.4) | (6.8) | — | — | (22.2) | (20.4) | — | — |
| Amortization of prior service cost (gain) | 0.1 | 0.1 | (2.1) | (1.9) | 0.3 | 0.3 | (5.8) | (5.7) |
| Curtailment credits | — | — | (9.4) | — | — | — | (9.4) | — |
| Amortization of net loss/(gain) | 1.6 | 1.5 | (0.3) | (0.3) | 4.8 | 4.5 | (0.9) | (0.9) |
| Net periodic benefit cost (gain) | $ 4.8 | $ 4.8 | $(10.3) | $(0.5) | $ 14.4 | $ 14.4 | $(11.2) | $(1.3) |

The Company expects to contribute $10.9 million to its pension plans in 2004. Through the third quarter ended September 30, 2004, $8.6 million has been contributed.

The *"Medicare Prescription Drug, Improvement and Modernization Act of 2003,"* (the *"Act"*) reduced the net periodic postretirement benefit cost by $0.1 million and $0.2 million for the three and nine months ended September 30, 2004, respectively, including service cost, interest cost and amortization of the actuarial experience gain. The total impact of the Act on our actuarial liability was $3.0 million and is being accounted for as an actuarial gain, in accordance with guidance from the Financial Accounting Standards Board (*"FASB"*) Staff Position 106-2 *"Accounting and Disclosure Requirements Related to the Medicare Prescription Drug, Improvement and Modernization Act of 2003."* As a result, the gain will be amortized as a reduction of our periodic expense and balance sheet liability over the estimated future lifetime of the active employees, depending on the plan.

On June 24, 2004, the Company announced that postretirement medical subsidies for all non-union medical plans and all postretirement life insurance (except for union and executive plans) would be eliminated effective January 1, 2006. Accordingly, these events are treated as an amendment with curtailments as appropriate for each plan. The effect of the plan amendments for the nine months ended September 30, 2004 resulted in the Company recognizing $9.4 million of curtailment credits and a $0.4 million gain in amortization of prior service costs. These gains are recognized as a $5.2 million benefit in selling, general and administrative expenses and a $4.6 million benefit in cost of goods sold. For the fourth quarter of 2004 the Company expects to recognize approximately $10.5 million in postretirement benefits, of which approximately $2.5 million ($1.8 million, net of taxes) will be classified as income from discontinued operations. Additionally, in 2005, the Company expects to recognize approximately $50.0 million in postretirement benefits, of which approximately $11.0 million ($7.0 million, net of taxes) will be classified as income from discontinued operations, relating to the effect of the plan amendments.

12

**Table of Contents**

**11.   Restructuring and Impairment**

Activity related to the restructuring reserve is as follows (in millions):

| | Severance Costs | Lease Commitments and Other Exit Costs | Total |
|---|---|---|---|
| Restructuring reserves: | | | |
| Balance at beginning of year | $ 21.6 | $ 9.3 | $ 30.9 |
| | | | |
| 2004 Expense: | | | |
| 2nd quarter 2003 program | 0.1 | — | 0.1 |
| 3rd quarter 2003 program | 0.8 | — | 0.8 |
| 4th quarter 2003 program | 0.2 | — | 0.2 |
| 1st quarter 2004 program | 7.6 | 1.8 | 9.4 |
| 2nd quarter 2004 program | 9.1 | 1.3 | 10.4 |
| 3rd quarter 2004 program | 10.3 | 1.7 | 12.0 |
| Adjustments to prior period programs | (4.0) | — | (4.0) |
| | | | |
| Total net expense | 24.1 | 4.8 | 28.9 |
| | | | |
| Costs paid | (22.1) | (7.1) | (29.2) |
| | | | |
| Ending balance at September 30, 2004 | $ 23.6 | $ 7.0 | $ 30.6 |
| | | | |
| 3rd quarter 2003 restructuring: | | | |
| Costs expected | $ 21.2 | $ 6.8 | $ 28.0 |
| Costs paid in 2004 | 4.4 | 1.0 | 5.4 |
| Costs paid to date | 12.2 | 4.1 | 16.3 |
| 4th quarter 2003 restructuring | | | |
| Costs expected | $  6.8 | $ 1.7 | $  8.5 |
| Costs paid in 2004 | 3.0 | 1.1 | 4.1 |
| Costs paid to date | 5.8 | 1.1 | 6.9 |
| 1st quarter 2004 restructuring | | | |
| Costs expected | $  7.6 | $ 1.8 | $  9.4 |
| Costs paid in 2004 | 4.9 | 0.9 | 5.8 |
| Costs paid to date | 4.9 | 0.9 | 5.8 |
| 2nd quarter 2004 restructuring | | | |
| Costs expected | $  9.1 | $ 1.3 | $ 10.4 |
| Costs paid in 2004 | 3.7 | 0.1 | 3.8 |
| Costs paid to date | 3.7 | 0.1 | 3.8 |
| 3rd quarter 2004 restructuring | | | |
| Costs expected | $ 10.3 | $ 1.7 | $ 12.0 |
| Costs paid in 2004 | 2.0 | 0.6 | 2.6 |
| Costs paid to date | 2.0 | 0.6 | 2.6 |

13

Table of Contents

During the third quarter 2004, the Company continued its initiative to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $12.0 million. The third quarter charge included $10.3 million of severance cost and $1.7 million of costs related to the establishment of accruals for lease commitments and other exit costs. Also included in the third quarter 2004 charges is adjustments related to previously established accruals which did not require cash outlays of $3.0 million resulting in a net charge of $9.0 million. Additionally, the Company recognized an $10.3 million write down of assets primarily related to the closing of an International Plastic location totaling $7.0 million. The $3.3 million remaining fixed asset write down was related to Global Soft Trim locations.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 3rd Quarter 2004 Restructuring: | | | | | |
| Total costs expected | $ 1.5 | $ 5.1 | $ 3.2 | $2.2 | $12.0 |
| Costs incurred in 2004 | 1.5 | 5.1 | 3.2 | 2.2 | 12.0 |
| Costs incurred to date | 1.5 | 5.1 | 3.2 | 2.2 | 12.0 |
| Headcount Reduction | 103 | 528 | 235 | 16 | 882 |

During the second quarter 2004, the Company undertook a restructuring program to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $10.4 million. Additionally, the Company recognized a $27.4 million write down of assets related to the Company impairing $13.6 million of Intellimold assets, including a $2.7 million patent, a finite intangible asset, acquired as part of the TAC-Trim acquisition. The Company also impaired $11.0 million of customer contracts as a result of changes in customer sourcing. The $2.8 million remaining fixed asset write down was related primarily to Global Soft Trim locations.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 2nd Quarter 2004 Restructuring: | | | | | |
| Total costs expected | $ 1.3 | $0.8 | $ 5.9 | $2.4 | $10.4 |
| Costs incurred in 2004 | 1.3 | 0.8 | 5.9 | 2.4 | 10.4 |
| Costs incurred to date | 1.3 | 0.8 | 5.9 | 2.4 | 10.4 |
| Headcount Reduction | 250 | 10 | 250 | 40 | 550 |

During the first quarter 2004, the Company undertook a restructuring program to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $9.4 million. Additionally, the Company recognized a $3.0 million write down of fixed assets related primarily to Global Soft Trim locations. The Company also incurred and recorded restructuring charges of $1.1 million for prior year programs along with an adjustment related to a previously established accrual, which did not require cash outlays of $1.0 million.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 1st Quarter 2004 Restructuring: | | | | | |
| Total costs expected | $1.3 | $ 1.9 | $1.7 | $4.5 | $ 9.4 |
| Costs incurred in 2004 | 1.3 | 1.9 | 1.7 | 4.5 | 9.4 |
| Costs incurred to date | 1.3 | 1.9 | 1.7 | 4.5 | 9.4 |
| Headcount Reduction | 30 | 170 | 30 | 30 | 260 |

During the fourth quarter 2003, the Company undertook a restructuring program to right size its overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of

14

$9.3 million. Additionally, the Company recognized a $4.6 million write down of fixed assets related to U.S. and Mexico Plastics and Global Soft Trim locations.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 4th Quarter 2003 Restructuring: | | | | | |
| Total costs expected | $ 0.9 | $ 4.0 | $ 2.6 | $1.0 | $   8.5 |
| Costs incurred in 2004 | — | 0.2 | (1.0) | — | (0.8) |
| Costs incurred to date | 0.9 | 4.0 | 2.6 | 1.0 | 8.5 |
| Headcount Reduction | 100 | 500 | 400 | — | 1,000 |

During the third quarter 2003, the Company undertook a restructuring program to right size its overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of $27.2 million. Additionally, the Company recognized a $2.2 million write down of fixed assets related primarily to International Plastics locations.

Included in the third quarter 2003 restructuring charge severance cost were charges related to the separation agreement with Jerry L. Mosingo, the former President and CEO. In August 2003, the Company's Board of Directors appointed David Stockman as CEO, in addition to retaining his position of Chairman. Under the terms of his separation agreement, Mr. Mosingo received $0.6 million in the third quarter of 2003 and will receive $0.2 million per quarter through December 31, 2004 and $0.1 million for the quarter ending March 31, 2005, and other fringe and retirement benefits. The resulting third quarter 2003 restructuring charge was $5.3 million, which includes the present value of future benefits of $2.8 million, included in pension liability.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 3rd Quarter 2003 Restructuring: | | | | | |
| Total costs expected | $ 6.3 | $ 5.6 | $ 5.9 | $10.2 | $ 28.0 |
| Costs incurred in 2004 | — | 0.6 | 0.2 | — | 0.8 |
| Costs incurred to date | 6.3 | 5.6 | 5.9 | 10.2 | 28.0 |
| Headcount Reduction | 500 | 300 | 600 | 200 | 1,600 |

During the second quarter 2003, the Company undertook a restructuring program to rationalize operations on a worldwide basis with the primary focus on U.S. and Mexico operations resulting in a restructuring charge of $4.9 million. The 2003 charge included approximately $4.2 million of severance cost and $0.7 million of costs related to the establishment of reserves for lease commitments and other exit costs. The Company's restructuring plan includes severance of over 500 personnel. Of the 500 personnel approximately 450 were terminated in the second quarter of 2003 with approximately 170 personnel at the Company's International Plastics segment, approximately 160 at Global Soft Trim segment and approximately 120 at the Company's corporate locations. Additionally, the Company recognized a $0.8 million write down of fixed assets related to an International Plastics location. Restructuring charges related to the first quarter of 2004 for this program were $0.1 million for severance costs with less than $0.1 million of severance costs remaining to be charged during 2004 and 2005.

Reserves for lease terminations costs are paid in conjunction with the remaining terms of the leases, while severance and other exit costs are generally paid within one year of the restructuring program.

During 2003, the Company recognized a $7.5 million write-down of fixed assets related to its 50% interest in an Italian joint venture acquired in 2001 and $10.4 million impairment of the Becker non-compete agreement.

15

Table of Contents

12.    **Related Party Transactions**

*Heartland Transactions*

The Company is a party to a Services Agreement with Heartland under which Heartland provides advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The Services Agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.

Under the Services Agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee payable in quarterly installments and reimburse its out-of-pocket expenses related to the services it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions and 1% of the gross proceeds of certain financings.

In March 2004, the Company's Board of Directors, including the disinterested and independent directors of the Board, approved a fee of $1.0 million to Heartland for its services rendered in connection with the 2004 amendments to the Company's credit facility to add a supplemental revolving credit facility.

In May 2004, the Company's Board of Directors, including the disinterested and independent directors of the Board, approved an amendment of the Services Agreement to provide for a fee of up to $5.0 million related to services rendered in connection with the notes offering and a fee of 1% of the gross proceeds of certain future financings, excluding the amendment and restatement of our senior secured credit facility. The $1.0 million fee for the February 2004 amendments to the Company's credit facility was subsequently waived when the Company completed its credit facility and notes refinancing during the third quarter of 2004, as part of which Heartland received a fee of $5.0 million.

For the quarter and nine months ended September 30, 2004, the Company recorded total fees to Heartland of $6.3 million and $8.5 million, respectively. For the quarter and nine months ended September 30, 2003, the Company recorded total fees of $1.0 million and $3.0 million, respectively.

*Charles E. Becker Transactions*

For the quarter and nine months ended September 30, 2004, the Company recorded total lease payments of $2.2 million and $6.5 million, respectively, under various lease agreements with entities controlled by Charles E. Becker, a former director of the Company. For the quarter and nine months ended September 30, 2003, the Company recorded total lease payments of $2.3 million and $6.9 million, respectively, under various lease agreements.

Mr. Becker resigned as director of the Company effective as of May 6, 2004.

*Elkin McCallum Transactions*

In 2004 and 2003, the Company engaged in ordinary course transactions with entities controlled by Elkin McCallum, a former director of the Company, for the purchase and sale of goods and services as part of ongoing business relationships. The Company recorded purchases for goods and services from entities controlled by Mr. McCallum of $0.7 million and $4.1 million for the quarter and nine months ended September 30, 2004, respectively, and $4.1 million and $15.2 million (net $1.2 million of rebates) for the quarter and nine months ended September 30, 2003, respectively, for goods and services purchased. The rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr. McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition. Supplier rebates such as these are common in the automotive industry as part of ongoing price negotiations and adjustments. The rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements. In addition, the Company recorded sales to entities controlled by Mr. McCallum of $0.6 million and $4.0 million for the quarter and nine months ended September 30, 2004, respectively, and $0.8 million and $5.3 million for the quarter and nine months ended September 30, 2003, respectively.

16

Table of Contents

The following table summarizes the balances outstanding from entities controlled by Mr. McCallum (in millions):

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Accounts Receivable | $4.4 | $2.7 |
| Accounts Payable | 2.7 | 1.0 |

Mr. McCallum resigned as director of the Company effective as of May 6, 2004.

**13.  Income Taxes**

The Company recognized an income tax benefit of $13.4 million and $8.6 million for the quarters ended September 30, 2004 and 2003, respectively. The Company recognized an income tax benefit of $17.0 million and an income tax expense of $0.1 million for the nine months ended September 30, 2004 and 2003, respectively. The primary reasons for the Company's effective tax rate being different from its statutory rate are non-deductible preferred stock dividends and accretion, foreign losses for which tax benefits are not recorded and state and foreign taxes that do not fluctuate directly with income, partially offset by the effect of a financing arrangement and tax credits.

**14.  Information About the Company's Operations**

In conjunction with the 2003 restructurings, the Company changed its reportable segments to align with organization changes and senior management responsibilities. The Company's reportable segments consist of U.S. and Mexico Plastics, International Plastics and Global Soft Trim. International Plastics includes international plastics operations, including Canada but excluding Mexico. The U.S. and Mexico Plastics and International Plastics segments include interior trim components such as door panels, instrument panels, consoles, package trays and cargo management systems, exterior trim components such as bumper fascias and cladding and fully assembled cockpit systems and components thereof. The Global Soft Trim segment includes molded non-woven and tufted carpet, alternative molded flooring, accessory mats and acoustics systems consisting of absorbing materials, damping materials, engine compartment noise vibration and harshness systems, interior insulators, seat body cloth, insert fabric, headliner fabric, convertible roof systems, hard top retractable roof systems, tonneau covers and actuation systems. The Company changed the composition of its reportable segments beginning July 1, 2003 and restated prior period segment data to be comparable.

The Company evaluates performance based on operating profit or loss. Information about the Company's segments is presented below (in millions):

|  | Quarter Ended September 30, 2004 | | | | |
|---|---|---|---|---|---|
|  | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| External revenues | $261.7 | $319.6 | $283.5 | $  — | $864.8 |
| Inter-segment revenues | 8.2 | 3.3 | 1.1 | (12.6) | — |
| Interest expense from preferred stock requirement | — | — | — | 11.1 | 11.1 |
| Depreciation and amortization | 11.4 | 11.6 | 13.9 | 2.3 | 39.2 |
| Operating income (loss) | 13.8 | (8.8) | 11.9 | (7.4) | 9.5 |
| Capital expenditures | 23.6 | 29.8 | 15.4 | 0.4 | 69.2 |

17

Table of Contents

|  | Quarter Ended September 30, 2003 | | | | |
| --- | --- | --- | --- | --- | --- |
|  | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| External revenues | $312.0 | $273.8 | $316.4 | $    — | $902.2 |
| Inter-segment revenues | 3.0 | 4.1 | 0.3 | (7.4) | — |
| Interest expense from preferred stock requirement | — | — | — | 9.6 | 9.6 |
| Depreciation and amortization | 10.2 | 9.3 | 11.9 | 2.2 | 33.6 |
| Operating income (loss) | 17.5 | 1.3 | 27.6 | (38.1) | 8.3 |
| Capital expenditures | 11.1 | 15.5 | 18.0 | 0.2 | 44.8 |

|  | Nine Months Ended September 30, 2004 | | | | |
| --- | --- | --- | --- | --- | --- |
|  | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| External revenues | $  947.6 | $1,072.8 | $947.1 | $    — | $2,967.5 |
| Inter-segment revenues | 21.7 | 10.6 | 1.5 | (33.8) | — |
| Interest expense from preferred stock requirement | — | — | — | 32.1 | 32.1 |
| Depreciation and amortization | 35.0 | 32.7 | 37.8 | 7.2 | 112.7 |
| Operating income (loss) | 38.1 | 0.9 | 73.8 | (47.3) | 65.5 |
| Capital expenditures | 50.6 | 56.8 | 40.1 | 3.8 | 151.3 |
| As of September 30: |  |  |  |  |  |
|   Goodwill | 757.2 | 346.9 | 274.4 | — | 1,378.5 |
|   Total assets | 1,092.2 | 852.2 | 675.6 | 576.7 | 3,196.7 |

|  | Nine Months Ended September 30, 2003 | | | | |
| --- | --- | --- | --- | --- | --- |
|  | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| External revenues | $1,018.2 | $917.9 | $1,034.7 | $    — | $2,970.8 |
| Inter-segment revenues | 9.8 | 12.9 | 1.1 | (23.8) | — |
| Interest expense from preferred stock requirement | — | — | — | 27.2 | 27.2 |
| Depreciation and amortization | 31.6 | 28.7 | 35.0 | 5.9 | 101.2 |
| Operating income (loss) | 49.8 | (18.0) | 118.4 | (78.6) | 71.6 |
| Capital expenditures | 28.2 | 34.3 | 52.0 | 5.4 | 119.9 |
| As of September 30: |  |  |  |  |  |
|   Goodwill | 707.3 | 343.5 | 274.5 | — | 1,325.3 |
|   Total assets | 1,049.1 | 803.6 | 697.2 | 633.1 | 3,183.0 |

(a) Other includes the Company's non-operating units and the effect of eliminating entries. During 2004 and 2003, certain corporate costs that were previously included at the divisional units were included in the Other category. Those costs that could be attributed to a divisional unit were allocated back to the appropriate division. Operating income (loss) for the nine months ended September 30, 2004 reflects: $46.1 million, $58.1 million and $35.5 million of corporate costs allocated back to U.S. and Mexico Plastics, International Plastics and Global Soft Trim, respectively. Operating income (loss) for the nine months ended September 30, 2003 reflects: $40.8 million, $51.6 million, and $24.6 million of corporate costs allocated back to U.S. and Mexico Plastics, International Plastics and Global Soft Trim, respectively.

18

Table of Contents

Direct and indirect sales to significant customers in excess of ten percent of consolidated net sales from continuing operations are as follows:

|  | Quarter Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
|  | September 30, 2004 | September 30, 2003 | September 30, 2004 | September 30, 2003 |
| DaimlerChrysler AG | 30.1% | 28.3% | 31.5% | 29.1% |
| General Motors Corporation | 20.5% | 24.4% | 19.7% | 22.2% |
| Ford Motor Company | 24.0% | 24.1% | 26.1% | 24.7% |

## 15.   Commitments and Contingencies

Except as described below, the Company and its subsidiaries are not party to any material pending legal proceedings, but is involved in ordinary routine litigation incidental to the business.

### *Environmental*

The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, other locations such as former facilities, facilities where we have sent wastes for treatment or disposal and other properties to which the Company may be linked. Such liability may include, for example, investigation and cleanup of the contamination, personal injury and property damage caused by the contamination and damages to natural resources. Some of these liabilities may be imposed without regard to fault and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct the Company's various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material effect on the Company's business, consolidated financial condition, future results of operations or cash flows.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites and for personal injury or property damages, if any, associated with such contamination. At some of these sites, the Company has been notified that it is a potentially responsible party (*"PRP"*) under the federal Superfund law or similar state laws. Other sites at which the Company may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites, as discussed in the paragraphs below. In estimating the cost of investigation and remediation, the Company considered, among other things, its prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency (*"USEPA"*), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including:

• incomplete information regarding particular sites and other PRPs;

• uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems;

19

Table of Contents

- the ultimate selection among alternative approaches by governmental regulators;

- the complexity and evolving nature of environmental laws, regulations and governmental directives;

- changes in cleanup standards.

The Company is a party to a Consent Decree with the State of New Hampshire to remediate a former industrial landfill known as the Cardinal Landfill in Farmington, New Hampshire. Pursuant to that Consent Decree, the Company is currently conducting a pilot test for a proposed remediation of chlorinated compound contaminants in groundwater. The Consent Decree calls for a remedy to be in place during 2005. The Company is a defendant in three lawsuits filed by a total of 91 individual plaintiffs for alleged personal injuries arising from Cardinal Landfill conditions. The Company will vigorously contest these allegations. As of September 30, 2004, the Company has accrued $11.0 million for Cardinal Landfill.

The Company is a party, as a member of a PRP workgroup, to a Consent Decree entered with the USEPA for the remediation of a former municipal landfill in Dover, New Hampshire. The town of Dover, New Hampshire is also a member of the PRP group and a party to the Consent Decree. Pursuant to the terms of the Consent Decree, the PRP group has recently completed an alternative remediation design. The USEPA and the State of New Hampshire have reviewed, provided for public comment and approved the alternative remedial design and subsequently issued an amended Record of Decision. As of September 30, 2004, the Company has accrued $8.2 million for Dover.

Pursuant to a Consent Decree signed with the USEPA, the Company is currently engaged in a full-scale remediation for groundwater and soil contamination at the former Stamina Mills manufacturing facility in North Smithfield, Rhode Island. Remediation activities have been ongoing since 1998. Another Consent Decree resolving the USEPA claim for past oversight costs was signed during 2003, and a payment of $7.3 million was made during the third quarter of 2003. As of September 30, 2004, the Company has accrued $6.4 million for Stamina Mills.

The Company is working with the Michigan Department of Environmental Quality ("*MDEQ*") to investigate and remediate soil and groundwater contamination at a former manufacturing plant in Mancelona, Michigan and at adjacent owned property formerly used for the treatment and disposal of plating waste. MDEQ is likely to require remediation of groundwater contamination.

The current owner of one of the Company's former manufacturing plants located in Bowling Green, Ohio has entered into an Administrative Order on Consent with the Ohio Environmental Protection Agency ("*OEPA*") requiring investigation and remediation of contamination at the site. The Company is reimbursing the current owner for costs associated with ongoing groundwater monitoring and, following selection of an appropriate remedy by OEPA, will assume 90% of future remediation costs.

In the 1980's and 1990's, the California Regional Water Quality Control Board ("*CRWQCB*") and other state agencies ordered a predecessor of the Company to investigate and remediate soil and groundwater contamination at a former lumber treatment plant in Elmira, CA. In 1996, the Company entered into an agreement with the State of California to conduct long-term operation and maintenance of the remedy implemented at the site. Currently, the Company is conducting a pilot test of an alternative treatment option that will reduce the cost and time for clean up at this site.

The Company has entered into an Administrative Order by Consent with the USEPA requiring investigation, delineation and removal of contamination from a vacant three acre site in Zanesville, Ohio. The delineation report has been submitted to USEPA for comment, and the Administrative Order by Consent calls for the submittal and implementation of an action plan during 2004. Based on ongoing investigations at the site in regards to potential lead contamination in soil and groundwater, the USEPA has requested additional studies of groundwater and site wide soil stability studies in preparation for cap installation. Initial results of these studies indicate that there is no lead contamination in groundwater. The issue of cap installation is being evaluated in light of these recent findings.

In 2003, the Company signed a Consent Agreement with the State of South Carolina Department of Health and Environmental Control requiring soil and groundwater investigations at a former manufacturing

20

Table of Contents

facility in Cowpens, South Carolina. The Company had ceased operations at this location in 1981. Initial investigations will delineate potential groundwater contamination that has migrated under a residential area. These studies are scheduled to be completed in 2004.

The Company has established accruals for certain contingent environmental liabilities and management believes such reserves comply with accounting principles generally accepted in the United States of America. The Company accrues for environmental investigatory and non-capital remediation costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable, and the financial impact of such outcome is reasonably estimable. As of September 30, 2004 and December 31, 2003, total reserves for these environmental costs are approximately $45.7 million and $51.2 million, respectively.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows. However, management can give no assurance that they have identified or properly assessed all potential environmental liabilities arising from the business or properties, and those of present and former subsidiaries and their corporate predecessors.

*Legal Proceedings*

The Company and its subsidiaries have lawsuits and claims pending against them and have certain guarantees outstanding which were made in the ordinary course of business.

As of September 30, 2004, the Company was a party to approximately 1,102 pending cases alleging personal injury from exposure to asbestos containing materials used in boilers manufactured before 1966 by former operations of the Company which were sold in 1966. Asbestos-containing refractory bricks lined the boilers and, in some instances, the Company's former operations installed asbestos-containing insulation around the boilers. These pending cases do not include cases that have been dismissed or are subject to agreements to dismiss due to the inability of the plaintiffs to establish exposure to a relevant product and cases that have been settled or are subject to settlement agreements. Total settlement costs for these cases have been less than $1.3 million or an average of less than $6,250 per settled case. The defense and settlement costs have been substantially covered by the Company's primary insurance carriers under a claims handling agreement that expires in August 2006. The Company has primary, excess and umbrella insurance coverage for various periods available for asbestos-related boiler and other claims. The Company's primary carriers have agreed to cover approximately 80% of certain defense and settlement costs up to a limit of approximately $70.5 million for all claims made, subject to reservations of rights. The excess insurance coverage, which varies in availability from year to year, is approximately $615 million in aggregate for all claims made. The coverage may be impacted by matters described below. Based on the age of the boilers, the nature of the claims and settlements made to date and the insurance coverage, management does not believe that these cases will have a material impact on the Company's financial condition, results of operations or cash flows. However, the Company cannot assure that it will not be subjected to significant additional claims in the future in respect of these or other matters for which the insurance could be utilized, that insurance will be available as expected, that the matters described below may not impact the Company's coverage or that unanticipated damages or settlements in the future would not exceed insurance coverage.

In 1988, the Company divested its retail lumber and building materials business to Wickes Lumber Co. (now Wickes Inc.), which filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code in early 2004. As part of this divestiture, Wickes assumed responsibility for all liabilities associated with this business, including those associated with certain asbestos-related claims, and the Company agreed to give them access to its general liability insurance policies for such liabilities. These are, in several instances, the same policies referred to in the preceding paragraph. Wickes has been making claims against these policies for settlements of asbestos-related claims that it has characterized as insignificant as of late 2003 in its filings with the Securities and Exchange Commission. The Company has agreed to suspend making claims for other than defense costs to permit agreement upon a framework within the bankruptcy proceedings or otherwise for coordinating these claims as between the Company and Wickes. It is possible

21

Table of Contents

that resolution of these issues will await confirmation of a plan of reorganization for Wickes and that an equitable portion of the insurance will be made available for Wickes asbestos or other claimants, thereby reducing the coverage available to the Company for its own claims. Based upon the information available to the Company concerning Wickes' claims history, management does not believe these matters will materially and adversely affect the Company.

A purported class action was filed on March 24, 2003 in the United States District Court for the Eastern District of Michigan, against the Company, Heartland and ten current and former senior officers and/ or directors of the Company, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated there under. Four similar actions were subsequently filed in the United States District Court for the Eastern District of Michigan, purportedly filed on behalf of purchasers of the common stock of the Company between August 7, 2001 and August 2, 2002, which are identical to the purported class identified in the previously disclosed lawsuit, except in one instance in which the complaint alleges a class period beginning on July 5, 2001. On August 4, 2003, the court consolidated all five pending actions and appointed lead plaintiffs for the purported class. The Company believes that the claims are without merit and intends to vigorously defend the lawsuits. The Company does not believe that the suit will have a material impact on its financial condition, results of operations or cash flows.

The Company is a defendant in a lawsuit involving a sales commission arrangement inherited from a predecessor company and its partial ownership of an extinguished joint venture. In September 2003, the Oakland County Circuit Court entered a judgment by default against the company for $4.2 million based upon an inadvertent failure to produce a small number of documents that were to be produced with thousands of other documents that were delivered in the discovery process. The Company and its counsel believe that the default judgment was improperly entered and that damages were improperly assessed, and it has filed an appeal of the judgment with the Michigan Court of Appeals. The Company intends to vigorously pursue its appeal in this matter and has posted a letter of credit in the amount of the judgment as part of the normal appeal process. While management believes it has no liability to the plaintiff, the Company has established an appropriate reserve for this matter in an amount less than the amount of the current judgment.

The ultimate outcome of the legal proceedings to which the Company is a party will not, in the opinion of the Company's management, based on the facts presently known to it, have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

### Other Commitments

As of September 30, 2004, the Company's continuing operations had approximately $69.0 million in outstanding capital expenditure commitments. The majority of the leased properties of the Company's previously divested businesses have been assigned to third parties. Although releases have been obtained from the lessors of certain properties, Products remains contingently liable under most of the leases. Products' future liability for these leases, in management's opinion, based on the facts presently known to it, will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

22

Table of Contents

16.    **Other Comprehensive Loss**

Total comprehensive loss for the quarter and nine months ended September 30, 2004 and September 30, 2003 are as follows (in millions):

| | Quarter Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | September 30, 2004 | September 30, 2003 | September 30, 2004 | September 30, 2003 |
| Comprehensive loss: | | | | |
| Net loss | $(55.6) | $(32.1) | $(108.6) | $(47.6) |
| Other comprehensive income (loss): | | | | |
| Foreign currency translation adjustments | 20.5 | (2.0) | 8.4 | 57.5 |
| | $(35.1) | $(34.1) | $(100.2) | $  9.9 |

17.    **Consolidating Financial Statements**

Products issued Senior Notes in a total principal amount of $500.0 million in December 2001. The Senior Notes are guaranteed by the Company and all of the Company's wholly owned domestic subsidiaries other than its receivable, insurance and charitable subsidiaries (Guarantor Subsidiaries). In conjunction with certain sale-leaseback transactions, Products has issued lease payment guarantees on behalf of certain guarantor and non-guarantor subsidiaries. Since these lease payments are guaranteed, the leases are treated as capital lease obligations in the separate financial statements of those subsidiaries, but eliminated for consolidated financial statement purposes. The following are consolidating financial statements of the Company, Products, and its guarantor and non-guarantor subsidiaries:

23

Table of Contents

## SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF OPERATIONS

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | For the Quarter Ended September 30, 2004 | | |
| | | | | (in millions) | | |
| Net sales | $  — | $ 73.7 | $413.1 | $388.2 | $(10.2) | $864.8 |
| Cost of goods sold | — | 52.5 | 393.1 | 365.4 | (10.2) | 800.8 |
| Selling, general and administrative expenses | — | 39.7 | (6.4) | 2.0 | (0.1) | 35.2 |
| Restructuring charge | — | 0.3 | 2.3 | 6.4 | — | 9.0 |
| Impairment of long-lived assets | — | — | 3.3 | 7.0 | — | 10.3 |
| Operating income (loss) | — | (18.8) | 20.8 | 7.4 | 0.1 | 9.5 |
| Interest expense, net of interest income | — | 43.7 | (0.1) | 3.8 | (0.5) | 46.9 |
| Interest expense from subsidiary preferred stock dividends | — | 10.5 | — | — | — | 10.5 |
| Interest expense from subsidiary preferred stock accretion | — | 0.6 | — | — | — | 0.6 |
| Intercompany interest | — | (2.7) | (4.5) | 7.2 | — | — |
| Loss (gain) on sale of receivables | — | (0.2) | — | 2.6 | — | 2.4 |
| Loss on early extinguishment of debt | — | 18.8 | — | — | — | 18.8 |
| Other expense (income), net | — | (1.0) | 3.2 | (2.1) | (0.8) | (0.7) |
| Income (loss) from continuing operations before income taxes | — | (88.5) | 22.2 | (4.1) | 1.4 | (69.0) |
| Income tax expense (benefit) | — | (33.5) | 9.2 | 10.9 | — | (13.4) |
| Income (loss) from continuing operations | — | (55.0) | 13.0 | (15.0) | 1.4 | (55.6) |
| Equity in net income (loss) of subsidiaries | (55.6) | (0.6) | (18.4) | — | 74.6 | — |
| Net income (loss) | $(55.6) | $(55.6) | $ (5.4) | $(15.0) | $ 76.0 | $(55.6) |

24

Table of Contents

### SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF OPERATIONS

For the Quarter Ended September 30, 2003

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Net sales | $ — | $ 74.3 | $388.4 | $448.4 | $(8.9) | $902.2 |
| Cost of goods sold | — | 51.9 | 342.3 | 426.8 | (8.9) | 812.1 |
| Selling, general and administrative expenses | — | 44.5 | 2.8 | 10.4 | — | 57.7 |
| Restructuring charge | — | 18.4 | 0.2 | 3.3 | — | 21.9 |
| Impairment of long-lived assets | — | 0.7 | — | 1.5 | — | 2.2 |
| Operating income (loss) | — | (41.2) | 43.1 | 6.4 | — | 8.3 |
| Interest expense, net of interest income | — | 35.6 | (0.2) | 2.4 | — | 37.8 |
| Interest expense from subsidiary preferred stock dividends | — | 9.2 | — | — | — | 9.2 |
| Interest expense from subsidiary preferred stock accretion | — | 0.4 | — | — | — | 0.4 |
| Intercompany interest | — | (4.1) | (4.2) | 8.3 | — | — |
| Loss on sale of receivables | — | — | — | 1.8 | — | 1.8 |
| Loss on early extinguishment of debt | — | — | — | — | — | — |
| Other expense (income), net | — | (2.3) | 4.5 | (2.6) | 0.2 | (0.2) |
| Income (loss) from continuing operations before income taxes | — | (80.0) | 43.0 | (3.5) | (0.2) | (40.7) |
| Income tax expense (benefit) | — | (22.7) | 19.9 | (5.8) | — | (8.6) |
| Income (loss) from continuing operations | — | (57.3) | 23.1 | 2.3 | (0.2) | (32.1) |
| Cumulative effect of change in accounting principle | — | (0.2) | — | 0.2 | — | — |
| Equity in net income (loss) of subsidiaries | (32.1) | 25.4 | (0.4) | — | 7.1 | — |
| Net income (loss) | $(32.1) | $(32.1) | $ 22.7 | $ 2.5 | $ 6.9 | $(32.1) |

25

Table of Contents

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS**

**CONSOLIDATING STATEMENT OF OPERATIONS**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | For the Nine Months Ended September 30, 2004 | | |
| | | | | (in millions) | | |
| Net sales | $ — | $ 237.6 | $1,464.5 | $1,291.8 | $(26.4) | $2,967.5 |
| Cost of goods sold | — | 174.7 | 1,331.1 | 1,208.3 | (26.4) | 2,687.7 |
| Selling, general and administrative expenses | — | 160.3 | (24.9) | 1.9 | 7.4 | 144.7 |
| Restructuring charge | — | 6.0 | 6.3 | 16.6 | — | 28.9 |
| Impairment of long-lived assets | — | — | 28.6 | 12.1 | — | 40.7 |
| Operating income (loss) | — | (103.4) | 123.4 | 52.9 | (7.4) | 65.5 |
| Interest expense, net of interest income | — | 118.3 | (0.1) | 10.7 | (1.5) | 127.4 |
| Interest expense from subsidiary preferred stock dividends | — | 30.5 | — | — | — | 30.5 |
| Interest expense from subsidiary preferred stock accretion | — | 1.6 | — | — | — | 1.6 |
| Intercompany interest | — | (9.7) | (13.2) | 22.9 | — | — |
| Loss on sale of receivables | — | 0.1 | — | 7.1 | — | 7.2 |
| Loss on early extinguishment of debt | — | 20.3 | — | — | — | 20.3 |
| Other expense (income), net | — | — | 11.3 | (6.5) | (0.7) | 4.1 |
| Income (loss) from continuing operations before income taxes | — | (264.5) | 125.4 | 18.7 | (5.2) | (125.6) |
| Income tax expense (benefit) | — | (70.8) | 47.9 | 5.9 | — | (17.0) |
| Income (loss) from continuing operations | — | (193.7) | 77.5 | 12.8 | (5.2) | (108.6) |
| Equity in net income (loss) of subsidiaries | (108.6) | 85.1 | 3.8 | — | 19.7 | — |
| Net income (loss) | $(108.6) | $(108.6) | $ 81.3 | $ 12.8 | $ 14.5 | $ (108.6) |

26

Table of Contents

## SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF OPERATIONS

| | | | For the Nine Months Ended September 30, 2003 | | | |
|---|---|---|---|---|---|---|
| | **Parent** | **Issuer** | **Guarantors** | **Non-Guarantors** | **Eliminations** | **Consolidated Total** |
| | | | | (in millions) | | |
| Net sales | $ — | $ 237.5 | $1,585.7 | $1,167.6 | $(20.0) | $2,970.8 |
| Cost of goods sold | — | 167.7 | 1,410.5 | 1,100.1 | (20.0) | 2,658.3 |
| Selling, general and administrative expenses | 0.1 | 143.7 | 16.6 | 32.6 | — | 193.0 |
| Restructuring charge | — | 18.4 | 3.7 | 4.7 | — | 26.8 |
| Impairment of long-lived assets | — | 0.7 | 10.4 | 10.0 | — | 21.1 |
| Operating income (loss) | (0.1) | (93.0) | 144.5 | 20.2 | — | 71.6 |
| Interest expense, net of interest income | — | 106.4 | (0.2) | 5.1 | — | 111.3 |
| Interest expense from subsidiary preferred stock dividends | — | 22.4 | — | — | — | 22.4 |
| Interest expense from subsidiary preferred stock accretion | — | 4.8 | — | — | — | 4.8 |
| Intercompany interest | — | (17.8) | (13.5) | 31.3 | — | — |
| Loss on sale of receivables | — | — | — | 4.5 | — | 4.5 |
| Other expense (income), net | — | (1.8) | 16.6 | (39.8) | 1.1 | (23.9) |
| Income (loss) from continuing operations before income taxes | (0.1) | (207.0) | 141.6 | 19.1 | (1.1) | (47.5) |
| Income tax expense (benefit) | — | (55.9) | 52.1 | 3.9 | — | 0.1 |
| Income (loss) from continuing operations | (0.1) | (151.1) | 89.5 | 15.2 | (1.1) | (47.6) |
| Equity in net income (loss) of subsidiaries | (47.5) | 103.6 | (3.6) | — | (52.5) | |
| Net income (loss) | $(47.6) | $ (47.5) | $ 85.9 | $ 15.2 | $(53.6) | $ (47.6) |

27

A-158

Table of Contents

## SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS

### CONSOLIDATING BALANCE SHEET

As of September 30, 2004

|  | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
|  |  |  | (in millions) |  |  |  |
| **ASSETS** |  |  |  |  |  |  |
| Current Assets: |  |  |  |  |  |  |
| Cash and cash equivalents | $ — | $ (57.4) | $ 58.9 | $ 2.0 | $ — | $ 3.5 |
| Accounts and other receivables, net | — | 8.0 | 55.2 | 189.6 | 2.3 | 255.1 |
| Inventories | — | 14.3 | 97.3 | 67.3 | (0.1) | 178.8 |
| Other | — | 37.7 | 113.5 | 65.9 | — | 217.1 |
| Total current assets | — | 2.6 | 324.9 | 324.8 | 2.2 | 654.5 |
| Investment in subsidiaries | 340.1 | 1,748.6 | (25.9) | — | (2,062.8) | — |
| Property, plant and equipment, net | — | 51.7 | 337.2 | 464.6 | (47.5) | 806.0 |
| Goodwill | — | — | 1,101.7 | 276.8 | — | 1,378.5 |
| Other assets | — | 277.5 | 15.8 | 64.4 | — | 357.7 |
|  | $340.1 | $2,080.4 | $1,753.7 | $1,130.6 | $(2,108.1) | $3,196.7 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** |  |  |  |  |  |  |
| Current Liabilities: |  |  |  |  |  |  |
| Short-term borrowings | $ — | $ — | $ — | $ 25.3 | $ — | $ 25.3 |
| Current maturities of long-term debt and capital lease obligations | — | 5.1 | — | 3.4 | — | 8.5 |
| Accounts payable | — | 47.0 | 286.0 | 303.4 | (0.1) | 636.3 |
| Accrued expenses | — | 123.7 | 24.6 | 76.8 | — | 225.1 |
| Total current liabilities | — | 175.8 | 310.6 | 408.9 | (0.1) | 895.2 |
| Long-term debt and capital lease obligations | — | 1,355.9 | 5.9 | 40.8 | (41.4) | 1,361.2 |
| Mandatorily redeemable preferred stock of subsidiary | — | 193.3 | — | — | — | 193.3 |
| Intercompany payable (receivable) | — | (233.9) | (279.0) | 512.9 | — | — |
| Other, including pensions and post- retirement benefit obligation | — | 249.2 | 48.2 | 109.5 | — | 406.9 |
| Total liabilities | — | 1,740.3 | 85.7 | 1,072.1 | (41.5) | 2,856.6 |
| Total common stockholders' equity (deficit) | 340.1 | 340.1 | 1,668.0 | 58.5 | (2,066.6) | 340.1 |
|  | $340.1 | $2,080.4 | $1,753.7 | $1,130.6 | $(2,108.1) | $3,196.7 |

28

Table of Contents

### SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS

### CONSOLIDATING BALANCE SHEET

**As of December 31, 2003**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **ASSETS** | | | | | | |
| Current Assets: | | | | | | |
| Cash and cash equivalents | $ — | $ (71.2) | $ 78.4 | $ 6.0 | $ — | $ 13.2 |
| Accounts and other receivables, net | — | 1.1 | 34.4 | 220.4 | 1.4 | 257.3 |
| Inventories | — | 14.2 | 96.2 | 59.0 | — | 169.4 |
| Other | — | 47.8 | 105.4 | 59.0 | — | 212.2 |
| Total current assets | — | (8.1) | 314.4 | 344.4 | 1.4 | 652.1 |
| Investment in subsidiaries | 440.3 | 1,655.0 | (1.6) | — | (2,093.7) | — |
| Property, plant and equipment, net | — | 55.9 | 348.1 | 442.8 | (12.7) | 834.1 |
| Goodwill | — | — | 948.9 | 414.2 | — | 1,363.1 |
| Other assets | — | 276.0 | 11.4 | 54.5 | — | 341.9 |
| | $440.3 | $1,978.8 | $1,621.2 | $1,255.9 | $(2,105.0) | $3,191.2 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | | |
| Current Liabilities: | | | | | | |
| Short-term borrowings | $ — | $ — | $ — | $ 16.0 | $ — | $ 16.0 |
| Current maturities of long-term debt and capital lease obligations | — | 27.8 | 0.1 | 3.6 | — | 31.5 |
| Accounts payable | — | 46.0 | 301.4 | 291.5 | — | 638.9 |
| Accrued expenses | — | 146.9 | 2.2 | 90.4 | (0.6) | 238.9 |
| Total current liabilities | — | 220.7 | 303.7 | 401.5 | (0.6) | 925.3 |
| Long-term debt and capital lease obligations | — | 1,230.1 | — | 20.0 | (12.4) | 1,237.7 |
| Mandatorily redeemable preferred stock of subsidiary | — | 161.2 | — | — | — | 161.2 |
| Intercompany payable (receivable) | — | (317.3) | (215.7) | 533.0 | — | — |
| Other, including pensions and post- retirement benefit obligation | — | 243.8 | 74.9 | 108.0 | — | 426.7 |
| Total liabilities | — | 1,538.5 | 162.9 | 1,062.5 | (13.0) | 2,750.9 |
| Total common stockholders' equity (deficit) | 440.3 | 440.3 | 1,458.3 | 193.4 | (2,092.0) | 440.3 |
| | $440.3 | $1,978.8 | $1,621.2 | $1,255.9 | $(2,105.0) | $3,191.2 |

29

Table of Contents

## SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF CASH FLOWS

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by (used in) operating activities | $ — | $ 13.8 | $(43.9) | $ 21.2 | $ — | $ (8.9) |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment and other non-current assets | — | (3.3) | (62.7) | (85.3) | — | (151.3) |
| Sales of property, plant and equipment | — | | 26.6 | 33.8 | — | 60.4 |
| Payments of acquisitions and related costs | — | — | (2.7) | (0.5) | — | (3.2) |
| Net cash used in investing activities | — | (3.3) | (38.8) | (52.0) | — | (94.1) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issuance of long-term debt | — | 848.9 | — | — | — | 848.9 |
| Repayment of long-term debt | — | (799.7) | (0.1) | (2.8) | — | (802.6) |
| Payments for debt issuance costs | — | (15.6) | | | — | (15.6) |
| Decrease in short-term borrowings | — | | — | 8.9 | — | 8.9 |
| Net borrowings (repayments) on revolving credit facilities | — | 53.1 | — | — | — | 53.1 |
| Intercompany transfers to (from) subsidiary | — | (83.4) | 63.3 | 20.1 | — | — |
| Net cash provided by financing activities | — | 3.3 | 63.2 | 26.2 | — | 92.7 |
| Effect of exchange rate changes on cash | — | — | — | 0.6 | — | 0.6 |
| Increase (decrease) in cash and cash equivalents | — | 13.8 | (19.5) | (4.0) | — | (9.7) |
| Cash and cash equivalents at beginning of period | — | (71.2) | 78.4 | 6.0 | — | 13.2 |
| Cash and cash equivalents at end of period | $ — | $ (57.4) | $ 58.9 | $ 2.0 | $ — | $ 3.5 |

For the Nine Months Ended September 30, 2004

30

A-161

Table of Contents

## SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF CASH FLOWS

|  | For the Nine Months Ended September 30, 2003 | | | | | |
|---|---|---|---|---|---|---|
|  | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|  |  |  |  | (in millions) | | |
| **OPERATING ACTIVITIES** |  |  |  |  |  |  |
| Net cash provided by (used in) operating activities | $ — | $ 6.8 | $115.0 | $(77.8) | $ — | $ 44.0 |
| **INVESTING ACTIVITIES** |  |  |  |  |  |  |
| Additions to property, plant and equipment and other non-current assets | — | (11.7) | (54.9) | (53.3) | — | (119.9) |
| Sales of property, plant and equipment | — | — | 0.5 | 14.7 | — | 15.2 |
| Payments of acquisitions and related costs | — | — | (37.8) | — | — | (37.8) |
| Net cash used in investing activities | — | (11.7) | (92.2) | (38.6) | — | (142.5) |
| **FINANCING ACTIVITIES** |  |  |  |  |  |  |
| Issuance of long-term debt | — | — | — | — | — | — |
| Repayment of long-term debt | — | (21.6) | — | (0.8) | — | (22.4) |
| Decrease in short-term borrowings | — | — | — | 2.1 | — | 2.1 |
| Net borrowings (repayments) on revolving credit facilities | — | — | — | 58.5 | — | 58.5 |
| Intercompany transfers to (from) subsidiary | — | (21.4) | 26.2 | (4.8) | — | — |
| Net cash provided by (used in) financing activities | — | (43.0) | 26.2 | 55.0 | — | 38.2 |
| Effect of exchange rate changes on cash | — | — | — | 1.5 | — | 1.5 |
| Increase (decrease) in cash and cash equivalents | — | (47.9) | 49.0 | (59.9) | — | (58.8) |
| Cash and cash equivalents at beginning of period | — | 0.2 | 0.3 | 80.8 | — | 81.3 |
| Cash and cash equivalents at end of period | $ — | $(47.7) | $ 49.3 | $ 20.9 | $ — | $ 22.5 |

31

A-162

Table of Contents

**Item 2.** *Management's Discussion and Analysis of Financial Condition and Results of Operations*

## GENERAL

*The following discussion and analysis of our financial condition and results of operations includes statements concerning our expectations for our industry and our performance. These statements are forward-looking statements and are subject to numerous risks and uncertainties, including those highlighted elsewhere under "Cautionary Statements Concerning Forward-Looking Information and Risk Factors." Our actual results may differ materially from those contained or implied by the following discussion.*

### Introduction

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric and interior trim, as well as exterior trim and convertible roof systems. In reviewing the Company's results for the periods discussed, consideration should be given to the following critical events: the impact of the material acquisitions that we have made, the numerous restructuring and acquisition integration activities that we have undertaken, the material impact of general economic conditions in North America and within our industry specifically, the increasingly difficult customer and competitive environment, the capital intensive nature of our business and our high degree of leverage and liquidity and debt maturity position.

*Key Factors Impacting Our Reported Results.* Critical factors affecting our ability to succeed include the following:

- *Automotive Sales and OEM Production Levels.* In North America, the Company manufactures components for approximately 90% of all light vehicle production platforms. Sales are primarily made to North American based global OEMs, as well as Asian and European based global OEMs. The automotive supply industry in which the Company competes is cyclical and is influenced by the level of North American and Western European vehicle production. The Company's sales results are influenced heavily by the volume of OEM production of light vehicles (*"builds"*) in the markets it serves. Industry wide NAFTA builds were down almost 1% for the quarter ended September 30, 2004 versus the same period of 2003 and were flat for the nine month comparable periods. Within NAFTA, the builds of the Big 3 OEM's were down approximately 4% and 3% for the quarter and nine month period over period, respectively. Industry wide, for Europe, third quarter and nine month builds were up 2% and 1% for 2004 compared to 2003, respectively, while builds in South America were up 30% for the third quarter and nine month period over period.

- *Our relationships with our customers.* Collins & Aikman does business with all of the world's largest vehicle manufacturers including Ford, General Motors, DaimlerChrysler, Toyota, Honda, Nissan, Volkswagen, Renault and Porsche. These relationships have typically developed over a period of many years, and have, in many cases, been enhanced by the Company's recent acquisitions, which have provided the Company with a resulting global footprint and capacity to supply a full range of interior products. In each case, there is a complex mutual dependency and cooperation between the Company and its customers necessary to ensure that vehicle programs are successful in key areas of quality, timing and cost. At the same time, customer expectations are evolving, as vehicle manufacturers continue to outsource more design and integration responsibilities to the Company and other Tier 1 suppliers. As a result, customer satisfaction, especially at critical inflexion points (such as new vehicle launches and vehicle refreshes), has become more complicated and places significant demands on the Company's resources. Also, there is an inherent tension between the Company and its customers resulting from intense competition and pricing pressures within the industry. For example, OEM customers in the automotive industry attempted to impose price decreases and givebacks. Such attempted price decreases were generally in the 2% to 4% range. Several reductions have been agreed to, and others are currently being negotiated with OEMs and pressures may increase if overall economic and industry conditions do not improve. Finally, on some vehicle programs involving component integration at the Tier 1-level, the Company is either a supplier to, or a customer of, some of its largest Tier 1 competitors, such as Delphi, Visteon and Lear. These types of arrangements are

32

Table of Contents

becoming more common within the industry and add a new level of complexity to customer relationships, including the relationship with the vehicle manufacturer as the ultimate customer.

- *Our ability to secure profitable new business.* The Company actively pursues new business opportunities with its traditional customer base as well as with potential new customers. The Company seeks to distinguish itself on a variety of factors, including its global footprint, its capacity to supply a full range of interior products and its full-service capabilities (such as design, engineering, manufacturing and quality services). There is intense competition and pricing pressure on all of these opportunities. Price is typically achieved through direct negotiations with the customer, but in certain instances customers have utilized auctions or relied on benchmarking data that have included reputed world class suppliers in emerging markets. At the same time, the Company seeks to manage its cost structure through a variety of strategies, such as vertical integration initiatives that provide greater cost control opportunities. For example, since the Company is a major purchaser of raw materials like resins, it can arrange favorable supply contracts and benefit broadly from material science developments and product simplification. Additionally, the Company believes that it has the world's largest fleet of injection molding equipment for automotive products, which provides a unique ability to benefit from process improvements and best practices with respect to its plastics products on a global basis.

- *Our ability to successfully realize the benefits of our restructuring and integration initiatives.* The Company has undertaken a series of restructuring and integration initiatives to rationalize first its global manufacturing footprint and more recently its salaried workforce, including home office headcount. These activities are expected to have the following primary benefits: First, the Company has closed about 20 subscale plants and other facilities such as warehouses and consolidated activity into 80 world-class operations, which will result in a significant densification of production and resulting gains in fixed cost absorption and operating efficiencies. Second, the Company is beginning to win more *"bundled"* awards — with a full range of slush molded, injection molded and carpet, acoustics and fabric components on new vehicle programs. And third, the Company's salaried workforce will shrink by more than 20% from the legacy levels, while effectiveness and customer service levels will improve due to consolidation, standardization and level-loading of support infrastructure.

- *The impact of raw materials and energy costs.* The Company is a significant consumer of plastic resins and polyester and nylon fibers, which presents both a challenge and an opportunity for the Company. The challenge results from the Company's sensitivity to price movements in these raw materials (such as those related to recent short run spikes in the oil market), while the opportunity arises from the Company's ability to leverage its buying power as, in management's opinion, the largest single automotive grade resin buyer in the world. The Company has largely been able to avoid these pricing pressures due to its ability to negotiate with a variety of global suppliers and to shift volume from one supplier to another. However, it is possible that the Company may begin to see increased cost pressure if the spikes in the oil market continue. The Company's customers have historically been reluctant to provide pricing relief based on this type of raw material cost increases, as recently demonstrated in the handling of the recent near tripling of global steel prices.

- *Our liquidity and capital resources.* The Company is highly leveraged, due primarily to financing associated with recent acquisitions. Another contributing factor has been that most new business awards in the automotive industry require that suppliers advance certain costs relating to tooling and engineering and design services, which in some cases are incurred years before vehicle launch and are reimbursed over many years following vehicle launch as part of the piece price. In February 2004, the Company obtained amendments to its credit facilities that significantly loosened the principal financial covenants. The Company also obtained an additional revolving credit facility of $100 million and a new term loan in the amount of $185 million, the proceeds of which were used to pre-fund debt amortization requirements. As a result, the Company has greatly improved its financial flexibility and liquidity and has no significant amortization requirements until June 2010.

33

Table of Contents

*Impact of Acquisitions.* Our results for the periods discussed have been impacted by several key acquisitions, which, together with related financing transactions, have substantially increased revenues and cash flow and materially altered the Company's capital and operating structure.

For example, in 2001, the Company completed three key acquisitions: (1) the acquisition of Becker Group L.L.C., a leading supplier of plastic components to the automotive industry, (2) the acquisition of Joan Automotive Fabrics, a leading supplier of body cloth to the automotive industry, and Joan's affiliated yarn dyeing operation, Western Avenue Dyers, L.P., and (3) the acquisition of Textron Automotive Company's Trim division (TAC-Trim), one of the largest suppliers of instrument panels and fully assembled cockpit modules and a major automotive plastics manufacturer of interior and exterior trim components in North America, Europe and South America. These acquisitions, together with the Company's 2002 acquisition of Southwest Laminates, a fabric lamination business, contributed approximately $2 billion of additional net sales in 2002 and drove the 113% increase in net sales from the prior year. In addition, these acquisitions were financed by varying combinations of the Company's common stock and preferred stock, warrants to purchase the Company's common stock, cash on hand and borrowings under a revolving credit facility, public issuances of debt and sales of the acquired companies' accounts receivable under the receivables facility.

The Company also completed the following acquisitions in 2002 and 2003: (1) the acquisition of Dutton Yarns' yarn texturizing business, (2) the acquisition of Delphi Corp.'s plastic injection molding plant and related equipment in Logroño, Spain, and (3) the acquisition from Textron of the remaining 50% interest of an Italian automotive joint venture. These transactions have likewise impacted the Company's financial results and capital structure, although not to the same degree as the transactions described above.

*Impact of Integration Activities and Restructuring Initiatives.* We have devoted considerable efforts beginning in 2001 to properly integrate the acquired companies. We have also implemented a series of restructuring initiatives to ensure that the resulting combined operations have the proper structure and necessary resources to perform on a profitable basis. These initiatives were directed initially at establishing a proper, global manufacturing footprint and included combining and rationalizing the Company's legacy and acquired operations in North America, Europe and South America. More recent restructuring initiatives have focused on developing an appropriate overhead structure, including strengthening and streamlining the senior management team on a worldwide basis. As a consequence of these restructuring initiatives, the Company has incurred significant restructuring and impairment charges in each of 2001, 2002, 2003 and 2004 for severance costs, plant and office closures, equipment and lease impairments, contractual obligations and other restructuring activities, which have impacted cash flow, operating income and net income. For a more detailed description of these charges, see Note 11, *"Restructuring and Impairment."*

*Key Indicators of Performance.* In evaluating our business, our management uses operating income as an important indicator of performance. In addition, management also considers EBITDA to be a useful proxy for measuring the cash generated by our business, and it is commonly used in the industry to analyze operating performance, liquidity and entity valuation. We define EBITDA as operating income plus depreciation and amortization. Management believes EBITDA to be a good measure of operating performance because cash generation is necessary for the Company to achieve many of the critical success factors outlined above, including investment in cost reduction activities, reducing leverage and improving liquidity. Additionally, management reviews return on invested capital, working capital changes and capital expenditures as critical financial performance metrics. Management also uses certain non-financial metrics of performance, including equipment utilization and efficiency; service, production and first time quality performance; set up and tool changeover time; employee turnover and absenteeism; and safety performance.

34

Table of Contents

**Results of Operations**
(Dollars in millions)

*Quarter Ended September 30, 2004 versus Quarter Ended September 30, 2003*

Analysis of sales for each of our segments for the third quarter of 2004 and 2003 are as follows:

| | Quarter Ended September 30, | | | | | | |
|---|---|---|---|---|---|---|---|
| | Net Sales | | | | Composition of Dollar Change | | |
| | 2004 | 2003 | Dollar Change | % Change | Foreign Exchange Effects | Commercial Items(1) | Volume, Mix & Other(2) |
| U.S. and Mexico Plastics | $261.7 | $312.0 | $(50.3) | (16.1)% | $ — | $ (3.9) | $(46.4) |
| International Plastics | 319.6 | 273.8 | 45.8 | 16.7% | 21.2 | (3.7) | 28.3 |
| Global Soft Trim | 283.5 | 316.4 | (32.9) | (10.4)% | 4.5 | (6.5) | (30.9) |
| Other | — | — | — | | — | — | — |
| Consolidated | $864.8 | $902.2 | $(37.4) | (4.1)% | $25.7 | $(14.1) | $(49.0) |

(1)  Commercial items include customer price increases and decreases affecting reported sales revenue.

(2)  Volume, Mix and Other is the remaining impact after excluding the effects of currency movements and commercial items

Overall sales revenue for the quarter declined primarily due to longer summer vacation shutdowns largely related to adjustments to dealer inventory levels and new model year changeover on several significant programs on which the Company was the incumbent supplier. The strengthening of the Euro, British Pound and Canadian dollar against the U.S. dollar since the third quarter of 2003 had a positive impact on our sales revenue. Several other factors decreasing third quarter revenue were competitive bidding, discontinued products and customer assembly plant production schedule adjustments on programs where the Company has significant content.

U.S. and Mexico Plastics experienced a sales decline resulting from the aforementioned items and a transfer of assembly content to an International Plastics segment location in Canada. This shift in content to Canada was part of a major new award of cockpit and sequencing business on a vehicle that launched in the first quarter of 2004.

In addition to the favorable currency gains mentioned above, International Plastics sales revenue increased due to volume growth for incremental cockpit and sequencing business. Also, a strategic initiative increased export business at our South American operations. A significant increase in third quarter volume on a major car platform in Europe also accounted for additional growth in sales revenue in the International Plastics segment.

Global Soft Trim segment sales declined primarily as a result of discontinued business. Along with the aforementioned items new model year changeovers also significantly reduced Global Soft Trim sales revenues.

Table of Contents

*Gross Profit Analysis by Segment*

| | Gross Profit | | | | As a Percentage of Sales | | | |
| | 2004 | 2003 | Dollar Change | % Change | 2004 | 2003 | Increase (Decrease) | % Change |
|---|---|---|---|---|---|---|---|---|
| U.S. and Mexico Plastics | $14.3 | $27.3 | $(13.0) | (47.6)% | 5.5% | 8.8% | (3.3)% | (37.5)% |
| International Plastics | 18.2 | 14.3 | 3.9 | 27.3% | 5.7% | 5.2% | 0.5% | 9.6% |
| Global Soft Trim | 31.0 | 46.7 | (15.7) | (33.6)% | 10.9% | 14.8% | (3.9)% | (26.4)% |
| Other | 0.5 | 1.8 | (1.3) | (72.2)% | — | — | — | — |
| Consolidated | $64.0 | $90.1 | $(26.1) | (29.0)% | 7.4% | 10.0% | (2.6)% | (26.0)% |

Quarter Ended September 30,

Overall gross profit was impacted by the aforementioned decline in sales and higher lease costs due to the sale-leasebacks of buildings and equipment previously owned by the Company. Also, customer price reductions could not be offset by raw material cost savings to the extent previously expected due to higher costs for injection resins. Partially offsetting the decrease in gross profit was $4.6 million due to the termination of post-retirement benefits. To conform to the current year presentation, the 2003 amounts reflect a reclassification to costs of sales of $5.4 million in manufacturing facility lease costs previously recognized as selling, general and administrative expenses.

Gross profit at the U.S. and Mexico Plastics segment has decreased primarily due to the reduction in sales. Pressure in resin pricing resulted in higher material costs. These negative gross profit impacts, along with customer givebacks, were partially offset by positive influences from manufacturing efficiencies and savings from a plant closure.

The International Plastics segment's gross profit was positively impacted by the increase in their sales highlighted above, as well as material cost savings initiatives at several plants, partially offset by commercial items.

Global Soft Trim's gross profit decline was mainly due to the reduction in sales and commercial items, offset by savings realized from manufacturing efficiencies.

| | Quarter Ended September 30, | | |
| | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Selling, General and Administrative Expenses | $35.2 | $57.7 | $(22.5) |

Selling, general and administrative expenses decreased from 6.4% of sales in the third quarter 2003 to 4.1% in 2004. Contributing to the cost decrease were savings realized in connection with the salaried workforce restructuring programs and realization of the Company's cost cutting initiatives. Also impacting the decrease is the termination of post-retirement benefits, which per actuary calculations decreased selling, general and administrative expenses by $5.2 million.

*Restructuring Charges:* During the third quarter 2004, the Company continued its initiative to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $12.0 million. The 2004 third quarter charge included approximately $10.3 million of severance cost, affecting approximately 882 personnel and $1.7 million of costs related to the establishment of accruals for lease commitments and other exit costs. Offsetting the third quarter restructuring charge are adjustments to previously established accruals, not requiring cash outlays, totaling $3.0 million, resulting in a net expense of $9.0 million.

In the third quarter of 2003, the Company undertook a restructuring program to rationalize operations on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of $21.9 million. The 2003 charge included approximately $16.8 million of severance cost and $5.1 million of costs related to the establishment of reserves

for lease commitments and other exit costs.

36

Table of Contents

*Impairment of Long-Lived Assets:* During the third quarter 2004, the Company recognized an $10.3 million write-down of fixed assets primarily related to the closing of an International Plastics plant totaling $7.0 million. The $3.3 million remaining fixed asset write down was related to Global Soft Trim locations.

In the third quarter 2003, the Company recognized a $2.2 million write-down of fixed assets related to an International Plastics location.

|  | Quarter Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Operating Income | $9.5 | $8.3 | $1.2 |

The positive effect of lower selling, general and administrative costs along with a decrease in restructuring costs more than offset the decline in sales and gross profit described above. The net result was an increase in operating income of $1.2 million for the third quarter 2004 when compared to the same quarter in 2003.

|  | Quarter Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Interest Expense | $46.9 | $37.8 | $9.1 |

The increase in interest expense is related to approximately $6.2 million of additional interest on the new Senior Subordinated Notes due 2012 as they overlapped for 41 days with the prior Senior Subordinated Notes due 2006 which were refinanced. The remainder of the increase is due to higher average debt balances period over period.

|  | Quarter Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Loss on Sale of Receivables | $2.4 | $1.8 | $0.6 |

Throughout the normal course of business, receivables are sold to non-recourse facilities and through factoring arrangements, and a loss is recorded. The increase in loss is due to higher facility usage of existing agreements and new facilities entered into in 2004.

|  | Quarter Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Other Expense (Income), Net | $(0.7) | $(0.2) | $(0.5) |

In the third quarter 2004, other expense (income), net included $2 million of foreign currency transaction gains, offset by minority interest share of gains of a consolidated subsidiary and losses related to derivatives used in the Company's foreign currency hedging strategy.

In the third quarter 2003, other expense (income), net primarily included $1 million of losses related to credit default swaps used in the Company's U.S. accounts receivable securitization program, offset by minority interest in a consolidated subsidiary of $2 million.

A-170

|  | Quarter Ended September 30, | | |
|---|---|---|---|
|  | 2004 | 2003 | Dollar Change |
| Income Tax Benefit | $(13.4) | $(8.6) | $(4.8) |

The primary reasons for the Company's effective tax rate being different from its statutory rate are non-deductible preferred stock interest and accretion, foreign losses for which tax benefits are not recognized and

37

Table of Contents

state and foreign taxes that do not fluctuate directly with income, partially offset by the effect of intercompany financing and tax credits. Net cash taxes paid during the period were $2.3 million

*Nine Months Ended September 30, 2004 versus Nine Months Ended September 30, 2003*

Analysis of sales for each of our segments for the first nine months of 2004 and 2003 are as follows:

| | Nine Months Ended September 30, | | | | | | |
|---|---|---|---|---|---|---|---|
| | Net Sales | | | | Composition of Dollar Change | | |
| | 2004 | 2003 | Dollar Change | % Change | Foreign Exchange Effects | Commercial Items(1) | Volume, Mix & Other(2) |
| U.S. and Mexico Plastics | $ 947.6 | $1,018.2 | $(70.6) | (6.9)% | $ — | $(15.6) | $(55.0) |
| International Plastics | 1,072.8 | 917.9 | 154.9 | 16.9% | 89.8 | (10.0) | 75.1 |
| Global Soft Trim | 947.1 | 1,034.7 | (87.6) | (8.5)% | 17.9 | (16.8) | (88.7) |
| Other | — | — | — | | — | | — |
| Consolidated | $2,967.5 | $2,970.8 | $ (3.3) | (0.1)% | $107.7 | $(42.4) | $(68.6) |

(1)  Commercial items include customer price increases and decreases affecting reported sales revenue.

(2)  Volume, mix and Other is the remaining impact after excluding the effects of currency movements and commercial items

Total sales for the nine months ended September 30, 2004 when compared to the same 2003 period were relatively flat. New program launches and the strengthening of the Euro, British Pound and Canadian dollar against the U.S. dollar during the first nine months of 2004 compared to 2003 had a positive impact on our sales revenue. The negative volume mix change relates to elevated dealer inventory levels, competitive bidding, discontinued products and new model year changeover on several large programs on which the Company is the incumbent supplier. Finally, customer assembly plant production schedule adjustments on programs where the Company has significant content had a negative effect on sales.

U.S. and Mexico Plastics experienced a sales decline resulting from the aforementioned items and a transfer of assembly content to an International Plastics segment location in Canada. This shift in content to Canada was part of a major new award of cockpit and sequencing business on a vehicle that launched in the first quarter of 2004. Partially offsetting these decreases was new business from a major new program launch.

In addition to the favorable currency gains mentioned above, International Plastics sales revenue increased due to volume growth for incremental cockpit and sequencing business. Also, a strategic initiative increased export business at our South American operations. A 20% increase in third quarter volume on a major car platform in Europe also accounted for additional growth in sales revenue in the International Plastics segment.

Global Soft Trim segment sales declined primarily as a result of discontinued business. Along with the aforementioned items, new model year changeovers also significantly reduced Soft Trim sales revenues.

38

Table of Contents

*Gross Profit Analysis by Segment*

| | | Nine Months Ended September 30, | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Gross Profit** | | | | **As a Percentage of Sales** | | | |
| | 2004 | 2003 | Dollar Change | % Change | 2004 | 2003 | Increase (Decrease) | % Change |
| U.S. and Mexico Plastics | $ 78.0 | $ 94.7 | $(16.7) | (17.6)% | 8.2% | 9.3% | (1.1)% | (11.8)% |
| International Plastics | 62.8 | 35.4 | 27.4 | 77.4% | 5.9% | 3.9% | 2.0% | 51.3% |
| Global Soft Trim | 137.2 | 179.3 | (42.1) | (23.5)% | 14.5% | 17.3% | (2.8)% | (16.2)% |
| Other | 1.8 | 3.1 | (1.3) | (41.9)% | — | — | — | — |
| Consolidated | $279.8 | $312.5 | $(32.7) | (10.5)% | 9.4% | 10.5% | (1.1)% | (10.5)% |

Overall gross profit was impacted by the aforementioned decline in sales and higher lease costs from sale-leasebacks of buildings and equipment. Partially offsetting the decrease in gross profit was $4.6 million due to the termination of post-retirement benefits. To conform to the current year presentation, the 2003 amounts reflect a reclassification to cost of sales of $17.1 million in manufacturing facility lease costs previously recognized as selling, general and administrative expenses.

Gross profit at the U.S. and Mexico Plastics segment has decreased primarily due to the reduction in sales. Pressure in resin pricing resulted in higher material costs. These negative gross profit impacts, along with customer givebacks, were partially offset by positive influences from manufacturing efficiencies and savings from a plant closure.

The International Plastics segment's gross profit was positively impacted by their sales highlighted above, as well as manufacturing efficiencies and material cost savings initiatives at several plants, partially offset by commercial items.

Global Soft Trim's gross profit decline was mainly due to the reduction in sales, commercial items and material price increases, offset by savings realized from manufacturing efficiencies

| | Nine Months Ended September 30, | | |
|---|---|---|---|
| | 2004 | 2003 | Dollar Change |
| Selling, General and Administrative Expenses | $144.7 | $193.0 | $(48.3) |

Selling, general and administrative expenses decreased from 6.5% of sales in the first nine months of 2003 to 4.9% in the comparable period of 2004. Contributing to the cost decrease were savings realized in connection with the salaried workforce restructuring programs and realization of the Company's cost cutting initiatives. Also impacting the decrease is the termination of post-retirement benefits, which per actuary calculations decreased selling, general and administrative expenses by $5.2 million.

*Restructuring Charges:* During the third quarter 2004, the Company continued its initiative to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $12.0 million. The third quarter 2004 charge included $10.3 million of severance cost, affecting approximately 882 personnel and $1.7 million of costs related to the establishment of accruals for lease commitments and other exit costs. Offsetting the third quarter restructuring charge are adjustments to previously established accruals not requiring a cash outlay totaling $3.0 million, resulting in a net expense of $9.0 million.

In the second quarter 2004, the Company undertook a restructuring program to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $10.4 million. The 2004 charge included approximately $9.1 million of severance

cost, affecting approximately 550 personnel and $1.3 million of costs related to the establishment of accruals for lease commitments and other exit costs.

39

Table of Contents

The Company under took a restructuring program costing $9.5 million in the first quarter of 2004. The 2004 charge included $7.6 million of severance cost and $1.8 million of other exit costs and affected approximately 260 personnel. Also included in the restructuring charge are expenses related to 2003 programs of $1.1 million, offset by an adjustment related to a previously established accrual, which did not require cash outlays of $1.0 million.

During the third quarter 2003, the Company undertook a restructuring program to rationalize operations on a worldwide basis with the primary focus on domestic operations resulting in restructuring charge of $21.9 million. The 2003 charge included approximately $16.8 million of severance cost and $5.1 million of costs related to the establishment of reserves for lease commitments and other exit costs.

During the second quarter 2003, the Company undertook a restructuring program to rationalize operations on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of $4.9 million. The 2003 charge included approximately $4.2 million of severance cost and $0.7 million of costs related to the establishment of reserves for lease commitments and other exit costs.

*Impairment of Long-Lived Assets:* During the third quarter 2004, the Company recognized an $10.3 million write-down of fixed assets primarily related to the closing of an International Plastics plant totaling $7.0 million. The $3.3 million remaining fixed asset write down was related to Global Soft Trim locations.

In the second quarter 2004, the Company recognized a $27.4 million write-down of fixed assets primarily related to the Company impairing $13.6 million of Intellimold assets, including a $2.7 million patent, a finite intangible asset, acquired as part of the TAC-Trim acquisition. Additionally, the Company impaired $11.0 million of customer contracts as a result of changes in customer sourcing. The $2.8 million remaining fixed asset write down was related primarily to Global Soft Trim locations.

During the first quarter 2004, the Company recognized a $3.0 million write-down of fixed assets as a result of the first quarter restructuring program.

Throughout the nine months ended September 30, 2003, the Company recognized a $10.7 million write-down of fixed assets, $7.7 million of which related to the initial 50% interest acquired in an Italian joint venture and $3.0 million related to an International Plastics location. The Company also recognized a $10.4 million impairment of the Becker non-compete agreement.

|  | Nine Months Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
| --- | --- | --- | --- |
| Operating Income | $65.5 | $71.6 | $(6.1) |

The positive effect of lower selling, general and administrative costs partially offset the increase in restructuring costs and the decline in sales and gross profit described above. The net result was a decrease in operating income of $6.1 million for the nine months ended September 30, 2004 when compared to the same period in 2003.

|  | Nine Months Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
| --- | --- | --- | --- |
| Interest Expense | $127.4 | $111.3 | $16.1 |

The increase in interest expense is related to approximately $6.2 million of additional interest on the new Senior Subordinated Notes due 2012 as they overlapped for 41 days with the prior Senior Subordinated Notes due 2006 which were refinanced. The remainder of the increase is due to higher average debt balances period over period and additional amortization of financing fees.

| | Nine Months Ended September 30, | | |
| | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Loss on Sale of Receivables | $7.2 | $4.5 | $2.7 |

40

Table of Contents

Throughout the normal course of business, receivables are sold to non-recourse facilities and through factoring arrangements, and a loss is recorded. The increase in loss is due to higher facility usage of existing agreements and new facilities entered into in 2004.

|  | Nine Months Ended September 30, | | |
| --- | --- | --- | --- |
|  | 2004 | 2003 | Dollar Change |
| Other Expense (Income), Net | $4.1 | $(23.9) | $28.0 |

In the nine months ended September 30, 2004, other expense (income), net included $4 million of foreign currency transaction losses and $2 million of losses related to derivatives used in the Company's foreign currency hedging strategy, offset by minority interest share of losses of a consolidated subsidiary of $2 million.

In the nine months ended September 30, 2003, other expense (income), net primarily included $24 million of foreign currency transaction gains and minority interest share of losses of a consolidated subsidiary of $4 million primarily offset by $3 million of losses related to derivatives used in the Company's hedging strategies.

|  | Nine Months Ended September 30, | | |
| --- | --- | --- | --- |
|  | 2004 | 2003 | Dollar Change |
| Income Tax Expense (Benefit) | $(17.0) | $0.1 | $(17.1) |

The primary reasons for the Company's effective tax rate being different from its statutory rate are non-deductible preferred stock interest and accretion, foreign losses for which tax benefits are not recognized and state and foreign taxes that do not fluctuate directly with income, partially offset by the effect of intercompany financing and tax credits. Net cash taxes paid during the period were $7.6 million

## Liquidity and Capital Resources

The Company and its subsidiaries had cash and cash equivalents totaling $3.5 million and $13.2 million at September 30, 2004 and December 31, 2003, respectively.

The Company's principal sources of funds are cash generated from operating activities and borrowings under its revolving credit facilities, receivables arrangements and sale leaseback arrangements. In addition, to facilitate the collection of funds from operating activities, the Company has sold receivables under its receivables facility and has also entered into accelerated payment collection programs with its larger customers. If those additional liquidity sources were to become unavailable or limited by customer concentration or credit quality or otherwise, the Company would require additional capital, access to which is not assured.

The Company believes that cash flow from operations, together with its revolving credit facilities, receivables arrangements, leasing arrangements and cash generations projects will provide adequate sources of liquidity to fund operations. The Company continues to seek means to generate additional cash for debt reduction and its growth strategy. Among its potential cash generation projects, the Company seeks to further improve working capital management (including factoring of receivables) and to continue to utilize lease financings.

Aggregate unutilized availability under the Company's financing facilities at September 30, 2004 was $182.7 million, consisting of $163.2 million under the Company's senior secured credit facilities and $19.5 million under uncommitted bank facilities in foreign locations. At September 30, 2004 the Company's receivables facility was fully drawn relative to available collateral. Limitations on the Company's availability are based on financial performance and target levels established by the covenants. At September 30, 2004, of the $182.7 million in aggregate unutilized availability under the facilities, $6.8 million would not have been

41

available due to covenant constraints. As of September 30, 2004, the Company believes it is in compliance with all covenants under our various obligations.

The Company was recently informed that certain of the accelerated payment collection programs with its larger customers will be discontinued in 2005 and that one of those customers, Ford Motor Company, intends to phase out its accelerated payment collection program from September 2004 through December 2004. At September 30, 2004, the Company had approximately $10.2 million collected under the Ford program. These programs have materially enhanced our liquidity in the past. At September 30, 2004, the Company had approximately $130.9 million collected under these arrangements, including the Ford program. The impact of the discontinuance of these programs is expected to be partially offset by a greater utilization of our existing $250 million accounts receivable securitization facility. The existing receivables facility expires on December 20, 2004, and the Company expects to have a multi-year replacement facility established before that time. The Company will also consider replacement accelerated payment programs offered on behalf of our customers or through other financial intermediaries. However, we may not be able to timely or fully replace these arrangements, and the new terms of any such program may be less advantageous than current arrangements. If the Company is unable to replace these arrangements, it could adversely affect its liquidity under its senior secured credit facilities.

*Operating Activities*

Net cash used in operating activities was $8.9 million for the nine months ended September 30, 2004, compared to net cash provided by operating activities of $44.0 million for the nine months ended September 30, 2003. The 2004 decrease is primarily the result of an increase in net loss, an increase in accounts receivable and increases in other assets, offset by improvements in working capital changes, an increase in proceeds from participating interests in accounts receivable, and a decrease in accounts receivable factored.

*Investing Activities*

Net cash used in investing activities was $94.1 million for the nine months ended September 30, 2004, compared to $142.5 million for the nine months ended September 30, 2003. The decrease in cash used in investing activities is primarily the result of receiving $45.2 million more of proceeds from the sale of property, plant and equipment primarily sale-leaseback transactions and a decrease of $34.6 million of business acquisition costs offset by $31.4 million more of capital expenditures.

*Financing Activities*

Net cash provided by financing activities for the nine months ended September 30, 2004 was $92.7 million compared to net cash provided by financing activities for the nine months ended September 30, 2003 of $38.2 million. This increase in cash provided from financing activities is the result of $54.5 million increase in net borrowings.

In the third quarter of 2004, the Company refinanced its existing senior secured credit facilities in order to extend debt maturities and enhance financial and operating flexibility. Through a syndicate of financial institutions the Company entered into debt agreements for a 5 year $105 million revolving credit facility and a 5 year $170 million supplemental credit facility. In addition, the Company issued $415 million aggregate principal amount of 12 7/8% Senior Subordinated Notes due 2012 at a $14.7 million discount.

The Company incurred an $18.8 million loss on debt extinguishment as a result of these transactions due primarily to the write-off of existing debt issuance costs. The proceeds of the new financing were primarily used to repay outstanding borrowings under the prior Senior Subordinated Notes and pay fees and expenses related to the refinancing. The remaining proceeds were used for general corporate purposes.

During the first quarter of 2004, in conjunction with the fifth amendment to its Senior Secured Credit Facilities, the Company recognized a $1.5 million loss on early extinguishment of debt.

**Outlook**

A-179

To further enhance North American automobile revenues, OEM's continue to offer incentives to increase sales volumes. However, sales for the fourth quarter of 2004 are projected to be 5%-10% lower than the prior

42

**Table of Contents**

year primarily due to reduced OEM production levels and inventory adjustments on several vehicle platforms in North America and Europe.

The Company's principal uses of funds from operating activities and borrowings for the next several years are expected to fund interest and principal payments on its indebtedness, growth related working capital increases, capital expenditures, product launches and lease expenses. Consistent with the automotive supply industry, the Company continues to experience significant competitive pressure and expects to face continued downward cost pressure from vehicle manufacturers. The Company has an ongoing aggressive plan to improve the various operating performance at all of its facilities. While improvements are being made, further work remains to bring all plants to a profitable level on a continuing basis. In addition, the Company recently confirmed its strategy for new business, which involves pursuing sales growth based on criteria intended to more effectively allocate the Company's resources to the most promising new business opportunities. As part of this strategy, the Company reviewed its parts profitability for each plant and program worldwide.

Management believes cash flow from operations, together with its revolving credit facility, receivables arrangements and sale and leaseback arrangements will provide adequate sources of liquidity for the Company to fund its operations. However, the Company's sources of liquidity may be inadequate if the Company is unable to meet its operating targets, which would cause the Company to seek covenant relief from its existing lenders in the near future. In addition, matters affecting the credit quality of our significant customers could adversely impact the availability of our receivables arrangements and our liquidity. The Company continues to explore other sources of liquidity, including additional debt, but existing debt instruments may limit the Company's ability to incur additional debt, and the Company may be unable to secure equity or other financing.

We continually discuss commercial issues and broader relationship issues with our customers. While we seek to improve the profitability of our programs with our customers, there can be no assurance that we will not lose desirable programs over time. While we continue to believe that issues will be resolved to the mutual satisfaction of the parties on an ongoing basis, there can be no assurances that such a resolution will be timely obtained or, whether or not obtained, will not have a material adverse impact on us.

*Contractual Obligations*

Below is the table that identifies the Company's significant contractual obligations. Following the table is a more detailed description of these obligations.

|  | | Payment due by Period | | | |
|---|---|---|---|---|---|
|  | Total | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
|  | | | (In millions) | | |
| Short-term borrowings | $ 25.3 | $ 25.3 | $ — | $ — | $ — |
| Long-term debt and capital lease obligations | 1,369.7 | 8.5 | 13.5 | 67.4 | 1,280.3 |
| Preferred stock(a) | 193.3 | — | — | — | 193.3 |
| Operating leases(b) | 371.2 | 27.0 | 86.1 | 76.0 | 182.1 |
| Environmental reserves | 45.7 | 2.0 | 20.4 | 9.3 | 14.0 |
| Capital expenditure commitments | 69.0 | 69.0 | — | — | — |
| Total obligations | $2,074.2 | $131.8 | $120.0 | $152.7 | $1,669.7 |

(a) Mandatorily Redeemable Preferred Stock of Subsidiary

(b) Includes operating leases related to restructuring charges. See Note 11, *"Restructuring and Impairment."* In

addition to the operating lease obligations, at the end of the Textron Leasing Transaction for certain equipment leases (including the expiration of all renewal options), the Company is required to guarantee a minimum value of the equipment to the lessor of up to approximately $21 million.

43

Table of Contents

*Capital Expenditures:* The Company incurs capital expenditures on a recurring basis for replacements and improvements. During the nine months ended September 30, 2004, the Company had approximately $151.3 million in capital expenditures for continuing operations. Capital expenditures in future years will depend upon demand for the Company's products and changes in technology.

Estimates for capital expenditures in 2004 range from approximately $175 to $185 million. A portion of capital expenditures are expected to be financed through leasing arrangements.

### Other Commitments

As of September 30, 2004, the Company's continuing operations had approximately $69.0 million in outstanding capital expenditure commitments. The majority of the leased properties of the Company's previously divested businesses have been assigned to third parties. Although releases have been obtained from the lessors of certain properties, Products remains contingently liable under most of the leases. Products' future liability for these leases, in management's opinion, based on the facts presently known to it, will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

## Safe Harbor Statement

This Report on Form 10-Q contains *"forward-looking"* information, as that term is defined by the federal securities laws, about our financial condition, results of operations and business. You can find many of these statements by looking for words such as *"may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict"* and similar words used in this Form 10-Q. The forward-looking statements in this Form 10-Q are intended to be subject to the safe harbor protection provided by the federal securities laws.

These forward-looking statements are subject to numerous assumptions, risks and uncertainties (including trade relations and competition). Because the statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by the forward-looking statements. We caution readers not to place undue reliance on the statements, which speak only as of the date of this Quarterly Report.

The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that the Company or persons acting on its behalf may issue. The Company does not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

This Quarterly Report contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results and events may differ materially from those that are anticipated because of certain risks and uncertainties, including, but not limited to, general economic conditions in the markets in which the Company operates and industry based factors such as:

- declines in the North American, South American and European automobile and light truck builds,

- labor costs and strikes at the Company's major customers and at the Company's facilities,

- fluctuations in the production of vehicles for which we are a supplier,

- changes in the popularity of particular car models, particular interior trim packages or the loss of programs on particular vehicle models,

- dependence on significant automotive customers,

- the level of competition in the automotive supply industry and pricing pressure from automotive customers,

• risks associated with conducting business in foreign countries and

44

Table of Contents

• fluctuation in the price of certain raw materials, including resins and other petroleum-based products, and steel.

For a discussion of certain of these and other important factors which may affect the Company's operations, products and markets, see our Annual Report on Form 10-K filed with the Securities and Exchange Commission on March 16, 2004, and our other filings with the Securities and Exchange Commission.

## Item 3.    *Quantitative and Qualitative Disclosures About Market Risk*

### Foreign Currency and Interest Rate Risk Management

The Company operates on a global basis and is exposed to the risk that its earnings, cash flows and stockholders' equity could be adversely impacted by fluctuations in currency exchange rates and interest rates. To manage the volatility relating to these exposures, the Company aggregates the exposures on a consolidated basis to take advantage of natural offsets. For exposures that are not offset within its operations, the Company may enter into various derivative transactions pursuant to its risk management policies. The primary purpose of the Company's foreign currency and interest rate risk management policies and activities is to manage these risks to acceptable levels.

To manage its risks, the Company primarily utilizes forward exchange contracts and purchased options with durations of generally less than 12 months. The Company has in place forward exchange contracts and purchased options with third parties, denominated in multiple currencies, which will mature during fiscal 2004. The details are as follows (amounts in millions, except average contract rate):

| Derivative Type | Currency Sold | Currency Purchased | USD Equivalent of Notional Amount | Weighted Average Contract Rate (per Convention) | Unrealized Gain/(Loss) |
|---|---|---|---|---|---|
| Options | CAD | USD | $50.0 | 1.50 CAD per USD | $0.1 |

In order to manage the interest rate risk associated with our debt portfolio, the Company may enter into derivative transactions to manage its exposures to changes in global interest rates, although the Company did not have in place any interest rate derivatives at September 30, 2004.

Gains and losses on derivatives qualifying as hedges under SFAS No. 133 *"Accounting for Derivative Instruments and Hedging Activities"* are recorded on the balance sheet as a component of *"Accumulated other comprehensive loss"* to the extent that the hedges are effective until the underlying transactions are recognized in earnings. As of September 30, 2004, the Company had no derivatives designated as hedges under SFAS No. 133. Gains and losses from all derivatives that do not qualify as hedges under SFAS No. 133 are recorded in the income statement as required by SFAS No. 133, and the fair value is recorded in the balance sheet.

### Concentration of Credit Risk

In the normal course of business, the Company provides credit to its customers who are concentrated in the automotive industry, performs credit evaluations of these customers and maintains reserves for potential credit losses. When realized, the losses have been within the range of management's allowance for doubtful accounts.

### Other Concentrations of Risk

The Company invests the majority of its excess cash in money market accounts and, where appropriate, diversifies the concentration of cash among financial institutions. With respect to financial institutions, the Company has diversified its selection of counterparties and has arranged master-netting agreements, where allowed by law and the Company's policies, to minimize the risk of loss.

Table of Contents

**Item 4.    *Controls and Procedures***

### *a. Evaluation of disclosure controls and procedures:*

We maintain disclosure controls and procedures designed to ensure that both non-financial and financial information required to be disclosed in our periodic reports is recorded, processed, summarized and reported as and when required. Based on our third quarter evaluation, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures are effective as of the end of the period covered by this report.

### *b. Changes and modifications in internal controls:*

We are currently undertaking a comprehensive assessment of our internal controls for financial reporting in connection with Section 404 of the Sarbanes-Oxley Act of 2002. This assessment consists of evaluating and testing applicable controls, and, as control deficiencies are identified, remediating the deficiency and then verifying the new or modified control. The scope of our assessment includes our plant and corporate operations worldwide and covers, among other things, assessments of inventory, revenue, purchasing, payroll, fixed assets, accounting and reporting cycles, information technologies general controls and business process application controls.

During the course of our evaluation, we have identified certain control deficiencies, including reviews of non-routine journal entries, account reconciliations and supporting documentation, reviews of financial data sourced from manual spreadsheets, segregation of duties, system access and user authorization, and business process application controls. Our independent auditors, KPMG LLP, previously identified certain of these items as reportable conditions in connection with the completion of their audit of our 2003 financial information. We believe that these deficiencies are primarily attributable to reduction-in-force cost reduction initiatives and residual process harmonization and personnel integration issues from prior acquisitions.

We do not believe that any of the deficiencies identified to date constitute material weaknesses in our internal controls over financial reporting. Further, while we have identified various compensating controls that mitigate the risks associated with these deficiencies, we are nevertheless implementing rigorous remediation plans to improve each of these deficiencies through new or modified controls, and we have supplemented our internal project team with the services of several outside specialists for this task.

Some of the required remediation efforts have been completed. For example, we have adopted new control procedures to catalog manual spreadsheets used as sources for financial reporting and to centralize lease contracts with related lease data to facilitate periodic reconciliations at the corporate and plant levels. We have also initiated modifications of certain existing internal controls, such as new documentation requirements of relevant business process controls — to ensure information technology applications are processing data as intended — and information technologies general controls. System access and user authorization controls are also being enhanced.

We have made our assessment of our internal controls for financial reporting a top priority and are committed to continuously refining and improving our internal control procedures. However, there can be no assurances that all control deficiencies identified and validated will be remediated before the end of our fiscal year or that the remaining unresolved control deficiencies, or control deficiencies that we may subsequently identify, will not rise to the level of material weaknesses.

Table of Contents

### c. Changes in Audit Committee:

Effective September 29, 2004, Anthony Hardwick and Richard C. Jelinek were appointed to the Board of Directors of the Company. Mr. Hardwick was also appointed to the Audit Committee of the Board of Directors, and Mr. Jelinek was also appointed to the Compensation Committee (as Chairman) and Nominating and Governance Committee of the Board of Directors.

Mr. Hardwick and Mr. Jelinek, both of whom the Board of Directors has determined are *"independent"*, are replacing Samuel Valenti III and Cynthia L. Hess, who resigned as directors of the Company to accommodate the restructuring of the Company's board to meet the new independence requirements.

## PART II — OTHER INFORMATION

**Item 1.   *Legal Proceedings***

The Company and its subsidiaries have lawsuits and claims pending against them and have certain guarantees outstanding, which were made in the ordinary course of business.

As of September 30, 2004, the Company was a party to approximately 1,102 pending cases alleging personal injury from exposure to asbestos containing materials used in boilers manufactured before 1966 by former operations of the Company which were sold in 1966. Asbestos-containing refractory bricks lined the boilers and, in some instances, the Company's former operations installed asbestos-containing insulation around the boilers. These pending cases do not include cases that have been dismissed or are subject to agreements to dismiss due to the inability of the plaintiffs to establish exposure to a relevant product and cases that have been settled or are subject to settlement agreements. Total settlement costs for these cases have been less than $1.3 million or an average of less than $6,250 per settled case. The defense and settlement costs have been substantially covered by the Company's primary insurance carriers under a claims handling agreement that expires in August 2006. The Company has primary, excess and umbrella insurance coverage for various periods available for asbestos-related boiler and other claims. The Company's primary carriers have agreed to cover approximately 80% of certain defense and settlement costs up to a limit of approximately $70.5 million for all claims made, subject to reservations of rights. The excess insurance coverage, which varies in availability from year to year, is approximately $615 million in aggregate for all claims made. The coverage may be impacted by matters described below. Based on the age of the boilers, the nature of the claims and settlements made to date and the insurance coverage, management does not believe that these cases will have a material impact on the Company's financial condition, results of operations or cash flows. However, the Company cannot assure that it will not be subjected to significant additional claims in the future in respect of these or other matters for which the insurance could be utilized, that insurance will be available as expected, that the matters described below may not impact the Company's coverage or that unanticipated damages or settlements in the future would not exceed insurance coverage.

In 1988, the Company divested its retail lumber and building materials business to Wickes Lumber Co. (now Wickes Inc.), which filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code in early 2004. As part of this divestiture, Wickes assumed responsibility for all liabilities associated with this business, including those associated with certain asbestos-related claims, and the Company agreed to give them access to its general liability insurance policies for such liabilities. These are, in several instances, the same policies referred to in the preceding paragraph. Wickes has been making claims against these policies for settlements of asbestos-related claims that it has characterized as insignificant as of late 2003 in its filings with the Securities and Exchange Commission. The Company has agreed to suspend making claims for other than defense costs to permit agreement upon a framework within the bankruptcy proceedings or otherwise for coordinating these claims as between the Company and Wickes. It is possible that resolution of these issues will await confirmation of a plan of reorganization for Wickes and that an equitable portion of the insurance will be made available for Wickes asbestos or other claimants, thereby reducing the coverage available to the Company for its own claims. Based upon the information available to the Company concerning Wickes' claims history, management does not believe these matters will materially and adversely affect the Company.

47

Table of Contents

A purported class action was filed on March 24, 2003 in the United States District Court for the Eastern District of Michigan, against the Company, Heartland and ten current and former senior officers and/or directors of the Company, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated there under. Four similar actions were subsequently filed in the United States District Court for the Eastern District of Michigan, purportedly filed on behalf of purchasers of the common stock of the Company between August 7, 2001 and August 2, 2002, which are identical to the purported class identified in the previously disclosed lawsuit, except in one instance in which the complaint alleges a class period beginning on July 5, 2001. On August 4, 2003, the court consolidated all five pending actions and appointed lead plaintiffs for the purported class. The Company believes that the claims are without merit and intends to vigorously defend the lawsuits. The Company does not believe that the suit will have a material impact on its financial condition, results of operations or cash flows.

The Company is a defendant in a lawsuit involving a sales commission arrangement inherited from a predecessor company and its partial ownership of an extinguished joint venture. In September 2003, the Oakland County Circuit Court entered a judgment by default against the Company for $4.2 million based upon an inadvertent failure to produce a small number of documents that were to be produced with thousands of other documents that were delivered in the discovery process. The Company and its counsel believe that the default judgment was improperly entered and that damages were improperly assessed, and it has filed an appeal of the judgment with the Michigan Court of Appeals. The Company intends to vigorously pursue its appeal in this matter and has posted a letter of credit in the amount of the judgment as part of the normal appeal process. While management believes it has no liability to the plaintiff, the Company has established an appropriate reserve for this matter in an amount less than the amount of the current judgment.

The ultimate outcome of the legal proceedings to which the Company is a party will not, in the opinion of the Company's management, based on the facts presently known to it, have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

**Item 6.** *Exhibits and Reports on Form 8-K*

**(a) Exhibits**

| Exhibit Number | Description |
|---|---|
| 4.1 | Indenture, dated as of August 26, 2004, among Collins & Aikman Products Co., as Issuer, the Guarantors parties thereto and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 99.1 of Collins & Aikman Corporation's current report on Form 8-K dated August 26, 2004 and filed on August 31, 2004. |
| 4.2 | Credit Agreement dated as of December 20, 2001, as amended and restated as of September 1, 2004, among Collins & Aikman Products Co., as Borrower, Collins & Aikman Corporation, the lenders named therein, JPMorgan Securities Inc. and Credit Suisse First Boston, as Joint Lead Arrangers, JPMorgan Securities Inc. and Deutsche Bank Securities Inc., as Joint Bookrunners for the supplemental revolving credit facility, Deutsche Bank Securities Inc., as Documentation Agent, Credit Suisse First Boston as Syndication Agent and JPMorgan Chase Bank as Administrative Agent, which is incorporated herein by reference to Exhibit 99.1 of Collins & Aikman Corporation's current report on Form 8-K dated September 1, 2004 and filed on September 7, 2004. |
| 11 | Computation of Earnings Per Share. |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 31.1 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. 1350(a) and (b)). |

Table of Contents

**(b) Reports on Form 8-K**

The Company filed or furnished the following Reports on Form 8-K covering the following items:

| | |
|---|---|
| July 8, 2004 | Item 12 Results of Operations and Financial Condition. |
| August 2, 2004 | Item 12 Results of Operations and Financial Condition. |
| August 31, 2004 | Item 2.03 Creation of a Direct Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant. |
| September 7, 2004 | Item 2.03 Creation of a Direct Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant. |
| September 30, 2004 | Item 5.02 Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers. |

49

Table of Contents

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

COLLINS & AIKMAN CORPORATION

By:                              /s/ *BRYCE KOTH*

                                    Bryce Koth
                                *Chief Financial Officer*
                              *(Principal Financial Officer)*

Dated: November 17, 2004

50

A-191

Table of Contents

## EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 4.1 | Indenture, dated as of August 26, 2004, among Collins & Aikman Products Co., as Issuer, the Guarantors party thereto and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 99.1 of Collins & Aikman Corporation's current report on Form 8-K dated August 26, 2004 and filed on August 31, 2004. |
| 4.2 | Credit Agreement dated as of December 20, 2001, as amended and restated as of September 1, 2004, among Collins & Aikman Products Co., as Borrower, Collins & Aikman Corporation, the lenders named therein, JPMorgan Securities Inc. and Credit Suisse First Boston, as Joint Lead Arrangers, JPMorgan Securities Inc. and Deutsche Bank Securities Inc., as Joint Bookrunners for the supplemental revolving credit facility, Deutsche Bank Securities Inc., as Documentation Agent, Credit Suisse First Boston as Syndication Agent and JPMorgan Chase Bank as Administrative Agent, which is incorporated herein by reference to Exhibit 99.1 of Collins & Aikman Corporation's current report on Form 8-K dated September 1, 2004 and filed on September 7, 2004.. |
| 11 | Computation of Earnings Per Share. |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 31.1 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. 1350(a) and (b)). |

51

# EXHIBIT D

Table of Contents

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

SCHEDULE 14A INFORMATION

**PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE
SECURITIES EXCHANGE ACT OF 1934**

Filed by the Registrant [X]
Filed by a Party other than the Registrant [ ]

Check the appropriate box:

[ ]     Preliminary Proxy Statement

[ ]     Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

[X]     Definitive Proxy Statement

[ ]     Definitive Additional Materials

[ ]     Soliciting Material Pursuant to Section 240.14a-11(c) or Section 240.14a-12

Collins & Aikman Corporation

(Name of Registrant as Specified in Its Charter)

Not Applicable

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X] No fee required.

[ ]  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    1)   Title of each class of securities to which transaction applies:

    2)   Aggregate number of securities to which transaction applies:

    3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

4)  Proposed maximum aggregate value of transaction:

5)  Total fee paid:

[ ]  Fee paid previously with preliminary materials.

[ ]  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee
was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

1)  Amount Previously Paid:

2)  Form, Schedule or Registration Statement No.:

3)  Filing Party:

4)  Date Filed:

Table of Contents



Collins & Aikman Corporation
250 Stephenson Highway
Troy, Michigan 48083

April 25, 2002

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of Collins & Aikman Corporation to be held on May 16, 2002 at The Waldorf-Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, at 11:00 a.m., Eastern Daylight Savings Time.

You are urged to read carefully the formal notice of the meeting and the Proxy Statement which follow. After reading them, please sign, date and mail the enclosed proxy card so that your shares will be represented at the meeting. A prepaid return envelope is provided for this purpose.

We look forward to seeing you at the meeting.

Sincerely,

Thomas E. Evans
Chairman of the Board
and Chief Executive Officer

Table of Contents

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### To Be Held May 16, 2002

To the Stockholders of
COLLINS & AIKMAN CORPORATION:

NOTICE IS HEREBY GIVEN that the Annual Meeting (the "Meeting") of the holders of common stock, par value $0.01 per share (the "Common Stock"), of COLLINS & AIKMAN CORPORATION, a Delaware corporation (the "Company"), will be held on May 16, 2002 at The Waldorf-Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, commencing at 11:00 a.m., Eastern Daylight Savings Time, for the purpose of considering and voting upon the following matters:

I. the election of five directors to hold office until the 2005 Annual Meeting and thereafter until their successors are elected and qualified;

II. the approval of the Company's 2002 Employee Stock Option Plan;

III. the approval of a proposal to effect a one-for-two and one-half reverse stock split of the Company's Common Stock; and

IV. such other matters as may properly come before the Meeting or any adjournment or postponement thereof.

The Board of Directors has fixed the close of business on April 2, 2002 as the record date for the determination of stockholders entitled to notice of and to vote at the Meeting. Therefore, only holders of record of Common Stock at the close of business on such date will be entitled to notice of and to vote at the Meeting.

A complete list of stockholders entitled to notice of and to vote at the Meeting will be available at our offices at 250 Stephenson Highway, Troy, Michigan 48083, at least ten days prior to the Meeting. The list will also be available for inspection by stockholders at the Meeting.

Stockholders are requested to sign and date the enclosed proxy card and return it promptly in the enclosed pre-addressed reply envelope, whether or not they plan to attend the Meeting, so that their shares may be represented. Any proxy may be revoked by filing with the Secretary of the Company, in care of the First Union Customer Information Service Center at the address set forth in the accompanying Proxy Statement, either a written notice of revocation bearing a later date than the proxy card or a subsequent proxy relating to the same shares at any time prior to the time the proxy is voted. Further, any person who has executed a proxy card and is present at the Meeting may vote in person instead of by proxy, thereby canceling any proxy previously given.

By Order of the Board of Directors,

_Ronald T. Lindsay_
_Secretary_

PLEASE EXECUTE, DATE AND RETURN THE ENCLOSED PROXY CARD WHETHER OR NOT YOU INTEND TO BE PRESENT AT THE MEETING.

April 25, 2002

Collins & Aikman Corporation - DEF 14A

Collins & Aikman Corporation - DEF 14A

## TABLE OF CONTENTS

PROXY STATEMENT
PROPOSAL I ELECTION OF DIRECTORS
REPORT OF THE AUDIT COMMITTEE
COMPENSATION COMMITTEE REPORT ON EXECUTIVE COMPENSATION
EXECUTIVE OFFICERS OF THE COMPANY
EXECUTIVE COMPENSATION
Performance Graph
PROPOSAL II APPROVAL OF THE COMPANY'S 2002 EMPLOYEE STOCK OPTION PLAN
PROPOSAL III APPROVAL OF THE ONE-FOR-TWO AND ONE-HALF REVERSE STOCK SPLIT
CHANGES IN CERTIFYING ACCOUNTANT
STOCKHOLDER PROPOSALS
ANNUAL REPORT
OTHER MATTERS
Definitive Proxy Statement

Table of Contents

---

# PROXY STATEMENT

---

## COLLINS & AIKMAN CORPORATION
250 Stephenson Highway
Troy, Michigan 48083

### ANNUAL MEETING OF STOCKHOLDERS
### To Be Held May 16, 2002

**General Information**

This Proxy Statement is furnished in connection with the solicitation by the Board of Directors of Collins & Aikman Corporation, a Delaware corporation (the "Company"), of proxies for use at the Annual Meeting of Stockholders of the Company to be held on May 16, 2002 at The Waldorf-Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, commencing at 11:00 a.m., Eastern Daylight Savings Time, and at any adjournment or postponement thereof (the "Meeting").

The presence, in person or by proxy, of stockholders holding a majority of the shares entitled to vote at the Meeting is necessary to constitute a quorum at the Meeting.

All shares of the common stock, par value $0.01 per share (the "Common Stock"), of the Company which are entitled to vote and are represented at the Meeting by properly executed proxies received prior to or at the Meeting, and not revoked, will be voted at the Meeting in accordance with the instructions indicated on such proxies. If no instructions are indicated, such proxies will be voted for the election of the five nominees for director named below (or if any nominee becomes unavailable, such other person as the Nominating Committee of the Board of Directors or the Company selects), for the approval of the Company's 2002 Employee Stock Option Plan, for the approval of the proposed one-for-two and one-half reverse stock split and in accordance with the Board of Directors' recommendations with respect to any other matter that may properly come before the Meeting.

The Board of Directors has fixed the close of business on April 2, 2002 as the record date (the "Record Date") for the determination of stockholders entitled to notice of and to vote at the Meeting. Therefore, only holders of record of Common Stock at the close of business on the Record Date will be entitled to notice of and to vote at the Meeting.

Any proxy may be revoked by the person giving it at any time before it is voted. A proxy may be revoked by filing, with the Secretary of the Company (in care of the First Union Customer Information Service Center, Client Service Group, 1525 West W.T. Harris Boulevard, 3C3, Charlotte, North Carolina, 28288-1153, Attention: Proxy Department) at any time prior to the time the proxy is voted, either a written notice of revocation bearing a later date than the proxy card or a subsequent proxy relating to the same shares, or by attending the Meeting and voting in person (although attendance at the Meeting will not in and of itself constitute revocation of a proxy).

All expenses of this solicitation, including the cost of preparing and mailing this Proxy Statement, will be borne by the Company. In addition to solicitation by use of the mails, proxies may be solicited by directors, officers and employees of the Company in person or by telephone, telegram or other means of communication. Such directors, officers and employees will not be additionally compensated, but may be reimbursed for out-of-pocket expenses in connection with such solicitation. Arrangements will also be made with custodians, nominees and fiduciaries for forwarding of proxy solicitation materials to beneficial owners of Common Stock held of record by such custodians, nominees and fiduciaries, and the Company may reimburse such custodians, nominees and fiduciaries for reasonable expenses incurred in connection therewith.

---

Table of Contents

proxies will be voted for the election of such other person or persons as the Nominating Committee of the Board of Directors or the Company may select. The Company is not aware of any circumstances likely to render any nominee unavailable. According to the bylaws of the Company, directors shall be elected by a plurality of the votes cast. Therefore, the five persons receiving the greatest number of votes cast at the Meeting for the election of directors shall be elected as directors, and abstentions and broker non-votes shall be counted for purposes of determining whether a quorum is present but will not affect the outcome of the election.

## Information as to Nominees and Other Directors

Set forth below, as of March 20, 2002, are the name, age and principal occupation or employment during the last five years of each nominee for election to the Board of Directors and all other directors whose terms have not expired. On March 15, 2002, Stephen V. O'Connell and Neil P. Simpkins resigned from the Board of Directors. Effective April 1, 2002, the Board of Directors by unanimous written consent decreased the number of members of the Board of Directors from fifteen to fourteen. None of the nominees or other directors is related to any executive officer or other director of the Company by blood, marriage or adoption. The affiliations between the Company and Heartland, WP Management, WP Group, WP & Co., Blackstone, Charles E. Becker, Becker Ventures, Elkin McCallum, Joan Fabrics and Textron (as such terms are defined herein) are set forth under "Security Ownership of Management and Principal Stockholders" and "Certain Relationships and Related Transactions — Certain Relationships."

**Management recommends that stockholders vote FOR the election of each of Messrs. Rudman, Valenti, Dauch and Cohen and Ms. Hess.**

## Nominees for Election at the Meeting — Class II Directors

| | |
|---|---|
| Warren B. Rudman | Age 71. Mr. Rudman has been a director of the Company since June 1995. Mr. Rudman has been a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison since January 1993. Mr. Rudman served as a United States Senator from New Hampshire from 1980 through 1992 and as Attorney General of New Hampshire from 1970 until 1976. Mr. Rudman is also a director of the Chubb Corporation, Allied Waste, Boston Scientific, the Raytheon Company and an independent trustee of several mutual funds of the Dreyfus Corporation. |
| Cynthia L. Hess | Age 45. Ms. Hess is the owner and CEO of Hess Group, LLC. Prior to forming Hess Group in 2002, Ms. Hess was a senior managing director of Heartland Industrial Partners L.P. ("Heartland") (See "Certain Relationships and Related Transactions — Certain Relationships — Heartland"). She was formerly Vice President of corporate quality for DaimlerChrysler, where she led the corporate strategy for quality improvement and facilitated quality plan execution. In her 22 years with DaimlerChrysler, Ms. Hess held various engineering, manufacturing and procurement supply positions. Ms. Hess is also a director of Metaldyne Corporation (formerly known as MascoTech, Inc.), a diversified industrial manufacturing company ("Metaldyne"). |
| Samuel Valenti, III | Age 56. Mr. Valenti has been a director of the Company since February 2001. He is a senior managing director of Heartland, Chairman of Valenti Capital LLC, and has been a director of Metaldyne Corporation since January 2001 Mr. Valenti is a director of Masco Capital Corporation and has been its President since 1988. Mr. Valenti was formerly Vice President — Investments of Masco Corporation, a home improvement and building products company. Mr. Valenti is also a director of Collins & Aikman |

5

## Table of Contents

Products Co. ("Products"), a wholly-owned subsidiary of the Company.

David C. Dauch

Age 37. Mr. Dauch has been vice president of manufacturing — driveline division of American Axle & Manufacturing since 2001, a company he joined in 1995 as manager, sales administration. In 1996, he became director of sales, GM full size truck programs and was named vice president of sales and marketing in 1998. From 1987 to 1995, Mr. Dauch was employed by Products at which he held positions of product manager, account executive, and director of Ford sales and marketing for the Automotive Carpet and Fabric Groups.

Marshall A. Cohen

Age 67. Mr. Cohen has been a director of the Company since April 2001. Mr. Cohen has been Counsel at Cassels Brock and Blackwell, a Canadian law firm, since October 1996. From 1988 until September 1996, Mr. Cohen served as President and Chief Executive Officer of The Molson Companies Ltd., a brewing company. Mr. Cohen is also a director of The Toronto-Dominion Financial Group, Barrick Gold Corporation, American International Group, Inc., Lafarge Corporation, SMK Speedy International Inc., The Goldfarb Corporation, Premcor Inc., The Quorum Group (Vice Chairman), Haynes International, Inc., Metaldyne and Golf Town Canada Inc. Mr. Cohen serves on the Advisory Boards of The Blackstone Group and Heartland.

### Directors Whose Terms Expire at the 2003 Annual Meeting — Class III Directors

Charles E. Becker

Age 55. Mr. Becker is Vice Chairman of the Board and has been a director since July 2001. For over 25 years, through 1998, Mr. Becker was the CEO and co-owner of Becker Group, Inc., a global automotive interiors components supplier. Becker Group, Inc. was sold to Johnson Controls, Inc. in 1998. In January 1999, Mr. Becker re-acquired 10 North American plastic molding and tooling operations from Johnson Controls, which subsequently became Becker Group, LLC. Mr. Becker is also the owner and chairman of Becker Ventures, LLC, which was established in 1998 to invest in a variety of business ventures, including the manufacturing, real estate and service industries.

Robert C. Clark

Age 58. Mr. Clark has been a director of the Company since October 1994. Mr. Clark is Dean of the Harvard Law School and Royal Professor of Law. Mr. Clark joined Harvard Law School in 1979 after four years at Yale Law School, where he was a tenured professor, and became Dean in 1989. Mr. Clark is a corporate law specialist and author of numerous texts and legal articles. Prior to his association with academia, he was in private practice with Ropes & Gray. Mr. Clark is also a director of American Lawyer Media Holdings, Inc. and American Lawyer Media, Inc. and a trustee of Teachers Insurance Annuity Association (TIAA).

David A. Stockman

Age 55. Mr. Stockman has been a director of the Company since February 2001. Mr. Stockman is also a director of Metaldyne, and Springs Industries, Inc. He is the senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of The Blackstone Group L.P. and had been with Blackstone since 1988. Mr. Stockman also served as the director of the Office of Management and Budget in the Reagan Administration, and represented Southern Michigan in the U.S. House of Representatives from 1976 to 1981.

6

Collins & Aikman Corporation - DEF 14A                                    Page 16 of 70

**Table of Contents**

| Daniel P. Tredwell | Age 44. Mr. Tredwell has been a director of the Company since February 2001. Mr. Tredwell is also a director of Metaldyne and Springs Industries, Inc. He is a senior managing director and a co-founder of Heartland. He has more than a decade of leveraged financing experience. Mr. Tredwell served as a Managing Director at Chase Securities Inc. and had been with Chase Securities since 1985. From 1980 to 1985, Mr. Tredwell was employed as the Press Secretary to U.S. Representative Robert L. Livingston. |

**Directors Whose Terms Expire at the 2004 Annual Meeting — Class I Directors**

| Thomas E. Evans | Age 50. Mr. Evans has been Chairman of the Board and Chief Executive Officer of the Company since April 1999. Previously, he was President of Tenneco Automotive, an automotive supplier and a division of Tenneco, Inc., from 1995 until April 1999. Prior to that, Mr. Evans served for six years with Case Corporation, a manufacturer of farm machinery and construction equipment and a subsidiary of Tenneco, Inc., in a series of senior management positions, the last being Senior Vice President of Worldwide Operations. Prior to his employment with Case Corporation, he spent sixteen years in the automotive industry with Rockwell International and Federal Mogul Corporation. Mr. Evans is also a director of the Motor & Equipment Manufacturers Association, the National Association of Manufacturers and the Institute of Textile Technology. Mr. Evans is also a director of Products. |

| Timothy D. Leuliette | Age 52. Mr. Leuliette was elected as a director of the Company in February 2001 and has been a director of Metaldyne since November 2000. He is currently President and Chief Executive Officer of Metaldyne. He is a co-founder of Heartland. Prior to joining Heartland, Mr. Leuliette joined the Penske Corporation as President and Chief Operating Officer in 1996. From 1991 to 1996 Mr. Leuliette served as President and Chief Executive Officer of ITT Automotive, an automotive company. He also serves on a number of corporate and charitable boards, including serving as director of The Federal Reserve of Chicago, Detroit Branch. |

| Elkin McCallum | Age 58. Mr. McCallum was elected as a director of the Company in September 2001. Mr. McCallum has been the Chairman of the Board and CEO of Joan Fabrics Corporation since 1989 and has also been the Chairman and CEO of Tyng Textiles LLC since 1996. Mr. McCallum is currently Vice Chairman of the Board of Trustees of Bentley College and chairman elect for the next academic year. |

| W. Gerald McConnell | Age 38. Mr. McConnell was elected as a director of the Company in February 2001 and has been a senior managing director of Heartland since its founding in 2000. Mr. McConnell was formerly a managing director at Deutsche Bank Alex. Brown (formerly Bankers Trust Co.), a banking firm, from 1997 until 1999. From 1991 until 1999, Mr. McConnell specialized in leveraged finance and financial sponsor coverage at Deutsche Bank Alex. Brown. Mr. McConnell also serves on the board of directors of Springs Industries, Inc. |

7

Collins & Aikman Corporation - DEF 14A

Table of Contents

J. Michael Stepp

Age 57. Mr. Stepp was elected as a director of the Company in February 2001. Mr. Stepp was previously Executive Vice President and Chief Financial Officer of the Company from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February 2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland. He is also a director of Products.

## Certain Relationships and Related Transactions

### Certain Relationships

#### Heartland

Heartland is a private equity firm established in 1999 for the purpose of acquiring and expanding industrial companies operating in various industrial sectors of the American manufacturing economy that are well positioned for global consolidation and growth. Six of the Company's directors, Messrs. Stockman, Leuliette, Tredwell, Stepp, McConnell and Valenti, are also employed by Heartland. As of March 12, 2002, Heartland beneficially owned approximately 40% of the outstanding Common Stock.

The Company is a party to a services agreement with Heartland under which Heartland provides the Company with advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as the Company may reasonably request and are within Heartland's expertise. The services agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of those owned by them on February 23, 2001. Pursuant to the agreement, the Company is obligated to pay to Heartland a $4 million annual advisory fee on a quarterly basis and to reimburse its out-of-pocket expenses related to the services Heartland provides to the Company. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. In connection with Heartland's initial investment in the Company on February 23, 2001, the Company paid Heartland a fee of $12 million and reimbursed it for the reasonable out-of-pocket expenses incurred in connection with that initial investment. A fee of $12.5 million was paid by the Company to Heartland as a result of its advisory services in connection with the TAC-Trim acquisition. During 2001, the Company also reimbursed Heartland for $1.5 million of expenses that Heartland incurred in relation to the Becker acquisition.

#### Blackstone and Wasserstein

Blackstone Partners is a Delaware limited partnership formed in 1987 for the purpose of, among other things, (i) committing capital to facilitate corporate restructurings, leveraged buyouts, bridge financings and other investments and (ii) capitalizing affiliates that will engage in investment and merchant banking activities. The sole general partner of Blackstone Partners is Blackstone Associates, a Delaware limited partnership. At present, the business of Blackstone Associates consists of performing the function of, and serving as, the general partner of certain limited partnerships, including Blackstone Partners. One of the Company's directors, Mr. Simpkins, is also a member of Blackstone Management Partners L.L.C., which is the general partner of Blackstone Management Partners L.P. ("Blackstone Management"), and BMA, which is the general partner of BFIP.

WP Partners is a Delaware limited partnership, the sole general partner of which is Wasserstein Management, which is controlled by CCA (fka Wasserstein & Co., Inc.). WP Partners was formed by Wasserstein Perella Group, Inc. ("WP Group") for the purpose of participating in merchant banking activities, including committing capital to the organization and consummation of private equity investments and leveraged buyout transactions. On January 3, 2001, WP Group merged with Dresdner Bank AG and spun off CCA, as a result of which Wasserstein Management and its affiliates are no longer affiliated with WP Group. Wasserstein Management serves as general partner of WP Partners and as such is engaged in

8

Collins & Aikman Corporation - DEF 14A

Table of Contents

and bonuses that would not be deductible for federal income tax purposes, including payments under the 2000 and 2001 Bonus Plans and the Company's stock option plans.

Compensation Committee of the Board of Directors of Collins & Aikman Corporation:

David A. Stockman
Daniel P. Tredwell
Marshall A. Cohen

## EXECUTIVE OFFICERS OF THE COMPANY

The following is a list of the names and ages, as of March 28, 2002, of the executive officers of the Company and a description of all positions and offices with the Company held by each such person and each such person's principal occupations and employment during the past five years. All executive officers hold office at the pleasure of the Company's Board of Directors.

| Name | Age | Position |
|------|-----|----------|
| Thomas E. Evans | 50 | Chairman of the Board and Chief Executive Officer |
| J. Michael Stepp | 57 | Chief Financial Officer (Interim) |
| Gerald E. Jones | 56 | Executive Vice President Global Manufacturing Operations, Fabrics |
| Millard L. King | 57 | Executive Vice President Global Manufacturing Operations, Carpet and Acoustics Systems |
| Bernd Lattemann | 60 | President and Managing Director European Operations |
| Ronald T. Lindsay | 51 | Senior Vice President, General Counsel and Secretary |
| Michael A. Mitchell | 58 | President Global Commercial Operations |
| Jerry L. Mosingo | 50 | Executive Vice President Global Manufacturing Operations, Plastics & Cockpit Systems |
| Jonathan L. Peisner | 42 | Senior Vice President, Treasurer |
| Jeffrey A. Rose | 42 | Senior Vice President Global Product Development and Technology |
| Russell N. Stroud | 59 | Senior Vice President Global Supply Chain Management and Company-Wide Cost Optimization |
| Gregory L. Tinnell | 41 | Senior Vice President, Human Resources |
| Reed A. White | 54 | President of Collins & Aikman Dura Convertible Systems |

*Thomas E. Evans* has been Chairman of the Board and Chief Executive Officer of the Company since April 1999. Previously, he was President of Tenneco Automotive, an automotive supplier and a division of Tenneco, Inc., from 1995 until April 1999. Prior to that, Mr. Evans served for six years with Case Corporation, a manufacturer of farm machinery and construction equipment and a subsidiary of Tenneco, Inc., in a series of senior management positions, the last being Senior Vice President of Worldwide Operations. Prior to his employment with Case Corporation, he spent sixteen years in the automotive industry with Rockwell International and Federal Mogul Corporation. Mr. Evans is also a director of the Motor & Equipment Manufacturers Association, the National Association of Manufacturers and the Institute of Textile Technology. Mr. Evans is also a director of Products.

*J. Michael Stepp* has been serving as Chief Financial Officer on an interim basis for the Company since the resignation of Mr. Shah effective January 7, 2002. Mr. Stepp has been a director of the Company since March 2001 and is also a director of Products. Mr. Stepp will continue to serve as Chief Financial Officer of

19

<u>Table of Contents</u>

the Company until a successor to the office is elected by the Board of Directors. In his interim capacity, Mr. Stepp is receiving compensation from the Company of $1 per year.

*Gerald E. Jones* has been Executive Vice President of Global Manufacturing Operations, Fabrics since November 2001 and an executive officer since March 2002. Mr. Jones, who has over 30 years of industry experience, joined the Company as a director of manufacturing in July 1995. From April 2000 until November 9, 2001, he was General Manager, Automotive Woven Fabrics.

*Millard L. King, Jr.* has been Chief Operating Officer of U.S. Automotive Carpet Systems since January 1999 and an executive officer of the Company since March 2002. Mr. King joined the Company in 1971. Prior to his current position with the Company, Mr. King most recently held the positions of Vice President of Operations for Automotive Knit Fabrics and then Chief Operating Officer of the Automotive Knit and Woven Operations.

*Bernd Lattemann* has been President and Managing Director of European Operations since January 2002 and an executive officer of the Company since March 2002. Mr. Lattemann has over 30 years of sales and manufacturing and automotive experience, including serving as an independent consultant from 1998 to 2002 and Chief Executive Officer from 1996 to 1998 for Becker Group Europe GmbH. Previously, Mr. Lattemann held several progressively responsible positions at SKF's Specialty Bearings Division.

*Ronald T. Lindsay* has been Senior Vice President, General Counsel and Secretary and an executive officer of the Company since 1999. He has been Senior Vice President since 1999, Vice President 1988-1999, and since 1988, General Counsel and Secretary of Products.

*Michael A. Mitchell* has been President, Global Commercial Operations since January 2002 and an executive officer of the Company since March 2002. Mr. Mitchell has over 40 years of industry experience, having previously held senior management positions at Chrysler Corporation and American Motors. He served as Executive Vice President, Business & Product Development from 1997 to 2002 and Executive Vice President of Engineering, Purchasing and Program Management from 1995 to 1997 for Textron Automotive Company.

*Jerry L. Mosingo* has been Executive Vice President, Global Plastics and Cockpit Systems since January 2002 and an executive officer of the Company since March 2002. Mr. Mosingo has over 30 years of industry experience, and he was previously Executive Vice President of Manufacturing from 1999 to 2002 and Senior Vice President of Operations in 1999 for Textron. Previously, he served as Vice President of Quality from 1997 to 1999 and Director of Operations from 1992 to 1997 for A.O. Smith.

*Jonathan L. Peisner* has been Senior Vice President and Treasurer since February 2002. Mr. Peisner joined the Company in 1999 as Senior Vice President of Communications and Investor Relations. From January 2000 until February 2002, he was Senior Vice President of Communications, Investor Relations and Business Planning. He has been an executive officer of the Company since February 2000. From 1997 until 1999, he was Director of Investor Relations and Business Planning for Lear Corporation, an automotive supplier, and from 1995 until 1997 he was director of Investor Relations. Mr. Peisner serves on the National Association of Manufacturers Public Affairs Steering Committee and the National Investor Relations Institute Small Cap Advisory Group.

*Jeffrey A. Rose* has been Senior Vice President, Global Product Development and Technology since January 2002 and an executive officer of the Company since March 2002. Mr. Rose has 20 years of industry experience, and he previously served as Vice President of Technology for TAC-Trim, which he joined in 1995 as Director of Interior Trim Engineering. Prior to 1995, he worked for Toyota at their Technical Center in Ann Arbor, Michigan.

*Russell N. Stroud* has been Senior Vice President, Global Supply Chain Management and Company-Wide Cost Optimization and an executive officer of the Company since March 2002. He has over 35 years of broad automotive experience with both OEMs and suppliers. Previously, he served as Vice President of Procurement from 2000 to 2002 and Vice President of Sales, Marketing and Strategic Planning from 1998 to

Table of Contents

2000 for New Venture Gear and President & COO for Thyssen Steel Group from 1996 to 1998 and held progressively responsible positions at Chrysler Corporation.

*Gregory L. Tinnell* has been Senior Vice President of Human Resources and an executive officer since April 2000. Previously, he was Vice President of Human Resources for the Company's southern and Mexican Operations, as well as Vice President of Global Compensation & Benefits. Tinnell joined the Company in 1995. Prior to Collins & Aikman, he served in various management positions with Sara Lee Corporation, Nabisco Foods Group and North American Refractories Company. Mr. Tinnell serves on the National Association of Manufacturers Human Resources Steering Committee.

*Reed A. White* has been President of Dura Convertible Systems, Inc. (also known as Collins & Aikman Dura Convertible Systems) since 1994, has been employed thereby in various management positions since April 1985 and has been an executive officer of the Company since February 2000.

See "Executive Compensation — Employment Agreements" for a description of employment agreements with Messrs. Evans, Lindsay and White, pursuant to which they are required to be elected to the offices they currently hold. Additionally, Messrs. Lattemann, Mitchell, Mosingo, Stroud, King, Jones, Rose and Tinnell have employment agreements and Mr. Peisner has a severance benefit agreement pursuant to which they are required to be elected to the offices they currently hold.

## EXECUTIVE COMPENSATION

The following table sets forth information concerning the compensation for services rendered to the Company and its subsidiaries by (i) all individuals serving as the Company's Chief Executive Officer during 2001, (ii) the Company's four most highly compensated executive officers (other than the Chief Executive Officer) whose total annual salary and bonus exceeded $100,000 and who were serving as executive officers at the end of the fiscal year ended December 31, 2001 and (iii) up to two of the Company's former executive officers whose compensation would have been reported herein if they had been serving as executive officers of the Company at the end of the fiscal year (the individuals named in clauses (i), (ii), and (iii) being referred to herein as the "Named Executive Officers"). All compensation shown has been paid by Products or by a subsidiary of Products (although any options shown as awarded are for Common Stock of the Company). The Company does not separately compensate its executive officers for their duties as officers of the Company (except for any such options).

### Summary Compensation Table

| Name and Principal Position | Year(1) | Annual Compensation | | | Securities Underlying Options(#) | All Other Compensation($) |
| | | Salary($) | Bonus($) | Other Annual Compensation(2) | | |
|---|---|---|---|---|---|---|
| Thomas E. Evans | 2001 | 735,000 | 1,350,000(4) | 45,406 | — | 139,835(5) |
| Chairman of the Board and | 2000 | 729,167 | 175,000(6) | 35,955 | 60,000 | 77,158 |
| Chief Executive Officer(3) | 1999 | 485,513 | 1,325,000(7) | 28,508 | 1,200,000 | 19,950 |
| Brian Batey | 2001 | 291,672 | — | 0 | — | 0 |
| President, European | 2000 | 124,458 | 142,243 | 0 | 100,000 | 0 |
| Automotive Systems(8) | 1999 | N/A | N/A | N/A | N/A | N/A |
| Ronald T. Lindsay | 2001 | 222,500 | 53,400 | 12,609 | — | 9,308(9) |
| Senior Vice President, | 2000 | 220,625 | — | 52 | N/A | 12,830 |
| General Counsel and Secretary | 1999 | 177,950 | 100,000 | 63 | 40,000 | 8,385 |
| Rajesh K. Shah | 2001 | 345,000 | — | 15,851 | — | 14,837(10) |
| Executive Vice President & | 2000 | 333,750 | — | 48 | 35,000 | 21,654 |
| Chief Financial Officer(11) | 1999 | 130,769 | 200,000 | N/A | 100,000 | 2,887 |
| Reed A. White | 2001 | 250,000 | 20,000 | 11,032 | — | 10,701(12) |
| President, Collins & Aikman | 2000 | 237,500 | — | 843 | 20,000 | 17,317 |
| Dura Convertible Systems | 1999 | 188,333 | 200,000 | 871 | N/A | 12,744 |

(1)  The information given in this table is for the fiscal years indicated, rather than calendar years. 2001 indicates the fiscal year ended December 31, 2001. 2000 indicates the fiscal year ended December 31, 2000. 1999 indicates the fiscal year ended December 25, 1999.

Collins & Aikman Corporation - DEF 14A

21

# EXHIBIT E

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

---

# Form 10-K

(Mark One)

☑      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2003**

or

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 1-10218**

---

# Collins & Aikman Corporation

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **13-3489233** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification Number)* |

**250 Stephenson Highway
Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**Registrant's telephone number, including area code:
(248) 824-2500**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:
None**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☑

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☑ No ☐.

The aggregate market value of voting stock held by non-affiliates of the Registrant was $168,794,241 as of March 1, 2004.

As of February 26, 2004, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

### WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins & Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to the Securities and Exchange Commission.

The Company's Code of Business Conduct is available free of charge through the Company's internet website. Any amendments to the Company's Code of Business Conduct and any waivers of the Code of Business Conduct involving executive officers or directors of the Company will also be made available on the Company's internet website. Printed copies of the Company's Code of Business Conduct are also available free of charge to any shareholder upon request to: Corporate Secretary, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, MI 48083.

**PART III**

**Item 10.**    *Directors and Executive Officers of the Registrant*

    The Restated Certificate of Incorporation of the Company provides that the Board of Directors of the Company is divided into three classes serving staggered three-year terms. Set forth below, as of March 1, 2004, are the name, age and principal occupation or employment during the last five years of each of the current directors of the Company. None of the directors is related to any executive officer or other director of the Company by blood, marriage or adoption. The affiliations between the Company and Heartland, Blackstone Partners, Charles E. Becker, Becker Ventures, Elkin McCallum, Joan Fabrics and Textron (as such terms are defined herein) are set forth under Item 12, "Security Ownership of Certain Beneficial Owners and Management" and Item 13, "Certain Relationships and Related Transactions."

**Directors Whose Terms Expire at the 2004 Annual Meeting — Class I Directors**

| | |
|---|---|
| Timothy D. Leuliette | Age 54. Mr. Leuliette was elected as a director of the Company in February 2001 and has been a director of Metaldyne Corporation ("Metaldyne") since November 2000 and a director of Trimas Corporation ("Trimas") since 2002. He is currently Chairman, President and Chief Executive Officer of Metaldyne. He is a senior managing director and one of the co-founders of Heartland. Prior to joining Heartland, Mr. Leuliette joined the Penske Corporation as President and Chief Operating Officer in 1996. From 1991 to 1996 Mr. Leuliette served as President and Chief Executive Officer of ITT Automotive, an automotive company. He also serves on a number of corporate and charitable boards, and served as chairman of the Board of Directors of The Federal Reserve Bank of Chicago, Detroit Branch. |
| Elkin McCallum | Age 60. Mr. McCallum was elected as a director of the Company in September 2001. Mr. McCallum has been the Chairman of the Board and Chief Executive Officer of Joan Fabrics since 1989 and was Chairman and Chief Executive Officer of Tyng Textiles L.L.C. from 1996 to 2003. Mr. McCallum is currently Chairman of the Board of Trustees of Bentley College. |
| W. Gerald McConnell | Age 40. Mr. McConnell was elected as a director of the Company in February 2001 and has been a senior managing director of Heartland since its founding. Mr. McConnell was formerly a managing director at Deutsche Bank Alex. Brown (formerly Bankers Trust Co.) from 1997 until 1999. From 1991 until 1999, Mr. McConnell specialized in leveraged finance and financial sponsor coverage at Deutsche Bank Alex. Brown. Mr. McConnell also serves on the boards of directors of Springs Industries, Inc. ("Springs") and Trimas. |
| J. Michael Stepp | Age 59. Mr. Stepp has been a director of the Company since February 2001. Mr. Stepp is currently Vice Chairman of the Board of Directors and Chief Financial Officer of the Company. He was previously Executive Vice President and Chief Financial Officer of the Company from May 2002 through July 2002 (after serving as interim Chief Financial Officer from January 2002 through April 2002) and from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February |

47

---

2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland but has not been an employee of Heartland since April 2002. He is also a director of Products.

**Directors Whose Terms Expire at the 2005 Annual Meeting — Class II Directors**

| | |
|---|---|
| Warren B. Rudman | Age 73. Mr. Rudman has been a director of the Company since June 1995. Mr. Rudman was a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison from 1993 through 2002, and since January 2003 Mr. Rudman has been of counsel to the law firm. Mr. Rudman served as a United States Senator from New Hampshire from 1980 through 1992 and as Attorney General of New Hampshire from 1970 until 1976. Mr. Rudman is also a director of the Chubb Corporation (which term will expire in April, 2004), Allied Waste, Boston Scientific, the Raytheon Company and an independent trustee of several mutual funds of the Dreyfus Corporation. |
| Cynthia L. Hess | Age 47. Ms. Hess is the owner and Chief Executive Officer of Hess Group, LLC. Prior to forming Hess Group in 2002, Ms. Hess was a senior managing director of Heartland. She was formerly Vice President of Corporate Quality for DaimlerChrysler, where she led the corporate strategy for quality improvement and facilitated quality plan execution. In her 22 years with DaimlerChrysler, Ms. Hess held various engineering, manufacturing and procurement supply positions. Ms. Hess is also a director of Metaldyne. |
| Samuel Valenti, III | Age 58. Mr. Valenti has been a director of the Company since February 2001. He is a senior managing director of Heartland, chairman of Valenti Capital LLC, has been a director of Metaldyne since January 2001, and is Chairman of the Board of Directors of Trimas. Mr. Valenti is a director of Masco Capital Corporation and has been its President since 1988. Mr. Valenti was formerly Vice President — Investments of Masco Corporation, a home improvement and building products company, from May 1974 to October 1998. |
| David C. Dauch | Age 39. Mr. Dauch has been Senior Vice President of Sales, Marketing and Manufacturing — Driveline Division of American Axle & Manufacturing since 2003, a company he joined in 1995 as Manager, Sales Administration. In 1996, he became Director of Sales, GM Full Size Truck Programs and was named Vice President of Sales and Marketing in 1998. In 2001, he became Vice President of Manufacturing — Driveline Division. From 1987 to 1995, Mr. Dauch was employed by Products where he held positions of product manager, account executive, and Director of Ford Sales and Marketing for the Automotive Carpet and Fabric Groups. |
| Marshall A. Cohen | Age 69. Mr. Cohen has been a director of the Company since April 2001. Mr. Cohen has been Counsel at Cassels Brock and Blackwell, a Canadian law firm, since October 1996. Mr. Cohen is also a director of The Toronto-Dominion Financial Group, Barrick Gold Corporation, American International Group, Inc., Lafarge Corporation N.A., The Goldfarb Corporation, Premcor Inc., |

48

Metaldyne, and Golf Town Canada Inc. Mr. Cohen serves on the Advisory Boards of the Blackstone Group and Heartland.

**Directors Whose Terms Expire at the 2006 Annual Meeting — Class III Directors**

| | |
|---|---|
| Charles E. Becker | Age 56. Mr. Becker has been a director since July 2001. He was Vice Chairman of the Board from July 2001 until July 2002. For over 25 years, through 1998, Mr. Becker was the Chief Executive Officer and co-owner of Becker Group, Inc., a global automotive interior components supplier. Mr. Becker is the owner and Chairman of Becker Ventures, which was established in 1998 to invest in a variety of business ventures, including the manufacturing, real estate and service industries. Mr. Becker is also a director of Metaldyne and Trimas. |
| Robert C. Clark | Age 60. Mr. Clark has been a director of the Company since October 1994. Mr. Clark is a Harvard University Distinguished Service Professor, Harvard Law School. Mr. Clark joined Harvard Law School in 1979 after four years at Yale Law School, where he was a tenured professor, and served as Dean of the Harvard Law School from 1989 to 2003. Mr. Clark is a corporate law specialist and author of numerous texts and legal articles. Prior to his association with academia, he was in private practice with Ropes & Gray. Mr. Clark is also a director of Omnicom Group, Inc., Time Warner Inc., and a trustee of Teachers Insurance Annuity Association (TIAA). |
| David A. Stockman | Age 57. Mr. Stockman has been a director of the Company since February 2001 and has been Chairman of the Board of the Company since August 2002. Mr. Stockman is also a director of Metaldyne, Springs and Trimas. He is a senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of The Blackstone Group L.P. ("Blackstone") and had been with Blackstone since 1988. Mr. Stockman also served as the director of the Office of Management and Budget in the Reagan Administration, and represented a district in southern Michigan in the U.S. House of Representatives from 1976 to 1981. |
| Daniel P. Tredwell | Age 45. Mr. Tredwell has been a director of the Company since February 2001. Mr. Tredwell is also a director of Metaldyne, Trimas and Springs. He is a senior managing director and a co-founder of Heartland. He has two decades of leveraged financing and buyout experience. Mr. Tredwell served as a Managing Director at Chase Securities Inc. and had been with Chase Securities since 1985. |

**Arrangements Regarding Election of Directors**

See Item 12, "Security Ownership of Management and Principal Stockholders — Voting" of this Report.

49

## EXECUTIVE OFFICERS OF THE COMPANY

The following is a list of the names and ages, as of March 1, 2004, of the executive officers of the Company and a description of all positions and offices with the Company held by each such person and each such person's principal occupations and employment during the past five years. All executive officers hold office at the pleasure of the Company's Board of Directors.

| Name | Age | Position |
| --- | --- | --- |
| David A. Stockman | 57 | Chairman of the Board and Chief Executive Officer |
| J. Michael Stepp | 59 | Vice Chairman of the Board and Chief Financial Officer |
| Wallace W. Creek | 65 | Senior Vice President-Finance |
| Millard L. King, Jr | 59 | President, Global Soft Trim |
| Robert A. Krause | 47 | Vice President and Treasurer |
| L. Gregory Tinnell | 43 | Senior Vice President, Human Resources |
| Michael G. Torakis | 47 | President, International Plastics |
| Eric J. White | 48 | President, U.S. and Mexico Plastics |

*David A. Stockman* has been a director of the Company since February 2001 and has been Chairman of the Board of the Company since August 2002. Mr. Stockman has been Chief Executive Officer of the Company since August 2003. Mr. Stockman is also a director of Metaldyne, Springs and Trimas. He is a senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of Blackstone and had been with Blackstone since 1988. Mr. Stockman also served as director of the Office of Management and Budget in the Reagan Administration, and represented a district in southern Michigan in the U.S. House of Representatives from 1976 to 1981.

*J. Michael Stepp* has been a director of the Company since February 2001. Mr. Stepp is currently Vice Chairman of the Board of Directors and Chief Financial Officer of the Company. He was previously Executive Vice President and Chief Financial Officer of the Company from May 2002 through July 2002 (after serving as interim Chief Financial Officer from January 2002 through April 2002), and from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February 2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland but has not been an employee of Heartland since April 2002. He is also a director of Products.

*Wallace W. Creek* has been Senior Vice President — Finance since December 2002, and an executive officer of the Company since December 2002. Before joining the Company in 2002, Mr. Creek was corporate comptroller for General Motors. Mr. Creek is a director of Columbus McKinnon Corp.

*Millard L. King, Jr.* has been President, Global Soft Trim since August 2003 and an executive officer of the Company since March 2002. From November 2001 to March 2002, he was Executive Vice President of Global Manufacturing Operations, Carpet and Acoustics Systems. Mr. King joined the Company in 1971. Prior to November 2001, Mr. King held the positions of Senior Vice President of Operations for Automotive Knit Fabrics and Chief Operating Officer of the U.S. automotive carpet systems and of automotive knit and woven operations.

*Robert A. Krause* has been Vice President and Treasurer since October 2002, and an executive officer of the Company since December 2002. Before joining the Company, Mr. Krause was associated with American Axle & Manufacturing Holdings, Inc., where he was Vice President and Treasurer from 1999 to August 2002, and Vice President — Investor Relations from August 2002 to October 2002, Treasurer and Acting Interim Chief Financial Officer during 1999, and Treasurer from 1998 to 1999.

*L. Gregory Tinnell* has been Senior Vice President of Human Resources and an executive officer since April 2000. Previously, he was Vice President of Human Resources for the Company's southern and Mexican operations, as well as Vice President of Global Compensation & Benefits. Mr. Tinnell joined the Company in 1995. Prior to joining the Company, he served in various management positions with Sara Lee Corporation,

50

Nabisco Foods Group and North American Refractories Company. Mr. Tinnell serves on the National Association of Manufacturers Human Resources Steering Committee.

*Michael G. Torakis* has been President, International Plastics since August 2003 and an executive officer of the Company since March 2004. Mr. Torakis joined the Company in August 2003. Prior to joining the Company, Mr. Torakis was President of Venture Holdings Company, LLC and Chief Executive Officer of Peguform GmbH. On or about March 28, 2003, Venture Holdings Company, LLC and certain of its affiliates filed a petition for protection under the United States Bankruptcy Code. Mr. Torakis was President of Venture Holdings Company, LLC at the time of the bankruptcy filing. In addition, on or about May 28, 2002, Peguform GmbH, a subsidiary of Venture Holdings Company, LLC, filed for bankruptcy in Germany. Mr. Torakis was Chief Executive Officer of Peguform GmbH at the time of the filing.

*Eric J. White* has been President, U.S. and Mexico Plastics since August 2003 and an executive officer of the Company since August 2002. From August 2002 to August 2003, he was Executive Vice President of Global Manufacturing, Interior Trim & Cockpit Systems. Prior to August 2002, Mr. White held the positions of Vice President Operations — Plastics with responsibility for multiple plant operations, and Vice President Operations for two operations with Textron Automotive Company, Inc.

See "Executive Compensation — Employment Agreements" for a description of the Company's employment agreements with Messrs. Stepp, King, Torakis and White. Additionally, Mr. Tinnell has a written employment agreement.

Mr. Stockman does not receive any compensation for his service to the Company as Chief Executive Officer. Mr. Stockman's services are provided to the Company by Heartland pursuant to a services agreement that is more fully described in Item 13, "Certain Relationships and Related Transactions" of this Report. The assumption by Mr. Stockman of the office of Chief Executive Officer did not change the compensation due Heartland under the services agreement.

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934 requires the Company's officers and directors, and persons who own more than ten percent of a registered class of the Company's equity securities, to file reports of ownership and changes in ownership with the Securities and Exchange Commission (the "SEC"). Officers, directors and greater than ten percent stockholders are required by SEC regulation to furnish the Company with copies of all Section 16(a) reports they file. Based solely on review of the copies of such reports furnished to the Company during or with respect to fiscal 2003, or written representations that no Forms 5 were required, the Company believes that during the fiscal year ended December 31, 2003, all persons subject to the Section 16(a) filing requirements filed the required reports on a timely basis.

### Code of Ethics

Products has a code of ethics entitled "Collins & Aikman Products Co. Code of Business Conduct" which is applicable to all employees, consultants and contractors of Products, its subsidiaries and affiliates, including the Company. The above-referenced Code of Business Conduct is also applicable to the Company's principal executive officer, principal financial officer, principal accounting officer or controller and persons performing similar functions for the Company ("Senior Officers").

The Code of Business Conduct is available on the Company's website at www.collinsaikman.com. All amendments to the Code of Business Conduct will also be made available on the Company's website, along with all waivers of the Code of Business Conduct involving Senior Officers of the Company.

### Audit Committee Financial Expert

The Board of Directors of the Company has determined that none of the current members of the Audit Committee is an "audit committee financial expert," as the Board interprets that requirement in its business judgment. However, each member of the Audit Committee is financially literate, and each member of the Audit Committee satisfies the heightened independence requirements of Sections 303.01(B)(2)(a) and

# EXHIBIT F

**Table of Contents**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0059 |
| Expires: | August 31, 2004 |
| Estimated average burden hours per response | 14.73 |

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**

Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934 (Amendment No.    )

Filed by the Registrant    ☒

Filed by a Party other than the Registrant    ☐

Check the appropriate box:

☐  Preliminary Proxy Statement
☐  **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
☒  Definitive Proxy Statement
☐  Definitive Additional Materials
☐  Soliciting Material Pursuant to §240.14a-12

Collins and Aikman Corporation
_____

(Name of Registrant as Specified In Its Charter)
_____

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒  No fee required.
☐  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

1) Title of each class of securities to which transaction applies:
_____

2) Aggregate number of securities to which transaction applies:
_____

3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):
_____

4) Proposed maximum aggregate value of transaction:

5) Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

1) Amount Previously Paid:

2) Form, Schedule or Registration Statement No.:

3) Filing Party:

4) Date Filed:

SEC 1913 (02-02)          **Persons who potentially are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**

Table of Contents



Collins & Aikman Corporation
250 Stephenson Highway
Troy, Michigan 48083

September 30, 2004

To Our Stockholders:

You are cordially invited to attend the annual meeting of stockholders of Collins & Aikman Corporation to be held at our offices located at 250 Stephenson Highway, Troy, Michigan 48083, on October 13, 2004 at 10:30 a.m., Eastern Daylight Savings Time.

Whether or not you plan to attend, submitting your proxy by completing, signing and mailing your proxy card will both assure your shares are represented at the meeting and minimize the cost of proxy solicitation. Thank you for your continued support of Collins & Aikman.

Sincerely,

David A. Stockman
*Chairman
and Chief Executive Officer*

Table of Contents



## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

Date: Wednesday, October 13, 2004
Time: 10:30 AM Eastern Daylight Time
Location: Collins & Aikman Corporation
World Headquarters
250 Stephenson Highway
Troy, Michigan

To Our Stockholders,

We invite you to attend our 2004 Annual Meeting of Stockholders at our World Headquarters. At this meeting, you and the other stockholders will be able to vote for the following purpose, together with any other business that may properly come before the meeting:

*Elect four directors to the Board of Directors for three-year terms.* The Board has nominated for re-election Anthony Hardwick, Timothy D. Leuliette, W. Gerald McConnell and J. Michael Stepp, all current directors.

You may vote on this proposal in person or by proxy. If you cannot attend the meeting, we urge you to vote by proxy, so that your shares will be represented and voted at the meeting in accordance with your instructions. (See the attached proxy statement for details on voting by proxy.) Of course, if you attend the meeting, you may withdraw your proxy and vote your shares. Only stockholders of record at the close of business on August 30, 2004, will be entitled to vote at the meeting or any adjournment thereof.

By order of the Board of Directors,

Jay B. Knoll
*Secretary*

Troy, Michigan
September 30, 2004

## CONTENTS

| | |
|---|---|
| INTRODUCTION | 1 |
| VOTING | 1 |
| How to Vote Your Shares | 1 |
| How to Revoke Your Proxy | 2 |
| Required Vote | 2 |
| Where to Find Voting Results | 2 |
| PROPOSAL | 3 |
| Election of Directors | 3 |
| Other Matters | 4 |
| BOARD OF DIRECTORS | 4 |
| Directors Continuing in Office | 4 |
| Meetings and Committees | 5 |

| | |
|---|---|
| Director Compensation | 7 |
| Compensation Committee Interlocks and Insider Participation | 7 |
| Section 16(a) Beneficial Ownership Reporting Compliance | 7 |
| Director Nomination Process | 7 |
| Certain Litigation | 8 |
| INDEPENDENT AUDITORS | 8 |
| Fees | 8 |
| Pre-Approval Policy | 9 |
| REPORT OF THE AUDIT COMMITTEE | 9 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 11 |
| Security Ownership of Management and Principal Stockholders | 11 |
| Other Relationships and Transactions | 12 |
| EXECUTIVE COMPENSATION | 18 |
| Executive Officers | 18 |
| Summary Compensation | 19 |
| Option Grants in Last Fiscal Year | 21 |
| Aggregate Option Exercises in Last Fiscal Year and Fiscal Year End Option Values | 21 |
| Option Cancellation/ Repricing Program | 21 |
| 2004 Option Exchange Program | 22 |
| 10-Year Option/ SAR Repricing Table | 22 |
| Defined Benefit or Actuarial Plan Disclosure | 23 |
| Pension Plan Table | 25 |
| Employment Agreements | 26 |
| COMPENSATION COMMITTEE REPORT ON EXECUTIVE COMPENSATION | 28 |
| ADDITIONAL INFORMATION | 30 |
| Annual Report | 30 |
| Code of Business Conduct | 31 |
| Stockholder Proposals and Nominations | 31 |
| Stockholder Communications with the Board of Directors | 31 |
| Appendix A — Performance Graph | A-1 |
| Appendix B — Collins & Aikman Director Independence Guidelines | B-1 |

i

Table of Contents

# COLLINS & AIKMAN CORPORATION
### 250 Stephenson Highway
### Troy, Michigan 48083

---

## PROXY STATEMENT

---

September 30, 2004

## INTRODUCTION

The Board of Directors is soliciting your proxy to encourage your participation in the voting at the Annual Meeting. You are invited to attend the Annual Meeting and vote your shares directly. However, even if you do not attend, you may vote by proxy, which allows you to direct another person to vote your shares at the meeting on your behalf.

There are two parts to this solicitation: the proxy card and this proxy statement. The proxy card is a means by which you may authorize another person to vote your shares in accordance with your instructions. This proxy statement provides you with a variety of information on the proposal and other matters that you may find useful in determining how to vote.

Collins & Aikman Corporation ("Collins & Aikman" or the "Company") will bear the cost of this solicitation, including the cost of preparing and mailing this proxy statement. In addition to the solicitation of the proxies by use of the mails, some of our directors, officers and employees, without extra remuneration, may solicit proxies personally, or by telephone or otherwise. The Company may retain a proxy solicitation firm for assistance in connection with the solicitation of proxies for the Annual Meeting, should the Board of Directors deem such action prudent. The Company will also make arrangements with brokerage houses and other custodians, nominees and fiduciaries to forward proxies and proxy material to their principals, and will reimburse them for their expenses in forwarding soliciting materials.

This proxy statement and accompanying proxy are being distributed on or about September 30, 2004.

## VOTING

You are entitled to one vote at the Annual Meeting for each share of the Company's common stock that you owned of record at the close of business on August 30, 2004.

On August 30, 2004, we had issued and outstanding 83,630,087 shares of common stock and there were approximately 120 stockholders of record. A list of the stockholders of record entitled to vote at the Annual Meeting will be available for review by any stockholder, for any purpose related to the meeting, between 9:00 a.m. and 5:00 p.m. at the principal offices of the Company, located at 250 Stephenson Highway, Troy, Michigan 48083, for ten days before the Annual Meeting.

### How to Vote Your Shares

You may vote your shares at the Annual Meeting in person or by proxy. To vote in person, you must attend the Annual Meeting, and obtain and submit a ballot, which will be provided at the meeting. To vote by proxy, you must complete and mail the enclosed proxy card.

By completing and submitting your proxy, you will direct the designated persons (known as "proxies") to vote your shares at the Annual Meeting in accordance with your instructions. The Board has appointed J. Michael Stepp and Jay B. Knoll to serve as the proxies for the Annual Meeting.

1

Table of Contents

## PROPOSAL

**Election Of Directors**

The proposal on the agenda for the Annual Meeting will be electing four directors to serve as Class I directors for a three-year term beginning at this Annual Meeting and expiring at the 2007 Annual Meeting of Stockholders. (For a description of the three classes of directors, see the "Board of Directors," page 4.) The nominees receiving the greatest number of votes cast will be elected.

We expect each nominee for election as a director to be able to serve if elected. If any nominee is not able to serve, proxies will be voted in favor of the remainder of those nominated and may be voted for substitute nominees, unless the Board of Directors chooses to reduce the number of directors serving on the Board.

The Board of Directors has nominated Anthony Hardwick, Timothy D. Leuliette, W. Gerald McConnell and J. Michael Stepp for re-election as Class I directors. The following is a brief biography of each nominee. You will find information on their holdings of the Company's common stock in "Certain Relationships and Related Transactions," page 11.

*Anthony Hardwick* has been a director of the Company since September 2004. Mr. Hardwick is currently Executive Vice President and Chief Financial Officer of Easley Custom Plastics, Inc., a supplier of injection molded plastic parts to the industrial, building and construction, transportation, and power tool markets. Easley Custom Plastics is a wholly-owned subsidiary of CH Industries, Inc., of which Mr. Hardwick is co-owned and co-founder. Previously, he was senior managing director of Source Companies, LLC, a Pittsburgh-based investment banking and business consulting firm, from 2001 to 2004, and Chief Financial Officer of AstenJohnson, Inc., a privately held producer of paper machine clothing sold to paper manufacturers on a global basis, from 1996 to 2001. Mr. Hardwick is a director of Consolidated Systems, Inc., a fabricator of metal decking and support systems, and Curo Source, Inc., a company which recovers and stores cord blood stem cells. Mr. Hardwick was employed by the Company from 1979 to 1996, where he served as Vice President, Administration and Control of the Company's Automotive Group and then Vice President and Controller. He is a certified public accountant. Mr. Hardwick is 59 years old.

*Timothy D. Leuliette* has been a director of the Company since February 2001 and has been a director of Metaldyne Corp. since November 2000 and a director of TriMas Corp. since 2002. He is currently Chairman, President and Chief Executive Officer of Metaldyne. He is a senior managing director and one of the co-founders of Heartland. Prior to joining Heartland, Mr. Leuliette joined the Penske Corporation as President and Chief Operating Officer in 1996. From 1991 to 1996, Mr. Leuliette served as President and Chief Executive Officer of ITT Automotive, an automotive company. He also serves on a number of corporate and charitable boards and served as Chairman for The Federal Reserve of Chicago, Detroit Branch. Mr. Leuliette is 54 years old.

*W. Gerald McConnell* has served as director of the Company since February 2001 and has been a senior managing director of Heartland since its founding. Mr. McConnell was formerly a managing director at Deutsche Bank Alex. Brown (formerly Bankers Trust Co.) from 1997 until 1999. From 1991 until 1999, Mr. McConnell specialized in leveraged finance and financial sponsor coverage at Deutsche Bank Alex. Brown. Mr. McConnell also serves on the board of directors of Springs Industries, Inc. and TriMas. Mr. McConnell is 40 years old.

*J. Michael Stepp* has been a director of the Company since February 2001. Mr. Stepp is currently Vice Chairman of the Board of Directors and Chief Financial Officer. He was previously Executive Vice President and Chief Financial Officer from May 2002 through July 2002 (after serving as interim Chief Financial Officer from January 2002 through April 2002) and from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February 2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland but has not been an employee of Heartland since April 2002. He is also a director of Collins & Aikman Products Co. ("Products"), the Company's wholly-owned operating subsidiary. Mr. Stepp is 60 years old.

3

Table of Contents

**Other Matters**

Neither the Company nor its directors intend to bring before the Annual Meeting any matters other than the election of the three directors. Also, they have no present knowledge that any other matters will be presented by others for action at the meeting.

**BOARD OF DIRECTORS**

The Board of Directors consists of eleven directors divided into three classes (Class I, Class II and Class III) serving staggered three-year terms. The Class I directors are up for election at the Annual Meeting as described under "Proposal-Election of Directors" (page 3), and the nominees for election are all currently Class I directors.

**Directors Continuing in Office**

The Class II and III directors will continue in office following this Annual Meeting, and their terms will expire in 2005 (Class II) or 2006 (Class III). The following are brief biographies of each of these directors. You will find information on their holdings of the Company's common stock in "Certain Relationships and Related Transactions," page 11.

*David A. Stockman* has been a director of the Company since February 2001, and his current term as a Class III director expires in 2006. He has also been Chairman of the Board since August 2002 and Chief Executive Officer since August 2003. Mr. Stockman is also a director of Metaldyne, Springs and TriMas. He is a senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of The Blackstone Group L.P. and had been with Blackstone since 1988. Mr. Stockman also served as the director of the Office of Management and Budget in the Reagan Administration, and represented Southern Michigan in the U.S. House of Representatives from 1976 to 1981. Mr. Stockman is 57 years old.

*Robert C. Clark* has been a director of the Company since October 1994, and his current term as a Class III director expires in 2006. Mr. Clark is a Harvard University Distinguished Service Professor, Harvard Law School. Mr. Clark joined Harvard Law School in 1979 after four years at Yale Law School, where he was a tenured professor, and served as Dean from 1989 to 2003. Mr. Clark is a corporate law specialist and author of numerous texts and legal articles. Prior to his association with academia, he was in private practice with Ropes & Gray. Mr. Clark is also a director of Omnicom Group, Inc. and Time Warner, Inc., and is a trustee of Teachers Insurance Annuity Association (TIAA). Dean Clark is 60 years old.

*Marshall A. Cohen* has been a director of the Company since April 2001, and his current term as a Class II director expires in 2005. Mr. Cohen has been Counsel at Cassels Brock and Blackwell, a Canadian law firm, since October 1996. Mr. Cohen is also a director of The Toronto-Dominion Financial Group, Barrick Gold Corporation, American International Group, Inc., Lafarge Corporation, The Goldfarb Corporation, Premcor Inc., Metaldyne, and Golf Town Canada Inc. Mr. Cohen serves on the Advisory Boards of Blackstone and Heartland. Mr. Cohen is 69 years old.

*David C. Dauch* has been a director of the Company since 2002, and his current term as a Class II director expires in 2005. He has been the Senior Vice President-Commercial of American Axle & Manufacturing since June 2004, a company he jointed in 1995 as Manager, Sales Administration. In 1996, he became Director of Sales, GM Full Size Truck Programs and was named Vice President of Sales and Marketing in 1998. In 2001, he became Vice President, Manufacturing-Driveline Division and assumed the position of Senior Vice President, Sales, Marketing and Driveline Division in September 2003. From 1987 to 1995, Mr. Dauch was employed by the Company where he held positions as product manager, account executive, and Director of Ford Sales and Marketing for the Automotive Carpet and Fabric Groups. Mr. Dauch is 40 years old.

*Richard C. Jelinek* has been a director of the Company since September 2004, and his current term as a Class II director expires in 2005. Mr. Jelinek is the former Chairman of Lifemark Corporation, a position in

4

Table of Contents

which he served from 1994 until it merged with United Health Group in 2001. Mr. Jelinek is currently a member of the Executive Committee of the Aspen Valley Medical Foundation and a board member of the Aspen Valley Community Foundation. He is also on the advisory board of the School of Public Health at the University of Michigan. Mr. Jelinek is 67 years old.

*Warren B. Rudman* has been a director of the Company since June 1995, and his current term as a Class II director expires in 2005. Mr. Rudman was a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison from 1993 through 2002, and since January 2003 Mr. Rudman has been of counsel to the law firm. Mr. Rudman served as a United States Senator from New Hampshire from 1980 through 1992 and as Attorney General of New Hampshire from 1970 until 1976. Mr. Rudman is also a director of Allied Waste, Boston Scientific and the Raytheon Company, and is an independent trustee of several mutual funds of the Dreyfus Corporation. Senator Rudman is 74 years old.

*Daniel P. Tredwell* has been a director of the Company since February 2001, and his current term as a Class III director expires in 2006. Mr. Tredwell is also a director of Metaldyne, TriMas and Springs. He is a senior managing director and a co-founder of Heartland. He has two decades of leveraged financing and buyout experience. Mr. Tredwell served as a Managing Director at Chase Securities Inc. and had been with Chase Securities since 1985. Mr. Tredwell is 46 years old.

## Meetings and Committees

During 2003, our Board of Directors held five meetings and took action by written consent three times in lieu of additional meetings. All of the directors attended at least 75% of all meetings of the board and board committees on which they served during 2003, except Messrs. Leuliette and McConnell, who missed two meetings. Under the Company's Corporate Governance Guidelines, directors are expected to attend all regularly scheduled Board meetings and all committee meetings of committees on which they serve, and should attend the Company's Annual Meeting of Stockholders. Three directors attended the Company's 2003 Annual Meeting of Stockholders.

Our Board of Directors has four standing committees: the Audit Committee, the Compensation Committee, the Executive Committee and the Nominating and Corporate Governance Committee. The Board of Directors approved a charter for each of the Audit, Compensation and Nominating and Governance Committees, which charters are available on our website, www.collinsaikman.com. We also have a Nominating Committee designated in our charter documents.

The Board of Directors has determined that the following directors are independent pursuant to the Collins & Aikman Director Independence Guidelines (a copy of which is attached as Appendix B): Robert C. Clark, Marshall A. Cohen, David C. Dauch, Anthony Hardwick, Richard C. Jelinek and Warren B. Rudman. It has also confirmed that a majority of the Board of Directors and all members of the Audit, Compensation and Nominating and Governance Committees are independent.

Under our Corporate Governance Guidelines, the Board of Directors will schedule regular executive sessions at which non-management directors meet without management participation. If this group includes directors who do not meet the Company's independence standards, the directors who are so independent will also meet in executive session at least once a year. The Chairman of the Nominating and Governance Committee (who also serves as Lead Director) will preside at each executive session.

The principal responsibilities of each committee are described in the following paragraphs.

### Audit Committee

Our Audit Committee is composed of Marshall A. Cohen (Chairman), Robert C. Clark and Anthony Hardwick. The purpose of the Committee is to assist the Board of Directors in fulfilling its oversight responsibility relating to (a) the integrity of our financial statements and financial reporting process and our systems of internal accounting and financial controls; (b) the performance of the internal audit function; (c) the annual independent audit of our financial statements, the engagement of the independent auditors and

Table of Contents

## EXECUTIVE COMPENSATION

### Executive Officers

Biographical information regarding Mr. Stockman and Mr. Stepp can be found on pages 4 and 3, respectively. Set forth below is information regarding the other executive officers of the Company.

*Millard L. King, Jr.* has been President, Global Soft Trim since August 2003 and an executive officer since March 2002. From November 2001 to March 2002, he was Executive Vice President of Global Manufacturing Operations, Carpet and Acoustics Systems. Mr. King joined C&A in 1971. Prior to November 2001, Mr. King held the positions of Senior Vice President of Operations for Automotive Knit Fabrics and Chief Operating Officer of the U.S. automotive carpet systems and of automotive knit and woven operations. Mr. King is 59 years old.

*Robert A. Krause* has been Vice President and Treasurer since October 2002, and an executive officer since December 2002. Before joining C&A, Mr. Krause was associated with American Axle & Manufacturing Holdings, Inc., where he was Vice President and Treasurer from 1999 to August 2002, and Vice President-Investor Relations from August 2002 to October 2002, Treasurer and Acting Interim Chief Financial Officer during 1999, and Treasurer from 1998 to 1999. Mr. Krause is also a director of Products. Mr. Krause is 48 years old.

*L. Gregory Tinnell* has been Senior Vice President of Human Resources and an executive officer since April 2000. Previously, he was Vice President of Human Resources for our southern and Mexican operations, as well as Vice President of Global Compensation & Benefits. Mr. Tinnell joined C&A in 1995. Prior to joining C&A, he served in various management positions with Sara Lee Corporation, Nabisco Foods Group and North American Refractories Company. Mr. Tinnell serves on the National Association of Manufacturers Human Resources Steering Committee. Mr. Tinnell is 44 years old.

*Michael G. Torakis* has been President, International Plastics since August 2003 and an executive officer since March 2004. Mr. Torakis joined C&A in August 2003. Prior to joining C&A, Mr. Torakis was President of Venture Holdings Company, LLC and Chief Executive Officer of Peguform GmbH. On or about March 28, 2003, Venture Holdings Company, LLC and certain of its affiliates filed a petition for protection under the United States Bankruptcy Code. Mr. Torakis was President of Venture Holdings Company, LLC at the time of the bankruptcy filing. In addition, on or about May 28, 2002, Peguform GmbH, a subsidiary of Venture Holdings Company, LLC, filed for bankruptcy in Germany. Mr. Torakis was Chief Executive Officer of Peguform GmbH at the time of the filing. Mr. Torakis is 47 years old.

*Eric J. White* has been President, U.S. and Mexico Plastics since August 2003 and an executive officer since August 2002. From August 2002 to August 2003, he was Executive Vice President of Global Manufacturing, Interior Trim & Cockpit Systems. Prior to August 2002, Mr. White held the positions of Vice President Operations-Plastics with responsibility for multiple plant operations, and Vice President Operations for two operations with Textron Automotive Company, Inc. Mr. White is 48 years old.

18

# EXHIBIT G

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**

---------------------------------------------------------- x

In re                                                  :    **Chapter 11**
                                                       :
**COLLINS & AIKMAN**                                   :
**CORPORATION, et al.,**                               :    **Case No. 05-55927 (SWR)**
                                                       :
                          Debtors.                     :    **(Jointly Administered)**
                                                       x

----------------------------------------------------------

### This Statement of Financial Affairs Applies To:

| X | Collins & Aikman Corporation (05-55927) | Collins & Aikman Development Company (05-55943) |
|---|---|---|
| | Amco Convertible Fabrics, Inc. (05-55949) | Collins & Aikman Europe, Inc. (05-55971) |
| | Becker Group, LLC (d/b/a/ Collins & Aikman Premier Mold) (05-55977) | Collins & Aikman Fabrics, Inc. (d/b/a Joan Automotive Industries, Inc.) (05-55963) |
| | Brut Plastics, Inc. (05-55957) | Collins & Aikman Intellimold, Inc. (d/b/a M&C Advanced Processes, Inc.) (05-55976) |
| | Collins & Aikman (Gibraltar) Limited (05-55989) | Collins & Aikman Interiors, Inc. (05-55970) |
| | Collins & Aikman Accessory Mats, Inc. (f/k/a the Akro Corporation) (05-55952) | Collins & Aikman International Corporation (05-55951) |
| | Collins & Aikman Asset Services, Inc. (05-55959) | Collins & Aikman Plastics, Inc. (05-55960) |
| | Collins & Aikman Automotive (Argentina), Inc. (f/k/a Textron Automotive (Argentina), Inc.) (05-55965) | Collins & Aikman Products Co. (05-55932) |
| | Collins & Aikman Automotive (Asia), Inc. (f/k/a Textron Automotive (Asia), Inc.) (05-55991) | Collins & Aikman Properties, Inc. (05-55964) |
| | Collins & Aikman Automotive Exteriors, Inc. (f/k/a Textron Automotive Exteriors, Inc.) (05-55958) | Comet Acoustics, Inc. (05-55972) |
| | Collins & Aikman Automotive Interiors, Inc. (f/k/a Textron Automotive Interiors, Inc.) (05-55956) | CW Management Corporation (05-55979) |
| | Collins & Aikman Automotive International, Inc. (05-55980) | Dura Convertible Systems, Inc. (05-55942) |
| | Collins & Aikman Automotive International Services, Inc. (f/k/a Textron Automotive International Services, Inc.) (05-55985) | Gamble Development Company (05-55974) |
| | Collins & Aikman Automotive Mats, LLC (05-55969) | JPS Automotive, Inc. (d/b/a PACJ, Inc.) (05-55935) |
| | Collins & Aikman Automotive Overseas Investment, Inc. (f/k/a Textron Automotive Overseas Investment, Inc.) (05-55978) | New Baltimore Holdings, LLC (05-55992) |
| | Collins & Aikman Automotive Services, LLC (05-55981) | Owosso Thermal Forming, LLC (05-55946) |
| | Collins & Aikman Canada Domestic Holding Company (05-55930) | Southwest Laminates, Inc. (d/b/a Southwest Fabric Laminators Inc.) (05-55948) |
| | Collins & Aikman Carpet & Acoustics (MI), Inc. (05-55982) | Wickes Asset Management, Inc. (05-55962) |
| | Collins & Aikman Carpet & Acoustics (TN), Inc. (05-55984) | Wickes Manufacturing Company (05-55968) |

**General Notes**

**Note 1**: The Statement of Financial Affairs (the "Statement") has been prepared by the Debtor's management and are unaudited. While management of the Debtor has made every reasonable effort to ensure that the Statement is accurate and complete based upon information that was available at the time of preparation, the subsequent receipt of information may result in material changes in financial data contained in the Statement and inadvertent errors or omissions may exist. To the extent the Debtor discovers additional information that may suggest a material difference, the Debtor will amend the Statement to reflect such changes. Accordingly, the Debtor reserves all rights to amend its Statement as may be necessary or appropriate.

**Note 2**: Unless otherwise indicated, all amounts are listed as of the close of business on May 16, 2005.

**Note 3**: It would be prohibitively expensive and unduly burdensome to obtain current market valuations of the Debtor's property interests. Accordingly, unless otherwise indicated, the Statement reflects the net book values, rather than current market values, of the Debtor's assets and may not reflect the net realizable value.

**Note 4**: The Statement does not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles, nor are they intended to fully reconcile to any financial statements otherwise prepared and/or distributed by the Debtor.

**Note 5**: The claims of individual creditors for, among other things, goods, products, services or taxes are listed as the amounts entered on the Debtor's books and records and may not reflect credits, allowances or other adjustments due from such creditors to the Debtor. The Debtor reserves all of its rights respecting such credits, allowances and other adjustments.

**Note 6**: The Debtor estimates that prior to May 17, 2005, it accrued certain current expenses and other long-term liabilities that either are not payable at this time or have not yet been reported and, therefore, are not otherwise set forth in the Statement. The accrued liabilities, for which the Debtor has accrued reserves, relate to, among other things, the Debtor's medical and pension plans, workers' compensation plans, vacation policies, litigation, environmental programs and federal, state and local taxes.

**Note 7**: All information relating to employee benefits and pension plans are set forth on a consolidated basis on the Statement of Collins & Aikman Products Co., Case No. 05-55932.

**Note 8**: With respect to any item of tooling listed on the Statement, the Debtor is still evaluating whether such tooling is property of the Debtor or whether the Debtor has any other rights in such tooling, and, accordingly, the Debtor reserves all rights with respect to such tooling.

FORM 7 (9/00)

# FORM 7 - STATEMENT OF FINANCIAL AFFAIRS
## UNITED STATES BANKRUPTCY COURT
### Eastern District of Michigan

In re: Collins & Aikman Corporation

Case No. 05-55927(SWR)

## STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs.

Questions 1 - 18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19 - 25. If the answer to an applicable question is "None," mark the box labeled "None." If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

### DEFINITIONS

"In business." A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within the six years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed.

"Insider." The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any owner of 5 percent or more of the voting or equity securities of a corporate debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor. 11 U.S.C. § 101.

**1. Income from employment or operation of business**
State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the **two years** immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | AMOUNT | | SOURCE (if more than one) |
|---|---|---|---|
| X | | | |

**2. Income other than from employment or operation of business**
State the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the **two years** immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | AMOUNT | | SOURCE (if more than one) |
|---|---|---|---|
| X | | | |



0555927050812044410102190

A-231

**3. Payments to creditors**

a. List all payments on loans, installment purchases of goods or services, and other debts, aggregating more than $600 to any creditor, made within **90 days** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENT | AMOUNT PAID | AMOUNT STILL OWING |
|------|------------------------------|------------------|-------------|--------------------|
| X    |                              |                  |             |                    |

b. List all payments made within **one year** immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENT | AMOUNT PAID | AMOUNT STILL OWING |
|------|------------------------------|------------------|-------------|--------------------|
| X    |                              |                  |             |                    |

**4. Suits and administrative proceedings, executions, garnishments and attachments**

a. List all suits and administrative proceedings to which the debtor is or was a party within **one year** immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|------|----------------------------------|----------------------|------------------------------|-----------------------|
|      | See attachment to SOFA 4a        |                      |                              |                       |

b. Describe all property that has been attached, garnished or seized under any legal or equitable process within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF PERSON FOR WHOSE BENEFIT PROPERTY WAS SEIZED | DATE OF SEIZURE | DESCRIPTION AND VALUE OF PROPERTY |
|------|------------------------------------------------------------------|-----------------|-----------------------------------|
| X    |                                                                  |                 |                                   |

**5. Repossessions, foreclosures and returns**

List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF CREDITOR OR SELLER | DATE OF REPOSSESSION, FORECLOSURE SALE, TRANSFER OR RETURN | DESCRIPTION AND VALUE OF PROPERTY |
|------|-----------------------------------------|-----------------------------------------------------------|-----------------------------------|
| X    |                                         |                                                           |                                   |

**6. Assignments and receiverships**

a. Describe any assignment of property for the benefit of creditors made within **120 days** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include any assignment by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF ASSIGNEE | DATE OF ASSIGNMENT | TERMS OF ASSIGNMENT OR SETTLEMENT |
|------|-------------------------------|--------------------|-----------------------------------|
| X    |                               |                    |                                   |

b. List all property which has been in the hands of a custodian, receiver, or court-appointed official within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF CUSTODIAN | NAME AND LOCATION OF COURT CASE TITLE NUMBER | DATE OF ORDER | DESCRIPTION AND VALUE OF PROPERTY |
|------|-------------------------------|----------------------------------------------|---------------|-----------------------------------|
| X    |                               |                                              |               |                                   |

### 7. Gifts

List all gifts or charitable contributions made within **one year** immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient. (Married debtors filing under chapter 12 or chapter 13 must include gifts or contributions by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF PERSON OR ORGANIZATION | RELATIONSHIP TO DEBTOR, IF ANY | DATE OF GIFT | DESCRIPTION AND VALUE OF GIFT |
|------|--------------------------------------------|--------------------------------|--------------|-------------------------------|
| X    |                                            |                                |              |                               |

### 8. Losses

List all losses from fire, theft, other casualty or gambling within **one year** immediately preceding the commencement of this case **or since the commencement of this case**. (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | DESCRIPTION AND VALUE OF PROPERTY | DESCRIPTION OF CIRCUMSTANCE AND, IF LOSS WAS COVERED IN WHOLE OR IN PART BY INSURANCE, GIVE PARTICULARS | DATE OF LOSS |
|------|-----------------------------------|--------------------------------------------------------------------------------------------------------|--------------|
| X    |                                   |                                                                                                        |              |

### 9. Payments related to debt counseling or bankruptcy

List all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of a petition in bankruptcy within **one year** immediately preceding the commencement of this case.

| NONE | NAME AND ADDRESS OF PAYEE | DATE OF PAYMENT NAME OF PAYER IF OTHER THAN DEBTOR | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|------|---------------------------|---------------------------------------------------|-----------------------------------------------------|
| X    |                           |                                                   |                                                     |

### 10. Other transfers

List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF TRANSFERREE, RELATIONSHIP TO DEBTOR | DATE | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
|------|---------------------------------------------------------|------|--------------------------------------------------|
| X    |                                                         |      |                                                  |

**11. Closed financial accounts**

List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within **one year** immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses and other financial institutions. (Married debtors filing under chapter 12 or chapter 13 must include information concerning accounts or instruments held by or for either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF INSTITUTION | TYPE AND NUMBER OF ACCOUNT AND AMOUNT OF FINAL BALANCE | AMOUNT AND DATE OF SALE OR CLOSING |
|---|---|---|---|
| X | | | |

**12. Safe deposit boxes**

List each safe deposit or other box or depository in which the debtor has or had securities, cash, or other valuables within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include boxes or depositories of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF BANK OR OTHER DEPOSITORY | NAMES AND ADDRESSES OF THOSE WITH ACCESS TO THE BOX OR DEPOSITORY | DESCRIPTION OF CONTENTS | DATE OF TRANSFER OR SURRENDER, IF ANY. |
|---|---|---|---|---|
| X | | | | |

**13. Setoffs**

List all setoffs made by any creditor, including a bank, against a debt or deposit of the debtor within **90 days** preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF CREDITOR | DATE OF SETOFF | AMOUNT OF SETOFF |
|---|---|---|---|
| X | | | |

**14. Property held for another person**

List all property owned by another person that the debtor holds or controls.

| NONE | NAME AND ADDRESS OF OWNER | DESCRIPTION AND VALUE OF PROPERTY | LOCATION OF PROPERTY |
|---|---|---|---|
| X | | | |

**15. Prior address of debtor**

If the debtor has moved within the **two years** immediately preceding the commencement of this case, list all premises which the debtor occupied during that period and vacated prior to the commencement of this case. If a joint petition is filed, report also any separate address of either spouse.

| NONE | ADDRESS | NAME USED | DATES OF OCCUPANCY |
|---|---|---|---|
| | 10101 Claude Freeman Drive Charlotte, NC 28262 | Collins & Aikman Corporation | June 2002 - December 2003 |
| | 250 Stephenson Hwy Troy, MI 48083 | Collins & Aikman Corporation | 2001 - Present |
| | 701 McCullough Drive Charlotte, NC 28262 | Collins & Aikman Corporation | 1994 - June 2002 |

**16. Spouses and Former Spouses**
If the debtor resides or resided in a community property state, commonwealth, or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within the **six year period** immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state.

| NONE | NAME |
|------|------|
| X    |      |

**17. Environmental Information.**
For the purpose of this question, the following definitions apply:
"Environmental Law" means any federal, state, or local statute or regulation regulating pollution, contamination, releases of hazardous or toxic substances, wastes or material into the air, land, soil, surface water, groundwater, or other medium, including, but not limited to, statutes or regulations regulating the cleanup of these substances, wastes, or material.
"Site" means any location, facility, or property as defined under any Environmental Law, whether or not presently or formerly owned or operated by the debtor, including, but not limited to, disposal sites. "Hazardous Material" means anything defined as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, or contaminant or similar term under an Environmental Law.

a. List the name and address of every site for which the debtor has received notice in writing by a governmental unit that it may be liable or potentially liable under or in violation of an Environmental Law. Indicate the governmental unit, the date of the notice, and, if known, the Environmental Law:

| NONE | SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|------|------------------------|----------------------------------------|----------------|--------------------|
| X    |                        |                                        |                |                    |

b. List the name and address of every site for which the debtor provided notice to a governmental unit of a release of Hazardous Material. Indicate the governmental unit to which the notice was sent and the date of the notice.

| NONE | SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|------|------------------------|----------------------------------------|----------------|--------------------|
| X    |                        |                                        |                |                    |

c. List all judicial or administrative proceedings, including settlements or orders, under any Environmental Law with respect to which the debtor is or was a party. Indicate the name and address of the governmental unit that is or was a party to the proceeding, and the docket number.

| NONE | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DOCKET NUMBER | STATUS OR DISPOSITION |
|------|----------------------------------------|---------------|------------------------|
| X    |                                        |               |                        |

**18 . Nature, location and name of business**

a. If the debtor is an individual, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the **six years** immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within the **six years** immediately preceding the commencement of this case.

If the debtor is a partnership, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities, within the **six years** immediately preceding the commencement of this case.

If the debtor is a corporation, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities within the **six years** immediately preceding the commencement of this case.

| NONE | NAME AND ADDRESS | TAXPAYER ID NUMBER | NATURE OF BUSINESS | BEGINNING AND ENDING DATES OF OPERATION |
|------|------------------|--------------------|--------------------|----------------------------------------|

*Please see Schedule B12 for a listing of affiliated parties which the Debtor may have been a partner or owned 5 percent or more of the voting or equity securities within six years immediately preceding the commencement of this case.*

b. Identify any business listed in response to subdivision a., above, that is "single asset real estate" as defined in 11 U.S.C. § 101.

| NONE | NAME | ADDRESS |
|------|------|---------|

The following questions are to be completed by every debtor that is a corporation or partnership and by any individual debtor who is or has been, within the **six years** immediately preceding the commencement of this case, any of the following: an officer, director, managing executive, or owner of more than 5 percent of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or otherwise self-employed.

*(An individual or joint debtor should complete this portion of the statement only if the debtor is or has been in business, as defined above, within the six years immediately preceding the commencement of this case. A debtor who has not been in business within those six years should go directly to the signature page.)*

**19. Books, records and financial statements**

a. List all bookkeepers and accountants who within the **two years** immediately preceding the filing of this bankruptcy case kept or supervised the keeping of books of account and records of the debtor.

| NONE | NAME | ADDRESS | DATES SERVICES RENDERED |
|------|------|---------|-------------------------|
| | J. Michael Stepp | CFO<br>250 Stephenson Highway<br>Troy, MI 48083 | Until 10/13/2004 |
| | Dave Cosgrove | SVP - Financial Planning & Controller<br>250 Stephenson Highway<br>Troy, MI 48083 | 7/9/2005 - Present |
| | Bryce M. Koth | CFO<br>250 Stephenson Highway<br>Troy, MI 48083 | 10/13/2004 - 7/08/2005 |

b. List all firms or individuals who within the **two years** immediately preceding the filing of this bankruptcy case have audited the books of account and records, or prepared a financial statement of the debtor.

| NONE | NAME | ADDRESS | DATES SERVICES RENDERED |
|------|------|---------|-------------------------|
| | KPMG LLP | 150 West Jefferson<br>Suite 1200<br>Detroit, MI 48226 | 2003 and 2004 audits |

*Data as of 5/16/05*

c. List all firms or individuals who at the time of the commencement of this case were in possession of the books of account and records of the debtor. If any of the books of account and records are not available, explain.

| NONE | NAME | ADDRESS |
|---|---|---|
| | Robert Solomon - Director of Corporate Accounting | 250 Stephenson Highway Troy, MI 48083 |

d. List all financial institutions, creditors and other parties, including mercantile and trade agencies, to whom a financial statement was issued within the **two years** immediately preceding the commencement of this case by the debtor.

| NONE | NAME AND ADDRESS | DATE ISSUED |
|---|---|---|

*In the ordinary course of its business, the Debtor issued various financial statements to various interested parties including, but not limited to, shareholders, financial institutions, creditors and other parties. The Debtor did not maintain a record of the recipients of financial statements or the date the financial statements were issued.*

## 20. Inventories

a. List the dates of the last two inventories taken of your property, the name of the person who supervised the taking of each inventory, and the dollar amount and basis of each inventory.

| NONE | DATE OF INVENTORY | INVENTORY SUPERVISOR | DOLLAR AMOUNT OF INVENTORY (Specify cost, market or other basis) |
|---|---|---|---|
| X | | | |

b. List the name and address of the person having possession of the records of each of the two inventories reported in a., above.

| NONE | DATE OF INVENTORY | NAME AND ADDRESS OF CUSTODIAN OF INVENTORY RECORDS |
|---|---|---|
| X | | |

## 21 . Current Partners, Officers, Directors and Shareholders

a. If the debtor is a partnership, list the nature and percentage of partnership interest of each member of the partnership.

| NONE | NAME AND ADDRESS | NATURE OF INTEREST | PERCENTAGE OF INTEREST |
|---|---|---|---|
| X | | | |

b. If the debtor is a corporation, list all officers and directors of the corporation, and each stockholder who directly or indirectly owns, controls, or holds 5 percent or more of the voting or equity securities of the corporation.

| NONE | NAME AND ADDRESS | TITLE | NATURE AND PERCENTAGE OF STOCK OWNERSHIP |
|---|---|---|---|
| | See attachment to SOFA 21b | | |

*Please also see Schedule B12 for a listing of parties who may control 5% or more of the voting or equity securities of the Debtor.*

## 22 . Former partners, officers, directors and shareholders

a. If the debtor is a partnership, list each member who withdrew from the partnership within **one year** immediately preceding the commencement of this case.

| NONE | NAME | ADDRESS | DATE OF WITHDRAWAL |
|---|---|---|---|
| X | | | |

b. If the debtor is a corporation, list all officers or directors whose relationship with the corporation terminated within **one year** immediately preceding the commencement of this case.

| NONE | NAME AND ADDRESS | TITLE | DATE OF TERMINATION |
|---|---|---|---|
| | Charles E Becker | Director of C&A | 07/19/04 |

*Address information for former C&A Officers and Directors is available upon written request.*

| | Cynthia L Hess | Director of C&A | 09/30/04 |

*Address information for former C&A Officers and Directors is available upon written request.*

| | Elkin McCallum | Director of C&A | 07/19/04 |

*Address information for former C&A Officers and Directors is available upon written request.*

| | Samuel Valenti III | Director of C&A | 09/30/04 |

*Address information for former C&A Officers and Directors is available upon written request.*

## 23 . Withdrawals from a partnership or distributions by a corporation

If the debtor is a partnership or corporation, list all withdrawals or distributions credited or given to an insider, including compensation in any form, bonuses, loans, stock redemptions, options exercised and any other perquisite during **one year** immediately preceding the commencement of this case.

| NONE | NAME AND ADDRESS OF RECIPIENT, RELATIONSHIP TO DEBTOR | DATE AND PURPOSE OF WITHDRAWAL | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|---|
| | See SOFA 3b | | |

## 24. Tax Consolidation Group.

If the debtor is a corporation, list the name and federal taxpayer identification number of the parent corporation of any consolidated group for tax purposes of which the debtor has been a member at any time within the **six-year period** immediately preceding the commencement of the case.

| NONE | NAME OF PARENT CORPORATION | TAXPAYER IDENTIFICATION NUMBER |
|---|---|---|
| | Collins & Aikman Corporation | EIN: 13-3489233 |

## 25. Pension Funds.

If the debtor is not an individual, list the name and federal taxpayer identification number of any pension fund to which the debtor, as an employer, has been responsible for contributing at any time within the **six-year period** immediately preceding the commencement of the case.

| NONE | NAME OF PENSION FUND | TAXPAYER IDENTIFICATION NUMBER |
|---|---|---|
| X | | |

**In re: Collins & Aikman Corporation**
**Case No. 05-55927**
**Attachment 4a**

| Matter Name | Description | Venue/Date Filed | Status |
|---|---|---|---|
| Clayton, Frances H. v. Collins & Aikman Products Co. and Collins & Aikman Corp. | Age discrimination, retaliation, wrongful termination case. | U.S. District Court, Middle District North Carolina | Discovery ongoing. |
| Keats, Linda and Ronald C. Spry v. Collins & Aikman Products Co. and Collins & Aikman Corporation | Keats alleges age and sex discrimination and Spry alleges age discrimination. | USDC, Middle District of NC | Discovery ongoing. |
| Langworth, Norman v. Collins & Aikman Corporation | Age discrimination. | U.S. District Court Western District of Michigan | Internal investigation and discovery proceeding. |
| Mosingo, Jerry L. v. Collins & Aikman Corporation | Breach of Resignation and Separation agreement for alleged violation of non-compete provision. | Oakland County Circuit Court, MI | Internal investigation and discovery proceeding. |
| Patterson, Wanda, et al. v. Heartland Industrial Partners LLP, Collins & Aikman Corporation and Collins and Aikman Products Company. | Plaintiffs allege that the USWA and its officials have requested and are receiving illegal things of value from an employer and/or its agents. | USDC ND OH ED - 7/28/03 | |
| Peisner, Jonathan v. Collins & Aikman Corporation | Breach of Separation Agreement for failing to pay medical benefits. | Michigan 52nd District | Internal investigation and discovery proceeding. |
| Sareini, Ali T. v. Collins & Aikman | Race discrimination case. | Wayne County Michigan | Newly filed. |
| Products Company, Inc. (f/k/a Collins & | Environmental contamination. | Palm Beach County Circuit Court | Tentative settlement. |
| Onebeacon America Insurance Company v. Collins & Aikman Co., et al. (Insurance recovery) | Two different declaratory judgment actions; one re: Viacom and the other re: environmental claims. | Supreme Court of New York - 4/3/03 | |
| Allied Machinery Co. v. PGAM Advanced Technologies, Collins & Aikman Corp. and Premier Mold | Collection of commissions allegedly owed on sale of equipment from PMGA to Premier Mold. PMGA is the primary defendant. | Malcomb County Michigan | Discovery proceeding. |
| Applied Material Solutions, Inc. v. Collins & Aikman Corporation | Alleged failure to pay for conveyor belts but belts were not completed in time. | St. Clair County, Michigan | Settlement negotiations ongoing; Case evaluation 5/20/05. |
| Arvinmeritor OE, LLC v. Textron, Inc. and Collins & Aikman Corporation | Breach of contract for clean up costs of Grenada, MS site. | Delaware State Court | Answer filed. |
| Yazaki North America, Inc. v. Collins & Aikman Corporation and Collins & Aikman Plastics | Alleged fraud arising out of joint venture with Mexican Industries for $1.4million. | Circuit Court of County of Wayne, Michigan | Discovery proceeding. |
| Bruno, Joseph, Individually and On Behalf of All Others Similarly Situated v. Collins & Aikman Corp., David Stockman, J. Michael Stepp and Bryce Koth | Shareholder's class action. | U.S. District Court Eastern District of Michigan | Newly filed. |
| Securities Litigation v. Collins & Aikman Corporation, Heartland Industrial Partners L.P., Thomas e. Evans, Terry Mosingo, Marshall A. Cohen, Cynthia Hess, Timothy D. Leuiliette, N. Gerald McConnell, J. Michael Stepp, David A. Stockman, Daniel P. Tredwel | This is a federal Class Action brought by the Plaintiff on behalf of himself and Class consisting of all other persons who purchased the publicly traded securities of Collins & Aikman (includes Dotson). | USDC ED Michigan - 3/27/02 | |
| Neese, Shannon Blakely  v. James Bradford Drye, Salem Leasing Corporation and Collins & Aikman  Products Co. f/k/a Collins & Aikman  Corporation. | Automobile accident where in Defendant Drye rear ended Plaintiff. Drye is alleged to have been in the scope of employment with C&A at the time | District Court Division, Iredell County, NC; Filed 4/23/04 | Settled. |
| White, Haywood and Linda v. Collins & Aikman Corporation and City of Greenville | Plaintiff alleges he slipped and fell, and struck his head on the floor.  Plaintiff further alleges the Pro-Gym carpeting, manufactured by defendant's former floor coverings division was defectively manufactured, designed, formulated and/or processed. | Greenville Superior Court - 7/7/00 | Settled. |
| Landstar Logistics, Inc. v. Collins & Aikman Corporation | Landstar alleges that the defendants failed to compensate Landstar as required by a transportation logistics services contract. | Duval County Circuit Court - 8/11/00 | Settled. |
| Tenibac-Graphion, Inc. v. Collins & Aikman Corporation | Alleged failure to pay for repair services. | Clinton Township, Michigan | Settled. |

Page 1 of 2

8/12/2005 4:44 AM
00022752

A-239

**In re: Collins & Aikman Corporation**
**Case No. 05-55927**
**Attachment 4a**

| Matter Name | Description | Venue/Date Filed | Status |
|---|---|---|---|
| Platinum Resources LLC v. Collins & Aikman Corporation | Collection of payment for temporary staffing services. | 14A-3 Judicial district Michigan | Dismissal with prejudice signed. |
| Steel Hector & Davis v. Collins & Aikman Corporation | Breach of contract for alleged failure to pay legal bills. | Palm Beach County Florida | Settled. |
| Hematite Manufacturing, a division of Pavaco Plastics, Inc. v. Collins & Aikman Corporation. | Collection for goods provided. | Oakland County Court, Michigan | Invoice paid. Closing paperwork pending. |
| Kent Adhesive Products Co. v. Collins & Aikman Corporation | Collection for goods provided. | Portage County Municipal Court, Kent, Ohio | Case dismissed. |

| | | | |
|---|---|---|---|
| *Note 1: Parties to "multi-plaintiff" cases relating to asbestos have not been listed but will be included in the creditor matrix for notice purposes. A complete list as of May 17, 2005 is available upon written request to Kurtzman Carson Consultants.* | | | |
| *Note 2: Out of an abundance of caution, the Debtor has scheduled all suits and administrative proceedings under C&A Products Co. To the extent the Debtor was able to identify the relevant legal entity, the action will be scheduled with that Debtor entity as well.* | | | |
| *Note 3: This listing shall not constitute an admission by the Debtor of any liability or that the actions or proceedings listed herein were correctly filed against the Debtor or any affiliate of the Debtor. The Debtor reserves its rights to dispute or assert defenses to any suit or proceeding listed herein and to assert that neither the Debtor nor any other affiliated debtor in these jointly administered cases is an appropriate party to such actions or proceedings.* | | | |

8/12/2005 4:44 AM
00022752

A-240

**In re: Collins & Aikman Corporation**
**Case No. 05-55927**
**Attachment 21b**

| Name | Title | Nature and percentage of stock ownership |
|------|-------|------------------------------------------|
| Charles Becker | Chief Executive Officer, Shareholder | 8.80% |
| Bryce M. Koth | Senior Vice President, Chief Financial Officer | |
| Jay B. Knoll | Vice President, General Counsel, Secretary | |
| John A. Galante | Vice President, Treasurer | |
| J. Michael Stepp | Class I Director | |
| Timothy D. Leuliette | Class I Director | |
| W. Gerald McConnell | Class I Director | |
| Anthony Hardwick | Class I Director | |
| Marshall A. Cohen | Class II Director (Chairman) | |
| David C. Dauch | Class II Director | |
| Richard Jelinek | Class II Director | |
| Warren B. Rudman | Class II Director | |
| Robert C. Clark | Class III Director | |
| Daniel P. Tredwell | Class III Director | |
| Heartland Industrial Partners | Shareholder | 39.10% |
| Aspen Advisors, LLC | Shareholder | 8.40% |
| | | |
| Note: Data as of 5/16/05 | | |

8/12/2005 4:44 AM
00021985

A-241

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

In re: Collins & Aikman Corporation

Case No. 05-55927(SWR)

# Declaration Concerning Debtors' Statement of Financial Affairs

I, David Cosgrove, Sr. Vice President - Fin. Planning and Controller of the corporation named as debtor in this case, declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct to the best of my knowledge, information and belief.

Date ___8/12/2005___

Signature: ___/ s / David Cosgrove___

**David Cosgrove**

**Sr. Vice President - Fin. Planning and Controller**

---

**Penalty for making a false statement or concealing property: Fine of up to $500,000 or imprisonment for up to 5 years or both.  18 U.S.C.§§ 152 and 3571.**

A-242

# EXHIBIT H

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

K.J. EGLESTON, individually and on behalf
of all others similarly situated,

       Plaintiff,                Case No. 06-13555
                                 Hon. Arthur Tarnow
  vs.

HEARTLAND INDUSTRIAL PARTNERS, L.P., a
Delaware limited liability partnership,
HEARTLAND INDUSTRIAL ASSOCIATES, L.L.C.,
a Delaware limited company, DAVID A.
STOCKMAN, J. MICHAEL STEPP, and
BRYCE M. KOTH,

           Defendants.
                               /

MAINSTAY HIGH YIELD CORPORATE BOND FUND,
on behalf of itself and all others
similarly situated,

                        Case No. 07-10542
          Plaintiff,        Hon. Arthur Tarnow
     vs.

HEARTLAND INDUSTRIAL PARTNERS, L.P., a
Delaware limited liability partnership,
HEARTLAND INDUSTRIAL ASSOCIATES, L.L.C.,
 a Delaware limited company, DAVID A.
STOCKMAN, J. MICHAEL STEPP, TIMOTHY D.
LEULIETTE, DANIEL P. TREDWELL, W. GERALD
McCONNELL, SAMUEL VALENTI, III, JOHN A.
GALANTE, BRYCE M. KOTH, ROBERT A. KRAUSE,
GERALD E. JONES, DAVID R. COSGROVE, ELKIN B.
McCALLUM, PAUL C. BARNABA, THOMAS V.
GOUGHERTY and CHRISTOPHER M. WILLIAMS,

           Defendants.
                               /

**TRANSCRIPT OF MOTION TO DISMISS COMPLAINT HEARING**

BEFORE THE HONORABLE ARTHUR J. TARNOW
UNITED STATES DISTRICT COURT JUDGE
Detroit, Michigan
Tuesday, March 18, 2008

APPEARANCES:

FOR PLAINTIFF             THOMAS H. BURT, ESQ.
EGLESTON:                 PAULETTE S. FOX, ESQ.
                          Wolf Haldenstein Adler Freeman & Herz
                          270 Madison Avenue
                          New York, NY 10016

                          E. POWELL MILLER, ESQ.
                          The Miller Law Firm
                          950 W. University Drive, Suite 300
                          Rochester, MI 48307

FOR PLAINTIFF             STEVEN B. SINGER, ESQ.
MAINSTAY:                 JOHN C. BROWNE, ESQ.
                          Bernstein Litowitz Berger & Grossman
                          1285 Avenue of Americas, 38th floor
                          New York, NY 10019

FOR DEFENDANTS            LEA MARGARET HABER KUCK, ESQ.
HEARTLAND,                REBECCA MIN, ESQ.
TREDWELL, VALENTI         Skadden Arps Slate Meagher & Flom
& McCONNELL:              Four Times Square
                          New York, NY 10036

FOR DEFENDANT             ANDREW B. WEISSMAN, ESQ.
STOCKMAN:                 Wilmer Hale
                          1875 Pennsylvania Avenue, N.W.
                          Washington, DC 20006

FOR DEFENDANT             DAVID E. SWARTS, ESQ.
STEPP:                    Sullivan & Cromwell
                          125 Broad Street
                          New York, NY 10004-2498

FOR DEFENDANTS            JOSEPH O. CLICK, ESQ.
KOTH & KRAUSE:            Blank Rome
                          600 New Hampshire Ave., NW, Ste 1200
                          Washington, DC 20037

3

APPEARANCES CONTINUED:

| | |
|---|---|
| FOR DEFENDANT LEULIETTE: | SCOTT M. HIMES, ESQ.<br>Stillman Friedman & Shechtman<br>425 Park Avenue<br>New York, NY 10022 |
| FOR DEFENDANT COSGROVE: | MONIQUE GAYLOR, ESQ.<br>KENNETH HASHIMOTO, ESQ.<br>Arnold & Porter<br>399 Park Avenue<br>New York, NY 10022-4690 |
| FOR DEFENDANT BARNABA: | CARL S. KRAVITZ, ESQ.<br>Zuckerman Spaeder<br>1800 M Street, N.W., Suite 1000<br>Washington, DC 20036 |
| FOR DEFENDANT GOUGHERTY & WILLIAMS: | MARTIN C. WEISMAN, ESQ.<br>Weisman, Young, Schloss & Ruemenapp<br>30100 Telegraph Road, Suite 428<br>Bingham Farms, MI 48025-4518 |
| FOR DEFENDANT McCALLUM: | JEFFREY SIMES, ESQ.<br>Goodwin Procter<br>599 Lexington Avenue<br>New York, NY 10022 |

*   *   *

TO OBTAIN CERTIFIED TRANSCRIPT CONTACT:
Denise A. Mosby, CRR, RMR
313.961.6230

57

1    second is the reliance element.  Both are required elements of

2    a 10(b) cause of action.

3                    I think Your Honor has probably seen, you know,

4    the statement of the elements of a 10(b) cause of action, but

5    the Supreme Court in January --

6                    THE COURT:    See, when I went to law school, there

7    was only 9(c).  They got 10(b) after I . . .

8                    MR. KRAVITZ:    Well, now there are only six

9    elements to the claim.

10                    THE COURT:    Okay.  You are relying on Stonebridge

11    v. Scientifica-Atlanta?

12                    MR. KRAVITZ:    We are going to rely on Stonebridge,

13    yes.

14                    THE COURT:    You already have.

15                    MR. KRAVITZ:    Yes.

16                    THE COURT:    I want to hear Plaintiffs' response as

17    to why I shouldn't dismiss this as to Barnaba.

18                    MR. BROWNE:    Okay.  Your Honor, to begin with, I

19    think scienter is adequately alleged in the complaint, as it

20    was to the other Defendants, as to Barnaba.

21                    THE COURT:    Are you relying on group

22    responsibility here?

23                    MR. BROWNE:    We are, along with one other theory,

24    which is --

25                    THE COURT:    You can't with Barnaba.  He's not an

1   officer.  He didn't sign anything.  And while he may have

2   participated in the side letters, he had no duty to disclose.

3            MR. BROWNE:   Okay.  Let me on that point.  His

4   title actually at the company was Director of Financial

5   Analysis.  It is alleged in the complaint that when he was

6   preparing the false side letters and directing other employees

7   to do that, that -- and this is paragraph 93 -- that Barnaba

8   knew and intended that it was intended to falsely inflate

9   C&A's reported current earnings.

10           So, I will move on from the group pleading, but I

11  will quickly submit to you, Your Honor, if there was a

12  situation where a group --

13           THE COURT:   Is he a Defendant in the SEC case?

14           MR. BROWNE:   He is indicted in the criminal case.

15  He's a Defendant in the SEC case.  He has been sustained in

16  the SEC case by Judge Sheindlin.  So, yes.

17           And can I make a 30-second point on the group

18  pleading?

19           THE COURT:   Sure.

20           MR. BROWNE:   And then I'm done with it forever.

21           THE COURT:   You've got to get to the Sixth

22  Circuit.

23           MR. BROWNE:   I don't think the Sixth Circuit deals

24  with -- but it is an open question in the Sixth Circuit.  It

25  is widely accepted in the Second Circuit.  And the district

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 28, 2008, I caused to be electronically filed the "Appendix to Opening Brief in Support of Defendant Paul C. Barnaba's Motion to Dismiss Plaintiffs' First Amended Complaint" with the Clerk of Court using CM/ECF, which will send notification of such filing to the following:

Joseph A. Rosenthal
Carmella P. Keener
Rosenthal, Monhait & Goddess, P.A.
Mellon Bank Center
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
Email: jrosenthal@rmgglaw.com
Email: CKeener@rmgglaw.com

Andrew B. Weissman
Jenny R. Chou
Michele L. Taylor
WilmerHale
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000
Email: andy.weissman@wilmerhale.com
Email: jenny.chou@wilmerhale.com
Email: michele.taylor@wilmerhale.com

David A. Rosenfeld
Samuel H. Rudman
Coughlin Stoia Geller Rudman & Robbins LLP
52 Duane Street, 7th Floor
New York, NY 10007
(212) 693-1058
Email: drosenfeld@csgrr.com
Email: srudman@csgrr.com

Richard L. Horowitz
Potter Anderson & Corron, LLP
1313 N. Market St., Hercules Plaza
6th Floor
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
Email: rhorwitz@potteranderson.com

Peter B. Ladig
Stephen B. Brauerman
The Bayard Firm
222 Delaware Avenue, Suite 900,
P.O. Box 25130
Wilmington, DE 19899
(302) 429-4219/(302) 429-4232
Email: bankserve@bayardfirm.com
Email: sbrauerman@bayardlaw.com

David E. Swartz
Stacey Friedman
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004-2498
United States
(212) 558-4000
Email: swartsd@sullcrom.com
Email: friedmans@sullcrom.com

Andrew Goldman
WilmerHale
399 Park Avenue
New York, New York 10022
(212) 230-8800
Email: andrew.goldman@wilmerhale.com

Thomas P. Preston
Blank Rome LLP
1201 North Market Street
Suite 800
Wilmington, DE 19801-4226
(302) 425-6400
Email: preston-t@blankrome.com

Vernon R. Proctor
Proctor Heyman LLP
1116 West Street
Wilmington, DE 19801
(302) 472-7300
Email: vproctor@proctorheyman.com

James L. Holzman
J. Clayton Athey
Prickett, Jones & Elliott, P.A.
1310 King Street
Wilmington, DE 19899
(302) 888-6500
Email: jlholzman@prickett.com
Email: jcathey@prickett.com

Daniel B. Tehrani
Stephen L. Ascher
Jenner & Block
919 Third Avenue
37th Floor
New York, NY 10022-3908
212-891-1600
Email: dtehrani@jenner.com
Email: sascher@jenner.com

Kenneth J. Nachbar
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 575-7294
Email: knachbar@mnat.com

Andrew Auchincloss Lundgren
Christian D. Wright
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6743/(302) 571-6691
Email: alundgren@ycst.com
Email: cwright@ycst.com

Albert H. Manwaring, IV
Pepper Hamilton LLP
1313 Market Street, Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
(302) 777-6500
Email: manwaringa@pepperlaw.com

Thomas Henry Kovach
Parkowski, Guerke & Swayze, P.A.
800 King Street, Suite 203
Wilmington, DE 19801
(302) 594-3313
Email: tkovach@pgslegal.com

Robert Scott Saunders
Skadden, Arps, Slate, Meagher & Flom
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
(302) 651-3000
Email: rsaunder@skadden.com

Anne Churchill Foster
Robert J. Stearn Jr.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 658-6541/(302) 651-7700
Email: foster@rlf.com
Email: stearn@rlf.com

Michael J. Maimone
Joseph Benedict Cicero
Edwards Angell Palmer & Dodge LLP
919 N. Market Street, Suite 1500
Wilmington, DE 19801
(302) 777-7770
Email: mmaimone@eapdlaw.com
Email: jcicero@eapdlaw.com

 /s/ Thomas G. Macauley
       Thomas G. Macaulay