UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COLLINS & AIKMAN CORPORATION and COLLINS & AIKMAN PRODUCTS CO., as Debtors in Possession, | ) ) ) ) | Civ. No. 07-265-SLR/LPS |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| DAVID A. STOCKMAN, et al., | ) ) | |
| Defendants. | ) ) | |

## OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' (OTHER THAN AUDITOR DEFENDANTS) MOTIONS TO DISMISS

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
Samuel H. Rudman
David A. Rosenfeld
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

ROSENTHAL, MONHAIT &
  GODDESS, P.A.
Joseph A. Rosenthal (#234)
Carmella P. Keener (#2810)
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
Telephone: 302/656-4433
302/658-7567 (fax)
jrosenthal@rmgglaw.com
ckeener@rmgglaw.com

*Attorneys for Plaintiffs Collins &
Aikman Corporation and Collins &
Aikman Products Co.*

Date Filed: July 28, 2008

## TABLE OF CONTENTS

**Page**

I.  STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS .................................................................................................1

II. SUMMARY OF THE ARGUMENT .............................................................................3

III. STATEMENT OF FACTS ...........................................................................................5

    A.    The Legal Backdrop of this Case..........................................................................5

          1.    The Criminal Indictment and Guilty Pleas ..................................5

          2.    The SEC's Civil Action ..................................................................6

          3.    The Federal Securities Actions .....................................................6

    B.    Factual Summary of the FAC ...............................................................................7

          1.    Background .....................................................................................7

          2.    Heartland Causes C&A to Undertake an Unnecessary and Expensive Acquisition Spree .........................................................8

          3.    Fraudulent Schemes Delay C&A's Demise.................................10

               a.    The Joan Fabrics Round-Trip Transactions Scheme .....................10

               b.    The Supplier Rebate Scheme.........................................................11

          4.    The Audit Committee's First Investigation into Allegations of Intentional Wrongdoing.........................................................13

          5.    Materially Misleading Statements Suppress C&A's Deepening Liquidity Crisis.........................................................14

          6.    As the Fraud Begins to Unravel, Misrepresentations about C&A's True Condition Continue................................................15

          7.    The Audit Committee's Second Investigation Confirms the Details of the Massive Fraud ....................................................17

IV. ARGUMENT................................................................................................................18

    A.    Applicable Pleading Standards ...........................................................................18

    B.    Plaintiff Sufficiently Alleges a Violation of §10(b) ...........................................21

          1.    The Elements of a §10(b) Claim.................................................21

**Page**

2. Two Separate District Courts Already Found that Allegations Identical to Those in the FAC Satisfied the Falsity, Materiality and Scienter Elements of a §10(b) Claim as to Stockman, Stepp, Cosgrove and McCallum ..........22

a. The August 2004 Senior Note Offering Contained False and Misleading Financial Results ..........22

b. Materiality of the August 2004 Senior Note Offering Misrepresentations ..........24

c. Plaintiff Adequately Alleges Scienter for Stockman, Stepp, Cosgrove and McCallum ..........25

3. The FAC Pleads Reliance ..........27

4. Plaintiff Pleads a Cogent Theory of Economic Loss and Provides Adequate Notice of the Causal Link Between that Loss and the Alleged Misrepresentations ..........32

a. Economic Loss ..........32

b. Loss Causation ..........35

C. Plaintiff Sufficiently Alleges a Claim for Breach of Fiduciary Duties under Delaware Law ..........38

1. Defendants Owed Fiduciary Duties to the C&A, Its Shareholders and its Creditors. ..........38

2. The FAC Adequately Alleges Several Breaches of the Duty of Loyalty Owed to the Company and Its Creditors ..........41

a. Violations of the Duty of Loyalty/Good Faith ..........41

b. Violations of the Duty of Candor ..........43

c. Violations of the Duty to Monitor ..........45

d. Liability for the Breaches of the Duty of Loyalty Should Be Imputed to Heartland ..........46

3. C&A's Exculpatory Clause Does Not Provide Immunity from the Consequences of the Alleged Wrongful Acts ..........47

**Page**

|  | 4. | The Protections of the Business Judgment Rule Do Not Apply.........................................................................................................49 |
|  | 5. | The FAC Alleges that C&A Was Harmed by the Various Breaches of Fiduciary Duties......................................................................50 |
| D. | | The FAC States a Claim for Common Law Fraud .................................................52 |
| E. | | The FAC States a Claim for Breach of Contract Against Heartland.....................54 |
| F. | | The FAC States a Claim for Unjust Enrichment ...................................................55 |
| V. | | CONCLUSION..................................................................................................................57 |

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alidina v. Internet.com Corp.*,
    Civ. No. 17235-NC, 2002 Del. Ch. LEXIS 156
    (Del. Ch. Nov. 6, 2002)............................................................................................48

*Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*,
    315 F. Supp. 2d 666 (E.D. Pa. 2004)......................................................................27

*ATR-Kim Eng Fin. Corp. v. Araneta*,
    C.A. No. 489-N, 2006 Del. Ch. LEXIS 215
    (Del. Ch. Dec. 21, 2006), aff'd., 930 A.2d 928 (Del. 2007)...................................43

*Ballan v. Wilfred American Educational Corp.*,
    720 F. Supp. 241 (E.D.N.Y. 1989) ....................................................................5, 26

*Blair v. Scott Specialty Gases*,
    283 F.3d 595 (3d Cir. 2002)....................................................................................34

*Bovay v. H.M. Byllesby & Co.*,
    38 A.2d 808 (Del. 1944) .........................................................................................40

*Buckley v. Clifford Chance, LLP*,
    No. 2:06-CV-1003, slip op. (E.D. Pa. Oct. 4, 2006).........................................31, 32

*Buckley v. Deloitte & Touche USA LLP*,
    06 Civ. 3291 (SHS), 2007 U.S. Dist. LEXIS 37107
    (S.D.N.Y. May 22, 2007)....................................................................................30, 32

*Buckley v. O'Hanlon*,
    C.A. No. 04-955 (GMS), 2007 U.S. Dist. LEXIS 22211
    (D. Del. Mar. 28, 2007)................................................................................... *passim*

*Cede & Co. v. Technicolor*,
    634 A.2d 345 (Del. 1993) .................................................................................41, 42

*Corporate Prop. Assocs. 14 Inc. v. CHR Holding Corp.*,
    C.A. No. 3231-VCS, 2008 Del. Ch. LEXIS 45
    (Del. Ch. Apr. 10, 2008) .........................................................................................53

*Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*,
    C.A. No. 12150, 1991 WL 277613
    (Del. Ch. Dec. 30, 1991).....................................................................................40, 41

*Dalton v. Educational Testing Serv.*,
    663 N.E.2d 289 (N.Y. 1995)...................................................................................55

**Page**

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005)................................................................................21, 35, 36

*Emerald Partners v. Berlin,*
    726 A.2d 1215 (Del. 1999) ...................................................................................48

*Emerald Partners v. Berlin,*
    787 A.2d 85 (Del. 2001) .................................................................................47, 48

*Eminence Capital, LLC v. Aspeon, Inc.,*
    316 F.3d 1048 (9th Cir. 2003) .............................................................................57

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976)..............................................................................................25

*Estate of Soler v. Rodriguez,*
    63 F.3d 45 (1st Cir. 1995)...............................................................................28, 36

*Federal Sav. & Loan Ins. Corp. v. Musacchio,*
    695 F. Supp. 1053 (N.D. Cal. 1988).....................................................................50

*Flynn v. Bachow,*
    C.A. No. 15885, 1998 WL 671273
    (Del. Ch. Sept. 18, 1998) .....................................................................................56

*Geyer v. Ingersoll Publications Co.,*
    621 A.2d 784 (Del. Ch. 1992)...............................................................................40

*Globis Partners, L.P. v. Plumtree Software, Inc.,*
    No. 1577, 2007 WL 4292024
    (Del. Ch. Nov. 30, 2007).......................................................................................41

*Guttman v. Huang,*
    823 A.2d 492 (Del. Ch. 2003)...............................................................................42

*ID Biomedical Corp. v. TM Technologies, Inc.,*
    C.A. No. 13269, 1995 WL 130743
    (Del. Ch. Mar. 16, 1995).......................................................................................56

*In re Abbott Labs. Deriv. S'holders Litig.,*
    325 F.3d 795 (7th Cir. 2003) ..........................................................................45, 50

*In re Adelphia Communications Corp.,*
    365 B.R. 24 (S.D.N.Y. 2007)................................................................................32

**Page**

*In re Alpharma Sec. Litig.*,
  372 F.3d 137 (3d Cir. 2004)...................................................................................25

*In re Brown Sch.*,
  386 B.R. 37 (D. Del. 2008)........................................................................34, 50, 51

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)..................................................................................21

*In re Caremark Int'l. Inc. Derivative Litigation*,
  698 A.2d 959 (Del. Ch. 1996)..........................................................................45, 46

*In re Citx Corp.*,
  448 F.3d 672 (3d Cir. 2006).............................................................................33, 34

*In re Crown Am. Realty Trust Sec. Litig.*,
  Civ. No. 95-2025, 1997 U.S. Dist. LEXIS 14609
  (W.D. Pa. Sept. 15, 1997).......................................................................................23

*In re Cylink Secs. Litig.*,
  178 F. Supp. 2d 1077 (N.D. Cal. 2001)..................................................................21

*In re Encore Computer Corp. S'holder Litig.*,
  C.A. No. 16044, 2000 WL 823373
  (Del. Ch. June 16, 2000)..........................................................................................49

*In re Fleming Cos. Sec. & Derivative Litig.*,
  03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488
  (E.D. Tex. June 10, 2004).......................................................................................37

*In re Fruehauf Trailer Corp.*,
  250 B.R. 168 (D. Del. 2000)......................................................................19, 20, 37

*In re Global Serv. Group LLC*,
  316 B.R. 451 (S.D.N.Y. 2004).................................................................................33

*In re GM (Hughes) S'holder Litig.*,
  C.A. No. 20269, 2005 Del. Ch. LEXIS 65
  (Del. Ch. May 4, 2005), aff'd. 897 A.2d 162 (Del. 2006)......................................50

*In re Greater Southeast Community Hosp. Corp.*,
  353 B.R. 324 (D.D.C. 2006)........................................................................34, 35, 50

*In re Inacom Corp.*,
  C.A. No. 00-2426 (PJW), 2001 Bankr. LEXIS 1297
  (D. Del. Aug. 7, 2001)............................................................................................20

- vi -

**Page**

*In re Investors Funding Corp. Sec. Litig.*,
523 F. Supp. 533 (S.D.N.Y. 1980) ...........................................................................31

*In re Lukens Inc. S'holders Litig.*,
757 A.2d 720 (Del. Ch. 1999), aff'd. sub. nom., 757 A.2d 1278 (Del.
2000) .........................................................................................................................42

*In re Student Fin. Corp.*,
No. 02-11620, 2004 WL 609329
(D. Del. Mar. 23, 2004)...........................................................................................56

*In re Sunrise Sec. Litig.*,
793 F. Supp. 1306 (E.D. Pa. 1992) ........................................................................26

*In re Tower Air, Inc.*,
416 F.3d 229 (3d Cir. 2005)....................................................................................50

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
236 F.R.D. 62 (D.N.H. 2006) .................................................................................36

*In re Walt Disney Co., Derivative Litig.*,
731 A.2d 342 (Del. Ch. 1998).................................................................................44

*In re Walt Disney Co. Deriv. Litig.*,
906 A.2d 27 (Del. 2006) .........................................................................................42

*In re Walt Disney Co. Derivative Litig.*,
825 A.2d 275 (Del. Ch. 2003)...........................................................................45, 48

*In re Western Nat'l Corp. S'holders Litig.*,
C.A. No. 15927, 2000 Del. Ch. LEXIS 82
(Del. Ch. May 22, 2000) .....................................................................................38, 39

*In re WorldCom, Inc. Sec. Litig.*,
294 F. Supp. 2d 392 (S.D.N.Y. 2003)....................................................................29

*Ivanhoe Partners v. Newmont Mining Corp.*,
535 A.2d 1334 (Del. 1987) .....................................................................................38

*Jackson Nat'l Life Ins. Co. v. Kennedy*,
741 A.2d 377 (Del. Ch. 1999).............................................................................44, 56

*LaSala v. Bordier Et Cie*,
519 F.3d 121 (3d Cir. 2008)...............................................................................40, 52

Page

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)...................................................................................37

*Malone v. Brincat*,
    722 A.2d 5 (Del. 1998) ...........................................................................38, 43, 44

*Mills Acquisition Co. v. MacMillan, Inc.*,
    559 A.2d 1261 (Del. 1989) ....................................................................................49

*New Park Min. Co. v. Cranmer*,
    225 F. Supp. 261 (S.D.N.Y. 1963) .......................................................................28

*Nicolet, Inc. v. Nutt*,
    525 A.2d 146 (Del. 1987) ......................................................................................53

*Oberly v. Kirby*,
    592 A.2d 445 (Del. 1991) ......................................................................................41

*Odyssey Partners, L.P. v. Fleming Cos., Inc.*,
    735 A.2d 386 (Del. Ch. 1999)...............................................................................40

*Official Comm. of Unsecured Creditors of Allegheny Health, Ed. & Research
    Found. v. Pricewatershouse Coopers, LLP*,
    00cv684, 2007 U.S. Dist. LEXIS 3331
    (W.D. Pa. Jan. 17, 2007).......................................................................................34

*Official Committee of Unsecured Creditors v. R. F. Lafferty & Co.*,
    267 F.3d 340 (3d Cir. 2001)............................................................................ passim

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)............................................................................21, 23

*Phillips v. County of Allegheny*,
    515 F.3d 224 (3rd Cir. 2008) ................................................................................19

*Resolution Trust Corp. v. Fiala*,
    870 F. Supp. 962 (E.D. Mo. 1994)........................................................................50

*Ruckle v. Roto Am. Corp.*,
    339 F.2d 24 (2d Cir. 1964).....................................................................................28

*Schacht v. Brown*,
    711 F.2d 1343 (7th Cir. 1983) ...............................................................................33

*SEC v. Collins & Aikman Corp.*,
    524 F. Supp. 2d 477 (S.D.N.Y. 2007)............................................................. passim

**Page**

*SEC v. Zandford,*
    535 U.S. 813 (2002).................................................................................53

*Semerenko v. Cendant Corp.,*
    223 F.3d 165 (3d Cir. 2000).....................................................................36

*Stanford Trading Co. v. V.R.I. Distrib. Corp.,*
    No. 3:98-cv-0591L, 2003 WL 21662828
    (N.D. Tex. July 14, 2003) ........................................................................26

*Stephenson v. Capano Development, Inc.,*
    462 A.2d 1069 (Del. 1983) ................................................................52, 53

*Stone v. Ritter,*
    911 A.2d 362 (Del. 2006) ...................................................................38, 42

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,*
    ____ U.S. ___, 128 S. Ct. 761 (2008).................................................27, 29

*Superintendent of Ins. v. Bankers Life & Casualty Co.,*
    404 U.S. 6 (1971).....................................................................................28

*Taylor v. Hall,*
    No. 2:02 cv 240, 2006 WL 1793603
    (N.D. Ind. June 28, 2006) ........................................................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    ___ U.S. ___, 127 S. Ct. 2499 (2007).................................................20, 25

*Texas Liquids Holdings, LLC v. Key Bank Nat'l Ass'n,*
    No. 05 cv 5070 (KMW), 2007 WL 950136
    (S.D.N.Y. Mar. 27, 2007) .........................................................................54

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,*
    906 A.2d 168 (Del. Ch. 2006)............................................................29, 51

*Zirn v. VLI Corp.,*
    621 A.2d 773 (Del. 1993) ........................................................................48

**STATUTES, RULES AND REGULATIONS**

8 Del. C.
    §102(b)(7) .........................................................................................47, 48
    §141(e) .....................................................................................................49

Page

15 U.S.C.
    §78u-4(b)(1) ............................................................................................... 19
    §78u-4(b)(2) ............................................................................................... 19

Exchange Act
    §10(b) .................................................................................................. *passim*
    §20(a) ................................................................................................... 6, 47

Federal Rules of Civil Procedure
    8 ............................................................................................................... 3
    8(a)(2) .................................................................................................... 35
    8(e)(2) .................................................................................................... 57
    9(b) ..................................................................................................... *passim*
    10b-5 ................................................................................................ 28, 29
    12(b)(6) .............................................................................................. *passim*
    15(a) ....................................................................................................... 57

Private Securities Litigation Reform Act of 1995 ...................................... *passim*

## SECONDARY AUTHORITIES

R. Franklin Balotti and Jesse A. Finkelstein,
*Del. Law of Corps. & Bus. Orgs.*, (3d Ed. 2003)
    §4.19, at 4-335 .......................................................................................... 48

## I.  STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

On May 16, 2007, Collins & Aikman Corporation and Collins & Aikman Products Co., as debtors in possession (collectively, "C&A" or the "Company"), filed a Complaint against certain of its former officers and directors, its former controlling shareholder, and its former outside auditors alleging causes of action for violations of the federal securities laws, breach of fiduciary duties, fraud, unjust enrichment, breach of contract, negligence/malpractice, and aiding and abetting. [DI 1]  On or about September 14, 2007, the named defendants moved to dismiss the Complaint, with one exception. [DI 23-51, 53-55, 57, 59, 66-67][1]

On January 28, 2008, with the Court's permission, the Collins & Aikman Litigation Trust, as successor to C&A, filed a First Amended Complaint ("FAC"), which included additional factual allegations regarding the defendants' misconduct. [DI 90]  On April 28, 2008, the following defendants moved to dismiss the FAC: (1) David A. Stockman ("Stockman") [DI 115]; (2) J. Michael Stepp ("Stepp") [DI 104]; (3) David R. Cosgrove ("Cosgrove") [DI 97]; (4) Paul C. Barnaba ("Barnaba") [DI 128]; (5) Thomas E. Evans ("Evans") [DI 101]; (6) Charles E. Becker ("Becker") [DI 124]; (7) Cynthia Hess ("Hess") [DI 131] ; (8) Robert A. Krause ("Krause") and Bryce M. Koth ("Koth") [DI 119]; (9) Elkin M. McCallum ("McCallum") [DI 99] ; (10) Daniel P. Tredwell ("Tredwell"), W. Gerald McConnell ("McConnell"), and Samuel Valenti III ("Valenti") [DI 106] ; (11) Heartland Industrial Partners, L.P., Heartland Industrial Associates, L.L.C., and Heartland Industrial Group, L.L.C. (collectively, "Heartland") [DI 110] ; (12) PricewaterhouseCoopers LLP [DI

---

[1]     One defendant, John A. Galante, did not, and has not, filed a response to any pleading in this action.

107]; and (13) KPMG LLP [DI 120]. This omnibus memorandum responds to all pending motions to dismiss, except for those filed by PricewaterhouseCoopers LLP and KPMG LLP, which will be addressed in a separate filing.

The allegations in the FAC – derived from, in large part, a criminal indictment obtained by the U.S. Attorney's Office for the Southern District of New York (the "Indictment"), a civil complaint filed by the Securities & Exchange Commission ("SEC"), and Reports prepared by the Audit Committee of C&A's Board of Directors (the "Audit Committee")[2] – detail a staggering fraud perpetrated by the defendants, at various times and in various capacities, that saddled the Company with tremendous debt, falsely portrayed the Company's financial condition to prolong the Company's life and, ultimately, forced the Company into bankruptcy. Although ignored by the defendants, two separate federal courts on two separate occasions have already upheld the sufficiency of these allegations. The only difference here is the identity of the Paintiffs seeking relief and the additional state law claims it seeks to pursue.

Indeed, it is the duly authorized Collins & Aikman Litigation Trust ("Plaintiff") that brings this action for the benefit of the creditors of C&A, who were damaged by the fraudulent schemes inflicted on C&A. And, in addition to the federal securities claims sustained in the parallel actions against some of the same defendants, Plaintiff asserts that those defendants who owed C&A the most strict and unyielding fiduciary duty of loyalty breached that duty by engaging in a course of conduct that kept the Company artificially alive for a significant time and then abruptly left it for dead.

---

[2]     These documents are attached hereto as Exhibits A-B and, as discussed below, may be considered by the Court in resolving the motions to dismiss.

As discussed more fully below, Plaintiff has sufficiently alleged claims in the FAC to withstand the numerous motions to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6). Accordingly, those motions should be denied.

## II.    SUMMARY OF THE ARGUMENT

Contrary to the defendants' overriding argument, a corporation may bring an action for violations of §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") against its own officers and directors. To that end, Plaintiff adequately alleges a §10(b) claim against Stockman, Stepp, Cosgrove and McCallum concerning false and misleading statements contained in an August 2004 Senior Notes Offering Memorandum. In fact, rejecting the same arguments that Defendants raise here, two federal district courts have already considered allegations identical to those raised in the FAC, and determined that those allegations satisfy the falsity, materiality and scienter elements of a §10(b) claim as to these defendants. On their third (or, more correctly, fourth) attempt, they offer no legitimate reason why those arguments *now* have merit or why those federal court rulings should be disturbed.

Additionally, courts have long rejected these defendants' contention that a legally separate corporate body, such as C&A, cannot rely on fraudulent statements disseminated by its officers and directors in the sale of its own corporate securities. And saddling C&A with corporate debt that could not be serviced or repaid is not the type of "benefit" that would allow their knowledge of the alleged fraudulent schemes that were used to procure the debt to be imputed to the Company. Finally, relying on Third Circuit authority, the FAC pleads a cognizable theory of economic loss, and also provides notice to the defendants of that theory of loss and its connection to the alleged misrepresentations, as required by Federal Rule of Civil Procedure 8.

- 3 -

Plaintiff adequately alleges a claim under Delaware law for various breaches of the fiduciary duty of loyalty owed to C&A and its creditors. More specifically, the FAC: (1) explains how Stockman, Stepp, Cosgrove, McCallum and Barnaba failed to act in good faith toward the Company by participating in numerous fraudulent schemes to misrepresent C&A's financial condition; (2) details how Stockman, Stepp, Cosgrove, McCallum and Barnaba failed to act with candor and honesty in their dealings with the Company and its creditors; and (3) describes how Krause, Koth, Becker, Hess, Tredwell, McConnell, Evans and Valenti abdicated their responsibilities to actively monitor the Company by allowing the fraudulent schemes to occur, despite their knowledge of evidence raising serious questions about ongoing misconduct at the Company and an ineffective system of internal controls. Moreover, due to the fact that it controlled C&A's Board of Directors and day-to-day operations, Heartland is also liable for those breaches of fiduciary duties committed on its behalf by its senior representatives. Because the FAC pleads viable claims for breach of the fiduciary duty of loyalty, the exculpatory clause contained in C&A's articles of incorporation and the business judgment rule do not apply.

To the extent that Plaintiff sufficiently alleges a §10(b) claim, it also alleges claims for common law fraud against Stockman, Stepp, Cosgrove and McCallum since the elements of those causes of action effectively overlap. Under certain circumstances, though, common law fraud claims are arguably broader than §10(b) claims because they do not require a connection to the sale of securities or an overt misrepresentation. Thus, Stockman, Stepp, Cosgrove, McCallum and Barnaba should be liable for damages caused by the active concealment of their fraudulent schemes from the Company.

Plaintiff states a claim for breach of contract against Heartland. Indeed, rather than simply providing advisory and consulting services as required by the contract at issue,

- 4 -

Heartland assumed complete control over C&A and allowed its representatives to commit various fraudulent schemes that adversely impacted the Company and ultimately led to its demise. At a minimum, Heartland's actions, through its representatives, constitute a breach of the implied covenant of good faith and fair dealing that exists in its agreement with C&A.

At this stage of the proceedings, the attacks on Plaintiff's unjust enrichment claim are premature as Plaintiff may plead alternative theories of relief. In any event, Plaintiff's claim should survive because the FAC, in essence, avers that it was inequitable and unjust for the defendants to have benefited, through, *inter alia*, maintaining employment and receiving compensation and other benefits for several years, as a result of their wrongful efforts to artificially prolong the life of the Company for years by saddling it with tremendous debt that could not be serviced or repaid.

## III.    STATEMENT OF FACTS

### A.    The Legal Backdrop of this Case

#### 1.    The Criminal Indictment and Guilty Pleas

On March 26, 2007, the U.S. Attorney's Office for the Southern District of New York unsealed an eight count Grand Jury Indictment against Stockman, Stepp, Cosgrove and Barnaba concerning the improper conduct detailed in the FAC, as described below. *See* Exh. A. The Indictment charged these individuals with, *inter alia*, three counts of securities fraud and conspiracy based on their efforts in: (1) orchestrating a fraudulent scheme to hide C&A's true operating performance and financial results; (2) fraudulently manipulating the financial results C&A reported to the SEC and the investing public; (3) making false statements in the sale of securities; and (4) defrauding C&A's lenders. *Id.*; s*ee, e.g., Ballan v. Wilfred American Educational Corp.*, 720 F. Supp. 241, 253-54 (E.D.N.Y. 1989) ("Although the indictments are not evidence, they issued upon a grand jury's finding of probable cause to

- 5 -

indict and are thus sufficient for the purposes of Rule 9(b) to support an inference of willful wrongdoing."). In addition, several other former C&A insiders who participated in the criminal conduct waived indictment, pleaded guilty to various conspiracy charges, and are cooperating with the U.S. Attorney's Office.

## 2. The SEC's Civil Action

On March 26, 2007, the SEC filed a civil complaint in the U.S. District Court for the Southern District of New York charging Stockman, Stepp, Cosgrove, McCallum and Barnaba, among others, with numerous violations of the federal securities laws relating to the same misconduct described in the FAC, as discussed below. Exh. B. On December, 21, 2007, U.S. District Court Judge Shira A. Scheindlin issued an extensive opinion denying all pending motions to dismiss the SEC's complaint. *SEC v. Collins & Aikman Corp.,* 524 F. Supp. 2d 477 (S.D.N.Y. 2007). Notably, as to the claims brought pursuant to §10(b) of the Exchange Act, Judge Scheindlin concluded that the SEC sufficiently pled, with the particularity required by Federal Rule of Civil Procedure 9(b), that the defendants made materially false and misleading statements with the requisite scienter. *Id.* at 492-95.

## 3. The Federal Securities Actions

In addition to the governmental actions, there are two private class actions alleging violations of the Exchange Act pending before U.S. District Court Judge Arthur J. Tarnow in the Eastern District of Michigan based on the same core allegations detailed in the FAC: (1) *Egleston v. Heartland Industrial Partners, L.P., et al.*, No. 2:06-cv-13555-AJT-SDP (E.D. Mich.) alleges violations of §§10(b) and 20(a) of the Exchange Act on behalf of those investors who purchased C&A stocks and bonds between August 6, 2002 and May 17, 2005; and (2) *Mainstay High Yield Corporate Bond Fund v. Heartland Industrial Partners, L.P., et al.*, No. 2:07-cv-10542-AJT-SDP (E.D. Mich.) alleges violations of §§10(b) and 20(a) of the

- 6 -

Exchange Act on behalf of those investors who purchased C&A's 12.875% Notes and 10.75% Notes through their duly authorized investment advisor between August 11, 2004 and May 17, 2005.

In each of these actions, the defendants moved to dismiss, contending that the Paintiffs failed to state claims for securities fraud pursuant to the heightened pleading standards established by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Rule 9(b). After extensive briefing and oral argument, Judge Tarnow issued a summary Order denying, in large part, the various motions to dismiss.

### B.    Factual Summary of the FAC

#### 1.    Background

C&A was engaged in the design, manufacture and supply of automotive interior components, which it sold to original equipment manufacturers ("OEMs") such as General Motors, Ford and Chrysler. ¶6, 35.[3] In the early 2000s, under significant competitive pressure, these OEMs demanded that C&A and other car parts manufacturers accept lower prices for their products. ¶37. At the same time, suppliers raised the prices they were charging C&A for its raw materials. *Id.* This combination of factors negatively impacted C&A's profit margins and profits, edging the Company to the brink of financial collapse. *Id.*

Amid these adverse business conditions, C&A received a much needed boost through a substantial equity investment from Heartland Industrial Partners, L.P., a $1 billion private equity firm, and its affiliates. ¶¶28, 45.[4] Indeed, beginning in February 2001, Heartland

---

[3]    Citations to the FAC are referred to as "¶___."

[4]    Heartland Industrial Partners, L.P. was a limited partnership organized under Delaware law. Heartland Industrial Associates, L.L.C., a limited liability company organized under Delaware law, served as general partner for Heartland Industrial Partners,

gobbled up a majority – later reduced to a controlling – interest in C&A's common stock, a \$360 million initial investment that represented approximately 30% of Heartland's overall investment portfolio. ¶¶27, 28, 45, 70. Heartland then used this interest to acquire complete control over C&A's business operations by installing its representatives as a majority of C&A's Board of Directors[5] and as C&A's senior executive officers.[6] ¶¶28, 45. Further cementing its tight relationship with C&A, Heartland obtained a lucrative Services Agreement from C&A through which C&A was required to pay Heartland millions of dollars in fees for, *inter alia*, its expenses incurred in purchasing C&A stock and other advisory services relating to the consummation of any acquisition or divestiture by C&A. ¶¶31, 32, 45, 46.

## 2.    Heartland Causes C&A to Undertake an Unnecessary and Expensive Acquisition Spree

Not surprisingly, shortly after investing in C&A and obtaining control over its operations, Heartland caused C&A to go on an acquisition spree that was purportedly designed to solidify C&A's position as a Tier 1 supplier to OEMs. ¶36. In fact, in less than a year after Heartland acquired control, C&A had announced and/or completed three major acquisitions. *Id.* First, in July 2001, C&A acquired Becker Group, L.L.C., a plastic parts manufacturer, for 17 million shares of C&A stock, a three year warrant for 500,000 C&A

---

L.P. and, thus, exercised complete control over it and its common stock investment in C&A. ¶¶27-30.

[5]    Heartland executives Stockman, Stepp, Hess, Tredwell, McConnell and Valenti assumed positions on C&A's Board of Directors in February 2001. ¶¶7, 8, 17-20.

[6]    Stockman began serving as C&A's CEO in August 2002. ¶7. Stepp began serving as C&A's Vice President and CFO in January 2002. ¶8. John A. Galante, who did not file a motion to dismiss, began serving as C&A's Director of Strategic Planning in October 2002. ¶13.

shares for $5 per share and $60 million to pay off outstanding debt.  ¶47.[7]  Second, in September 2001, C&A acquired Joan Automotive Fabrics, Inc. from Joan Fabrics, Inc. ("Joan Fabrics"), a fabrics manufacturer, for $100 million in cash and 12,760,000 shares of C&A common stock.  ¶¶51.[8]  Third, in December 2001, C&A acquired the trim division of Textron Automotive Company, known as "TAC-Trim," for $1 billion in cash and assumed debt, 18 million shares of C&A common stock, and $245 million in preferred stock of a C&A affiliate.  ¶52.  For each of these transactions, Heartland was richly rewarded with millions of dollars in advisory fees pursuant to the Services Agreement, despite complaints that C&A rushed into these transactions without conducting appropriate due diligence and, consequently, paid far in excess of what the companies were actually worth.  ¶¶32, 47, 50, 52.

Unfortunately, these transactions, while dramatically increasing the size of C&A, did little to alleviate the negative business conditions impacting C&A's financial condition. ¶¶36-37.  To be sure, throughout 2001 and 2002, C&A struggled to integrate the varied acquisitions into its existing operations.  ¶¶37-38.  Moreover, C&A was burdened by an increasing number of long-term contracts with little upside earning potential.  ¶38.  In essence, the Company was floundering, and management was under constant pressure to avoid triggering debt covenants and publicly portray the Company as financially stable. ¶¶37-39.

---

[7]    In connection with this acquisition, Becker joined C&A's Board of Directors, received an undisclosed $300,000 retainer from C&A, and secured an $18 million non-compete agreement from C&A.  Becker was also a limited partner in Heartland Industrial Partners, L.P.  ¶¶48-49.

[8]    In connection with this acquisition, McCallum joined C&A's Board of Directors. ¶51.

-9-

### 3.    Fraudulent Schemes Delay C&A's Demise

With bankruptcy looming as a realistic option, certain defendants embarked on a course of conduct designed to conceal C&A's true financial condition from the market for as long as possible and create the impression that C&A was a viable company.  ¶¶39, 40. Indeed, through a variety of fraudulent schemes, these defendants were able to artificially inflate C&A's reported financial results, avoid triggering existing debt covenants, and saddle C&A with a massive amount of debt that they knew would never be repaid.  *Id.*  In so doing, they were solely motivated by their own self-interests in maintaining their positions and investments, protecting their reputations and receiving substantial compensation from C&A. *Id.*

### a.    The Joan Fabrics Round-Trip Transactions Scheme

From the fourth quarter of 2001 through the first quarter of 2003, Stockman, Stepp, and McCallum, among others, participated in a series of "round-trip" transactions that artificially inflated C&A's financial results by nearly $15 million. ¶¶53-57, 116-124.  More specifically, shortly after acquiring Joan Automotive Fabrics, Stepp, under the direction of Stockman, requested that McCallum, the CEO of Joan Fabrics and a member of the C&A Board, provide C&A with a $3 million loan that C&A agreed to repay in the subsequent quarter.  ¶¶54, 116.  Rather than properly record this payment on C&A's books as a short-term loan as required by GAAP – which would have had no impact on reported income – these defendants falsely characterized the payment as a supplier rebate for past purchases and, as a result, reduced C&A's operating expenses by about $3 million. ¶¶54, 116-17.  By recording the transaction this way, Stockman and Stepp caused C&A to understate its operating loss for the fourth quarter of 2001 by more than 17% and overstate its annual 2001 operating income by approximately 9%.  ¶117.  Completing the "round-trip" for this

- 10 -

transaction, Stockman arranged to repay the loan, in or around March 2002, by transferring certain looms valued at $3.1 million to Joan Fabrics at no cost. ¶¶56, 116.

After the success of the initial $3 million "round-trip" transaction, Stockman continued to directly negotiate with McCallum for additional loan payments from Joan Fabrics. ¶¶55, 56, 118-121. In fact, through the first quarter of 2003, C&A received approximately $12 million in short-term loans from Joan Fabrics, which C&A then recorded as rebates for nonexistent past purchases or services, and thereby allowed C&A's quarterly financial results to be artificially inflated during this time period. ¶¶55-57, 119-21. On each occasion, McCallum and Joan Fabrics provided documentation falsely characterizing the loan payments as rebates on a supply contract between C&A and Joan Fabrics. ¶¶55-56. Stockman and Stepp subsequently caused C&A to repay Joan Fabrics for these loans through a variety of obscure transactions, including: (a) a $7 million overpayment, or 70% more than fair value, for Southwest Laminates, Inc., a company owned by McCallum; (b) a $2.2 million overpayment, or 110% more than fair value, for Dutton Yards, another company owned by McCallum; (c) a $2.7 million overpayment, or about 135% more than fair value, to Joan Fabrics for furniture loom assets; and (d) an overpayment for the purchase of air jet texturing machines from a subsidiary of Joan Fabrics. ¶¶56, 119-21. Each of these "round-trip" transactions violated GAAP and rendered C&A's financial statements false and misleading – in one case boosting quarterly income by 32%. ¶¶122-23.

**b.    The Supplier Rebate Scheme**

As part of its business, C&A regularly entered into supply contracts through which it would receive rebates from suppliers for purchasing a specified volume or type of future goods or services. ¶59. GAAP required that C&A record such rebates as a reduction in cost only when the future purchases actually occur. *Id.* Commencing in early 2002, however,

- 11 -

Stockman, Stepp, Cosgrove and Barnaba, in an effort to inflate C&A's reported earnings, began to manipulate the accounting for these vendor rebates by improperly recognizing the rebates before they had actually been earned. ¶¶60-62, 125. In fact, by obtaining side letters from numerous suppliers that falsely represented the terms of the rebate arrangements, these defendants caused C&A to falsely account for these rebates as though they had been earned on past purchases when, in fact, such rebates were contingent upon meeting future volume thresholds. ¶¶60-65.

More specifically, Stockman routinely met with employees in C&A's Purchasing Department to discuss what suppliers they should target, the amount of rebates to demand, and what incentives should be offered. ¶60. With a promise of future business, Barnaba and others, at the direction of Stockman and Cosgrove, then solicited the chosen suppliers to "offer" C&A rebates that could be tied to past, rather than future, purchases so that C&A could recognize the revenue in the current quarter. ¶¶60, 63. To facilitate this ruse, Cosgrove and Barnaba drafted or otherwise obtained detailed side letters from the suppliers that falsely attributed rebates to non-existent past purchases. ¶¶62-63. Stockman specifically approved several of these improperly recorded rebates. ¶64. Moreover, Stockman, Stepp and Cosgrove received periodic reports from the Purchasing Department which detailed the status of those rebates that were immediately recognized in return for the promise of future business. ¶60.

During 2002 and 2003, the scheme generated millions of dollars of prematurely recognized rebates which falsely boosted C&A's reported income by significant margins. As a result, coupled with the fact they dissipated the pool of existing raw material suppliers, Stockman, Stepp, Cosgrove and Barnaba expanded the scope of the scheme in 2004 to include rebates on capital equipment expenditures. ¶¶65-67, 126. In essence, these

- 12 -

defendants caused C&A to intentionally overpay for equipment and related maintenance services in exchange for a "rebate" equal to the amount of the overpayment. ¶¶66-67. Continuing the dubious use of side letters, these "rebates" were treated as if they were earned on past purchases of spare parts and/or maintenance, which allowed these defendants to book the rebates as income in the current quarter rather than as a reduction in the cost basis of the equipment and/or maintenance purchased. ¶¶67, 126. With this added component to the rebate scheme, Stockman, Stepp, Cosgrove and Barnaba caused C&A to falsely book rebates of more than $7.2 million during 2004 in violation of GAAP. ¶¶66, 68.

### 4. The Audit Committee's First Investigation into Allegations of Intentional Wrongdoing

In August 2003, the Audit Committee launched an investigation in response to certain concerns raised regarding, *inter alia*, C&A's accounting for revenue and tooling and certain related party transactions.[9] ¶¶41, 96. Among its investigatory work, the Audit Committee interviewed Stockman, Stepp, Cosgrove, and McCallum, among others, about their involvement in these and other matters. ¶97.

In its analysis of the accounting for revenue and tooling, the Audit Committee considered a complaint that C&A officers and directors might have entered into side agreements with customers to prematurely recognize rebates. Relying heavily on the statements of Stepp and Cosgrove, however, the Audit Committee concluded that there was no basis to question the Company's accounting for tooling or revenue generally.

In its analysis of certain related party transactions, the Audit Committee evaluated C&A's extensive and ongoing dealings with McCallum. ¶96. The Audit Committee found

[9] Plaintiff will submit copies of the Audit Reports when an appropriate protective order is entered.

that "documentation regarding certain transactions with McCallum was incomplete and the disclosures in the Company's financial statements were inadequate." ¶97. Similarly, the Audit Committee found that certain transactions at issue were never approved by the Board or disclosed. ¶41. Yet, despite serious concerns about the propriety of these transactions, the Audit Committee deferred to Stockman and McCallum, concluding that their unsubstantiated explanations for the reported deficiencies were creditable and satisfactory. ¶97.

As discussed more fully below, the Audit Committee disavowed the conclusions in its 2004 Report because it discovered that Stockman, Stepp, McCallum and others knowingly and intentionally provided the Audit Committee with false statements and false documents during the 2003 investigation in an effort to conceal their involvement in the fraudulent schemes. ¶¶42, 69, 97, 100.

### 5.    Materially Misleading Statements Suppress C&A's Deepening Liquidity Crisis

Despite the short term efforts to inflate C&A's earnings through various accounting manipulations, the Company's business continued to deteriorate. ¶70. Faced with a deepening liquidity crisis, Stockman and other C&A executives took additional steps to forestall the Company's inevitable bankruptcy by deceiving the market and several reputable banks into providing additional funding for the Company's operations, which they knew would never be repaid. ¶¶71-89. In fact, during Stockman's stewardship, C&A's debt load radically increased from $884 million as of December 30, 2000 to approximately $1.6 billion on December 31, 2004. ¶72.

For example, on or about August 26, 2004, Stockman, Stepp and Cosgrove caused C&A to issue an offering memorandum in connection with an offering of 12.875% Senior Subordinated Notes due in 2012. ¶71. Because it contained, *inter alia*, financial statements

- 14 -

for fiscal years 2001 through the second quarter of 2004 that were tainted by numerous accounting improprieties, the offering memorandum was materially false and misleading and otherwise concealed the true financial condition of the Company. ¶¶71, 93. Nonetheless, the offering was a "success" as C&A was able to sell $415 million worth of senior notes, something which Stockman and others knew could not be serviced or repaid. *Id.*

Within months of the note offering, Stockman concocted a scheme to defraud General Electric Capital Corporation ("GECC"), a company that agreed to lend C&A money based on collateral consisting of a pool of eligible accounts receivable, known as the "borrowing base." ¶¶74-79. In other words, GECC provided C&A with a cash advance equal to the difference between the "borrowing base" and the amount of outstanding debt owed to GECC. *Id.* Beginning in January 2005 and continuing through to May 2005, Stockman and others acting at his direction actively misrepresented the amount of the debt owed to GECC by intentionally overstating the size of the borrowing base through the improper inclusion of millions of dollars worth of ineligible receivables – *e.g.*, invoices for tooling, parts, design changes and other production-related items that were not sent to or otherwise approved by C&A's customers – and misdirecting receivable payments to a non-receivable account. *Id.* By inflating the borrowing base in this manner, Stockman fraudulently reduced the amount of money owed to GECC and, in turn, gave C&A access to liquidity to which it was not entitled. *Id.*

### 6. As the Fraud Begins to Unravel, Misrepresentations about C&A's True Condition Continue

Unable to keep the details of the fraudulent schemes concealed any longer, Stockman, with the assistance of Cosgrove and others, drafted a press release, issued by C&A on March 17, 2005, which announced that, due to an internal review of its accounting for supplier rebates, the Company expected to restate its financial results for the first three

- 15 -

quarters of 2004 to reflect the correct accounting for certain rebates and, consequently, indicated that C&A's fiscal 2004 financial results would be delayed. ¶¶80-82. Although Stockman knew that the supplier rebate scheme extended back into late 2001, the press release misrepresented that the vendor rebate issues only impacted fiscal 2004 financial results, and falsely attributed those issues to a failure of "controls" and "procedures," rather than intentional misconduct. *Id.* The press release further revealed that C&A had liquidity of $86 million as of December 31, 2004, despite the fact that C&A only had $12 million of liquidity due to restrictions on its borrowings, and was otherwise silent as to the Company's current liquidity position. *Id.*

Shortly after the press release, Stockman and other senior C&A executives held a conference call with analysts to discuss C&A's financial results. ¶83. During this call, Stockman continued to conceal the scope of the accounting fraud, denied that C&A was experiencing liquidity issues and deliberately misrepresented C&A's current financial condition, including a dramatic overstatement of expected EBITDA and understatement of capital expenditures. ¶¶83-84.

In addition to these public denials, Stockman continued to mislead C&A's lenders about the existing liquidity crisis impacting the Company. For example, on March 24, 2005, Stockman, using the same misleading financial information publicly disseminated on March 17, 2005, made a presentation to JP Morgan Chase and Credit Suisse First Boston, two significant C&A lenders, for the purpose of securing a waiver of compliance with financial covenants in its credit agreements. ¶85. Just over a week later, Stockman again approached Credit Suisse First Boston and, based on the same faulty financials, obtained $75 million in additional financing for C&A, which C&A disclosed in a press release on April 4, 2005. ¶¶87, 88.

As expected, the additional $75 million in financing received from Credit Suisse First Boston did not stop the Company's severely deteriorating financial condition, but only further deepened the Company's insolvency. ¶89. On May 12, 2005, C&A issued a press release announcing that C&A's Board had forced Stockman to resign from the Company. ¶90. Just five days later, on May 17, 2005, C&A and its subsidiaries filed for bankruptcy protection. ¶¶43, 91.

### 7. The Audit Committee's Second Investigation Confirms the Details of the Massive Fraud

Shortly after the March 17, 2005 announcement of an "internal review of vendor rebates," the Audit Committee launched its own investigation into: (1) the Company's accounting for supplier rebates from 2001 to 2005; (2) the Company's invoicing practices relating to GECC; and (3) the Company's financial forecasts for 2005. ¶¶42, 69, 86, 99, 100. With the assistance of outside counsel and accountants, the Audit Committee interviewed 77 current and former C&A employees and reviewed millions of pages of documents and electronic data.

On March 23, 2007, the Audit Committee issued its Report, which concluded that several of the Company's officers and directors, including Stockman, Stepp, Cosgrove, Barnaba and McCallum, engaged in serious misconduct and lied to the Audit Committee during its 2003 investigation. ¶¶42, 100 . First, the Audit Committee determined that numerous supplier rebates were accounted for improperly with the use of false side letters, resulting in premature income recognition and misleading financial statements. ¶100. In fact, the Audit Committee determined that, of 100 rebates examined, 84 were not accounted for properly, representing a dollar value of almost $50 million. ¶69 . Moreover, with respect to the rebate transactions between C&A and McCallum-controlled companies that were the

- 17 -

subject of the 2003 investigation, the Audit Committee stated that documents were intentionally withheld and certain witnesses provided inaccurate information. *See* ¶97.

Second, the Audit Committee determined that "the premature generation of invoices and the improper inclusion of those invoices in the borrowing base for the GECC" was orchestrated to gain liquidity through the GE Facility during a time period when C&A's cash resources were extremely limited. *See* ¶¶75, 100. Indeed, of 134 tooling invoices sampled, the Audit Committee found that 109 had been prematurely billed and thus wrongly included in borrowing base. ¶77. The Audit Committee further concluded that this conduct was pervasive and well-known within management, demonstrating that certain controls and policies relating to the invoicing process and the securitization facility were, at the very least, ignored if not purposefully circumvented.

Third, due to the fact that Stockman possessed unchecked discretion over the forecasts and other financial information, the Audit Committee found that Stockman made material misstatements in the first quarter of 2005 regarding the Company's projected financial performance for that quarter. ¶¶84, 100. In addition, the Audit Committee further determined that Stockman made other inaccurate statements at this time regarding the Company's liquidity. *Id.*

## IV.    ARGUMENT

### A.    Applicable Pleading Standards

In considering a Rule 12(b)(6) motion to dismiss, this Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be

entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3rd Cir. 2008).[10] "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because it strikes a savvy judge that actual proof of those facts is improbable." *Id.* At a minimum, though, the allegations in a complaint must be "plausible," which means that "there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation." *Id.* at 234-35.

For its federal securities fraud claims, Plaintiff acknowledges that it must satisfy the heightened pleading standards of the PSLRA for certain elements, such as falsity and scienter. This requires Plaintiff to "specify each statement alleged to have been misleading, [and] the reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1). The PSLRA also dictates that the FAC must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). These standards, in effect, incorporate the pleading requirements imposed by Rule 9(b), which provides that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P 9(b).

Moreover, Rule 9(b) does not necessarily apply to the bulk of Plaintiff's state law claims. For example, breach of fiduciary duty claims are not ordinarily governed by Rule 9(b). *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 197 (D. Del. 2000). Only where these claims sound in fraud do the requirements of Rule 9(b) apply. *Buckley v. O'Hanlon*, C.A. No. 04-955 (GMS), 2007 U.S. Dist. LEXIS 22211, at *13 (D. Del. Mar. 28, 2007). However, simply because a plaintiff "describes much of the defendants' conduct as

---

[10] Citations and footnotes are omitted, and emphasis is added, unless otherwise noted.

intentional or knowing, . . . [its] choice of terms, which are also seen in fraud claims, do not

transform claims for breach of fiduciary duty into claims based in fraud." *Id.* at *15.

In any event, the Third Circuit has recognized that the requirements of Rule 9(b), if

they apply to the state law claims, are not particularly onerous:

> The Third Circuit courts take a 'lenient approach' to the application of Rule
> 9(b). The Court should apply Rule 9(b) with some flexibility and should not
> require Plaintiffs to plead issues that may have been concealed by defendants.
> Although pleading the date of, place of, substance of, and person making
> each fraudulent act is sufficient to satisfy Rule 9(b), a complaint need not
> plead the 'date, place or time' of the fraud, so long as it uses an 'alternative
> means of injecting precision and some measure of substantiation into their
> allegations of fraud.' In addition, 'courts should be sensitive to the fact that
> application of [Rule 9(b)] prior to discovery may permit sophisticated
> defrauders to successfully conceal the details of their fraud.'

*Fruehauf Trailer*, 250 B.R. at 198; *see also Collins & Aikman*, 524 F. Supp. 2d at 493 ("Rule

9(b) demands specificity, but it does not demand that a plaintiff plead every fact that forms

the alleged violations, and a defendant cannot defeat a claim by pointing to facts that are

omitted if the allegations as pled meet the requisite standard."); *In re Inacom Corp.*, C.A.

No. 00-2426 (PJW), 2001 Bankr. LEXIS 1297, at *10-*12 (D. Del. Aug. 7, 2001)

("InaCom's claim that it has no means of readily ascertaining the underlying facts and that it

is therefore unable to meaningfully determine whether to admit or deny the allegations is

unfounded. The purpose of Rule 9(b) is to provide notice and to prevent false or

unsubstantiated charges. . . . [T]he Amended Complaint provides adequate notice to InaCom

of the allegations against it and the factual bases of the allegations.").

Finally, in ruling on these motions to dismiss, this Court "must consider . . . other

sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in

particular, documents incorporated into the complaint by reference, and matters of which a

court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, ___ U.S. ___,

127 S. Ct. 2499, 2509 (2007). In this case, this includes: (1) the Indictment obtained by the

- 20 -

U.S. Attorney's Office for the Southern District of New York against Stockman, Stepp, Cosgrove and Barnaba (Exh. A) and (2) the Complaint filed by the SEC against Stockman, Stepp, Cosgrove, McCallum, and Barnaba, among others (Exh. B). *See, e.g., In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (court may consider "document[s] integral to or explicitly relied upon in the complaint"); *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (court may "take judicial notice of properly-authenticated public disclosure documents filed with the SEC"); *In re Cylink Secs. Litig.*, 178 F. Supp. 2d 1077, 1080-81 (N.D. Cal. 2001) ("Because the [amended complaint] refers to the contents of the SEC complaint and no party challenges the SEC complaint's authenticity, the court may also consider the allegations contained therein when evaluating the sufficiency of plaintiffs' allegations under the PSLRA.").

## B.   Plaintiff Sufficiently Alleges a Violation of §10(b)

### 1.   The Elements of a §10(b) Claim

To state a claim under §10(b), Plaintiff must allege the following elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). The basis of Plaintiff's §10(b) claim is the August 2004 Senior Note Offering through which the defendants, based on materially misleading statements, caused C&A to sell $415 million of 12.875% Senior Subordinated Notes due in 2012. In analyzing Plaintiff's claim based on this sale of C&A securities, this Court should consider that "Section 10(b) should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *Collins & Aikman*, 524 F. Supp. 2d at 485. Consequently, the Court should conclude that Plaintiff has adequately alleged all of the requisite elements of a §10(b) claim, and the various motions to dismiss should be denied.

### 2. Two Separate District Courts Already Found that Allegations Identical to Those in the FAC Satisfied the Falsity, Materiality and Scienter Elements of a §10(b) Claim as to Stockman, Stepp, Cosgrove and McCallum

As discussed above, this action is not the only action alleging that Stockman, Stepp, Cosgrove and McCallum violated §10(b) of the Exchange Act. To be sure, the SEC and two groups of C&A investors have charged that these defendants knowingly issued false and misleading statements regarding C&A's financial condition. Both of those actions – which contain allegations that are identical to the allegations in the FAC, including those involving the August 2004 Senior Note Offering – have survived a motion to dismiss. In fact, while the district court in the two federal securities class actions summarily denied the defendants' motions to dismiss, the district court in *Collins & Aikman* issued an extensive opinion concluding that the SEC adequately alleged that Stockman, Stepp, Cosgrove and McCallum disseminated material misrepresentations with requisite scienter. 524 F. Supp. 2d at 492-95. Thus, the issues raised by Stockman, Stepp, Cosgrove and McCallum have been raised before and rejected by two separate district courts, and they offer no justifiable reason why their same arguments have merit *now*.

### a. The August 2004 Senior Note Offering Contained False and Misleading Financial Results

The FAC explains that the August 2004 Senior Note Offering materials were false and misleading because they contained financial results from 2001 through 2004 that were tainted by the defendants' fraudulent schemes, including the Joan Fabrics "round-trip" transaction scheme and the supplier rebate scheme. ¶¶71, 93. The FAC further details how Stock, Stepp and Cosgrove not only participated in these schemes, but also participated in the drafting of the marketing materials relating to the sale of the notes. ¶¶53-68, 71. And, while the FAC does not allege that McCallum drafted those marketing materials, his §10(b)

- 22 -

liability is based on the fact that, in addition to his participation in the fraudulent schemes, he signed numerous false financial statements that were incorporated by reference into the August 2004 Offering Memorandum.[11] *See* ¶93. Despite these allegations, Stockman, Stepp, Cosgrove and McCallum contend that Plaintiff has failed to allege falsity with the particularity required by the PSLRA and Rule 9(b). Stockman Mem. at 19-22; Stepp Mem. at 13-15; Cosgrove Mem. at 13-14; McCallum Mem. at 19-20.

The decision in *Collins & Aikman* put those arguments to rest:

- *First*, after describing Stockman's involvement in the various schemes, and his lies to the Audit Committee, the district court concluded that "[t]he SEC has thus identified specific allegedly fraudulent statements made by Stockman and provided detailed information as to the content of their statements and the circumstances under which they were made." 524 F. Supp. 2d at 492.

- *Second*, based on the same allegations, including his direct participation in the Joan Fabrics "round-trip" transactions and lies to the Audit Committee, the district court held that, "[n]otwithstanding McCallum's arguments to the contrary, these allegations, taken together, are more than sufficient to plead [] falsity." *Id.* at 493.

- *Third*, the district court noted that, "in light of Stepp's alleged involvement in the fraudulent schemes and his knowledge of the fraudulent nature of the transaction at issue, it is sufficient to state a claim under section 10(b)." *Id.* at 494.

- *Fourth*, rejecting Cosgrove's argument that "the Complaint is insufficient to plead falsity because it fails to identify the specific provision of GAAP that C&A allegedly violated," the district court determined that, "[b]ecause the SEC has alleged with particularity that Cosgrove intended to falsify C&A's

---

[11] *See, e.g., In re Crown Am. Realty Trust Sec. Litig.*, Civ. No. 95-2025, 1997 U.S. Dist. LEXIS 14609, at \*45 (W.D. Pa. Sept. 15, 1997) ("The fact that the statement was made at a time before any of the class members purchased shares would seem to be irrelevant, as it still could have been partly responsible -- along with the other alleged misrepresentations -- for the injury to investors who purchased their shares over a year later. That being the case, in the absence of controlling authority, I cannot conclude as a matter of law that this statement is too stale to be actionable."); *see also Oran*, 226 F.3d at 289 (court may "take judicial notice of properly-authenticated public disclosure documents filed with the SEC").

- 23 -

> financial statements, Cosgrove has more than adequate notice of the
> fraudulent activity at issue." *Id.* at 494-95.

Based on these rulings, this Court should equally find that the FAC, which is based on

identical allegations, sufficiently alleges falsity as to Stockman, Stepp, Cosgrove and

McCallum.

### b.    Materiality of the August 2004 Senior Note Offering Misrepresentations

Stockman and McCallum also assert that the FAC fails to establish materiality

because the financial impact of the challenged transactions was minimal when compared to

C&A's overall financial condition. Stockman Mem. at 16-18; McCallum Mem. at 13-15.

This argument is misplaced. Contrary to their suggestions, the FAC details the significant

financial impact that the various accounting schemes had on C&A's quarterly financial

results, including, for the supplier rebate scheme, the precise percentages by which reported

income was overstated. ¶¶53-57, 64-69, 116-21, 128. In any event, however, the *Collins &*

*Aikman* court expressly rejected similar efforts to consider materiality based solely on

"quantitative" factors:

> SEC guidance indicates that 'qualitative factors may cause misstatements of
> quantitatively small amounts to be material.' Therefore, magnitude by itself,
> without regard to the nature of the item and the circumstances in which the
> judgment has to be made, will not generally be a sufficient basis for a
> materiality judgment.' Among the relevant factors is 'whether the
> misstatement involves concealment of an unlawful transaction.'
>
> As noted, materiality is a mixed question of law and fact and is thus not
> generally suitable for treatment on a motion to dismiss. ***Surely investors***
> ***would consider the involvement of officers of a company in complex and***
> ***wide-ranging schemes to inflate the company's income to be material even***
> ***if the scheme had not yielded substantial results.*** Thus, I cannot find, at this
> stage, that the alleged deception is immaterial as a matter of law.

*Collins & Aikman*, 524 F. Supp. 2d at 496.

For the same reasons, Stockman's materiality argument should be rejected in this

case.

### c.    Plaintiff Adequately Alleges Scienter for Stockman, Stepp, Cosgrove and McCallum

Scienter is "the intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976). In the Third Circuit, "[t]he requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Alpharma Sec. Litig.*, 372 F.3d 137, 148 (3d Cir. 2004). The U.S. Supreme Court recently held that, in order to plead scienter, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510.

While Stockman, Stepp, Cosgrove and McCallum complain that the FAC fails to sufficiently allege scienter, the *Collins & Aikman* decision expressly held that the SEC's identical allegations supported a strong inference of scienter under the pleading standards established in *Tellabs*:

- *First*, the district court held that "[t]he facts alleged, taken as true, create an inference that Stockman acted deliberately to defraud investors, and this inference is at least as strong as any other inference that could be deduced from these facts. . . . Allegations of intentional misrepresentation are sufficient to plead scienter if the facts alleged are relatively strong. The allegations in this Complaint are more than adequate to plead scienter even under the heightened standards imposed by the Supreme Court in *Tellabs*." *Collins & Aikman*, 524 F. Supp. 2d at 492-93.

- *Second*, "the Complaint clearly alleges that McCallum entered into the Round-Trip Transactions knowing that C&A would book the loans as income. Contrary to McCallum's contentions, the most compelling inference that can be drawn from these facts is that McCallum acted with scienter." *Id.* at 493-94.

- *Third*, as to Stepp, the district court determined that "[i]t is reasonable to infer from the allegations in the Complaint that Stepp's intent in making this statement to McCallum [regarding the "round-trip" scheme] was an essential part of creating the deceptive financial statements that would be

- 25 -

> communicated to investors. The Complaint thus identifies a deceptive device intentionally used by Stepp in connection with the purchase or sale of securities." *Id.* at 494.

- *Fourth*, rejecting Cosgrove's argument that scienter must be demonstrated through allegations of "deliberate illegal behavior," the district court concluded that "[t]he facts alleged are more than adequate to support a strong inference of scienter." *Id.* at 494-95.

In addition to the *Collins & Aikman* decision, and the summary denial of the motions to dismiss filed by Stockman, Stepp and Cosgrove in the federal securities class actions, the Grand Jury Indictment, also based on the same allegations in the FAC, supports an inference of scienter as to Stockman, Stepp and Cosgrove. Exh. A; *Ballan*, 720 F. Supp. at 253-54 ("Although the indictments are not evidence, they issued upon a grand jury's finding of probable cause to indict and are thus sufficient for the purposes of Rule 9(b) to support an inference of willful wrongdoing."); *In re Sunrise Sec. Litig.*, 793 F. Supp. 1306, 1313 (E.D. Pa. 1992) ("[T]he allegations of misrepresentation in the Indictment are sufficient to preclude dismissal of the fraud claims under Rule 9(b)").[12]

---

[12]     Stepp argues that the Indictment does not establish civil liability. Stepp Mem. at 5 n.2. While that may be true, determining liability is not at issue right now. What is at issue is whether Plaintiff has sufficiently pled liability, an issue for which the Indictment is dispositive. The cases Stepp cites reject proving facts via indictments on summary judgment, not using indictments at the pleading stage. Moreover, in those cases, the indictments had no correlation with the underlying civil suit, which is clearly not the case here. *Taylor v. Hall*, No. 2:02 cv 240, 2006 WL 1793603, at *2-*6 (N.D. Ind. June 28, 2006) (plaintiff tried to incorporate an indictment for "mail fraud" when the underlying civil suit was for an unrelated civil rights violation); *Stanford Trading Co. v. V.R.I. Distrib. Corp.*, No. 3:98-cv-0591L, 2003 WL 21662828, at *3 (N.D. Tex. July 14, 2003) ("indictment does not even mention [the defendant] or his role in the crimes.").

Accordingly, based on these authorities, this Court should also find that the FAC sufficiently alleges a strong inference of scienter as to Stockman, Stepp, Cosgrove and McCallum.[13]

### 3.    The FAC Pleads Reliance

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the §10(b) private cause of action. It ensures that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists as a predicate for liability." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,* ___ U.S. ___, 128 S. Ct. 761, 769 (2008). Established "either directly or presumptively," a plaintiff must plead that, "but for the fraudulent misrepresentation, the investor would not have purchased or sold the security." *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 674 (E.D. Pa. 2004).

In arguing that the FAC fails to allege reliance, Stockman and Cosgrove suggest that there is some sort of "bright-line" rule that a corporation cannot rely on the misrepresentations of its officers and directors as a matter of law. Stockman Mem. at 12-13, Cosgrove Mem. at 20-21. That is an incorrect statement of the law that contradicts well established §10(b) jurisprudence.

---

[13]    Stockman and McCallum audaciously contend that the inference of scienter is negated by the fact that the Audit Committee, in its first investigation, exculpated them as to the transactions at the heart of the alleged fraudulent schemes. Stockman Mem. at 27; McCallum Mem. at 13. This is frivolous. The FAC expressly states that Stockman, McCallum and others lied and otherwise provided false documentation to the Audit Committee during that investigation. ¶¶42, 97. The Audit Committee subsequently disavowed parts of its 2004 report, stating that its conclusions and the statements of these individuals cannot be relied on. The Collins & Aikman court already rejected the same argument raised by McCallum here. 524 F. Supp. 2d at 493 (court found that McCallum's argument was "not persuasive").

To be sure, the U.S. Supreme Court has long recognized that §10(b) "protects corporations as well as individuals who are sellers of a security." *Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 10 (1971). More specifically, "[i]t is by now well established that a corporation has a claim under §10(b) if the corporation was defrauded in respect to the sale of its own securities by some or even all of its directors." *Estate of Soler v. Rodriguez*, 63 F.3d 45, 54 (1st Cir. 1995). In other words, "[w]here corporate fiduciaries deceive other board members and stockholders by withholding key information pertinent to the corporation's sale of its own securities, the corporation may have redress through §10(b)." *Id.* at 56.

In fact, the precise argument raised by Stockman and Cosgrove was rejected long ago by the Second Circuit in *Ruckle v. Roto Am. Corp.*, 339 F.2d 24 (2d Cir. 1964). There, a corporation sued to prevent its directors from committing fraud under §10(b) in the sale of its own securities. In allowing the suit to go forward, the Second Circuit concluded:

> We come then to the question whether it is possible within the meaning of Section 10(b) and Rule 10B-5 for a corporation to be defrauded by a majority of its directors. We note at the outset that in other contexts, such as embezzlement and conflict of interest, a majority or even the entire board of directors may be held to have defrauded their corporation. When it is practical as well as just to do so, ***courts have experienced no difficulty in rejecting such cliches as the directors constitute the corporation and a corporation, like any other person, cannot defraud itself.***
>
> If, in this case, the board defrauded the corporation into issuing shares either to its members or others, we can think of no reason to say that redress under Rule 10B-5 is precluded, though it would have been available had anyone else committed the fraud. There can be no more effective way to emasculate the policies of the federal securities laws than to deny relief solely because a fraud was committed by a director rather than by an outsider. Denial of relief on this basis would surely undercut the congressional determination to prevent the public distribution of worthless securities.

*Ruckle*, 339 F.2d at 29; *see also New Park Min. Co. v. Cranmer*, 225 F. Supp. 261, 266 (S.D. N.Y. 1963) ("A purchaser or seller of stock is not limited under Section 10(b) and Rule 10b-

5 to an action against the other party to the purchase or sale; he can sue a third person if in connection with the purchase or sale that person defrauded him. . . . Were this not the rule, corporate officers and directors would possess an immunity from the consequences of their fraud under Section 10(b) and Rule 10b-5 which outsiders who may have collaborated with them in defrauding the corporation would not possess.").[14]

In this action, the FAC sufficiently alleges that C&A relied on the false statements of Stockman, Stepp, Cosgrove and McCallum in the sale of its 12.875% Senior Subordinated Notes. ¶¶70, 92, 184. To be sure, the FAC pleads that, at the time of the sale, C&A was hemorrhaging cash and on the verge of financial collapse. *Id.* The fraudulent schemes perpetrated by these defendants falsely portrayed the Company as healthy and viable when, in reality, it was not. As such, but for the defendants' fraud, C&A would not have been able to successfully sell its securities and, in turn, increase its debt load and artificially prolong the life of the Company.[15]

---

[14]   Given these well established principles, Stockman's and Cosgrove's reliance on *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 211-12 (Del. Ch. 2006), is misplaced. *Trenwick* did not involve a §10(b) claim, but instead addressed a claim for common law fraud. *See id.* In any event, the court's analysis in *Trenwick* is flawed because it presumes that the directors were acting within the scope of their authority when committing fraud on the corporation. *Id.* That cannot be the law.

[15]   Relying on *Stoneridge Inv. Partners*, 128 S. Ct. at 769, McCallum contends that Plaintiff has not alleged reliance because "Plaintiffs do not allege that Mr. McCallum specifically had any involvement with about C&A's accounting decisions or policies, nor is there any allegations that he prepared C&A's financial statements." McCallum Mem. at 17. This is incorrect. As stated above, and as he concedes, McCallum "signed certain of C&A's public filings," many of which contained false financial information that were incorporated into the August 2004 Offering Memorandum and are attributable to his participation in the fraudulent schemes. By signing those SEC filings, McCallum made false and misleading statements, on which C&A relied to its detriment. *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 419-20 (S.D.N.Y. 2003) ("The very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has

As an offshoot of his reliance argument, Stockman asserts that the equitable doctrine of *in pari delicto* prevents Plaintiff from asserting reliance because his alleged wrongdoing is imputed to the company. Stockman Mem. at 13 n.13. Not only is this argument premature, it is also inapplicable to the facts of this case.

"The doctrine of *in pari delicto* provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." *Official Committee of Unsecured Creditors v. R. F. Lafferty & Co.*, 267 F.3d 340, 354 (3d Cir. 2001). "Under this equitable doctrine, when a plaintiff is 'standing in the shoes' of the bankrupt corporation, its claim is barred if the defendants' purported wrongdoing is imputed on the bankrupt corporation itself." *Buckley*, 2007 U.S. Dist. LEXIS 22211, at *22. "Under the law of imputation, courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation." *Id.* at *23.

As an affirmative defense, the doctrine of *in pari delicto* is not ordinarily suited for resolution at the motion to dismiss stage. *Id.* at *24. That is because "an equitable doctrine like *in pari delicto* is highly sensitive to the facts and readily adapted to achieve equitable results." *Id.* at *24-25. Consequently, courts are hesitant to apply this doctrine unless dismissal is "clearly warranted based on the face of the complaint." *Buckley v. Deloitte & Touche USA LLP*, 06 Civ. 3291 (SHS), 2007 U.S. Dist. LEXIS 37107, *14-*16 (S.D.N.Y. May 22, 2007) ("*Buckley II*") (citing cases); *Buckley*, 2007 U.S. Dist. LEXIS 22211, at *25 ("Simply put, the court finds it premature to bar Buckley's deepening insolvency claim on *in*

---

performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents.").

*pari delicto* grounds."). Because there are, at a minimum, disputed issues of fact concerning the application of the *in pari delicto* defense, the Court should not apply it in this case.

Nonetheless, Stockman argues that this defense should apply because "[t]here can be no doubt that C&A's August 2004 sale of Senior Notes was made for the benefit of C&A, which received the proceeds of the sale, and that the actions of C&A's officers and directors occurred in the course of their employment." Stockman Mem. at 13 n.13. This is wrong. "Under the ['adverse interest'] exception, fraudulent conduct will not be imputed if the officer's interests were adverse to the corporation and 'not for the benefit of the corporation.'" *Lafferty*, 267 F.3d at 359.

Indeed, courts recognize that engaging in fraudulent conduct that burdens a company with substantial debt, like Stockman did here, does not "benefit" that company. In *Buckley v. Clifford Chance, LLP*, No. 2:06-CV-1003, slip op. (E.D. Pa. Oct. 4, 2006) ("*Buckley III*"), the defendants raised an *in pari delicto* defense, arguing that "management was trying to benefit the corporation by generally preventing the company's collapse and specifically by maintaining access to the marketplace, credit and capital." *Id.* at 4; *see also id.* at 6 ("[T]he complaint alleges that the fraud enabled DVI to maintain access to the securitization marketplace, to avoid jeopardizing DVI's ability to raise capital, and to obtain credit that was otherwise unavailable."). In rejecting this defense, the district court held:

> While in most contexts these attainments would clearly represent corporate benefit, that may not be the case when the company operates in undisclosed financial distress and the corporation may truly benefit from complete disclosure, immediate bankruptcy, sale, or even liquidation. Sustaining a failing corporation does not benefit the corporation if the most prudent strategy would be to immediately confront the company's fiscal realities.

*Id.* at 6-7; *see also In re Investors Funding Corp. Sec. Litig.*, 523 F. Supp. 533, 541 (S.D.N.Y. 1980) ("A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it. . . . Accepting the allegations of the

- 31 -

complaint as true, it is manifest that the prolonged artificial solvency of IFC benefited only the Danskers and their confederates, not IFC.").

Additionally, "this Court must take into account equitable considerations when deciding whether to apply the doctrine of *in pari delicto*." *Buckley II*, 2007 U.S. Dist. LEXIS 37107, at \*23. As such, "it is incumbent upon the Court to consider whether application of the defense would produce an equitable result." *Buckley III*, slip op. at 9; *In re Adelphia Communications Corp.*, 365 B.R. 24, 55 n.124 (S.D.N.Y. 2007) ("It is true, as commentators have noted, that the imposition of the equitable doctrine of *in pari delicto* often victimizes the innocent and produces wholly inequitable results."). In *Buckley III*, the district court recognized that, unsecured creditors, on whose behalf the claims were brought, "are undoubtedly innocent and application of the *in pari delicto* defense would prevent their recovery entirely." *Id.*

Accordingly, because Stockman and others did not act for the benefit of C&A, the *in pari delicto* doctrine does not apply in this case, particularly where the innocent creditors of C&A, on whose behalf this action is brought, will be denied recovery by imputing Stockman's illegal conduct to the Company.

### 4. Plaintiff Pleads a Cogent Theory of Economic Loss and Provides Adequate Notice of the Causal Link Between that Loss and the Alleged Misrepresentations

#### a. Economic Loss

The FAC describes a cognizable theory of economic loss relating to increased debt load foisted on C&A, the artificial prolonging of its corporate life, and the eventual dissipation of its assets as C&A descended into, and ultimately filed for, bankruptcy. *See* ¶¶184-85. This theory of loss relies on the emerging concept of "deepening insolvency," which "refers to the fraudulent prolongation of a corporation's life beyond insolvency,

resulting in damage to the corporation by increased debt." *In re Global Serv. Group LLC*,

316 B.R. 451, 456 (S.D.N.Y. 2004); *Schacht v. Brown*, 711 F.2d 1343, 1350 (7th Cir. 1983)

("[T]he corporate body is ineluctably damaged by the deepening of its insolvency, through

increased exposure to creditor liability."). Finding this theory to be "essentially sound," the

Third Circuit explained:

> The fraudulent and concealed incurrence of debt can damage that value in
> several ways. For example, to the extent that bankruptcy is not already a
> certainty, the incurrence of debt can force an insolvent corporation into
> bankruptcy, thus inflicting legal and administrative costs on the corporation.
> When brought on by unwieldy debt, bankruptcy also creates operational
> limitations which hurt a corporation's ability to run its business in a
> profitable manner.　　Aside from causing actual bankruptcy, deepening
> insolvency can undermine a corporation's relationships with its customers,
> suppliers, and employees.　The very threat of bankruptcy, brought about
> through fraudulent debt, can shake the confidence of parties dealing with the
> corporation, calling into question its ability to perform, thereby damaging the
> corporation's assets, the value of which often depends on the performance of
> other parties. In addition, prolonging an insolvent corporation's life through
> bad debt may simply cause the dissipation of corporate assets.

*Lafferty*, 267 F.3d at 349-50.

Consequently, based on the soundness of the theory, the Third Circuit expressly

stated: ***"we believe 'deepening insolvency' is generally a valid theory [of injury] for federal***

***[securities] law claims."*** *Id.* at 354. In so doing, the Court adopted the rationale that:

> it would be crucial that the insolvency of the corporation be disclosed, so that
> shareholders may exercise their right to dissolve the corporation in order to
> cut their losses. Thus, acceptance of a rule which would bar a corporation
> from recovering damages due to the hiding of information concerning its
> insolvency would create perverse incentives for wrong-doing officers and
> directors to conceal the true financial condition of the corporation from the
> corporate body as long as possible.

*Id.* at 350 (citing *Schacht*, 711 F.2d at 1350).

Nonetheless, relying on *In re Citx Corp.*, 448 F.3d 672 (3d Cir. 2006), Stockman,

Stepp and Cosgrove claim that Plaintiff cannot plead damages for §10(b) under a deepening

- 33 -

insolvency theory. Stockman Mem. at 11; Stepp Mem. at 24; Cosgrove Mem. at 21. But the holding in *Citx* is not as broad as these defendants suggest.

In fact, several subsequent decisions have distinguished or otherwise limited the scope of *Citx*. *See, e.g., In re Greater Southeast Community Hosp. Corp.*, 353 B.R. 324, 337 (D.D.C. 2006) ("There is no way to make sense of *Lafferty* without concluding that the deepening of a company's insolvency can be harmful; otherwise, the *Lafferty* court could not have concluded that fraudulent conduct leading to the deepening of a company's insolvency constitutes tortious activity."); *In re Brown Sch.*, 386 B.R. 37, 48 (D. Del. 2008) ("The [*Greater Southeast Community Hosp*] Court, after considering the *Citx* decision, held that deepening insolvency was a valid theory of damages for the breach of fiduciary duty claim. The Court agrees with the Trustee and the reasoning of the [*Greater Southeast Community Hosp.*] Court."); *Official Comm. of Unsecured Creditors of Allegheny Health, Ed. & Research Found. v. Pricewatershouse Coopers, LLP*, 00cv684, 2007 U.S. Dist. LEXIS 3331, at \*21-\*22 (W.D. Pa. Jan. 17, 2007) ("In the instant action, the Committee alleges 'independent caus[es] of action' in the form of professional negligence, breach of contract, and aiding and abetting breach of fiduciary duty, which, if viable, give AHERF a 'remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits.' Therefore, PwC is not entitled to summary judgment based upon the holding in *Citx*.").

Accordingly, the *Citx* decision does nothing to limit the *Lafferty* court's prior recognition that deepening insolvency is a valid theory of damages for a federal securities fraud cause of action. *See Blair v. Scott Specialty Gases*, 283 F.3d 595, 610-11 (3d Cir. 2002) ("It is this court's tradition that a panel may not overrule or disregard a prior panel

- 34 -

decision unless that decision has been overruled by the Supreme Court or by our own court sitting en banc.").[16]

### b. Loss Causation

Having set forth a cognizable theory of economic loss, Plaintiff must also allege loss causation, which is "a causal connection between the material misrepresentation and the loss." *Dura Pharms.*, 544 U.S. at 341. This requires, according to the U.S. Supreme Court, only that a plaintiff "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347. Importantly, the Court rejected any heightened pleading standard for loss causation, reaffirming that the "ordinary pleading rules" of Rule 8(a)(2) provide a "simple test" which should not "impose a great burden upon a plaintiff." *Id.* at 346-47.

The FAC easily satisfies this "simple test." To be sure, the FAC explains that, due to the misrepresentations contained in the August 2004 Senior Notes Offering Memorandum, the defendants knowingly saddled C&A with increased debt that could not be serviced or repaid, which improperly prolonged the life of an already insolvent company, and, when the truth concerning those representations became known, C&A quickly descended into bankruptcy, leading to, *inter alia*, the dissipation of corporate assets and other significant

---

[16]     Stockman's suggestion that C&A did not suffer a loss, but rather benefited from the use of proceeds from the sale of notes to pay off other existing debt (Stockman Mem. at 2-3) ignores the reality of the Ponzi scheme that he orchestrated. *See Lafferty*, 267 F.3d at 343 n.1 ("A 'Ponzi scheme' is 'a fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments.'"). And his argument presupposes that C&A was able to pay off this new debt. *In re Greater Southeast Community Hosp.*, 353 B.R. at 335 n.7 ("The harm occurs only where the corporation lacks the assets or income to pay off the loan. The harm to the corporation comes from the artificial prolongation of the defective business model employed by the company, which ultimately causes the company to go further 'into the red' rather than dissolve or reorganize itself to be a productive, profitable business.").

- 35 -

expenses. *See* ¶¶71, 93, 184-85. Thus, on one hand, C&A suffered a loss upon the completion of the sale of the senior notes because that, in effect, immediately deepened the Company's insolvency. On the other hand, C&A continued to incur losses after those sales relating to, *inter alia*, the attempts to service the debt and the related dissipation of corporate assets. As a result, because the FAC provides clear notice to the defendants of the loss causation theory that Plaintiff "has in mind," loss causation is satisfied. *Id.* at 347; *Estate of Soler*, 63 F.3d at 56 (First Circuit reversed lower court ruling that "the defendants' alleged deception here was not sufficiently linked causally to a sale of securities" because "the misrepresentations or omissions did not relate to the inherent nature, characteristics or value of the security.").

In this regard, the defendants do not dispute that they know and understand Plaintiff's loss causation theory. They simply, as a factual matter, disagree with it. But such disagreement is not enough to support dismissal of the FAC.

For example, Stockman asserts that Plaintiff's loss theory is an "ill-disguised, and ultimately feckless, attempt to make C&A's officers and directors guarantors of the success of their business judgment." Stockman Mem. at 16. Putting aside the unnecessary rhetoric, Stockman's position presumes that his conduct demonstrates the unsuccessful exercise of business judgment, rather than, as the overwhelming evidence dictates, fraud. Yet, assuming, *arguendo*, that Stockman firmly believes he is guiltless, his arguments are not appropriate at the motion to dismiss stage. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 187 (3d Cir. 2000) ("While we are mindful that the defendants may disprove that the Class suffered a loss as a result of the alleged misrepresentations . . . we disagree that the defendants may do so at this stage of the proceedings."); *In re Tyco Int'l, Ltd. Multidistrict*

*Litig.*, 236 F.R.D. 62, 71 (D.N.H. 2006) ("Disputes about loss causation turn primarily on questions of fact.").

Stepp's attempt to shift the blame for the damage caused to C&A to "the declining economic conditions in the domestic automotive parts supply industry" (Stepp Mem. at 25-29) is equally misguided and premature. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) ("Loss causation is a fact-based inquiry . . . . If the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."). Moreover, Stepp's misleading inclusion of hand-picked stock charts for some "peer firms" does nothing but require the Court to undertake a factual determination as to the "real" cause of the decline of the Company, which is ordinarily the subject of expert evidence. *In re Fleming Cos. Sec. & Derivative Litig.*, 03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488, at *131 (E.D. Tex. June 10, 2004) ("At the motion to dismiss stage, the sole inquiry is whether the plaintiffs adequately plead loss causation, not whether they can prove it. The PSLRA does not affect causation pleadings, thus the allegations must only meet the traditional 'fair notice' standards.").[17]

---

[17]     McCallum mistakenly asserts that the statute of limitations bars his claims because the underlying "round-trip" transactions at issue "took place between 2001 and 2002." McCallum Mem. at 21. However, Plaintiff's §10(b) arises from the false and misleading August 2004 Senior Notes Offering Memorandum, which incorporated false and misleading financial statements signed by McCallum. ¶93. Thus, this action, which was brought within three years of the dissemination of that document, is timely. In any event, McCallum's argument fails to the extent that the statute of limitations was tolled by his (and others) fraudulent concealment of the fraud to, at a minimum, early 2005. *Fruehauf Trailer*, 250 B.R. at 186 ("If there has been fraudulent concealment, then the statute of limitations is tolled until the plaintiff knew or should have known of the alleged wrong.").

For all of the foregoing reasons, because Plaintiff pleads the required elements of a §10(b) claim as to Stockman, Stepp, Cosgrove and McCallum, the Court should dismiss their respective motions to dismiss.

### C. Plaintiff Sufficiently Alleges a Claim for Breach of Fiduciary Duties under Delaware Law

#### 1. Defendants Owed Fiduciary Duties to the C&A, Its Shareholders and its Creditors.

Under Delaware law, it is well settled that "fiduciary duties are imposed on the directors of Delaware corporations to regulate their conduct when they [manage the business of the corporation]." *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998). Characterized generally as a duty of care and a duty of loyalty, these fiduciary duties extend "not only to the stockholders but also to the corporations upon whose boards they serve." *Id.* at 10; *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (recognizing violations of the duties of care and loyalty as the basis for director liability). The importance of these duties cannot be understated as they represent "the constant compass by which all director actions for the corporation and interactions with its shareholders must be guided." *Malone*, 722 A.2d at 10.

While most of the defendants do not dispute that as directors and officers of C&A they owed fiduciaries duties to C&A and its stockholders, Heartland, C&A's controlling shareholder, argues that "C&A failed to plead any facts establishing that Heartland even owed a fiduciary duty to C&A." Heartland Mem. at 17. This is factually incorrect. Under Delaware law, a shareholder owes a fiduciary duty if it owns a majority interest in *or* held a dominant position and actually controlled the corporation's conduct. *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987); *In re Western Nat'l Corp. S'holders Litig.*, C.A. No. 15927, 2000 Del. Ch. LEXIS 82, at *18 (Del. Ch. May 22, 2000).

Here, the FAC alleges that Heartland held a dominant position in, and exercised

- 38 -

actual control over, C&A's operations. ¶¶28, 30, 36, 45, 46, 70. Through a $360 million equity investment, Heartland owned a majority and then a controlling interest in C&A's stock from 2001 through 2005. *Id.* Through this substantial ownership interest, Heartland placed its most senior representatives on C&A's Board of Directors and as C&A's highest executives. ¶¶30, 45, 46. For example, Stockman, a founding partner and Senior Managing Director of Heartland, served as both the Chairman of the Board and CEO of C&A and, in those roles, directed and actively participated in the fraudulent accounting schemes laid out in the FAC. ¶7. Other Heartland executives served as either C&A directors, senior executives, or both, including Stepp, Hess, Tredwell, McConnell and Valenti. ¶¶8, 13, 17-20. By controlling a majority of the seats on C&A's Board and by directing C&A's day-to-day operations through its managerial power, Heartland can hardly dispute that it exercised actual, and not potential, control over C&A.[18] Thus, there is no legitimate dispute that Heartland owed fiduciary duties to C&A and its stockholders.

While Heartland and the other defendants clearly owed fiduciary duties to the Company and its shareholders, Delaware law does not limit the scope of fiduciary duties to those groups. Indeed, when a corporation enters the zone or vicinity of insolvency – a point short of actual insolvency – directors' and officers' fiduciary duties expand to include the

---

[18]    Separately, Barnaba attempts to argue that he did not owe fiduciary duties because he purportedly has no authority over the financial or accounting controls of the Company. (Barnaba Mem. at 34-35). The FAC alleges that Barnaba – who was named in the Indictment and the SEC Complaint – was an officer of C&A who was directly involved in the rebate scheme (¶¶58-69) and other accounting improprieties. ¶¶125-129. The FAC also alleges that "Barnaba used the side letters to prematurely recognize the rebates in the Company's records and financial statements," documents which were provided to the SEC and the Company's shareholders. ¶62. Thus, the FAC sufficiently alleges Barnaba's involvement in the financial reporting functions of C&A such that he owed fiduciary duties to the Company and its shareholders.

- 39 -

company's creditors. *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 787 (Del. Ch. 1992) (denying defendant directors' motion to dismiss for failure to state a claim that directors owed fiduciary duties to creditors); *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, C.A. No. 12150, 1991 WL 277613, at *34 (Del. Ch. Dec. 30, 1991) (under Delaware law, directors owe a fiduciary duty to the corporation's creditors when the corporation is "in the vicinity of insolvency."). The economic rationale for this expansion of duty is simple:

> An insolvent corporation is civilly dead in the sense that its property may be administered in equity as a trust fund for the benefit of creditors. The fact which creates the trust is the insolvency, and when that fact is established, the trust arises, and the legality of the acts thereafter performed will be decided by very different principles than in the case of solvency.

*Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808, 813 (Del. 1944).[19] The Third Circuit recently commented on those duties owed to creditors in *LaSala*:

> While many corporations become insolvent for reasons that do not render anyone legally at fault, it is also not unusual for a bankrupt corporation to have viable legal claims against parties that wrongfully contributed to its demise. These claims can take myriad forms, from breach-of-contract claims against suppliers or customers, to tort claims against those who injured the corporation's property or economic interests, to, as here, claims for disloyalty against corporate fiduciaries and those who, so it is alleged, aided them. In bankruptcy - a process that seeks to gather and preserve all of the debtor's assets, and distribute them to creditors and interest holders in an orderly fashion - legal claims that belonged to the debtor are often important assets of the bankruptcy estate, and are fair game for distribution to the debtor's creditors and equity holders.

*LaSala v. Bordier Et Cie*, 519 F.3d 121, 126-27 (3d Cir. 2008).

---

[19]     In a bankruptcy situation, stockholders receive nothing for their equity interests unless and until all creditors are paid. Thus, when the liabilities of a corporation far exceed its assets, such that it is likely that stockholders will realize nothing, the directors' fiduciary duties extend primarily to creditors to maximize the assets available for distribution. *See Odyssey Partners, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 417-20 (Del. Ch. 1999).

In the instant case, the FAC contains numerous allegations describing how, due to the adverse business conditions impacting the Company, C&A's financial condition severely deteriorated from 2001 through 2005. ¶¶37-38, 54, 70, 81, 83, 84. It was these financial difficulties that pushed C&A to the brink of collapse and was the impetus for the fraudulent schemes perpetrated by the defendants. Consequently, once C&A entered this "zone of insolvency," the defendants' fiduciary duties expanded to cover C&A's creditors. *Buckley I*, 2007 U.S. Dist. LEXIS 22211, at *20 (court found that "Buckley has sufficiently pled that DVI was in the 'zone of insolvency,'" where "the complaint avers that DVI had great difficulty raising capital, shuffled delinquent accounts to make them appear healthy, and could only obtain advances from its line of credit by erroneously certifying impaired loans and leases."); *Credit Lyonnais,* 1991 WL 277613, at *36 n. 55 ("The possibility of insolvency can do curious things to incentives, exposing creditors to risks of opportunistic behavior and creating complexities for directors.").

## 2. The FAC Adequately Alleges Several Breaches of the Duty of Loyalty Owed to the Company and Its Creditors

### a. Violations of the Duty of Loyalty/Good Faith

The boards of directors of Delaware corporations owe their companies duties of unremitting loyalty. *Globis Partners, L.P. v. Plumtree Software, Inc.*, No. 1577, 2007 WL 4292024, at *4 (Del. Ch. Nov. 30, 2007); s*ee also Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) (a fiduciary must not seek to obtain any advantage over his principal by the slightest action). It is self-evident that corporate officers and directors are not permitted to use their position of trust and confidence to further private interests of themselves or others. *Cede & Co. v. Technicolor,* 634 A.2d 345, 361 (Del. 1993). The Supreme Court of Delaware has "traditionally and consistently" defined the duty of loyalty of officers and directors in "broad

- 41 -

and unyielding" terms" and "has deemed that directors shirk their duty of loyalty where there
exists an abdication of directorial duty." *Id.* at 361, 363.

Certain of the defendants attempt to minimize the scope of their duty of loyalty by
contending that it only applies where directors are engaged in conduct based on illicit
motivation or personal interests that are divergent from shareholder interest. *See, e.g.*,
Cosgrove Mem. at 28; Tredwell Mem. at 32-33. In fact, the scope of the fiduciary duty of
loyalty is much broader in scope as it "encompasses cases where the fiduciary fails to act in
good faith." *See Stone,* 911 A.2d at 370; *In re Lukens Inc. S'holders Litig.,* 757 A.2d 720,
731 (Del. Ch. 1999), aff'd. sub. nom., 757 A.2d 1278 (Del. 2000). To be sure, "[a] director
cannot act loyally towards the corporation unless she acts in the good faith belief that her
actions are in the corporation's best interest." *Guttman v. Huang*, 823 A.2d 492, 506 n.34
(Del. Ch. 2003). As the Delaware Supreme Court explained:

> A failure to act in good faith may be shown, for instance, where the fiduciary
> intentionally acts with a purpose other than that of advancing the best
> interests of the corporation, where the fiduciary acts with the intent to violate
> applicable positive law, or where the fiduciary intentionally fails to act in the
> face of a known duty to act, demonstrating a conscious disregard for his
> duties.

*In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006); *Cede & Co.,* 634 A.2d at
345 (A failure to act in good faith includes situations where "a corporate director . . . cause[s]
the corporation to violate the positive laws it is obliged to obey.").

In the instant case, the FAC contains numerous allegations describing, with sufficient
particularity, how the defendants failed to act in good faith in their stewardship of C&A by
engaging in a series of accounting schemes to misrepresent and otherwise conceal C&A's

- 42 -

true financial condition.  ¶¶53-69, 116-129.[20]  In this regard, the FAC describes how Stockman, Stepp and McCallum directed and participated in the several improper "round-trip" transactions involving Joan Fabrics.  ¶¶53-57, 116-24.  The FAC further details how Stockman, Stepp, Cosgrove and Barnaba caused C&A to prematurely account for supplier and other capital equipment rebates through the use of false documentation.  ¶¶58-69, 125-29.  As a result of these illicit activities, the FAC explains how these defendants caused C&A to issue false and misleading financial results throughout the period from 2001 to 2005.  ¶¶57, 66-69, 117, 123, 128.  Finally, the FAC demonstrates that these defendants then used these false financial results to obtain millions of dollars of financing from C&A's lenders that they knew would never be repaid.  ¶¶70-89, 93.

### b.    Violations of the Duty of Candor

Delaware law has long recognized that, in discharging their fiduciary duties, directors owe broad duties of candor, honesty and disclosure.  In this regard, "[w]henever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty."  *Malone*, 722 A.2d at 10.  This requires directors "to deal with their stockholders honestly" and otherwise provide them with "accurate and complete information material to," among other things, "the financial condition of a company."  *Id.*; *ATR-Kim Eng Fin. Corp. v. Araneta*, C.A. No. 489-N, 2006 Del. Ch. LEXIS 215, at *63 (Del. Ch. Dec. 21, 2006) ("[T]he fiduciary duty of loyalty prohibits a director

---

[20]    As noted above, although in the context of a federal securities claim, two separate district courts have found that the core allegations pled in the FAC satisfy the pleading requirements of Rule 9(b).  In addition, a federal grand jury concluded that probable cause existed on these facts and charged Stockman, Stepp, Cosgrove and Barnaba with numerous criminal violations.  Exh. A.

from lying to the stockholders."), aff'd., 930 A.2d 928, (Del. 2007); *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 390 (Del. Ch. 1999) ("[W]hen directors communicate with stockholders, they must recognize their duty of loyalty do so with honesty and fairness.").

This duty naturally extends to the corporation and its creditors: "directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances." *Malone*, 722 A.2d at 9. Corporate fiduciaries can breach their duty of disclosure in several ways – by making a materially false statement, by omitting a material fact, or by making a materially misleading partial disclosure. *See In re Walt Disney Co., Derivative Litig.*, 731 A.2d 342, 376 (Del. Ch. 1998).

Here, the FAC describes how the defendants knowingly caused C&A to publicly disseminate false and misleading financial results in various press releases, conference calls and other documents filed with the SEC from 2001 through 2005, including , notably, the August 2004 Offering Memorandum. ¶¶39-40, 57, 65, 68, 70-71, 80-89, 92-94. Further, the FAC illustrates that, using these false financial results, Stockman and others deceived C&A's lenders, including GECC, JP Morgan and Credit Suisse First Boston, into providing C&A with additional liquidity despite the fact that C&A was, in reality, on the brink of financial collapse. ¶¶70-89. And the FAC explains that, even when confronted with evidence of wrongdoing, Stockman, Stepp, Cosgrove, McCallum and Barnaba lied to the Audit Committee and the market regarding the scope of the Joan Fabrics' "round-trip" transactions scheme and the supplied rebate scheme. ¶¶42, 69, 97-101. Thus, these defendants can hardly contend that these public and private deceptive and fraudulent statements were made with the requisite candor and honesty required by Delaware law.

- 44 -

### c.    Violations of the Duty to Monitor

Nonfeasance by directors relative to their fiduciary duty to discharge supervisory and monitoring responsibilities constitutes a breach of the fiduciary duty of loyalty sufficient to state a cause of action.  As the Delaware Court of Chancery noted in *In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275 (Del. Ch. 2003):

> Knowing or deliberate indifference by a director to his or her duty to act faithfully and with appropriate care is conduct, in my opinion, that may not have been taken honestly and in good faith to advance the best interests of the company.

*Id.* at 290; *see also In re Abbott Labs. Deriv. S'holders Litig.*, 325 F.3d 795, 806 (7th Cir. 2003) (Seventh Circuit, applying Delaware law, found breach of duty of loyalty where "Plaintiff alleges that the directors 'knowingly' in an 'intentional breach and/or reckless disregard' of their fiduciary duties 'chose' not to address the FDA problems in a timely manner.").

Relatedly, known as a *Caremark* claim, Delaware courts recognize that director liability "may be said to arise from an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss."  *In re Caremark Int'l. Inc. Derivative Litigation,* 698 A.2d 959, 967 (Del. Ch. 1996).  As the *Caremark* court explained:

> [A] director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by non-compliance with applicable legal standards.

*Id.* at 970.  In other words, a directors' lack of good faith (and concomitant disloyalty) is demonstrated by a sustained or systematic failure to exercise oversight and assure adequate record keeping.  *Id.* at 971.

The allegations in the FAC adequately support a claim that certain officers, including Koth, Krause and Evans, and certain outside directors of C&A, including Becker, McCallum, Hess, Tredwell, McConnell and Valenti, abdicated their responsibilities to monitor the Company.  For example, the FAC pleads that these defendants allowed Stockman to have unfettered control over the Company's finances, accounting practices, acquisition strategy and other business decisions, which he and others abused for an extended period to the detriment of the Company.  ¶¶26, 41-42, 84.  The FAC further alleges that, even when the Audit Committee, in its first investigation, uncovered serious questions about the propriety of several transactions and recommended that the Company establish better procedures for certain transactions, these defendants ignored numerous "red flags" and failed to take any steps to establish and verify appropriate internal controls, thereby allowing to the fraudulent schemes to continue unabated. *Id.*; *see, e.g.*, *Buckley,* 2007 U.S. Dist. LEXIS 22211, at *10 (in denying motion to dismiss, court determined that "Buckley alleges that the defendants either knew or should have known that violations of law were occurring, that they took no good faith steps to ameliorate the situation, and that DVI and its creditors suffered damages").

### d.    Liability for the Breaches of the Duty of Loyalty Should Be Imputed to Heartland

As noted above, Heartland was not a passive controlling shareholder of C&A. To be sure, shortly after providing its $300 million investment, Heartland obtained majority control over C&A's Board of Directors and over the day-to-day operations of the Company.  ¶¶27-30, 45-46, 70.  Further, the FAC details how these Heartland senior executives directly participated in the fraudulent conduct forming the basis of the breaches of fiduciary duty (Stockman and Stepp) and allowed such fraudulent conduct to occur by abdicating their responsibilities to actively monitor the Company's operations, particularly when confronted

- 46 -

with evidence of wrongdoing (Hess, Becker, Tredwell, McConnell and Valenti). ¶¶26, 41-42, 53-68, 96-97. Because these individuals acted within the course of their employment with Heartland, and acted for the benefit of Heartland by attempting to protect its substantial equity investment, their breaches of fiduciary duties can be imputed directly to Heartland. *Lafferty*, 267 F.3d at 358 ("Under the law of imputation, courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation.").[21]

### 3.    C&A's Exculpatory Clause Does Not Provide Immunity from the Consequences of the Alleged Wrongful Acts

Relying on 8 Del. C. §102(b)(7) and the resulting exculpation clause contained within C&A's Restated Certificate of Incorporation, several defendants assert that they should be immunized from any liability for violations of the duty of care. Stepp Mem. at 33; Becker Mem. at 31. Although §102(b)(7) was created to allow Delaware corporations to limit or eliminate a director's personal liability for monetary damages for breaches of the fiduciary duty of care, it is not a panacea for directors. *Emerald Partners v. Berlin*, 787 A.2d 85, 91 (Del. 2001). Section 102(b)(7) contains several express exceptions:

A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

8 Del. C. §102(b)(7).

---

[21]    Notably, in the federal securities actions, Judge Tarnow, based on the same core facts, denied Heartland's motion to dismiss the plaintiffs' "control person" claims brought pursuant to §20(a) of the Exchange Act.

Indeed, §102(b)(7) provides that no provision in a corporation's articles of incorporation can eliminate or diminish a director's liability for "duty of loyalty violations, good faith violations and certain other conduct." *Emerald Partners*, 787 A.2d at 90; *see also Zirn v. VLI Corp.,* 621 A.2d 773, 782 (Del. 1993) (finding that §102(b)(7) does not insulate directors from liability for breaches of duty of loyalty, including breach of the duty of disclosure). In this regard, Delaware law provides that the protections of an exculpatory clause may properly be invoked and applied where the factual basis for a claim *solely* implicates a violation of the duty of care. *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223-24 (Del. 1999); *see also Walt Disney*, 825 A.2d at 286 n.29 ("[Section] 102(b)(7) bars a claim only if there is an unambiguous, residual due care claim and nothing else"); *Alidina v. Internet.com Corp.*, Civ. No. 17235-NC, 2002 Del. Ch. LEXIS 156, at *28 (Del. Ch. Nov. 6, 2002) ("[W]hen a duty of care breach is not the exclusive claim, a court may not dismiss based upon an exculpatory provision. Because the duty of loyalty is implicated in this case, the §102(b)(7) provision cannot operate to negate Plaintiffs' duty of care claim on a motion to dismiss.").[22]

Here, as described above, since the FAC alleges that the defendants breached their fiduciary duty of loyalty by acting in bad faith, engaging in intentional misconduct and knowingly violating the law, the exclusions of §102(b)(7) apply and the exculpatory provision in C&A's Restated Articles of Incorporation affords no protection. *Buckley*, 2007

[22]     Assuming, arguendo, that §102(b)(7) provides a bar to any claims by Plaintiff which solely implicate a violation of the duty of care, the statute only protects directors. 8 Del. C. §102(b)(7). Thus, the defendants who were officers of the Company are not shielded by the protections of the exculpatory provision for acts arising in their capacity as officers. *See* R. Franklin Balotti and Jesse A. Finkelstein, *Del. Law of Corps. & Bus. Orgs.*, §4.19, at 4-335 (3d Ed. 2003) (where a defendant is a director and officer, only those actions taken solely in the defendant's capacity as an officer are outside the purview of Section 102(b)(7)).

- 48 -

U.S. Dist. LEXIS 22211, at *17-*19 (where the trustee of a liquidating trust "has sufficiently pled breach of the duties of loyalty and good faith[,] . . . the Certificate of Incorporation cannot operate to insulate the defendants from a breach of fiduciary duty claim.").[23]

## 4. The Protections of the Business Judgment Rule Do Not Apply

Certain defendants assert that the claims for breach of fiduciary duties cannot survive because Plaintiff does not plead sufficient facts to overcome the presumption of the business judgment rule. *See, e.g.*, Stockman Mem. at 15-16. These arguments are misplaced. The presumption afforded to certain director decisions can be rebutted "when a plaintiff pleads particularized facts sufficient to raise a reason of doubt that the action was taken in good faith or on an informed basis." *Buckley*, 2007 U.S. Dist. LEXIS 22211, at *15-*16; *In re Encore Computer Corp. S'holder Litig.*, C.A. No. 16044, 2000 WL 823373, at *5 (Del. Ch. June 16, 2000) (business judgment rule only protects decisions "made by a loyal and informed board").

Again, the FAC describes numerous circumstances where the defendants, both inside and outside directors, breached their duties of loyalty and otherwise failed to act in an informed manner regarding the numerous fraudulent schemes inflicted on the Company

---

[23]     Becker asserts that he should be absolved from liability for a breach of the duty of care because, under 8 Del.C. §141(e), he relied on "the expertise of independent auditors." Becker Mem. at 32. This argument carries little weight where, as here, the FAC charges that those independent auditors disregarded their responsibilities in providing audit services. Moreover, the mere existence of independent auditors does not permit Becker to abdicate his responsibilities to faithfully monitor C&A's financial condition. *See generally Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1281 (Del. 1989) ("While a board of directors may rely in good faith upon 'information, opinions, reports or statements presented' by corporate officers, employees and experts 'selected with reasonable care,' 8 Del.C. §141(e), it may not avoid its active and direct duty of oversight in a matter as significant as the sale of corporate control.").

between 2001 and 2005. ¶¶26, 41-42, 53-68, 96-97. These allegations are clearly enough to rebut the presumption that the defendants have acted in the best interest of C&A and its shareholders, especially at this stage of the proceedings where the Court must assume that the facts alleged in the FAC, along with all reasonable inferences therefrom favorable to Plaintiff, are true. *See Abbott Labs.,* 325 F.3d at 809 ("The totality of the complaint's allegations need only support a reasonable doubt of business judgment protection, not 'a judicial finding that the directors' actions are not protected by the business judgment rule.'").[24]

### 5.    The FAC Alleges that C&A Was Harmed by the Various Breaches of Fiduciary Duties

As discussed above in the context of the §10(b) claims, the FAC sets forth a cognizable claim for damages based on a deepening insolvency theory. Those arguments apply equally to Plaintiff's claims for breach of fiduciary duty. *Brown Sch.*, 386 B.R. at 48 (court held that "deepening insolvency was a valid theory of damages for the breach of fiduciary duty claims" under Delaware law); *Greater Southeast Community Hosp.*, 353 B.R. at 337 (same).

---

[24]    The business judgment rule is an affirmative defense, which is generally not properly raised at this stage of the proceedings. *See, e.g., In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Generally speaking, we will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6)."); *Federal Sav. & Loan Ins. Corp. v. Musacchio*, 695 F. Supp. 1053, 1064 (N.D. Cal. 1988) ("[A] ruling on the applicability of the business judgment rule is peculiarly a question of fact, wholly inappropriate for consideration on a motion to dismiss."); *Resolution Trust Corp. v. Fiala*, 870 F. Supp. 962, 971 (E.D. Mo. 1994) ("'[T]he business judgment rule is peculiarly a question of fact, wholly inappropriate for consideration on a motion to dismiss.'"); *In re GM (Hughes) S'holder Litig.*, C.A. No. 20269, 2005 Del. Ch. LEXIS 65, at *10 (Del. Ch. May 4, 2005), aff'd. 897 A.2d 162 (Del. 2006) ("it is unlikely, if not impossible, for a defendant to meet this burden on a motion to dismiss").

- 50 -

Nonetheless, citing *Trenwick Am. Litig. Trust*, 906 A.2d at 204-05, certain defendants

argue that Delaware law does not recognize damage claims based on a deepening insolvency

theory. *See, e.g.*, Stockman Mem. at 11. But that is not what *Trenwick* says. Indeed,

although the *Trenwick* court stated that there is no independent cause of action for deepening

insolvency under Delaware law, it stopped short of holding that it was not a viable theory of

damages:

> The rejection of an independent cause of action for deepening insolvency
> does not absolve directors of insolvent corporations of responsibility. Rather,
> it remits plaintiffs to the contents of their traditional toolkit, which contains,
> among other things, causes of action for breach of fiduciary duty and for
> fraud.

<p style="text-align:center">*    *    *</p>

> If . . . the directors remain responsible to exercise their business judgment
> considering the company's business context, then the appropriate tool to
> examine the conduct of the directors is the traditional fiduciary duty ruler.
> No doubt the fact of insolvency might weigh heavily in a court's analysis of,
> for example, whether the board acted with fidelity and care in deciding to
> undertake more debt to continue the company's operations, but that is the
> proper role of insolvency, to act as an important contextual fact in the
> fiduciary duty metric.

*Trenwick Am. Litig. Trust*, 906 A.2d at 205. Thus, in considering Plaintiff's breach of

fiduciary duty claim, there is no basis to conclude that Delaware law does not consider

"deepening insolvency" as part of the damage analysis. *Brown Sch.*, 386 B.R. at 46

("*Trenwick* required dismissal of the deepening insolvency claim, but cannot be read so

broadly as to require dismissal of breach of fiduciary duty, aiding and abetting breach of

fiduciary duty, corporate waste, and civil conspiracy claims.").

In any event, in the context of a breach of fiduciary duty claim, Plaintiff's injury

extends beyond a simple deepening insolvency theory. Indeed, the Third Circuit, applying

Delaware law, recently recognized that a litigation trustee sufficiently alleged harm to the

bankrupt company based on claims that that the defendants aided and abetted a breach of

<p style="text-align:center">- 51 -</p>

fiduciary duty by company insiders who engaged in a "pump and dump" scheme. *LaSala*,

519 F.3d 121. The Third Circuit explained:

> Given that the scheme is alleged to have pushed AremisSoft into a liquidating bankruptcy, we conclude that the complaint alleges harm to the corporation. Moreover, the Purchasers complain that the declining stock price and subsequent bankruptcy, ultimately harmed them. By pleading this derivative harm, the Trust necessarily pleaded the initial harm to the corporation. The fact that AremisSoft no longer exists does not convert its corporate claims into direct shareholder claims; rather, the corporate nature of the claims endures, and ownership of the claims passes to AremisSoft's successor.

*Id.* at 131-32. Thus, "because of the pump-and-dump scheme, AremisSoft lost its economic

viability, as reflected in its declining stock price and eventual bankruptcy. This is, under

Delaware law, a purely derivative harm, and one that is remediable if caused by a breach of

fiduciary duty." *Id.* at 131.

In this case, as part of its breach of fiduciary duty claims, Plaintiff alleges that

Stockman and others caused C&A to "incur[] additional and unnecessary debt and costs

associated with certain debt, and us[e] the proceeds thereof to cause and facilitate a

deepening insolvency and a loss of opportunity to restructure itself as a going concern and

institute a business strategy that recognized the true financial condition of the Company."

¶195. Under Delaware law, this allegation, among others, more than sufficiently pleads that

C&A was harmed by the various breaches of fiduciary duties committed by the defendants.

## D. The FAC States a Claim for Common Law Fraud

Under Delaware law, the elements of common law fraud include "(1) a false

representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or

belief that the representation was false, or was made with reckless indifference to the truth;

(3) an intent to induce the plaintiffs to act or to refrain from acting; (4) the plaintiffs' action

or inaction taken in justifiable reliance upon the representation; and (5) damage to the

plaintiffs as a result of such reliance." *Stephenson v. Capano Development, Inc.*, 462 A.2d

1069, 1074 (Del. 1983). Because, in large part, these elements overlap with the elements of a §10(b) claim analyzed above, Plaintiff will not reiterate its arguments as to the liability of Stockman, Stepp, Cosgrove and McCallum, with two notable exceptions.

First, because common law fraud does not require that the fraud occur in connection with the sale of securities, this cause of action is arguably broader than Plaintiff's §10(b) securities fraud claim. *See generally SEC v. Zandford*, 535 U.S. 813, 820 (2002) ("While the statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b). . . ."). Thus, Stockman, Stepp, Cosgrove and McCallum can be liable for their participation in the numerous fraudulent schemes, including their misrepresentations to the Audit Committee in the course of its first investigation, regardless of whether such fraud impacted the August 2004 Senior Notes Offering.

Second, a common law fraud claim encompasses fraudulent conduct and does not expressly require a defendant to directly utter a false statement. Under Delaware law, "fraud does not consist merely of overt misrepresentations. It may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak." *Stephenson*, 462 A.2d at 1074; *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987) ("[O]ne who actively and fraudulently conceals information is liable for the physical harm caused by such conduct."). "To plead active concealment, a plaintiff must allege facts supporting an inference that the defendant took some action affirmative in nature designed or intended to prevent, and which does prevent, the discovery of facts giving rise to the fraud claim, some artifice to prevent knowledge of the facts or some representation intended to exclude suspicion and prevent inquiry." *Corporate Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, C.A. No. 3231-VCS, 2008 Del. Ch. LEXIS 45, at *32 (Del. Ch. Apr. 10, 2008).

As described above, the FAC spells out a clear case of "active concealment" by

Stockman, Stepp, Cosgrove and McCallum. The FAC further pleads such a fraud claim

against Barnaba. More specifically, as summarized in the *Collins & Aikman* decision:

> The Complaint alleges that as part of the Rebate Transactions, Barnaba
> 'initially served as liaison between Cosgrove and C & A's Purchasing
> Department, knowingly conveying Cosgrove's directions on how the rebates
> should be structured to implement the fraud and ensuring that Cosgrove's
> instructions were carried out.' It further states that Barnaba 'supervised
> Purchasing Department employees in soliciting documentation' for use with
> the fraudulent rebates. . . . These allegations, together with the supporting
> facts alleged, are sufficient to state a claim.

*Collins & Aikman*, 524 F. Supp. 2d at 495. Although rendered in the context of a §10(b)

claim, these findings, which are based on the same allegations in the FAC, support a

common law fraud claim against Barnaba.

Accordingly, the common law fraud claim should be sustained as to Stockman,

Stepp, Cosgrove, McCallum and Barnaba.

## E.    The FAC States a Claim for Breach of Contract Against Heartland

Under New York law, which Plaintiff agrees governs this claim by virtue of the terms

of the Services Agreement, the elements of a cause of action for breach of contract are: "(1)

the existence of an agreement between the plaintiff and defendant; (2) due performance of

the contract by the plaintiff; (3) breach of the contract by the defendant; and (4) damages

resulting from the breach." *Texas Liquids Holdings, LLC v. Key Bank Nat'l Ass'n*, No. 05 cv

5070 (KMW), 2007 WL 950136, at *2 (S.D.N.Y. Mar. 27, 2007). Heartland claims that this

claim fails because Plaintiff has not alleged a breach of the Services Agreement. Heartland

Mem. at 19. This is without merit.

The FAC alleges that, by virtue of the Services Agreement, Heartland assumed

express and implied contractual obligations to the Company, which included the

- 54 -

responsibility to provide the Company with "advisory and consulting services in relation to the affairs . . . of the Company and its subsidiaries." ¶206. The FAC further alleges that "[i]n violation of its express and implied undertakings, including the obligations of good faith and fair dealing and honest performance of its contractual duties, Heartland, through its representatives and designees, failed to perform the contracted for services fairly, lawfully, and in a manner calculated to serve the best interests of the Company." ¶207.

More specifically, far from providing mere advisory and consulting services, Heartland assumed complete control over the Company and, through its senior representatives, engaged in numerous fraudulent schemes that inflicted substantial, and ultimately fatal, damage to C&A. This is more than sufficient to plead a breach of the Services Agreement. At a minimum, though, this conduct adequately demonstrates that Heartland breached the implied covenant of good faith and fair dealing that is present in all contracts, including the Services Agreement. *See Dalton v. Educational Testing Serv.*, 663 N.E.2d 289, 291-92 (N.Y. 1995) ("Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance," which "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"). Contrary to Heartland's assertion, Plaintiff does not seek to impose additional obligations not found in the Services Agreement; rather, Plaintiff seeks to hold Heartland responsible for acting "arbitrarily or irrationally" in the performance of its express and implied contractual obligations. *Id.* Accordingly, Heartland's motion to dismiss the breach of contract claim should be denied.

## F.    The FAC States a Claim for Unjust Enrichment

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or

- 55 -

equity or good conscience." *Jackson Nat'l Life Ins. Co.*, 741 A.2d at 393. The elements of unjust enrichment are: (i) an enrichment; (ii) an impoverishment; (iii) a relation between the enrichment and impoverishment; (iv) the absence of justification; and (v) the absence of a remedy provided by law. *Id.* Courts developed unjust enrichment as a theory of recovery to remedy the absence of a formal contract. *ID Biomedical Corp. v. TM Technologies, Inc.*, C.A. No. 13269, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995). Therefore, claims of unjust enrichment may survive a motion to dismiss when the validity of the contract is in doubt or uncertain. *See, e.g., In re Student Fin. Corp.*, No. 02-11620, 2004 WL 609329, at *7 (D. Del. Mar. 23, 2004) (rejecting motion to dismiss unjust enrichment claim where complaint alleged underlying contract was invalid and subject to rescission because of fraudulent conduct and omissions).

Some defendants argue that Plaintiff fails to state a claim for unjust enrichment because they have various employment and or other agreements with C&A that govern the terms of the compensation that they received. Notwithstanding these assertions, such agreements are outside the four corners of the FAC and, as such, references to the agreements, if they exist, are inappropriate on a motion to dismiss. *See Flynn v. Bachow,* C.A. No. 15885, 1998 WL 671273, at *4 (Del. Ch. Sept. 18, 1998) (exercising discretion to convert motion to dismiss into motion for summary judgment because movant offered documents outside of the pleadings to the court for consideration).

Additionally, several defendants contend that this claim must fail because Plaintiff has an adequate remedy at law. While this may be true, the argument is premature, as Plaintiff is entitled to raise alternative theories of relief. In the event that its claims at law are rejected, the unjust enrichment claim serves as an alternative route for Plaintiff to seek

recovery. *See* Fed. R. Civ. P. 8(e)(2) (a complaint may "state as many separate claims . . . as [plaintiff] has regardless of consistency").

Finally, various defendants argue that the unjust enrichment count fails to state a claim because the FAC does not allege an enrichment or an impoverishment. This argument is again without merit. As to the enrichment, the FAC alleges that Stockman and the other defendants benefited from the fraudulent schemes by continuing in their positions with the Company and receiving compensation and other benefits while the Company was being kept artificially alive. ¶70.[25] In turn, as to the impoverishment, the FAC also alleges that, in addition to burdening C&A with overwhelming debt, the Company further deepened its insolvency by being forced to incur unnecessary expenses, including those relating to compensation and other perquisites, by the defendants through their improper efforts to sustain the life of the corporation solely for their own personal benefit. These allegations are more than sufficient to state a claim for unjust enrichment.

## V.    CONCLUSION

For all of the foregoing reasons, Plaintiff requests that the defendants' various motions to dismiss be denied. However, if the Court should determine that, despite the substantial factual allegations contained in the FAC and incorporated into the FAC by reference, additional factual information is required, Plaintiff requests leave to file an amended complaint that addresses any concern the Court may have, particularly given the complex nature of this litigation. Fed. R. Civ. P. 15(a) ("leave shall be freely given when justice so requires."); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003)

---

[25]    The FAC further alleges that defendants like McCallum personally benefited from the fraud because it allowed them to continue to engage in profitable business with the Company. *Id.*

-57-

("We need to bear in mind that we are not operating in the world of notice pleadings. In this

technical and demanding corner of the law, the drafting of a cognizable complaint can be a

matter of trial and error.").

DATED: July 28, 2008

Respectfully submitted,
ROSENTHAL, MONHAIT & GODDESS, P.A.

/s/ Carmella P. Keener

Joseph A. Rosenthal (#234)
Carmella P. Keener (#2810)
919 N. Market Street, Suite 1401
Wilmington, DE 19899
Telephone: 302/656-4433
ckeener@rmgglaw.com

*Attorneys for Plaintiffs*

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Special Counsel for Collins & Aikman
Corporation, et al.*

- 58 -

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on July 28, 2008, I electronically filed

with the Clerk of Court the foregoing document using CM/ECF which will send

notification of such filing to the following:

Thomas P. Preston
Blank Rome LLP
Chase Manhattan Centre
1201 Market Street
Suite 800
Wilmington, DE 19801

Robert S. Saunders
Skadden Arps Slate Meagher
 & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

Richard L. Horwitz
Peter J. Walsh, Jr.
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801

Peter B. Ladig
Stephen B. Brauerman
The Bayard Firm, P.A.
222 Delaware Ave., Suite 900
P.O. Box 25130
Wilmington, DE 19899-5130

Christian Douglas Wright
Young Conaway Stargatt
 & Taylor, LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

Thomas G. Macauley
Zuckerman Spaeder LLP
919 Market Street, Suite 990
Wilmington, DE 19801

Anne C. Foster
Robert J. Stearn, Jr.
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801

Kenneth J. Nachbar
Morris, Nichols, Arsht
 & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

James L. Holzman
J. Clayton Athey
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899

Vernon R. Proctor
Proctor Heyman LLP
1116 West Street
Wilmington, DE 19801

Albert H. Manwaring, IV
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
Wilmington, DE 19801

and also by electronic mail upon:

Michael Shapiro (mshapiro@clm.com)
Gerald Griffin (griffin@clm.com)
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005

Christopher Harris (christopher.harris@lw.com)
Seth L. Friedman (seth.friedman@lw.com)
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022

_____ */s/ Carmella P. Keener* _____
Joseph A. Rosenthal (Del. Bar No. 234)
Carmella P. Keener (Del. Bar No. 2810)
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
(302) 656-4433
jrosenthal@rmgglaw.com
ckeener@rmgglaw.com

*Delaware Attorneys for Plaintiffs*

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                    :

                -v-                         :

DAVID A. STOCKMAN,                          :
J. MICHAEL STEPP,
DAVID R. COSGROVE, and                      :
PAUL C. BARNABA,
                    Defendants.             :

- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED MAR 2 1 2007

INDICTMENT

07 Cr.

**07 CRIM.    0220**

JUDGE JONES

<u>COUNT ONE</u>

(Conspiracy To Commit Securities Fraud, Make False Statements In
Annual and Quarterly Reports, Make False Entries In Books And
Records, Lie To Auditors, Commit Bank Fraud, Wire Fraud, and
Obstruction of An Agency Proceeding)

          The Grand Jury charges:

                    <u>RELEVANT PERSONS AND ENTITIES</u>

          1.    At all times relevant to this Indictment, Collins

& Aikman, Inc. ("C&A") was a corporation organized under the laws

of the State of Michigan with its headquarters in Troy, Michigan.

At all times relevant to this Indictment, C&A's common stock was

listed under the symbol "CKC" on the New York Stock Exchange.

          2.    DAVID A. STOCKMAN, the defendant, served on C&A's

board of directors from in or about 2000 through in or about May

2005.  From on or about August 1, 2002 until in or about May

2005, STOCKMAN served as Chairman of the Board of Directors of

C&A, and from in or about August 2003 until in or about May 2005,

STOCKMAN served as Chief Executive Officer of C&A.  At all times

relevant to this Indictment, STOCKMAN was a partner in a private equity firm (the "Private Equity Firm"), which was the largest single shareholder in C&A.

3.    At all times relevant to this Indictment, J. MICHAEL STEPP, the defendant, was a partner in the Private Equity Firm.    From in or about 2000 until in or about April 2006, STEPP served as Vice Chairman of the C&A Board of Directors.    In or about 2001, STEPP was an advisor to C&A and from in or about January 2002 until in or about October 2004, STEPP served as the Chief Financial Officer of C&A.

4.    At all times relevant to this Indictment, DAVID R. COSGROVE, the defendant, was employed by C&A or an entity later purchased by C&A.    At various times relevant to this Indictment, COSGROVE served as Group Controller for the Plastics Group, Vice President of Finance for the North American Plastics Group (from in or about February 2002 to in or about August 2002), Vice President of the Financial Planning and Analysis Group (from in or about August 2002 to in or about October 2004), and Senior Vice President, Financial Planning and Controller (from in or about October 2004 to at least May 2005).

5.    At various times relevant to this Indictment, PAUL BARNABA, the defendant, was employed by C&A in the Purchasing Department.    From Spring 2002 to December 2004, BARNABA was the Director of Financial Analysis for the Purchasing Department.

2

From December 2004 until in or about April 2005, BARNABA held the position of Vice President and Director of Purchasing for the Plastics Division.

## BACKGROUND

### C&A's Business

6.    At all times relevant to this Indictment, C&A provided to businesses around the world a broad range of automotive supply parts, including, among other things, instrument panels and almost all other parts of an automobile interior, carpets, acoustics, fabrics, and convertible tops.  C&A owned and operated factories in North America, South America, and Europe, and supplied parts to both domestic and foreign auto manufacturers, such as Ford Motor Company, General Motors, DaimlerChrysler, and others.  The automobile manufacturers are commonly referred to within the industry as original equipment manufacturers or "OEMs."  C&A operated primarily as a Tier I supplier in the automotive industry, meaning that C&A supplied its products directly to the OEMs.  C&A also operated as a Tier II supplier, in that it supplied certain products to other automotive parts suppliers, who in turn supplied the OEMs.  By 2005, C&A had grown to be one of the largest automotive parts suppliers in the world.

7.    At all times relevant to this Indictment, in order to produce automobile interiors and parts for the OEMs, C&A had

3

to purchase either raw materials or certain component parts from vendors.  The costs of these raw materials and component parts were among C&A's largest expenses.

### The Private Equity Firm's Investment in C&A

8.    In 1999, DAVID A. STOCKMAN and others formed the Private Equity Firm with the stated goal of acquiring and expanding industrial companies.  As part of his initial investment strategy on behalf of the Private Equity Firm, STOCKMAN targeted C&A as a company which he planned to control and expand through acquisitions.  In or about February 2001, the Private Equity Firm acquired a controlling share of C&A's equity; thereafter, STOCKMAN and other representatives of the Private Equity Firm became members of the C&A Board of Directors.  C&A entered into a services agreement with the Private Equity Firm under which the Private Equity Firm provided advisory and consulting services, in return for a $4.0 million annual advisory fee and additional fees of 1% of the total enterprise value of certain acquisitions.

9.    During 2001, as directed by STOCKMAN and in accordance with the Private Equity Firm's planned strategy, C&A purchased three other auto parts businesses and in the process doubled its size.  First, in or about July, 2001, C&A acquired Becker Group L.L.C., a company that manufactured plastic parts for automobiles.  In or about September 2001, C&A acquired Joan

4

Automotive Fabrics, which was part of Joan Fabrics, a privately held fabrics manufacturing company. These two acquisitions were part of STOCKMAN and the Private Equity Firm's specific plan to form C&A into a "Mega Tier II" supplier of fabrics and plastic parts to other automotive parts suppliers. Finally, in December 2001, C&A made its largest acquisition, purchasing the trim division of Textron Automotive Company, known as "TAC-Trim." This acquisition was intended to further STOCKMAN's strategy of garnering a larger share of the Tier I market, towards C&A's goal of producing almost any part of an automobile interior to OEMs worldwide.

### C&A's Capital Structure

10. At all times relevant to this Indictment, in addition to capital raised in the equity markets, C&A availed itself of a variety of sources of debt financing. At various times relevant to this Indictment, C&A's capital structure included (1) between approximately $400 million and $900 million in notes; (2) revolving credit facilities and term loans from banks between approximately $575 million and $675 million; and (3) an accounts receivable securitization facility of between approximately $170 million and $250 million.

11. Once STOCKMAN and the Private Equity Fund were in control of C&A in 2001, they caused C&A to finance its purchase of Tac-TRIM in December 2001 in part through issuing an

additional $500 million in 10-year notes.  Between that note
issuance and other increases in its debts, under STOCKMAN's
control, C&A's net debt increased from approximately $884 million
as of December 30, 2000 to approximately $1.6 billion as of
December 31, 2004.

   12. At all times relevant to this Indictment, C&A's
credit facilities were governed by certain financial covenants.
Failure to comply with these covenants would, under terms of the
credit facilities, constitute a default by C&A and warrant a
demand for immediate payment of the full amount of the credit
facilities.  For example, C&A had to maintain a certain ratio of
performance, measured by dividing C&A's net debt by a specific
formula for "Earnings Before Interest, Taxes, Depreciation, and
Amortization" ("EBITDA"), referred to as a leverage covenant.  If
the ratio of C&A's net debt to its EBITDA fell below the covenant
requirements, C&A would be in default of its leverage covenant.
The credit facility agreements provided that, over time, the
leverage covenant would become more stringent, meaning that C&A
was expected to continue to meet increasing performance targets
and/or reduce its overall indebtedness to maintain compliance
with its covenants.  If C&A could not comply with its covenants,
C&A could attempt to negotiate a less stringent financial test
with its lenders, but such waivers of covenants were not
guaranteed and were costly to C&A.

13.  In the event that C&A were to default on its credit facilities, cross-default provisions in its indentures would trigger a default event on C&A's notes as well.

### C&A's Financial Reporting Process

14.  At all times relevant to this Indictment, C&A employed independent auditors who performed year-end audits of C&A's financial statements.  In addition, auditors completed quarterly reviews of selected C&A financial information.

15.  At all times relevant to this Indictment, at the close of each month and each quarter of C&A's fiscal year, employees in C&A's finance and accounting departments collected and summarized information reflecting C&A's operating performance and financial results for the particular period in question. This information was reflected in various financial statements and reports.

16.  At all times relevant to this Indictment, C&A tracked its sales, EBITDA, operating income, capital expenditures and other financial metrics on a monthly basis through the use of internal reports.  Each C&A plant was required to update an internal computer system with its monthly or quarterly forecasts and actual results.  The results from the plants then rolled up to corresponding divisions.  Each division then reviewed the plants' reports and consolidated them into divisional reports, which were sent to the Financial Planning and Analysis group,

which, from at least 2003 until 2005, was headed by DAVID R. COSGROVE. At the corporate level, the results from each division were aggregated and combined with the home office results, which typically consisted of corporate overhead and any "top side" adjustments. The consolidated reports tracked actual results and compared them to forecasted results. As months went by, forecasted results were updated with the latest information, including the latest estimates of future sales to the OEMs. STOCKMAN and STEPP reviewed the internal forecasts and STOCKMAN often made changes to the internal forecasts or suggested ways to improve C&A's results.

      17. At all times relevant to this Indictment, STOCKMAN led periodic meetings to discuss C&A's operating results for the upcoming months, with a focus on the current quarter. In connection with these meetings, STOCKMAN, STEPP, COSGROVE, and others reviewed documents that summarized information, including sales, expenses, and other anticipated accounting entries that would affect C&A's revenues in the current quarter and in following months. STOCKMAN regularly met with C&A employees to discuss the financial results and projections reflected in the various documents presented during these meetings.

## THE SCHEME TO DEFRAUD

## Introduction And Overview

18.  Beginning in or about 2001, after the Private
Equity Firm and STOCKMAN took operating control of C&A and
undertook their plan of expansion, C&A faced increasing pressures
in its business operations.  Over time, C&A was squeezed between
cost-reduction mandates from the OEMs and raw material price
increases from its vendors.  In addition, C&A's operating results
were further depressed by the high costs of integrating the
businesses it had acquired during 2001 into the existing C&A
operations.  From as early as in or about December 2001, these
operational pressures, among other issues, threatened to cause
C&A's financial performance to fall to levels that might trigger
default on the financial covenants governing the credit
facilities and the cross-default provisions in C&A's notes.
Thus, STOCKMAN, STEPP, COSGROVE, and the Private Equity Firm
continually faced pressure to keep C&A's financial performance at
a level that would (a) enable C&A to comply with the covenants in
its credit facilities; and (b) satisfy investors that STOCKMAN's
and the Private Equity Firm's financial plan was successful.

19.   In response to these operational pressures,
STOCKMAN orchestrated a scheme, joined in by COSGROVE, STEPP,
BARNABA, and others, to defraud C&A's investors, banks, and
creditors by manipulating C&A's reported revenues and earnings in

an effort to, among other things, (1) enable C&A to avoid violating covenants in its credit facilities agreements and thus C&A's financial ruin; and (2) raise additional capital in the debt markets to assist C&A in solving its business problems.

20.    In furtherance of that scheme, from at least as early as in or about December 2001, STOCKMAN, STEPP, COSGROVE, and BARNABA caused C&A's reported figures for EBITDA, operating income, and other financial metrics to be falsely and fraudulently inflated by systematically and improperly recognizing cost reductions based on supplier rebates, as detailed in paragraphs 26 to 48, below.

21.    In furtherance of the scheme, STOCKMAN and his co-conspirators made repeated public statements in which they (a) falsely described C&A's operating performance and financial results, and (b) omitted material facts necessary to make the statements that they made about C&A's operating performance and financial results complete, accurate, and not misleading.  In addition, STOCKMAN and his co-conspirators caused C&A to file financial statements with the SEC that presented a materially false and misleading description of C&A's operating performance and financial results.  STOCKMAN and others made similarly false and misleading statements to C&A's creditors and lenders, which falsely described C&A's operating performance and financial results, and omitted material facts necessary to make the

statements that they made about C&A's operating performance and financial results complete, accurate, and not misleading, as detailed in paragraphs 26 to 48, below.

22.    As C&A's true operating results substantially deteriorated at the end of 2004 and the beginning of 2005, causing an unprecedented liquidity crisis, STOCKMAN directed a scheme to further defraud C&A's creditors by, among other things, misrepresenting to a lender the nature of C&A's portfolio of accounts receivable, against which C&A was borrowing over a hundred million dollars on a daily basis, as detailed in paragraphs 49 to 61, below.

23.    As C&A's true operating results continued to deteriorate in the first quarter of 2005 and as its improper rebate accounting practices came under scrutiny from its auditors, STOCKMAN directed a scheme to further defraud C&A's investors and creditors by making numerous false statements to the public and to C&A's creditors concerning (a) C&A's current liquidity situation, (b) C&A's forecasted EBITDA for the first quarter of 2005, and (c) the scope of the improper rebate recognition practices that C&A's outside auditors and Audit Committee were beginning to examine, as detailed in paragraphs 62 to 90, below.

24.    On or about March 17, 2005, as part of its regularly scheduled public earnings call, C&A announced that it

would have to delay the filing of its 2004 Annual Report on SEC
Form 10-K because C&A had been improperly recognizing cost
reductions attributed to supplier rebates.  STOCKMAN falsely
sought to reassure C&A's investors, creditors, outside auditors,
and the Board of Directors that the rebate issue was small in
scale and did not reflect fundamental operating problems at C&A.
In early April 2005, STOCKMAN repeated many of these assurances
to Credit Suisse First Boston ("Credit Suisse"), in order to
secure $75 million in additional financing.  These additional
funds, however, were not sufficient to meet C&A's needs and were
depleted by late April 2005.  Ultimately, in or about May 2005,
the Board of Directors discovered that C&A had run out of cash
and had, at STOCKMAN's direction, misled C&A's investors about
C&A's true operating performance.  The Board of Directors also
discovered that STOCKMAN had understated to the Board and C&A's
investors the scope of the rebate accounting issue.  On or about
May 12, 2005, the Board of Directors requested STOCKMAN's
resignation.

    25.  On or about May 17, 2005, C&A filed for
bankruptcy.  As a result, C&A's common stock became nearly
worthless, and the price of C&A's bonds (Senior Subordinated
Notes, due 2012 and Senior Subordinated Notes, due 2011) also
plummeted.  The fraud carried out by STOCKMAN, STEPP, COSGROVE,

BARNABA, and others caused hundreds of millions of dollars in investor and creditor losses.

## THE JOAN FABRIC REBATE FRAUD SCHEME

26.   Starting in or about late 2001, STOCKMAN and STEPP, along with others, arranged for round trip transactions between C&A and Joan Fabrics in order to improperly manipulate C&A's EBITDA, as detailed below.

27.   On or about September 21, 2001, at STOCKMAN's direction, C&A acquired Joan Automotive Fabrics, a supplier of automotive fabric, from Joan Fabrics.

28.   In the fourth quarter of 2001, STOCKMAN, STEPP, and others realized that C&A's fourth quarter results were going to fall short of expectations.  Therefore, STEPP, with STOCKMAN's knowledge and approval, asked the Chief Executive Officer of Joan Fabrics ("the Joan CEO") for a $3 million payment from Joan Fabrics to C&A that would be used to boost C&A's EBITDA for the fourth quarter of 2001.  In return, STOCKMAN, STEPP, and others promised to repay Joan Fabrics in the future.  As STOCKMAN and STEPP intended, this $3 million payment was characterized as a supplier rebate to allow C&A to account for it as a reduction in cost for the fourth quarter of 2001, and therefore increase C&A's EBITDA for that period.  This characterization was false, as STOCKMAN and STEPP had agreed that C&A would make Joan Fabrics "whole" for the payment at some point in the future.  Therefore,

13

the transaction was a round trip of cash, not a supplier rebate, and should not have factored into C&A's EBITDA.

29.    After this first "rebate," STOCKMAN negotiated additional payments from Joan Fabrics in order to boost C&A's EBITDA.  STOCKMAN negotiated these payments personally with the Joan CEO, which totaled nearly $15 million in "rebates" between the fourth quarter of 2001 and the first quarter of 2003.  As with the first "rebate," C&A booked each payment as a reduction in cost, and increased its EBITDA.  Neither Joan Fabrics nor entities controlled by the Joan CEO had a contractual obligation to make these payments, and they in fact only agreed to do so with the understanding that Joan Fabrics would be repaid.

30.    At STOCKMAN and STEPP's direction, C&A repaid these "rebates" to Joan Fabrics through a series of subsequent transactions.  For example, on or about April 19, 2002, C&A gave back to Joan Fabrics certain looms that C&A had obtained as part of the original purchase of Joan Automotive, worth approximately $3.1 million, for no consideration and without approval by the C&A Board of Directors.  At STOCKMAN's direction, C&A repaid Joan Fabrics by systematically overpaying Joan Fabrics or entities controlled by the Joan CEO for additional purchases, including:

a.    C&A's purchase of Southwest Laminates, Inc., from the Joan CEO;

14

        b.    C&A's purchase of air jet texturing machines from a subsidiary of Joan Fabrics; and

        c.    the purported purchase of looms from Joan Fabrics for the purpose of running a furniture fabrics business at C&A.

31.    Thus, C&A improperly recognized approximately $14.9 million in "rebates" from Joan entities between 2001 and 2003.

32.    In August 2003, the Audit Committee of C&A's Board of Directors began an investigation of certain related party transactions, including the "rebates" paid by Joan Fabrics to C&A. In or about August 2003, the Securities and Exchange Commission ("SEC") opened an investigation into the matter. Knowing that the Audit Committee would keep the SEC apprised of its findings, STOCKMAN and STEPP sought to mislead the Audit Committee, and directed others to do so, including by concealing the true nature of the "rebate" transactions with Joan Fabrics and by creating false and fraudulent justifications for the "rebates."

33.    STOCKMAN, STEPP, and their co-conspirators, through their misrepresentations, convinced the Audit Committee that the "rebates" paid by Joan Fabrics had a legitimate business purpose, were not loans to C&A, and were not repaid through other transactions between C&A and Joan Fabrics. Thus, based on

misleading and incomplete information, the Audit Committee authorized a report concluding that the "rebate" transactions were legitimate, and communicated that report to the SEC in or about March 2004 in connection with the SEC's investigation.

## THE SUPPLIER REBATE FRAUD SCHEME

34.    Beginning in or about 2002, in order to respond to the financial pressures on C&A outlined above, STOCKMAN, STEPP, COSGROVE, and BARNABA schemed to inflate C&A's income by systematically recognizing "rebates" from C&A's suppliers before those cost reductions had in fact been earned by C&A, as detailed below.

35.    During the time period relevant to this Indictment, OEMs typically sought to secure long-term supply contracts for each part of each automobile they made for the life of the "program."  If awarded business from an OEM, C&A would typically sign a long-term – or "life of the program" – contract to produce specified parts of a vehicle for the OEM.  These contracts, which often lasted for several years, helped the OEM ensure it had a steady stream of parts which met the OEM's quality and engineering standards.  Once C&A had been awarded such business, C&A frequently sought to secure long-term supply agreements with its suppliers who would provide raw materials or component parts for the awarded program.

36.    In negotiating long-term supply agreements with

16

its suppliers, C&A would often demand price reductions.  C&A demanded such price reductions, in part, due to increasing cost pressure on C&A from the OEMs.  Price reductions could take different forms: (i) a per piece price reduction or volume discount, i.e., a reduction in the cost of each component part or each pound of raw material supplied to C&A; or (ii) an upfront lump sum payment, referred to by STOCKMAN and others as a "rebate," "pay to play," or "slotting fee."  Where the contract between C&A and a raw material supplier called for a volume discount per pound of material supplied, any such discount would normally be calculated at the end of a quarter or year, based upon the actual amount of raw materials supplied to C&A in that period.  To the extent that C&A negotiated a one-time "rebate" or "slotting fee," it would take the form of an upfront, lump sum payment that the supplier would agree to pay to C&A in exchange for future business.  In these instances, at STOCKMAN's direction or with his knowledge and approval, C&A either agreed to source new business to that supplier, or maintained existing business with a supplier, instead of resourcing the business to a cheaper source of supply.  In either event, C&A negotiated "rebates" that were contingent on C&A making future purchases from the supplier granting the rebate.  Thus, C&A's right to retain the total amount of a "rebate" was typically conditioned on C&A meeting its

17

contractual obligations, including sourcing particular business to the supplier.

37. At all times relevant to this Indictment, according to relevant accounting principles, and as STOCKMAN, STEPP, COSGROVE, and BARNABA knew, C&A could properly recognize and record rebates as a reduction in cost of sales only after C&A earned the rebate from the vendors, i.e., when C&A satisfied all the contractual terms that would entitle it to receive payment or keep any up-front lump sum payments.

38. Beginning in or about 2002, STOCKMAN, STEPP, COSGROVE, and BARNABA participated in a scheme to recognize the cost reductions from their "rebate" transactions before the rebates had been earned by C&A, in order to lower C&A's costs in the present quarter and thereby inflate its EBITDA for that period. C&A continuously faced pressure to improve performance, in order to meet external expectations and to comply with the covenants in its credit facilities agreements.

39. STOCKMAN, STEPP, and COSGROVE routinely attended meetings with members of the C&A Purchasing Department, including BARNABA, and knew that BARNABA and other employees from the C&A Purchasing Department were promising future business to suppliers in order to obtain up-front "rebates." In many cases, STOCKMAN directed C&A employees to get rebates from specific suppliers; STOCKMAN would specify the amount of the rebate to be requested

18

and the specific future business to be promised to the supplier.

Once STOCKMAN identified a rebate, it became part of the C&A

Purchasing Department's target goal for the quarter.  At times

relevant to this Indictment, STOCKMAN, STEPP, and COSGROVE

received weekly written reports from the C&A Purchasing

Department which included updated information concerning rebate

transactions.  These weekly updates often referred to the fact

that future business was being promised to suppliers in exchange

for rebates being booked immediately.

40.  Beginning at least as early as in or about March

2002, STOCKMAN and COSGROVE directed employees in C&A's

Purchasing Department to pull income forward into the current

reporting period and thereby falsely pad C&A's reported income.

STOCKMAN and COSGROVE understood that C&A's employees were

therefore soliciting false documentation from suppliers to allow

C&A to account for rebates improperly, using a template letter

approved by COSGROVE.  In particular, STOCKMAN and COSGROVE

directed C&A's employees, when documenting supplier rebates that

were contingent on future business, to obtain side letters or

separate documents that falsely attributed the supplier rebate to

past purchases.  Purchasing employees, acting at BARNABA's

direction, then solicited false documentation from suppliers

knowing that such false documents would be used for immediate and

improper recognition of cost reductions.  STOCKMAN, STEPP,

19

COSGROVE, and BARNABA used the false documents to justify immediate recognition of the supplier rebates in C&A's books and records and in its financial reports filed with the SEC.

41.   STOCKMAN specifically approved various contingent supplier rebates that were improperly booked in the current quarter.  For example, STOCKMAN approved the following rebates, with the knowledge and approval of STEPP and COSGROVE, each of which, as they each well knew, was contingent on future business, each of which was falsely documented to hide the contingency, and each of which was recognized in whole or in part in the current quarter:

        a.    Third quarter 2003: $1 million rebate from a plastic parts supplier;

        b.    Fourth quarter 2003:  $250,000 rebate from a tooling supplier.

42.   STOCKMAN directed employees, such as BARNABA, to seek COSGROVE's guidance in "booking" the "rebates" in the current quarter, despite knowing that it would be improper to book the "rebates" in the current quarter because they were contingent on future events.  COSGROVE reviewed false side letters obtained or prepared by BARNABA and C&A's Purchasing Department, with knowledge that they did not accurately reflect the true nature of the "rebates," and edited false side letters for the purpose of removing references to future business.  The

false side letters were typically then provided to C&A's outside
auditors as "proof" that the rebates were properly booked in the
current reporting period.

### Expansion Of The Rebate Scheme To Capital Equipment

43.    By 2004, C&A had obtained or tried to obtain
rebates from nearly all of its raw material suppliers and C&A had
already leveraged nearly all of its new business opportunities
for up-front lump sum rebates. Moreover, with rising costs of
raw materials, it was becoming more difficult to obtain
commitments to make lump sum payments from any suppliers,
particularly resin and steel producers. As a result, STOCKMAN,
STEPP, COSGROVE, and BARNABA and their co-conspirators expanded
the rebate scheme to capital equipment being purchased by C&A.
STOCKMAN, STEPP, COSGROVE, and BARNABA each knew that, under
generally accepted accounting principles, any discounts on the
purchase of capital would result in a reduction of the cost basis
of that asset, and would have no impact whatsoever on EBITDA. As
the defendants knew, historically, C&A had accounted for any
discounts on capital equipment in this manner. For the sole
purpose of inflating C&A's reported EBITDA and operating income,
STOCKMAN and COSGROVE, with STEPP's knowledge and approval,
directed C&A employees, including BARNABA, to negotiate discounts
on purchases of capital equipment and falsely document those
discounts as "rebates" for past purchases of non-capital items.

21

In order to convince the equipment suppliers to agree to the "rebate," C&A generally agreed to pay a higher price for the equipment than originally requested by the equipment supplier, in return for a "rebate" for the difference, coupled with documentation that falsely attributed the rebate to items, such as the purchase of spare parts, which appeared to justify a decrease in expenses, rather than a discount on the cost of capital.

44. For example, as STOCKMAN and his co-conspirators knew, C&A obtained the following capital cost reductions in 2004, among others:

a.    In or about February 2004, C&A negotiated a $1 million reduction in the cost of a large number of new machines for the Hermosillo plant with an equipment supplier.

b.    In or about 2004, C&A obtained two separate $500,000 rebates from an equipment supplier.

c.    In or about July 2004, C&A negotiated a $1 million rebate from a press manufacturer.

All of these rebates were in reality discounts in the purchase price of equipment, but at STOCKMAN's and COSGROVE's direction, C&A obtained documentation from the equipment suppliers falsely representing that the rebates were given for purchases of non-capital items or services, which was used to justify an increase

to EBITDA.  These "rebates" were reviewed with STOCKMAN, STEPP, and COSGROVE, and each were aware that the discounts were being falsely justified as rebates on non-capital expenses.

45.  In 2004, C&A improperly recognized approximately $7.2 million in pre-tax operating income based on capital expenditure "rebates."

## Booking The "Rebates"

46.  In furtherance of this scheme, from in or about 2002 through in or about 2005, rather than disclosing C&A's true financial condition and operating performance, STOCKMAN, STEPP, COSGROVE, and BARNABA directed C&A employees to falsely and fraudulently book the above-described rebates as cost reductions in the then-current quarter, in order to decrease artificially C&A's reported expenses, resulting in, among other things, artificially-inflated figures for C&A's EBITDA and operating income, among other financial metrics.  In light of their aggregate amount and timing, these entries made C&A's reported revenue and EBITDA materially misleading in reporting periods between the first quarter of 2002 and the first quarter of 2005.

47.  As a result of the above-described "rebate" schemes, between 2001 and 2004, C&A improperly inflated pre-tax operating income (or lowered pre-tax operating loss) by at least approximately $43.6 million.

## C&A's 2004 Debt Offering

48.   In or about August 2004, C&A offered, and the public purchased, approximately $415 million in 12.875% Senior Subordinated Notes due 2012 based, in part, on offering materials that were false and fraudulent in that they included results of operations that had been falsely and materially inflated by the rebate schemes described above.

## C&A's LIQUIDITY CRISIS IN THE FIRST QUARTER OF 2005

49.   In January 2005, as industry pressures on C&A increased, C&A faced an unprecedented liquidity crisis. Throughout much of the first quarter of 2005, C&A was fully drawn on its revolving credit facilities, and C&A did not have sufficient liquidity to pay its bills.  In order to avoid filing for bankruptcy, which would have acknowledged the failure of STOCKMAN's leadership and have resulted in the loss of STOCKMAN's and the Private Equity Firm's investment in C&A, STOCKMAN assumed personal responsibility for management of C&A's liquidity position on a daily basis.  STOCKMAN directed subordinates from various departments to commence a fraudulent invoicing scheme in order to increase the available liquidity under C&A's accounts receivable securitization facility.  As part of his effort to conceal the dire liquidity situation, STOCKMAN made various false statements about the problem, both to the public and to C&A's creditors.

## C&A's Credit Arrangements As Of January 2005

50.  As of January 2005, C&A had credit facilities totaling approximately $675 million.  C&A had obtained these credit facilities from J.P. Morgan Chase ("JPMC") and they consisted primarily of a $400 million term loan and two revolving credit facilities.  The revolving credit facilities could be drawn upon as needed.

51.  In or about December 2004, C&A entered into an agreement with General Electric Capital Corporation ("GECC") to become C&A's lender under its existing accounts receivable securitization facility.  At any given time, C&A had billed or invoiced the OEMs for millions of dollars worth of goods already sold.  Once an OEM received an invoice, that OEM then had a certain amount of time to pay for the parts made by C&A.  The amounts owed for these goods which had been sold but not yet paid for were listed as a receivable in C&A's books and records.  In order to increase its liquidity and speed up receipt of cash, the agreement with GECC allowed C&A to borrow against the outstanding balance in C&A's accounts receivable.  The maximum amount that C&A could borrow under the agreement with GECC was $250 million.  The amount that could be borrowed from GECC at any given time depended on the amount of outstanding unpaid receivables, referred to as the borrowing base.

52.   Under C&A's agreement with GECC, only certain receivables could be included in the calculation of the pool of eligible receivables, or borrowing base.  The size of the borrowing base changed on a daily basis to reflect the addition of new receivables, the payment of outstanding receivables, and the ineligibility of old receivables.  Among other requirements, in order to constitute an "eligible receivable," C&A had to be entitled to payment from the OEM once C&A generated an invoice and sent it to the OEM.  This requirement is common to these types of facilities, as GECC agreed to lend C&A money on the understanding that GECC could collect from the OEMs were C&A to default on its payment to GECC.  Under the relevant agreement between an OEM and C&A, OEMs were obligated to pay on the terms that had been otherwise agreed upon with C&A, but the maximum allowable term of payment under the agreement between C&A and GECC was 60 days.  Once an invoice was 60 days "past due," it was automatically excluded from the borrowing base.  Thus, theoretically, the maximum amount of time an unpaid receivable could remain in the borrowing base was 120 days – 60 days to take into account the time within which the OEM was supposed to pay C&A and 60 days in "past due" status.

53.   Each day, under its agreement with GECC, C&A was required to send a report to GECC which updated GECC on the status of the borrowing base.  Among other information, this

daily report included a calculation of the level of eligible
receivables. The daily report also stated whether C&A could
borrow more money from GECC - where the size of the borrowing
base had increased - or whether C&A had to make a payment to GECC
- because the level of the borrowing base had decreased. These
reports were signed by employees from the Treasury Department,
who certified to the accuracy of each day's report. C&A was
allowed a grace period of two days to report the borrowing base
calculation to GECC, and it typically took C&A the full two days
to prepare the report, given the amount of information that
needed to be gathered and the calculations that needed to be
done. Thus, the report prepared each day, although it reflected
the "events" of two business days earlier, either required an
immediate payment to GECC or allowed an immediate increase in the
amount of money that C&A could borrow from GECC. Typically, at
STOCKMAN's direction, C&A's Treasury Department sought to borrow
the maximum amount supported by the pool of eligible receivables
each day because of the low cost of financing under the GECC
agreement.

        54. From at least in or about early January 2005,
STOCKMAN and other employees knew that C&A faced a severe
liquidity crisis. At STOCKMAN's direction, C&A delayed paying
its bills as long as possible, and many of C&A's suppliers were
being paid only when they threatened to stop supplying C&A with

goods.  Although the amount borrowed from JPMC on the revolving
credit facilities fluctuated, starting in January 2005, C&A was
beginning to fully draw on its revolving credit facilities, which
essentially meant that C&A had run out of credit.

### The Scheme To Defraud GECC

55.  Starting in or about January 2005, STOCKMAN and
his co-conspirators engaged in a scheme to defraud GECC.  On or
about January 6, 2005, C&A's Treasury Department prepared a daily
report for GECC which revealed that C&A had to make an immediate
payment to GECC of approximately $21.8 million.  Employees in
C&A's Treasury Department realized that C&A did not have
sufficient liquidity to make the payment to GECC.  Thus, C&A was
in default of its obligations under the GECC facility if it did
not make the payment.  STOCKMAN was immediately informed of both
the need for an immediate payment to GECC and the fact that C&A
could not make the payment.  With STOCKMAN's knowledge and
approval, employees from the Treasury Department intentionally
misled GECC about the status of the daily report and the
approximate $21.8 million payment.  First, with STOCKMAN's
knowledge and approval, C&A employees failed to disclose to GECC
that C&A owed GECC approximately $21.8 million and that C&A could
not afford to make that payment.  Second, using a computer
systems error that prevented C&A from generating a complete
borrowing base report as an excuse, C&A employees delayed

28

providing daily reports due to GECC on January 6 and January 7, 2005.

56.  With STOCKMAN's knowledge and approval, in response to this crisis, C&A employees began trying to find receivables that could be invoiced, and thus, used to increase the level of the borrowing base by the next business day, Monday, January 10, 2005.  With STOCKMAN's knowledge and approval, C&A employees manually invoiced millions of dollars worth of receivables over the weekend for the sole purpose of inflating the borrowing base and misleading GECC about the default that had already occurred.  Since C&A's customers had not yet agreed to pay many of the receivables invoiced over the weekend, these receivables were not eligible to be included in the borrowing base.  STOCKMAN and other C&A employees thus improperly inflated the borrowing base by invoicing ineligible receivables.

57.  The following Monday, with STOCKMAN's knowledge and approval, employees of the Treasury Department prepared and submitted a daily report to GECC that failed to disclose the fact that C&A had created invoices for receivables that C&A's customers had not yet agreed to pay for the sole purpose of improperly inflating the borrowing base and avoiding the full approximately $21.8 million payment to GECC.  In addition, C&A failed to disclose the fact that C&A had been in default of its agreement with GECC.  Including the improperly invoiced

29

receivables, the amount due to GECC was brought down to approximately $11.8 million, which by then C&A could manage to pay.

58.  As a result of the early January 2005 crisis, during the first and second quarters of 2005, STOCKMAN reviewed C&A's liquidity situation on a daily basis.  Each day, STOCKMAN personally decided which of C&A's suppliers and creditors would get paid, and STOCKMAN personally managed all of C&A's liquidity.

59.  After the early January 2005 scheme, STOCKMAN and others continued to defraud GECC by intentionally including ineligible receivables in the borrowing base of the accounts receivable securitization facility to obtain cash and increase liquidity.  The majority of these ineligible receivables were invoices to OEMs for equipment, or "tooling," used to make auto parts.  Under C&A's agreement with GECC, as with any other receivable, invoices for such equipment could only be included in the borrowing base if the customer had agreed to make payment. In the automotive industry, OEMs agree to make payments on tooling in two ways: they either certify that the equipment is performing to specifications, through the Production Part Approval Process, or "PPAP," or an OEM can expressly agree to be billed for tooling in advance of that approval.  Although target dates for completion of PPAP are often set, typically, the OEM agrees to pay for tooling only once PPAP is completed and the OEM

30

has certified that C&A's production line makes parts properly. Thus, as STOCKMAN and his co-conspirators well knew, a target date for PPAP was no guarantee of OEM approval, and OEMs generally only agreed to make payment on tooling once PPAP had been completed.

60.    At STOCKMAN's direction, in or about January 2005, C&A began putting such invoices for tooling in the borrowing base prior to achieving PPAP and without customer agreement based on a calculated guess as to when C&A might expect to achieve PPAP and thus be eligible to get paid by the OEMs. At STOCKMAN's initiative, invoices for tooling were created and loaded into the system that calculated the GECC borrowing base 60 days prior to the PPAP target date. At the time these tooling invoices were created, STOCKMAN and others knew that there was no customer agreement to pay the invoices, and thus they were ineligible receivables under C&A's agreement with GECC. These invoices were created and entered into the system for the sole purpose of improperly inflating the GECC borrowing base, thus generating cash and liquidity for C&A.

61.    Between in or about January 2005 and in or about April 2005, C&A added a total of well over $100 million in ineligible receivables to the borrowing base. In many cases, the resulting invoice was not immediately sent to the OEM because STOCKMAN and others knew that it would not be paid. In order to

31

avoid bankruptcy and stay solvent, C&A borrowed from GECC against these fraudulent invoices in order to pay its bills throughout the first months of 2005.

## FALSE STATEMENTS TO INVESTORS IN 2005

### C&A's Rebate Fraud Comes To Light

62.   Beginning in or about November 2004, C&A's outside auditors at KPMG raised questions about supplier rebates generally and about some of the specific rebates fraudulently booked early at STOCKMAN's and COSGROVE's direction.  KPMG ultimately requested more documentation for supplier rebates negotiated by C&A.  As a result of this request and other events, STOCKMAN knew that C&A's practice of soliciting false side letters in regard to rebate transactions would likely be disclosed to KPMG and to C&A's Board of Directors.  Therefore, in March 2005, STOCKMAN reluctantly agreed to conduct an investigation of C&A's rebate accounting.  STOCKMAN sought, however, to take control of the investigation in order to minimize its scope and control its conclusions.  STOCKMAN also wanted to hide his own and other senior C&A management's involvement in the fraudulent scheme.

63.   For example, STOCKMAN, COSGROVE, and the other members of C&A's senior management limited the number of rebates examined and refused to restate certain improperly booked rebates.  STOCKMAN thereafter prepared conclusions of the

32

investigation's findings, which were presented to C&A's outside auditors with COSGROVE's knowledge, that minimized the financial impact of the rebate accounting errors and falsely characterized the source of the rebate accounting errors as "separation of duties," rather than the intentional fraud that it was, as evidenced by the pattern of false side letters.

64.    On March 17, 2005, C&A issued a press release announcing lagging 2004 financial results and disclosing the existence of an internal investigation into improper accounting for supplier rebates.  On the same date, STOCKMAN also participated in a public earnings call, for which he provided written slides to the investing public and analysts.  To mitigate the negative impact of these announcements, STOCKMAN presented false and misleading information concerning the internal investigation into the supplier rebates.

65.    On March 17, 2005, in the slides accompanying the public earnings call, in the press release, and on the earnings call itself, STOCKMAN sought to reassure investors and the public concerning the rebate issue.  STOCKMAN disclosed that as a result of a "comprehensive internal review" of more than "350 supplier rebate entries ... for 12 quarter period (2002-2004)" led by STOCKMAN, C&A would likely have to issue restated financial statements for 2003 and the first three quarters of 2004.

66.    STOCKMAN's description of the internal

33

investigation of the improper accounting for supplier rebates in the March 17, 2005 press release was intended to mislead investors and the public by minimizing the size of the restatement of C&A's financial statements, and exaggerating the degree to which management had explored, quantified, and rectified the rebate situation. First, the press release asserted that the internal investigation reviewed 2002 rebates, but did not indicate that any restatement was necessary. However, no meaningful review of 2002 rebates was conducted, and 2002 rebates, including those negotiated with Joan Fabrics and a $900,000 rebate from a steel supplier, were not restated even though STOCKMAN knew they were clearly accounted for improperly. Thus, the figures included in the press release regarding the proposed amount to be restated did not accurately reflect the true income earned for prior periods.

67. Second, the press release understated the degree to which previous financial statements needed to be restated based on 2003 and 2004 rebates, because the internal investigation upon which the press release was designed to justify C&A's previous accounting, rather than account for the rebates properly.

68. Finally and most importantly, the press release attributed the improper accounting to a failure of "controls" and "procedures" and to "other circumstances." This description was

34

intended to give the impression that the improper accounting was
inadvertent and at worst the result of negligence.  As described
above, however, the truth was that the improper accounting was
intentional and the result of a concerted scheme by STOCKMAN,
STEPP, COSGROVE, BARNABA, and other C&A employees.

69.  These misstatements were material in that they
falsely suggested to the public, investors and C&A's outside
auditors that the improper accounting for rebates was minor in
scope and impact and did not involve intentional misconduct by
senior management.  STOCKMAN personally crafted these disclosures
with the intent of misleading the public about his role and the
impact of the rebate fraud.

### Other Misleading Disclosures In 2005

### March 17, 2005 Earnings Call

70.  On March 17, 2005, the same day the press release
was issued, STOCKMAN presided over an earnings call with
investors and securities analysts.  STOCKMAN personally drafted
the slides used on that call, presented the slides, and took
questions.  During the call he made at least three material
misstatements or omissions regarding C&A's results of operations
and financial condition.  Part of the information routinely
provided by STOCKMAN and others to members of the investing
public was so-called "guidance" concerning C&A's operational and
financial results for upcoming reporting periods.  The "guidance"

provided by STOCKMAN and others concerned various measures of C&A's operational and financial performance, including its EBITDA, net income, operating income, and capital expenditures. STOCKMAN knew that securities analysts, ratings agencies, and investors relied on the "guidance" provided by STOCKMAN and others and their public statements in general concerning C&A's predicted performance in the automobile parts supply industry to gauge C&A's performance, to predict C&A's expected earnings, and to disseminate estimates of C&A's expected performance to the larger investing public.

71.  First, merely two weeks before the end of C&A's first quarter, STOCKMAN provided a forecast for EBITDA for the first quarter of 2005 that he knew would not be attained.  He stated that EBITDA would be between $65-75 million for the first quarter of 2005, even though the most current financial information for the company, including the actual results for January and February, showed that EBITDA for the first quarter would only be roughly half that figure.  Moreover, STOCKMAN represented that his projection did not assume that C&A would be able to obtain cost concessions from its customers, the OEMs, when in fact his forecast included millions of dollars of such assumed recoveries.

72.  Second, during the presentation STOCKMAN highlighted a slide representing that capital expenditures in

2005 would be limited to $30 million quarterly as a sign that C&A
was conserving cash.  This statement was misleading because
STOCKMAN knew that his projections showed that C&A would spend
more than $50 million in the first quarter of 2005 and knew that
C&A had actually already spent more than $30 million in capital
expenditures during January and February 2005.  This
misrepresentation was material because, among other reasons,
STOCKMAN emphasized this limitation on capital expenditures to
reassure investors and the public that C&A was preserving cash
and holding down its costs.

          73.  At the time of the March 17, 2005 press release,
C&A had virtually no liquidity, with only about $4 million
available to it from its revolving credit facilities and a
growing payables backlog.  STOCKMAN was personally managing C&A's
cash on a daily basis and was well aware that C&A was unable to
pay its bills on time, did not pay some bills at all, and did not
have sufficient liquidity to meet the needs of a company its
size.  To hide this fact, and to falsely reassure the public
about C&A's liquidity situation, STOCKMAN purposely omitted from
the March 17, 2005 press release any liquidity figures for 2005,
but instead chose to disclose C&A's liquidity as of December 31,
2004.  STOCKMAN knew that C&A was suffering an unprecedented
liquidity crisis, and that the failure to disclose current

liquidity information, given this crisis, made the press release materially misleading.

74.    While the press release did provide a liquidity figure for December 31, 2004, this disclosure was itself materially misleading.  In discussing C&A's liquidity, the press release reported that C&A had undrawn commitments of $86 million on that date, but failed to disclose that C&A was unable to actually borrow such an amount without breaching the leverage covenant in C&A's Credit Facilities agreements because it had reached its maximum permissible debt given its earnings. Instead, only about $12 million of that $86 million was actually available to C&A as of December 31, 2004.  The failure to disclose what C&A could actually use of the $86 million reported liquidity was intentional.  STOCKMAN understood the impact of covenants on liquidity availability and that C&A, when it made public liquidity figures, had always disclosed what was available, not just the gross liquidity figure.

75.    Finally, when asked during the March 17, 2005 earnings call, "intra quarter are you tapping out your liquidity?" STOCKMAN answered "no."  Given that C&A did not have enough liquidity at this time to pay its bills, this statement was a lie designed to hide the fact, well known to STOCKMAN, that C&A was suffering a major liquidity crisis.

**March 23, 2005 bond presentation**

76.   On March 23, 2005, C&A made a presentation to MacKay Shields, holders of C&A's bonds.  STOCKMAN presented the same slides he had used during the March 17, 2005 earnings call, which contained the material misrepresentations regarding EBITDA and capital expenditures described above.  In addition, STOCKMAN sought to assure the MacKay Shields investors that C&A had sufficient liquidity to meet its needs, when he knew that it did not.

**March 24, 2005 presentation to C&A's lenders**

77.   On March 24, 2005, STOCKMAN presided over a conference call with JP Morgan Chase and Credit Suisse (formerly known as Credit Suisse First Boston), among others, for the purpose of securing a waiver of compliance with C&A's financial covenants in its credit agreements.  STOCKMAN personally reviewed the slides and materials used on that call, presented the slides, and took questions.  During the call he made at least three material misstatements or omissions regarding C&A's results of operations and financial condition.

78.  First, now merely one week before the end of C&A's first quarter, STOCKMAN provided a forecast for EBITDA for the first quarter of 2005 that he knew would not be attained.  He stated that EBITDA would be $65.3 million for the first quarter of 2005, even though he knew that the most current financial

39

information for the company, including the actual results for
January and February, showed that EBITDA for the first quarter
would only be roughly half that figure.  Moreover, STOCKMAN again
falsely represented that his projection did not assume that C&A
would be able to obtain cost concessions from the OEMs and
STOCKMAN added that his projection for the first quarter of 2005
included a "contingency allowance" of $13 million, which was
supposed to provide a "cushion for volume shortfalls or unplanned
operating variances."  In fact, STOCKMAN knew that C&A would need
cost concessions from the OEMs to meet the targeted EBITDA, and
that with one week left in the quarter, C&A would neither get the
necessary cost concessions from the OEMs nor meet the target he
had stated.

        79.  Second, STOCKMAN represented that capital
expenditures would be $24 million for the first quarter of 2005,
when he knew that C&A had already exceeded $30 million in
expenditures for the quarter and was projected to spend over $50
million in the quarter.  This misrepresentation was material
because, among other reasons, STOCKMAN emphasized this limitation
on capital expenditures to reassure C&A's creditors that C&A was
preserving cash and holding down its costs.

        80.  To continue to hide the liquidity problems at C&A,
and to falsely reassure the banks about its liquidity situation,
STOCKMAN purposely omitted any liquidity figures from 2005 from

this presentation, but instead chose to disclose C&A's liquidity as of December 31, 2004. STOCKMAN knew that C&A was suffering a liquidity crisis, and that the failure to disclose current liquidity information, given this crisis, made the presentation materially misleading.

## March 24, 2005 Press Release

81.  On or about March 24, 2005, C&A announced that the audit committee had retained independent counsel to conduct a review of the rebate accounting related to supplier rebates. In this press release, with STOCKMAN's knowledge and approval, C&A repeated its earlier disclosures concerning the scope of the rebate accounting problem, with the intent of minimizing investors' concerns about the size of the restatement to C&A's financial statements.

## April 3, 2005 Due Diligence Presentation to Credit Suisse

82.  In or about early April 2005, desperate for cash, STOCKMAN and others sought additional financing from Credit Suisse. In connection with that request, STOCKMAN participated in an April 3, 2005 conference call with Credit Suisse to answer questions about C&A. During the call, STOCKMAN reiterated many of the same false statements he had made on the March 17, 2005 and March 24, 2005 calls described above.

83.  First, STOCKMAN misled the lenders concerning liquidity at C&A. STOCKMAN stated in this call that he believed

41

that C&A currently had approximately $110 million in liquidity
when STOCKMAN knew that C&A's revolving credit facilities were
fully drawn prior to April 3, 2005 and C&A had no other
substantial source of liquidity available at that time.  STOCKMAN
also told CSFB and other lenders that C&A had approximately $80-
85 million in liquidity as of March 31, 2005.  This statement was
false because C&A did not have $80-85 million in available
liquidity on March 31, 2005, as this figure did not take into
account covenant restrictions.  Despite having recently obtained
the leeway to assume more debt and still be in compliance with
the financial covenants under its Credit Facilities, C&A was
again at the debt ceiling given its level of earnings, and
therefore could not engage in any additional borrowing without
violating the new covenant.  As a result, C&A had only
approximately $8.6 million of available liquidity on March 31,
2005 when covenant restrictions were taken into account.

          84.  Second, STOCKMAN misled the lenders concerning
C&A's EBITDA and capital expenditures for the first quarter of
2005.  In the April 3, 2005 call, STOCKMAN reiterated the same
projections he had made in the March 17 and March 24, 2005
presentations, and stated in substance that there had been no
material changes to his forecast.  In fact, STOCKMAN had reviewed
current EBITDA calculations at the end of March 2005, which still
showed that C&A would miss the projected EBITDA target by a wide

                              42

margin and STOCKMAN knew that C&A had not yet received any of the hoped for recoveries from the OEMs, which were integral to his achieving his forecast for the first quarter.

85. After the April 3, 2005 due diligence call, CSFB agreed to lend C&A an additional $75 million in financing, which C&A received on or about April 8, 2005.

### April 4, 2005 press release

86. On April 4, 2005, C&A issued a press release stating that it had a commitment from Credit Suisse to obtain $75 million in financing. That press release stated that "the Company's available liquidity (cash and unutilized commitments under revolving credit and account receivables facilities) was approximately $81 million at March 31, 2005, as compared with approximately $86 million at December 31, 2004." This disclosure was false and misleading for several reasons.

87. First, as discussed above, C&A did not have $86 million in available liquidity on December 31, 2004. Because of covenant restrictions, C&A had no more than about $12 million in available liquidity on that date. Second, as discussed above, C&A did not have $81 million in available liquidity on March 31, 2005, because this figure also did not take into account covenant restrictions. As a result, C&A had only less than $9 million of available liquidity on March 31, 2005 when covenant restrictions were taken into account. In reviewing the press release,

43

STOCKMAN knew the impact of covenants on liquidity availability and that C&A, when it publicly disclosed liquidity figures, had always disclosed what was available, not just the gross liquidity figure.

88. Third, the $81 million figure, even if all of it had been available, would still have been materially misleading in that the press release did not disclose that this level of liquidity had only been attained by the scheme to defraud GECC. STOCKMAN knew that the liquidity number was false and misleading because he knew it was created by fraudulently inflating the GECC borrowing base.

## April 22, 2005 Presentation to GECC

89. On or about April 22, 2005, STOCKMAN and others participated in a conference call with employees of GECC. In addition to the credit that GECC provided to C&A through the accounts receivable securitization facility, GECC also provided substantial off-balance sheet financing to C&A. Thus, the primary purpose of the conference call was to discuss C&A's financial condition, as GECC was concerned about, among other things, the March 2005 disclosures regarding the investigation into accounting related to supplier rebates and about the liquidity situation at C&A. During this conference call, STOCKMAN used the same slides from his March 17, 2005 presentation, and thus repeated the same false statements

44

described above concerning first quarter 2005 EBITDA and capital expenditures. Although STOCKMAN indicated in substance that C&A might have some difficulty making the first quarter 2005 EBITDA, which the slides indicated would be between $65 million and $75 million, STOCKMAN sought to reassure GECC that 2005 EBITDA would be higher than 2004 levels, and was budgeted at $360 million for the year, which he indicated included a substantial cushion for unexpected events. STOCKMAN knew these statements were false because the first quarter had already ended with EBITDA at well below STOCKMAN's projections. Moreover, by April 22, 2005, STOCKMAN had not yet secured contractual commitments from the OEMs to provide C&A with the relief it needed to stay afloat.

90. At the time of the conference call, STOCKMAN told GECC in substance that C&A had improved its liquidity position from January 2005, despite knowing that C&A had already spent nearly all of the $75 million in additional financing obtained from Credit Suisse in early April. Finally, although the Audit Committee's independent investigation into the rebate accounting issue was ongoing, STOCKMAN repeated his earlier misleading statements concerning the limited scope of the rebate accounting problem, noting that 90% of the rebate transactions were properly booked.

45

## FALSE STATEMENTS AND MISLEADING OMISSIONS
## IN C&A'S SEC FILINGS

91.   As a result of the public listing of its
securities, at all relevant times C&A was required by federal
securities laws to make certain filings with the United States
Securities and Exchange Commission ("SEC") and to maintain
certain books and records.  In particular, applicable securities
statutes and regulations required C&A to, among other things, (a)
file with the SEC annual financial statements audited by an
independent accountant; (b) file with the SEC quarterly updates
of its financial statements that disclosed its financial
condition and the results of its business operations for each
three-month period; (c) devise and maintain a system of internal
accounting controls sufficient to provide reasonable assurances
that the company's transactions were recorded as necessary to
permit preparation of financial statements in conformity with
Generally Accepted Accounting Principles and other applicable
criteria; and (d) make and keep books, records, and accounts that
accurately and fairly reflected the company's business
transactions.

92.   The quarterly and annual reports filed by C&A for
the fourth quarter of 2001 through the third quarter of 2004
included financial statements that reflected the above-described
fraudulent adjustments to C&A's expenses and revenue.

46

93. By directing these adjustments to be made, and falsely concealing the adjustments from the C&A's auditors, STOCKMAN, STEPP, COSGROVE, BARNABA, and their co-conspirators disguised C&A's true operating performance and financial condition from the investing public. As a result, STOCKMAN, STEPP, COSGROVE, BARNABA, and their co-conspirators caused C&A to report financial results, which, as STOCKMAN, STEPP, COSGROVE, BARNABA, and their co-conspirators knew, exceeded by material amounts C&A's actual financial results in each reporting period.

## THE CONSPIRACY

94. From in or about December 2001 through in or about May 2005, in the Southern District of New York and elsewhere, DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL C. BARNABA, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely (a) to commit fraud in connection with the purchase and sale of securities issued by C&A, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) to make and cause to be made false and misleading statements of material fact in applications, reports, and documents required to be filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder, in

47

violation of Title 15, United States Code, Sections 78m(a) and 78ff; (c) to falsify books, records, and accounts of C&A, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1; (d) to make false and materially misleading statements to C&A's auditors, in violation of Title 17, Code of Federal Regulations, Section 240.13b2-2 and Title 15, United States Code, Section 78ff; (d) to commit bank fraud, in violation of Title 18, United States Code, Section 1344; (e) to commit wire fraud, in violation of Title 18, United States Code, Section 1343; and (f) to obstruct an agency proceeding, in violation of Title 18, United States Code, Section 1505.

## Objects Of The Conspiracy

### Fraud In Connection With The
### Purchase And Sale Of Securities

95.    It was a part and an object of the conspiracy that DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL C. BARNABA, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities issued by C&A, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices,

48

schemes, and artifices to defraud; (b) making and causing C&A to make untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon the purchasers and sellers of C&A securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

## False Statements In Annual And Quarterly SEC Reports

96.     It was further a part and an object of the conspiracy that DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL C. BARNABA, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, in applications, reports, and documents required to be filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder, would and did make and cause to be made statements that were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78m(a) and 78ff.

## False Books And Records

97.     It was further a part and an object of the conspiracy that DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL C. BARNABA, the defendants, and others known and unknown, unlawfully, willfully, and knowingly would and did,

directly and indirectly, falsify and cause to be falsified books, records, and accounts subject to Section 13(b)(2) of the Securities Exchange Act of 1934, namely books, records, and accounts of C&A, an issuer with a class of securities registered pursuant to the Securities Exchange Act of 1934, which C&A was required to make and keep, accurately and fairly reflecting, in reasonable detail, the transactions and dispositions of the assets of C&A, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1.

<u>Lying To The Auditors</u>

98.  It was further a part and an object of the conspiracy that DAVID A. STOCKMAN, J. MICHAEL STEPP, and DAVID R. COSGROVE, the defendants, being directors and officers of C&A, an issuer with a class of securities registered pursuant to Section 12 of the Act, and others known and unknown, unlawfully, willfully, and knowingly, would and did, directly and indirectly (a) make and cause to be made materially false and misleading statements; and (b) omit to state, and cause other persons to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which such statements were made, not misleading to accountants in connection with (i) audits and examinations of the Financial Statements of C&A; and (ii) the preparation and filing of

documents and reports, required to be filed with the SEC pursuant
to rules and regulations enacted by the SEC, in violation of
Title 17, Code of Federal Regulations, Section 240.13b2-2 and
Title 15, United States Code, Section 78ff.

<u>Bank Fraud</u>

99. It was a part and an object of the conspiracy that
DAVID A. STOCKMAN, the defendant, and others known and unknown,
unlawfully, willfully, and knowingly would and did execute and
attempt to execute a scheme and artifice to defraud financial
institutions, the deposits of which were then insured by the
Federal Deposit Insurance Corporation, and to obtain moneys,
funds, credits, assets, securities, and other property owned by,
and under the custody and control of said financial institutions,
by means of false and fraudulent pretenses, representations, and
promises, in violation of Title 18, United States Code, Section
1344.

<u>Wire Fraud</u>

100. It was a part and an object of the conspiracy
that DAVID A. STOCKMAN, the defendant, and others known and
unknown, unlawfully, willfully and knowingly, having devised and
intending to devise a scheme and artifice to defraud, and for
obtaining money and property by means of false and fraudulent
pretenses, representations and promises, would and did transmit
and cause to be transmitted by means of wire communication in

51

interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Obstruction Of Agency Proceeding

101.  It was further a part and an object of the conspiracy that DAVID A. STOCKMAN and J. MICHAEL STEPP, the defendants, unlawfully, willfully and knowingly would and did corruptly influence, obstruct, and impede and endeavor to influence, obstruct, and impede the due and proper administration of the law under which any pending proceeding was being had before a department and agency of the United States, to wit, the United States Securities and Exchange Commission, in violation of Title 18, United States Code, Section 1505.

### Means And Methods Of The Conspiracy

102.  Among the means and methods by which DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL C. BARNABA, and others would and did carry out the conspiracy were the following:

a.    STOCKMAN and STEPP negotiated "rebates" with Joan Fabrics that were in fact loans, and used the "rebates" to improperly recognize cost reductions, thereby causing, among other things, figures for C&A's publicly reported EPS, EBITDA and net income to be false and materially misleading.

52

b.    With STEPP's knowledge and approval, STOCKMAN, COSGROVE, and BARNABA directed members of C&A's Purchasing Department to solicit false side letters in connection with certain supplier "rebate" transactions, in order to improperly recognize, or accelerate the recognition, of cost reductions, thereby causing, among other things, figures for C&A's publicly reported EPS, EBITDA, revenue growth rate, and net income to be false and materially misleading.

c.    STOCKMAN, STEPP, COSGROVE, BARNABA and their co-conspirators caused C&A to file publicly with the SEC quarterly and annual reports that materially misstated, among other things, figures for C&A's EPS and net income.

d.    STOCKMAN and STEPP provided and directed others to provide false and misleading financial information to the investing public and analysts.

e.    STOCKMAN provided and directed others to provide false and misleading financial information to financial institutions and investment banks.

53

## Overt Acts

103.    In furtherance of the conspiracy and to effect its illegal objects, DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, PAUL C. BARNABA, and others committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. In or about 2002, STEPP solicited a rebate payment from the Joan CEO.

b. In or about 2002, STOCKMAN promised to repay a rebate received from the Joan CEO.

c. In or about May 2003, STOCKMAN, with STEPP's knowledge and approval, directed employees of the Purchasing Department to negotiate "rebates" with C&A's suppliers, in return for promises of future business.

d.  In or about Summer 2003, STOCKMAN and STEPP approved an improper "pull ahead" rebate transaction.

e.  In or about 2003, COSGROVE edited false documents in connection with rebate transactions.

f.  In or about 2003, BARNABA obtained approval from COSGROVE to create false documents in connection with rebate transactions.

g.  In or about 2004, BARNABA advised another employee to solicit false documents in connection with capital rebate transactions.

h.    In or about 2004, COSGROVE drafted false contract language for BARNABA and others to use in connection with capital rebate transactions.

i.    On or about March 16, 2004, STOCKMAN and STEPP signed C&A's Annual Report on Form 10-K for the Year Ending December 31, 2003.

j.    In or about August 2004, STOCKMAN and STEPP gave false and misleading information to bond investors.

k.    In or about January 2005, STOCKMAN directed that C&A mislead GECC concerning the accounts receivable securitization facility.

l.    On or about March 17, 2005, STOCKMAN provided false and misleading financial information to securities analysts and the investing public.

m.    On or about March 24, 2005, STOCKMAN provided false and misleading financial information to its lenders.

n.    On or about April 22, 2005, STOCKMAN provided false and misleading financial information to GECC.

(Title 18, United States Code, Section 371.)

## COUNT TWO

## (Securities Fraud)

The Grand Jury further charges:

104. The allegations contained in paragraphs 1 through 93 and paragraphs 102 and 103 of this Indictment are repeated and realleged as if fully set forth herein.

105. From in or about December 2001 up to and including in or about May 2005, in the Southern District of New York and elsewhere, DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL C. BARNABA, the defendants, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, in connection with the purchase and sale of the common stock of C&A, used and employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers of the common stock of C&A.

56

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2.)

## COUNT THREE

### (Securities Fraud)

The Grand Jury further charges:

106.   The allegations contained in paragraphs 1 through 93 and paragraphs 102 and 103 of this Indictment are repeated and realleged as if fully set forth herein.

107.   From in or about December 2001 up to and including in or about May 2005, in the Southern District of New York and elsewhere, DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL C. BARNABA, the defendants, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, in connection with the purchase and sale of the 10.75% Senior Subordinated Notes, due 2011, of C&A, used and employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of

57

business which operated and would operate as a fraud and deceit upon purchasers and sellers of the 10.75% Senior Subordinated Notes, due 2011, of C&A.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2.)

## COUNT FOUR

### (Securities Fraud)

The Grand Jury further charges:

108. The allegations contained in paragraphs 1 through 93 and paragraphs 102 and 103 of this Indictment are repeated and realleged as if fully set forth herein.

109. From in or about December 2001 up to and including in or about May 2005, in the Southern District of New York and elsewhere, DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL C. BARNABA, the defendants, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, in connection with the purchase and sale of 12.875% Senior Subordinated Notes, due 2012, of C&A, used and employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state

58

material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers of 12.875% Senior Subordinated Notes, due 2012, of C&A.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.)

## <u>COUNT FIVE</u>

### (Bank Fraud)

The Grand Jury further charges:

110. The allegations contained in paragraphs 1 through 93 and paragraphs 102 and 103 of this Indictment are repeated and realleged as if fully set forth herein.

111. From in or about January 2005 through in or about May 2005, in the Southern District of New York and elsewhere, DAVID A. STOCKMAN, the defendant, unlawfully, willfully, and knowingly did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Company, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of said financial institution, by means of false and fraudulent

pretenses, representations, and promises, to wit, a scheme to defraud General Electric Capital Corporation.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT SIX

### (Bank Fraud)

The Grand Jury further charges:

112.  The allegations contained in paragraphs 1 through 93 and paragraphs 102 and 103 of this Indictment are repeated and realleged as if fully set forth herein.

113.  From in or about February 2005 through in or about May 2005, in the Southern District of New York and elsewhere, DAVID A. STOCKMAN, the defendant, unlawfully, willfully, and knowingly did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Company, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of said financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud JP Morgan Chase.

(Title 18, United States Code, Sections 1344 and 2.)

60

## COUNT SEVEN

### (Wire Fraud)

The Grand Jury further charges:

114.   The allegations contained in paragraphs 1 through 93 and paragraphs 102 and 103 of this Indictment are repeated and realleged as if fully set forth herein.

115.   From in or about March 2005 up to and including in or about April 2005, in the Southern District of New York and elsewhere, DAVID A. STOCKMAN, the defendant, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud Credit Suisse First Boston of $75 million, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, a writing, sign, signal, picture and sound for the purpose of executing such scheme and artifice, to wit, STOCKMAN made misleading and false statements during a due diligence conference telephone call on or about April 3, 2005 between participants in New York, New York and participants outside New York.

(Title 18, United States Code, Sections 1343 and 2.)

61

## COUNT EIGHT

### (Obstruction of Agency Proceeding)

The Grand Jury further charges:

116.  The allegations contained in paragraphs 1 through 93 and paragraphs 102 and 103 of this Indictment are repeated and realleged as if fully set forth herein.

117.  From at least in or about August 2003 up to and including at least in or about March 2004, in the Southern District of New York, DAVID A. STOCKMAN and J. MICHAEL STEPP, the defendants, unlawfully, willfully and knowingly, did corruptly influence, obstruct, and impede and endeavor to influence, obstruct, and impede the proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, to wit, the SEC, by causing to be provided false and misleading information to the SEC relating to the Joan Fabrics Scheme.

(Title 18, United States Code, Sections 1505 and 2.)

### FORFEITURE ALLEGATION

118.     As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 77x, 78j(b), 78o(d), and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.15d-2, as alleged in Counts One, Two, Three, and Four; wire fraud offenses, in violation of Title 18, United States Code,

Section 1343, as alleged in Counts One and Sixteen of this Indictment, DAVID A. STOCKMAN, the defendant, J. MICHAEL STEPP, the defendant (as to the acts alleged in Counts One, Two, Three and Four), DAVID COSGROVE, the defendant (as to acts alleged in Counts One, Two, Three, and Four), and PAUL BARNABA, the defendant, (as to acts alleged in Counts One, Two, Three, and Four), shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses.

119.    As a result of committing one or more of the foregoing bank fraud offenses, in violation of Title 18 United States Code, Section 1344, as alleged in Counts Fourteen and Fifteen of this Indictment, DAVID A. STOCKMAN, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, any property constituting or derived from the proceeds obtained directly or indirectly as a result of the bank fraud offenses and all property traceable to the commission of the bank fraud offenses.

120.    The property subject to forfeiture includes, but is not limited to the following:

63

a. At least $775 million in United States currency, representing the amount of proceeds obtained as a result of the charged bank fraud offenses.

b. At least $575 million in United States currency, representing the amount of proceeds obtained as a result of the charged securities and wire fraud offenses, for which the defendants are jointly and severally liable.

## SUBSTITUTE ASSETS PROVISION

121.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(i)  cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

(iii)  has been placed beyond the jurisdiction of the court;

(iv)  has been substantially diminished in value; or

(v)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18,

United States Code, Section 982 and Title 21, United States Code,

Section 853(p), to seek forfeiture of any other property of said

defendants up to the value of the forfeitable property described

above.

(Title 18, United States Code, Sections 371, 981, 982, 1343,
1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d),
78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5,
240.15d-2; Title 21, United States, Section 853(p); and Title 28,
United States Code, Section 2461.)


FOREPERSON

MICHAEL J. GARCIA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

- v -

**DAVID A. STOCKMAN,**
**J. MICHAEL STEPP,**
**DAVID A. COSGROVE, and**
**PAUL C. BARNABA**

**Defendants.**

## INDICTMENT

07 Cr.

Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2;
Title 18, United States Code, Section 371;
Title 18, United States Code, Section 1344;
Title 18, United States Code, Section 1343;
Title 18, United States Code, Section 1505.

_____  MICHAEL J. GARCIA
                            United States Attorney.

**A TRUE BILL**

_____
                            Foreperson.

HR 3/21/07   Indictment filed under seal. A/W issued for all defendants.
             — Francis, J.

# EXHIBIT B

JUDGE PRESKA

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE )
COMMISSION, )
       Plaintiff, )
)
  v. )
)
COLLINS & AIKMAN CORPORATION, )
DAVID A. STOCKMAN, J. MICHAEL STEPP, )
GERALD E. JONES, DAVID R. COSGROVE, )
ELKIN B. MCCALLUM, PAUL C. BARNABA, )
JOHN G. GALANTE,  CHRISTOPHER M. )
WILLIAMS,  and THOMAS V. GOUGHERTY, )
)
      Defendants. )

Civil Action No.



# 07 CV 2419

## COMPLAINT

The Securities and Exchange Commission ("SEC" or "Commission") alleges as

follows as to Collins & Aikman Corporation, David A. Stockman, J. Michael Stepp,

David R. Cosgrove, Elkin B. McCallum, Paul C. Barnaba, John G. Galante, Gerald E.

Jones, Christopher M. Williams, and Thomas V. Gougherty ("Defendants").

## NATURE OF THIS ACTION

1.  This action arises out of pervasive accounting fraud by Collins & Aikman

Corporation ("C&A") and several of its former officers and employees, including Chief

Executive Officer ("CEO") David A. Stockman ("Stockman").   For more than three years,

from the fourth quarter of 2001 until early 2005, C&A inflated its quarterly earnings by

improperly accounting for payments from suppliers.  Beginning in late 2001, C&A

entered into numerous improper "round-trip" transactions with Elkin B. McCallum

("McCallum"), a member of C&A's Board of Directors and a supplier to C&A.  C&A

treated more than $14 million in payments received from McCallum in 2001, 2002, and 2003 as indirect increases to C&A's income, when in fact C&A surreptitiously repaid McCallum for each such payment. These round-trip transactions should have had no impact on C&A's income statement. Beginning in 2002, C&A further inflated its quarterly earnings by improperly recognizing in income numerous rebates received from suppliers in return for anticipated future business and other benefits. In 2004 C&A extended this fraudulent rebate scheme to purchases of capital equipment, improperly recording discounts on equipment as rebates for past purchases of non-capital goods or services. Some of these rebates were recognized in income prematurely, while others should never have been recognized at all. As part of each of these schemes, C&A induced suppliers, including McCallum, to provide false or misleading documentation regarding the payments they made or promised to C&A. C&A then used these false documents to justify accounting for these payments contrary to generally accepted accounting principles ("GAAP"). C&A's materially inflated earnings figures were disclosed to the investing public in reports and registration statements filed with the Commission, in press releases, and in other public statements.

     2.     Stockman negotiated the round-trip transactions with McCallum and directed the rebate fraud. McCallum engaged in the round-trip transactions knowing they were intended to improperly inflate C&A's earnings and provided C&A with false documents to justify the improper accounting. Other C&A executives knowingly or recklessly played important roles in connection with the McCallum round-trip transactions or the supplier rebate scheme, or both, including J. Michael Stepp, who helped arrange the round-trip transactions with McCallum, knew about the rebate

scheme, and directed at least one of the improper rebate transactions; Gerald Jones, who

helped arrange the round-trip transactions with McCallum and participated in the

improper recognition of rebates in the second quarter of 2004; David R. Cosgrove, who

advised C&A purchasing employees on the language to be used in false documentation

regarding the rebates, knowing the documentation was being used to recognize the

rebates improperly; Paul C. Barnaba, who directed Purchasing Department personnel to

solicit side letters falsely describing the rebate terms, knowing the letters were being used

to recognize the rebates improperly; and Thomas V. Gougherty, who solicited false

documents and directed accounting personnel to recognize rebates, despite knowing that

key documents were falsified and that such recognition was not in conformance with

GAAP.

      3.     C&A improperly accounted for at least 132 supplier payment transactions.

This resulted in an aggregate overstatement of C&A's pre-tax operating income, as

reported in C&A's filings with the SEC, of over $43.6 in twelve quarters (the fourth

quarter of 2001 through the third quarter of 2004). Additionally, C&A improperly

included over $5.6 million in rebates in its earnings for the fourth quarter of 2004, which

C&A reported in its press release of March 17, 2005.

      4.     When C&A's accounting manipulations came under scrutiny in early

2005, C&A attempted to minimize the fraud and conceal the company's perilous financial

condition. During March and April, in two press releases, a conference call with

analysts, and a presentation to potential investors, C&A made materially false or

misleading representations regarding its liquidity situation, its financial outlook, and the

scope and impact of the rebate fraud. These materially false or misleading statements were designed in part to enable C&A to obtain additional financing.

5.    Stockman directed C&A's effort in March and April 2005 to minimize the rebate fraud and hide C&A's financial condition. Other C&A executives knowingly or recklessly contributed to this concealment, including David R. Cosgrove, who reviewed investor presentation materials in March 2005 and knew that they contained false information to be disseminated to the public; John G. Galante, who helped draft a March 17, 2005 press release knowing that it contained false information and also provided false information for inclusion in an April 4, 2005 press release; and Christopher M. Williams, who participated in a scheme, directed by Stockman, to generate false documents regarding the company's borrowing base and thereby inflate the company's liquidity figures, knowing these liquidity figures would be reported to the public. The materially false or misleading public statements in March 2005 enabled C&A to secure millions of dollars in additional financing. Soon after C&A obtained these funds, its true financial condition became known and C&A filed for bankruptcy.

6.    Stockman had major financial incentives to engage in the fraud. Stockman and his private equity firm Heartland Industrial Partners ("Heartland") had invested approximately $360 million in C&A and knew that they would lose that investment if C&A's financial condition became public. By fraudulently inflating C&A's earnings and cash flow figures, Stockman was able to conceal C&A's true financial condition, secure additional funding, and maintain the appearance of financial viability. Moreover, throughout this period Heartland collected millions of dollars in management fees and other payments from C&A. Heartland received approximately $45 million in

4

fees from C&A between 2001 and 2004, with approximately $22 million ultimately going to Stockman. The other individual defendants also benefited from the fraud because it enabled them to continue receiving salary payments from C&A or, in the case of McCallum, to continue profitable business dealings with C&A.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78(u)(e) and 78aa].

8.      Venue is proper in this district pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77v(b)] and Section 27 of the Exchange Act.

9.      Defendants used the means or instrumentalities of interstate commerce or the mails in connection with the transactions described in this Complaint.

## DEFENDANTS

10.      C&A, a Delaware corporation headquartered in Troy, Michigan, manufactures and assembles parts used in automobile production. C&A operates facilities throughout North America and has approximately 12,000 employees. Prior to May 2005, C&A's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was traded on the New York Stock Exchange. On May 17, 2005, C&A petitioned for Chapter 11 bankruptcy. On June 29, 2005, the Commission deregistered C&A's common stock and granted a New York Stock Exchange petition to delist C&A. C&A's fiscal year ends December 31st.

11.    David A. Stockman is a co-founder and partner in Heartland, which acquired a controlling interest in C&A in 2001. Stockman became a member of C&A's Board of Directors in 2001 and in August 2003 became C&A's CEO, remaining in that position until May 2005. Stockman resides in Greenwich, Connecticut.

12.    J. Michael Stepp ("Stepp") was C&A's Chief Financial Officer ("CFO") from 1995 to 1999. From 1999 to 2002 he was a consultant to C&A. He returned as C&A's CFO in January 2002 and remained in that position until he left C&A in October 2004. He served on C&A's board of directors from 2001 until April 2006. Stepp resides in Charlotte, North Carolina.

13.    Gerald E. Jones ("Jones") served as Chief Operating Officer and Executive Vice President of C&A's Fabrics Division from 2000 to the end of 2006. He resides in Bahama, North Carolina.

14.    David R. Cosgrove ("Cosgrove") was C&A's Vice President of Finance from February to August 2002, and Vice President for Financial Planning and Analysis from August 2002 until October 2004. In October 2004, Cosgrove became C&A's Corporate Controller, remaining in that position through May 2005. Cosgrove resides in Rochester, Michigan.

15.    Elkin B. McCallum, 62, resides in Tyngsboro, Massachusetts. McCallum owns Joan Fabrics, a supplier to C&A, and sold businesses to C&A during the relevant period. He was a significant shareholder in C&A during the relevant period and served on its Board of Directors from September 2001 until May 2004.

16.    Paul C. Barnaba ("Barnaba") was the Director of Financial Analysis for C&A's Purchasing Department from April 2002 until December 2004. In December

6

2004, Barnaba became a vice president and the Director of Purchasing for the Plastics Division.  Barnaba left C&A in April 2005.  He resides in Orion, Michigan.

17.    Thomas V. Gougherty ("Gougherty") was Controller of C&A's International Plastics Division from July 2003 until September 2004, when he became Vice President of Finance and CFO of C&A's Global Plastics Division.  He remained at C&A through at least May 2005.  Gougherty resides in Gosslie, Michigan.

18.    John G. Galante ("Galante") was C&A's Director of Strategic Planning from October 2002 to October 2004.  He was Treasurer from October 2004 until July 2005.  Galante resides in Frisco, Texas.

19.    Christopher M. Williams ("Williams") joined C&A in 2000 as Director of Commercial Management for its contracts with Ford Motor Company.  He was the Executive Vice President of the Business Development and Specialty Products groups from November 2004 through May 2005.  Williams left C&A in January 2006.  He resides in Troy, Michigan.

## FRAUDULENT ACCOUNTING FOR SUPPLIER PAYMENTS

20.    Heartland purchased a controlling interest in C&A in February 2001.  Later that year C&A began inflating its earnings by engaging in round-trip transactions with McCallum.  The next year C&A began immediately recognizing rebates (on purchases of raw materials) to which C&A was not then entitled.  By 2004, C&A was also improperly recording rebates on purchases of capital equipment.  These fraudulent schemes were designed in part to create the appearance that C&A's financial performance was improving under Stockman's direction.

A.     **Round-Trip Transactions With McCallum**

21.     The fraudulent accounting for supplier payments began in late 2001 when C&A sought $3 million from McCallum to increase C&A's income for the fourth quarter. Stepp told McCallum that the $3 million would be returned to him in 2002. McCallum agreed and transferred $3 million to C&A in January 2002. This round-trip transaction was essentially a loan arrangement and should not have had any impact on C&A's income. Nevertheless, C&A recognized $2.8 million of the $3 million as a reduction of operating costs for the fourth quarter of 2001, thus inflating its earnings for that quarter. In March 2002 Stockman and McCallum agreed that C&A would repay the loan by transferring equipment worth approximately $3 million to McCallum at no cost.

22.     Also in March 2002, Stockman agreed to buy one of McCallum's businesses (Southwest Laminates) for more than its actual value, in exchange for future "rebate" payments to C&A from another McCallum company (Joan Fabrics). C&A then purchased Southwest Laminates for $17 million, at least $7 million more than C&A estimated it was worth. In return, McCallum agreed that Joan's Fabrics would pay C&A almost $7 million in rebates that could be improperly recognized in income.

23.     At additional meetings in late 2002, Stockman offered to overpay for another McCallum business and for furniture looms McCallum owned, in return for additional payments from Joan Fabrics. McCallum agreed to these round-trip transactions, and C&A paid him $4.2 million for Dutton Yarns (which had been appraised at just above $2 million), and $4.7 million for furniture looms (worth about $2 million). McCallum and Joan Fabrics then made payments to C&A corresponding to the

inflated purchase prices, and provided documentation falsely characterizing the payments

as rebates on a supply contract between C&A and Joan Fabrics.

24.     In total, C&A recognized approximately $14.8 million in payments from

McCallum from 2001 through 2003.  All were round-trip transactions in which

McCallum made payments that C&A labeled as rebates but repaid indirectly.  C&A

accounted for these payments as reductions in costs, increasing its pre-tax operating

income (or reducing its pre-tax operating loss) as shown below, in millions:

|  | 2001 (4th Q) | 2002 (1st Q) | 2002 (2nd Q) | 2002 (3rd Q) | 2002 (4th Q) | 2003 (1st Q) |
|---|---|---|---|---|---|---|
| Operating income/ (loss) w/o McCallum payments | ($16.3) | $49.4 | $79.7 | ($6.3) | $34.1 | $18.0 |
| McCallum payments | $2.8 | $5.0 | $1.8 | $2.0 | $2.0 | $1.2 |
| Operating income (loss), as reported | ($13.5) | $54.4 | $81.5 | ($4.3) | $36.1 | $19.2 |
| % change due to McCallum payments | 17% | 10% | 2% | 32% | 6% | 7% |

25.     Stockman personally negotiated the round-trip transactions with

McCallum.  Stepp helped arrange and collect the payments from McCallum, while Jones

helped collect the payments from McCallum and assisted in the transactions through

which McCallum was repaid.  Stockman, McCallum, Stepp, and Jones knew, or were

reckless in not knowing, that the McCallum payments were actually improper round-trip

transactions intended to inflate C&A's earnings and that the false earnings figures would

materially affect C&A's financial statements and the reports and registration statements

C&A filed with the SEC.  Further, during an investigation by C&A's Audit Committee in

2003, Stockman, Stepp, McCallum and Jones continued to conceal the true nature of the McCallum transactions. McCallum made false statements to the Audit Committee and signed a false or misleading representation letter regarding his payments. Stockman, Stepp, and Jones made false statements to C&A's Audit Committee and provided the Audit Committee with false position papers regarding the transactions. Each knew, or was reckless in not knowing, that KPMG would rely of these false statements and documents in connection with its audit of C&A's financial statement for 2003.

**B.    Purchasing Rebates**

**(i)    Goods and Services**

26.    Supply contracts in the automotive industry frequently provide that suppliers will pay rebates to their customers in return for a specified volume or type of future business. Rebates are properly recorded by the customer as reductions in cost, which has the effect of increasing income. However, because the customer is not entitled to the rebate until the promised purchases have been made, immediate recognition of the entire rebate is inconsistent with GAAP.

27.    In early 2002 C&A began to further inflate its quarterly earnings by improperly recognizing rebates tied to the future purchases of goods and services. As part of this scheme, C&A's Purchasing Department arranged for suppliers to create false or misleading documents stating that the rebates were based on past purchases. The false documentation was held by C&A for use in the event auditors questioned its recognition of the rebate in income.

28.    One of the first fraudulent rebates C&A's Purchasing Department negotiated was from PPG Industries, Inc. ("PPG"), a paint supplier. In April 2002, PPG

10

agreed to pay C&A a rebate in exchange for a specified volume of new business. At the direction of C&A's finance department, Barnaba worked with the Purchasing Department to solicit a side letter from PPG falsely stating that the rebate was based on past purchases. This letter provided a pretext for C&A's immediate recognition of the full amount of the rebate ($500,000) in the second quarter of 2002. Barnaba knew that the purpose of obtaining the side letter was to allow C&A to account for the rebate improperly. The PPG side letter became the template used in preparing side letters for subsequent rebate transactions.

29.    C&A extended the rebate scheme to several other Plastics Division agreements during the remainder of 2002. C&A improperly recognized income based on rebate agreements with, among others, Brown Corporation ($900,000 rebate recognized in Q3 2002), Jackson Plastics, Inc. ($138,750 rebate recognized in Q3 2002), Flambeau Corporation ($235,000 rebate recognized in Q3 2002), ATC, Inc. ($123,470 rebate recognized in Q4 2002), Pine River Plastics, Inc. ($67,000 rebate recognized in Q4 2002), and (again) Jackson Plastics, Inc. ($46,250 rebate recognized in Q4 2002).

30.    By the first quarter of 2003 it was standard operating procedure for C&A's Purchasing Department to solicit false or misleading side letters in connection with agreements negotiated on behalf of the Plastics Division. Cosgrove, who was in charge of C&A's Financial Planning and Analysis Group, instructed the Purchasing Department to obtain the side letters and provided detailed language for these letters. Barnaba ensured that Purchasing Department employees obtained the side letters and that these letters provided an apparent justification for the improper accounting.

31.     Stockman played a hands-on role in C&A's day-to-day operations before

he became CEO in August 2003.  From at least the second quarter of 2003, Stockman

met with Purchasing Department employees at least quarterly and emphasized the

importance of negotiating supplier rebates.  He routinely identified the suppliers to target,

the size of the rebates to demand, and the incentives to offer.  Stockman directed that the

rebates be used to boost income in the current quarter even though he knew, or was

reckless in not knowing, that such recognition was improper because the rebate income

was contingent on future purchases from the suppliers.  One such meeting took place on

May 27, 2003, when Stockman spoke via conference call with purchasing officials from

all three C&A divisions.  During that call, Stockman directed C&A's purchasing officials

to increase income in the second quarter of 2003 by "pulling ahead" rebates that would

otherwise be properly recognized in future quarters.

32.     During the second quarter of 2003, C&A improperly recognized rebates

from, among others, Brown Corporation ($500,000), Dow ($400,000), and

Manufacturer's Products ($150,000).   C&A also recognized a $1.2 million rebate from

DuPont Textiles & Interiors ("DuPont") in the second quarter of 2003, even though this

was actually a short-term loan similar to the McCallum payments.  Both Stockman and

Stepp were directly involved in C&A's fraudulent accounting for the DuPont transaction.

33.     Stockman became CEO in August 2003 and continued to direct the rebate

scheme.  In the third quarter of 2003, Stockman was personally involved in negotiating a

$1.56 million rebate agreement with Exxon Mobil Corp. ("Exxon").  Stockman met with

Exxon representatives as part of the negotiations, was regularly briefed on the status of

the negotiations, and knew the terms of the final rebate agreement.  As finalized, the

supply contract with Exxon provided that the $1.56 million rebate was not due until the

next quarter (Q4 2003), was contingent on purchases by C&A in that next quarter, and

was to be partially refunded if C&A did not make additional purchases the following

year. Nevertheless, C&A improperly recognized the entire $1.56 million in income in the

third quarter of 2003. Stockman knew, or was reckless in not knowing, that it was

improper to immediately recognize rebates that were contingent on future purchases and

that accounting for the Exxon rebate in this way improperly inflated C&A's income.

34.    In late 2003 Stockman instructed C&A's Purchasing Department to obtain

a $1 million rebate from Flambeau Corporation ("Flambeau") by promising future

business. Cosgrove advised Stepp and C&A purchasing officials on how to prepare a

side letter to justify immediate recognition of the potential rebate. This letter was false or

misleading in that it stated that the Flambeau rebate was for past purchases. C&A

nevertheless improperly recognized the anticipated $1 million Flambeau rebate in the

third quarter of 2003. Cosgrove and Stepp, like Stockman, knew, or were reckless in not

knowing, that this immediate recognition was improper and designed to inflate C&A's

income.

35.    Similarly, in December 2003 C&A persuaded Reko International Group,

Inc. ("Reko") to provide a $250,000 rebate in exchange for a guarantee of future business.

Stockman determined what the terms of the rebate agreement would be and Galante

negotiated the agreement with Reko. Galante arranged for the rebate to be described in

one letter and the guarantee of future business to be expressed in a separate letter.

Cosgrove approved the use of the two letters, and Stockman and Stepp knew that Reko

was providing a side letter not referring to the future business contingency. C&A

13

recognized the anticipated $250,000 rebate during the fourth quarter of 2003 as if there were no contingency. Stockman, Stepp, Galante and Cosgrove knew, or were reckless in not knowing, that this recognition was improper and designed to inflate C&A's income.

36.    In June 2004, C&A negotiated a $1.5 million rebate from GE Advanced Materials ("GE") contingent on future purchases. At C&A's request, GE signed a side letter intended to hide the contingency. C&A then demanded and received a revised version of the side letter, in order to better hide the true terms of the agreement. Stockman knew that the anticipated GE rebate was contingent on future purchases and that C&A was nevertheless recognizing the rebate in the second quarter of 2004. The GE agreement eventually fell apart, C&A did not provide GE the promised business, and GE never paid the rebate. Nevertheless, C&A retained the previously recorded rebate on its books with Stockman's knowledge and approval.

37.    In mid-2004 Stockman drew the Fabrics Division into the rebate scheme. During a meeting in North Carolina in May 2004, Stockman directed the Fabrics Division to solicit rebates based on future business but paper the transactions to justify the immediate recognition. In the second quarter of 2004, the Fabrics Division improperly recognized a $200,000 rebate from Unifi, a $150,000 rebate from M. Dohmen, U.S.A., Inc., and a $49,000 rebate from Clariant Corporation, in each case obtaining fraudulent side letters. Stockman knew, or was reckless in not knowing, that these transactions were recognized improperly. Jones, the head of C&A's Fabrics Division, knew that employees in his division were carrying out Stockman's instructions and therefore knew, or was reckless in not knowing, that the rebates were accounted for improperly.

38.     At about the same time, C&A also expanded the rebate scheme to other products and services.  In June 2004, C&A negotiated a $150,000 rebate agreement with Allied Waste, contingent on future business.  Here too C&A solicited a side letter falsely tying the rebate to past business.  Although the Allied Waste agreement was executed in October 2004, C&A improperly recognized the rebate in income in the second quarter of 2004.  Stockman and Stepp knew the rebate was contingent on future business, and therefore knew, or were reckless in not knowing, that its immediate recognition was improper.

39.     During the second quarter of 2004 C&A also negotiated rebates for its European operations, including an agreement calling for LVM to provide a €350,000 rebate (approximately $430,000) when a new supply contract was signed.  The new contract was not signed until February 2005.  Gougherty, the Controller for C&A's International Plastics Division, nevertheless directed his subordinates to recognize improperly the anticipated LVM rebate in the second quarter of 2004.  Gougherty knew at that time that the new supply contract had not been signed and consequently knew, or was reckless in not knowing, that the rebate could not be recognized consistent with GAAP.

40.     C&A continued to improperly recognize rebates on future purchases of goods and services through the third quarter of 2004, the last quarter for which C&A filed a quarterly or annual report with the SEC.  This included rebates from Angell Manufacturing ($97,197), Exxon ($44,000), and Trim Stamping ($227,850).

41.     C&A never filed a report with the SEC reflecting the fourth quarter of 2004.  However, during the fourth quarter C&A continued to record rebates in income

15

improperly, including rebates from Aerotek ($40,000), Vichem ($75,000), and Meurdter ($69,000). The fraudulent accounting for these rebates was included in earnings figures released by C&A in March 2005.

42.     Stockman was aware of, approved, and directed the scheme to increase income by prematurely recognizing rebates on supply contracts. Stockman knew, or was reckless in not knowing, that C&A was not entitled to the rebates if it did not provide the promised future business, and that C&A's immediate recognition of the rebates in income was improper. Stockman also participated personally in many of the rebate transactions, including Exxon, Flambeau and Reko. Stepp supervised Galante in the negotiation of the Reko rebate, participated in Purchasing Department meetings at which the rebate scheme was discussed, and knew that the Flambeau agreement had been "papered" so as justify immediate recognition of the rebate in income. Jones was aware of the rebate scheme as it related to the Fabrics Division, participated in the meeting where Stockman directed Fabrics Division personnel to negotiate rebates, and understood that his employees were obtaining false documentation for such rebates. Cosgrove advised C&A's Purchasing Department on the language for the side letters, knowing that these letters were false or misleading and designed for use in improperly accounting for the rebates. Barnaba initially served as a liaison between Cosgrove and C&A's Purchasing Department, knowingly conveying Cosgrove's directions on how the rebates should be structured to implement the fraud and ensuring that Cosgrove's instructions were carried out. Later Barnaba supervised Purchasing Department employees in soliciting documentation he knew was false and designed for use in improperly accounting for the rebates. Gougherty directed accounting employees in the International Plastics Division to recognize the

16

rebate in income immediately in connection with the LVM transaction, despite knowing that the rebate was contingent on future events. When taking these actions, Stockman, Stepp, Jones, Cosgrove, Barnaba, and Gougherty knew, or were reckless in not knowing, that C&A's treatment of the rebates did not reflect the true terms of the supply contracts and was intended to falsely inflate C&A's reported current earnings. Likewise, Stockman, Stepp, Jones, Cosgrove, Barnaba, and Gougherty knew, or were reckless in not knowing, that the side letters and other false documents were intended to mislead KPMG and that KPMG did in fact rely on some of the false documents.

### (ii)    Capital Equipment Expenditures

43.    In 2004 C&A expanded the fraudulent rebate scheme to include capital equipment expenditures. Under GAAP, discounts on capital equipment affect the book value of the purchased asset and are not immediately recognizable in income. Nevertheless, at Cosgrove's direction and with Stockman's approval, C&A began requiring suppliers to falsely state that price discounts on capital equipment they sold to C&A were rebates for past purchases of non-capital goods or services. C&A then improperly recognized the rebates in income.

44.    In April 2004, Demag Plastics Group ("Demag") agreed to a $1 million rebate in lieu of a discount on the purchase price of machinery it was selling to C&A. Knowing that C&A was receiving the rebate in place of a discount, Stockman instructed Cosgrove (through Barnaba) to ensure that the rebate was falsely documented so that it could be treated as an increase to income. At Cosgrove's direction, C&A personnel obtained documentation from Demag falsely attributing the rebate to past purchases by

17

C&A of spare parts and other services. C&A improperly recognized the $1 million in income in the second and third quarters of 2004.

45.    When C&A negotiated a $1 million discount on machinery purchased from Cincinnati Milacron, Stockman again directed Barnaba to work with Cosgrove to prepare paperwork that could be used to provide false justification for immediate recognition in income. The resulting documentation falsely ascribed the rebate to the purchase of "implementation training services, technical support and continuous improvements." The $1 million was recognized in the third quarter of 2004. Gougherty, who had become Controller of the Global Plastics Division, directed the improper recognition of at least $600,000 of this rebate.

46.    C&A's fraudulent accounting for capital equipment purchases materially increased C&A's reported income for the second and third quarters of 2004. During this period, C&A improperly recognized at least $7.2 million in pre-tax operating income based on capital expenditure rebates.

47.    C&A continued to use rebates on capital equipment to fraudulently inflate income in the fourth quarter of 2004. Pursuant to directions from Gougherty, the Global Plastics Division played a prominent role in the rebate scheme during this period, using rebates to compensate for deterioration in its earnings. In December 2004, Gougherty assisted in obtaining false documentation from Krauss Maffei to disguise a €165,000 discount (approximately $224,000) on capital equipment C&A was purchasing. Gougherty instructed a subordinate to obtain false documents attributing the rebate to prior purchases of non-capital items. Similarly, during the fourth quarter of 2004 C&A

also improperly recorded rebates on capital equipment purchases from Demag ($92,000), RPT ($100,000), and Conair ($38,000).

48.    Stockman directed and participated in the scheme to improperly treat discounts on capital equipment as rebates, knowing that the documentation was fraudulent and would improperly inflate C&A's income.  Cosgrove knew that immediately recording rebates on capital equipment purchases in income was contrary to GAAP.  However, he instructed Purchasing Department employees to obtain documents falsely attributing the rebates to past purchases of other items to justify accounting for the rebates improperly and thereby inflate C&A's income.  Barnaba directed Purchasing Department employees in implementing the false rebate transactions, knowing that the transactions were fraudulent.  Gougherty instructed employees under his direction to recognize the Cincinnati Milacron rebate as income in the third quarter of 2004 although he knew, or was reckless in not knowing, that this was improper.  He  later had his subordinates solicit false documentation for the Krauss Maffei rebate although he knew, or was reckless in not knowing, that this was improper and designed to falsely inflate C&A's income. Stockman, Cosgrove, Barnaba and Gougherty knew, or were reckless in not knowing, that the false documents were intended to mislead KPMG and that KPMG did in fact rely on some of the false documents.

## OVERSTATEMENT OF EARNINGS

49.    In August 2004, C&A sold $415 million in restricted senior subordinated notes.  C&A's offering memoranda incorporated C&A's financial statements from 2001 through the second quarter of 2004.  Because C&A's financial statements for the fourth quarter of 2001 through the second quarter of 2004 were materially false or misleading,

the offering memoranda were false or misleading. Stockman, Stepp, and Cosgrove participated in drafting these memoranda or in the marketing presentations relating to sale of the restricted senior subordinated notes, knowing that the memoranda and the marketing materials contained false or misleading financial information due to C&A's improper recognition of supplier payments.

50.    In connection with C&A's quarterly reports for the second quarter of 2003 through the third quarter of 2004 and C&A's annual report for 2003, Stockman signed certifications stating that the C&A financial statements and other financial information included in the reports fairly presented C&A's financial condition, results of operations, and cash flows for the reporting period. Stepp signed such certifications in connection with C&A's quarterly reports for the third quarter of 2002 through the second quarter of 2004 and C&A's annual reports for 2002 and 2003. These certifications were false or misleading, and were known by Stockman and Stepp to be false or misleading.

51.    As a result of the round-trip transactions with McCallum and the fraudulent rebate scheme, C&A materially overstated its income, or reduced its losses, in its quarterly reports (Form 10-Q) and annual reports (Form 10-K) for each reporting period from the fourth quarter of 2001 through the third quarter of 2004. Stockman and McCallum signed C&A's annual reports (Form 10-K) for each year from 2001 through 2003. Stepp signed all of C&A's filings from the 10-K for 2001 through the quarterly report (Form 10-Q) for the second quarter of 2004. The following table identifies the impact (in millions) of the improper recognition of the McCallum round-trip payments and the other improper supplier transactions on C&A's pre-tax operating income (or pre-tax operating loss) in each reported quarter:

20

| Year | Quarter | Operating income/(loss) w/o improper transactions | Improper supplier transactions | Operating income / (loss) as reported | % change due to improper transactions |
|------|---------|----------|---------|---------|---------|
| 2001 | Q4 | ($16.3) | $2.8 | ($13.5) | 17% |
| 2002 | Q1 | 49.4 | 5.0 | 54.4 | 10% |
|      | Q2 | 79.2 | 2.3 | 81.5 | 3% |
|      | Q3 | (7.6) | 3.3 | (4.3) | 43% |
|      | Q4 | 33.9 | 2.2 | 36.1 | 6% |
| 2003 | Q1 | 17.5 | 1.7 | 19.2 | 10% |
|      | Q2 | 41.1 | 3.0 | 44.1 | 7% |
|      | Q3 | 4.1 | 4.2 | 8.3 | 102% |
|      | Q4 | 25.7 | 4.7 | 30.4 | 18% |
| 2004 | Q1 | 28.8 | 1.1 | 29.9 | 4% |
|      | Q2 | 20.7 | 5.4 | 26.1 | 26% |
|      | Q3 | 1.6 | 7.9 | 9.5 | 494% |
| Total |  |  | $43.6 |  |  |

52.     C&A has not filed any quarterly or annual reports with the Commission since filing its Form 10-Q for the third quarter of 2004 in November 2004.

53.     On January 27, 2005, C&A filed a registration statement with the SEC in connection with an anticipated exchange, for unrestricted notes, of the $415 million in restricted senior subordinated notes sold in August 2004. The registration statement included C&A's quarterly and annual financial statements from 2001 through the third quarter of 2004. These financial statements materially overstated C&A's earnings and consequently the January 2005 registration statement was false or misleading. Stockman, Stepp, and Cosgrove signed this registration statement knowing it contained false or misleading financial information.

**FALSE PUBLIC STATEMENTS IN EARLY 2005**

54.     In late 2004, KPMG learned of C&A's widespread effort to obtain rebates and requested documentation for all rebates negotiated in 2004. In early 2005, Stockman reluctantly agreed to begin an internal investigation by C&A management of the rebates.

21

But rather than aggressively pursuing the investigation, Stockman attempted to limit its scope, minimize the significance of the violations, and conceal his involvement and the involvement of other senior C&A managers. Stockman also orchestrated an effort to conceal C&A's dire financial condition. In a March 17 press release, an earnings call on the same date, and a presentation to potential bond purchasers one week later, C&A materially misrepresented its financial condition. This deception enabled C&A to obtain $75 million in additional financing. Further, C&A's April 4, 2005 press release announcing this additional financing contained false or misleading financial information.

## A.    March 17, 2005 Press Release

55.    On March 17, 2005, C&A issued a press release announcing its fourth-quarter and year-end results for 2004 and disclosing that there had been improper accounting for rebates. This press release also provided information on C&A's liquidity situation and management's internal investigation of the rebates. Much of the information C&A provided with regard to its fourth quarter income, current liquidity situation, and the rebate investigation was materially false or misleading.

56.    The March 17, 2005 press release stated that C&A's earnings before interest, taxes, depreciation, and amortization (commonly referred to as "EBITDA") for the fourth quarter of 2004 were $72-73 million. This included at least $5.8 million in improperly recorded rebates, making the press release false or misleading.

57.    When the March 17 press release was issued, C&A was facing a liquidity crisis and did not have enough money to pay its bills. To hide this fact, Stockman directed that all 2005 liquidity figures be omitted from the press release. The only liquidity figure used in the press release was from December 31, 2004, more than two

months earlier. Stockman and Galante knew, or were reckless in not knowing, that in view of the liquidity crisis being experienced by C&A, the failure to disclose current liquidity information in the March 17 press release made that release materially misleading.

58.    The March 17 press release stated that C&A's liquidity on December 31, 2004, was $86 million. The majority of that liquidity was undrawn commitments under its accounts receivable facility. But C&A could not have borrowed the full amount of the undrawn commitments without breaching financial covenants. In fact, only approximately $12 million in liquidity was available to C&A on December 31, 2004. C&A's use of the $86 million liquidity figure without reference to the covenant restrictions was inconsistent with C&A's prior disclosure practices and materially misleading. Stockman and Galante understood the impact of the restrictive covenants, were aware of C&A's prior disclosure practices, and knew that far less than $86 million would have been available to C&A on December 31, 2004.

59.    The March 17 press release also contained material misrepresentations concerning the scope of management's internal investigation and the impact of the improper accounting for rebates. C&A stated in this press release that the rebates recognized in 2002 had been reviewed, and implied that no restatement was necessary for 2002, when in fact there had been little or no scrutiny of the 2002 rebates. The March 17 press release also intentionally understated the degree to which restatements would be required due to the rebates in 2003 and 2004

60.    The March 17 press release attributed C&A's improper rebate accounting to a failure of "controls" and "procedures." This gave the false impression that the

23

improper accounting was caused by inadvertence or negligence. In truth, the improper

rebate accounting was the intended product of a concerted scheme.

61. Stockman drafted portions of the March 17 press release which he knew,

or was reckless in not knowing, would mislead the public about C&A's fourth quarter

earnings, its liquidity situation, the scope of the rebate scheme, and the involvement of

senior managers in the rebate scheme. Galante participated in drafting the release and

knew, or was reckless in not knowing, that statements therein concerning C&A's liquidity

situation and the internal investigation were false and misleading. On March 17, 2005,

C&A filed this press release with the Commission as a current report (on Form 8-K).

**B.    March 17, 2005 Earnings Call**

62. On March 17, 2005, Stockman presided over a conference call in which

C&A's 2004 earnings were publicly presented. Stockman prepared the charts discussed

during that call, made C&A's presentation, and took questions. During the call he made

several material misrepresentations regarding C&A's financial condition.

63. Stockman provided an unreasonable forecast of C&A's anticipated

EBITDA for the first quarter of 2005. Stockman stated that EBITDA would be between

$65 million and $75 million, even though he knew, or was reckless in not knowing, that

EBITDA for the first quarter would be roughly half that figure.

64. Stockman also stated that capital expenditures in 2005 would be limited to

$30 million quarterly. Stockman knew, or was reckless in not knowing, when he made

this statement that C&A had already exceeded $30 million in capital expenditures for the

first quarter of 2005, and was projected to incur over $50 million in capital expenditures

for the quarter.

65.    When asked during the call whether C&A was "tapping out" its liquidity, Stockman answered "no." Stockman knew at that time, or was reckless in not knowing, that C&A did not have enough liquidity to pay its bills and that his negative response was untrue.

66.    Prior to the March 17 earnings call, Cosgrove previewed the charts Stockman intended to use during the call. Cosgrove was responsible for C&A's forecasting and budgeting and he knew, or was reckless in not knowing, that these charts contained false or misleading statements regarding EBITDA and capital expenditures. Nevertheless, Cosgrove did not correct these statements or ask that they be corrected.

**C.    March 23, 2005 Bond Presentation**

67.    On March 23, 2005, Stockman led a presentation to potential bond investors. The notes C&A had sold in August 2004 were now being resold by their original purchasers, and C&A was helping to promote the resale. During this presentation Stockman used the same charts he had presented during the March 17, 2005 earnings call. These charts contained material misrepresentations regarding EBITDA and capital expenditures, as described above in connection with the March 17 call. Based on this presentation, which Stockman knew or was reckless in not knowing contained misrepresentations, investors bought millions of dollars of senior subordinated notes.

**D.    April 4, 2005 Press Release**

68.    On April 4, 2005, C&A issued a press release stating that "the Company's available liquidity (cash and unutilized commitments under revolving credit and account receivables facilities) was approximately $81 million at March 31, 2005, as compared with approximately $86 million at December 31, 2004." Galante provided the liquidity

figures for the press release and Stockman approved the use of those figures in the release.

69. The liquidity figures in the April 4 press release were false. Due to its debt covenants, C&A had approximately $12 million in liquidity on December 31, 2004, rather than $86 million. Similarly, on March 31, 2005, C&A had materially less than the claimed $81 million in liquidity.

70. The $81 million liquidity figure in the April 4 press release was false or misleading for an additional reason. General Electric Capital Corporation ("GECC") made loans to C&A through an accounts receivable securitization facility. Between January 2005 and April 2005, C&A employees, at Stockman's direction and under Williams' supervision, added approximately $120 million in ineligible receivables to the borrowing base under the GECC agreement. C&A used the additional liquidity generated by this scheme to create a false $52 million liquidity cushion. This liquidity cushion constituted most of the $81 million reported in the April 4 press release.

71. Stockman was primarily responsible for the scheme to inflate C&A's reported liquidity, through the fraudulent use of the GECC accounts receivable securitization facility. Stockman directed Williams and others to create invoices prematurely and include those invoices in the borrowing base, knowing that this violated the agreement with GECC. Williams ensured that his employees in C&A's Business Group carried out Stockman's instructions, even though he knew, or was reckless in not knowing, that they were improper and that the inflated liquidity figures would be reported to the public. When drafting the April 4 press release, Stockman and Galante knew, or were reckless in not knowing, that the liquidity figure provided for March 31, 2005, was

false or misleading, because it was inflated by $52 million that had been obtained from the fraudulently inflated GECC borrowing base.

72.    On April 5, 2005, C&A filed this press release with the Commission as a current report (Form 8-K).

### FIRST CLAIM FOR RELIEF

#### Violations of Section 17(a) of the Securities Act
#### (C&A, Stockman, Stepp, and Cosgrove)

73.    Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

74.    Pursuant to 17(a) of the Securities Act [15 U.S.C. § 77q(a)], it is unlawful for any person, in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, to (i) employ any device, scheme, or artifice to defraud, (ii) obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

75.    C&A, Stockman, Stepp, and Cosgrove, acting knowingly, recklessly, or negligently, violated Section 17(a) in August 2004 when C&A sold $415 million in senior subordinated notes, as described in Paragraph 49. The offering memorandum relating to these notes included financial information from 2001 through June 30, 2004, that was materially false or misleading due to the fraudulent payment and rebate recognition schemes. Stockman, Stepp and Cosgrove participated in the road shows

27

and/or prepared the materials for those road shows, knowing that those materials contained false or misleading financial information.

76.    C&A, Stockman, Stepp, and Cosgrove, acting knowingly, recklessly, or negligently, violated Section 17(a) on January 27, 2005 when C&A filed a registration statement containing materially false or misleading financial information for the period from 2001 through September 30, 2004, as described in Paragraph 53. Stockman, Stepp, and Cosgrove signed this registration statement.

77.    Stockman, acting knowingly, recklessly, or negligently, violated Section 17(a) by making materially false or misleading statements to potential bond investors at the March 23, 2005 meeting, as described in Paragraph 67.

78.    Unless restrained, C&A, Stockman, Stepp, and Cosgrove will continue to violate Section 17(a).

## SECOND CLAIM FOR RELIEF

### Violations of Sections 10(b) of the Exchange Act and Exchange Act Rule 10b-5 (C&A, Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams)

79.    Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

80.    Pursuant to Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5], it is unlawful for any person in connection with the purchase or sale of any security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, to (a) employ any device, scheme, or artifice to defraud; (b) obtain money or property by means of any untrue statement of a material fact or any

omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

81.    C&A, Stockman, McCallum, Stepp, and Jones, acting knowingly or recklessly, violated Section 10(b) and Rule 10b-5 in connection with the round-trip transactions with McCallum as described in Paragraphs 20-25. Their acts and omissions resulted in material overstatement of C&A's earnings from October 2001 through March 31, 2003. These overstatements were included in the offering memorandum issued in August 2004, the registration statement filed on January 27, 2005, and in quarterly, annual, and current reports filed with the Commission, as described in Paragraphs 3, 24, 49-51, and 53.

82.    C&A, Stockman, Jones, Cosgrove, McCallum, Barnaba, and Gougherty, acting knowingly or recklessly, violated Section 10(b) and Rule 10b-5 in connection with C&A's purchasing rebate scheme as described in Paragraphs 20 and 26-48 above. Their acts and omissions resulted in material overstatement of C&A's reported earnings from April 2002 through September 2004. These overstatements were included in the offering memorandum issued in August 2004, the registration statement filed on January 27, 2005, and in quarterly, annual, and current reports filed with the Commission, as described in Paragraphs 3, 24, 49-51, 53, 55-61.

83.    C&A, Stockman, and Galante, acting knowingly or recklessly, violated Section 10(b) and Rule 10b-5 connection with the press release of March 17, 2005, as described in Paragraphs 55-61.

84.    C&A, Stockman, and Cosgrove, acting knowingly or recklessly, violated Section 10(b) and Rule 10b-5 in connection with the earnings call of March 17, 2005, as described in Paragraphs 62-66.

85.    C&A and Stockman, acting knowingly or recklessly, violated Section 10(b) and Rule 10b-5 during the bond presentation on March 23, 2005, as described in Paragraph 66.

86.    C&A, Stockman, Galante, and Williams, acting knowingly or recklessly, violated Section 10(b) and Rule 10b-5 in connection with press release of April 4, 2005, as described in Paragraphs 68-72.

87.    Unless restrained, C&A, Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams will continue to violate Section 10(b) and Rule 10b-5.

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act
and Exchange Act Rule 10b-5
(Jones, Barnaba, Gougherty, and Williams)**

88.    Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

89.    C&A violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 as stated above in the Second Claim For Relief.

90.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] whoever "knowingly provides substantial assistance" to another person in connection with a violation of the Exchange Act, or any regulation thereunder, is "deemed to be in

violation of such provision to the same extent as the person to whom such assistance is

provided."

91.     As described in Paragraphs 20-48 and 54-72,  Jones, Barnaba, Gougherty,

and Williams knowingly provided substantial assistance to C&A in connection with

C&A's violations of Section 10(b) and Rule 10b-5, and thereby violated Section 10(b)

and Rule 10b-5 to the same extent as C&A.

92.     Unless restrained, Jones, Barnaba, Gougherty, and Williams will continue

to aid and abet violations of Section 10(b) and Rule 10b-5 .

### FOURTH CLAIM FOR RELIEF

**Violations of Section 13(a) of the Exchange Act and
Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13
(C&A)**

93.     Paragraphs 1-72 are incorporated herein with the same force and

effect as if set out in full.

94.     Pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and

Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20,

240.13a-1,  240.13a.-11, and 240.13a-13], every issuer of a security registered pursuant

to Section 12 of the Exchange Act must file accurate quarterly, annual, and current

reports with the Commission.  Rule 12b-20 further requires that in addition to the

information expressly required to be included in a statement or report, there shall be

added such further material information, if any, as may be necessary to make the required

statements, in the light of the circumstances under which they are made, not misleading.

95.     The quarterly reports (Form 10-Q) filed by C&A for the fourth quarter of

2001 through the third quarter of 2004, the annual reports (Form 10-K) filed by C&A for

31

2001, 2002, and 2003, and the current reports (Form 8-K) filed by C&A on March 17 and April 5, 2005, were inaccurate because they contained materially false or misleading financial information, and failed to provide such additional material information as necessary to make the statements therein not misleading, as described in Paragraphs 49-72.

96.    C&A failed to file an annual report for 2004 and failed to file a quarterly report for the first quarter of 2005.

97.    By reason of the foregoing, C&A violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13, and unless restrained will continue to violate those provisions.

## FIFTH CLAIM FOR RELIEF

**Aiding and Abetting C&A's Violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 (Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams)**

98.    Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

99.    C&A violated Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 by failing to file accurate quarterly, annual, and current reports as alleged in the Fourth Claim For Relief.

100.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] whoever "knowingly provides substantial assistance" to another person in connection with a violation of the Exchange Act, or any regulation thereunder, is "deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."

101.    Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams each knowingly provided substantial assistance to C&A in connection with one or more inaccurate quarterly, annual, or current reports filed by C&A between April 2002 and April 2005, as described in Paragraphs 1-6 and 20-72, and thereby violated Section 13(a) and Rule 12b-20, as well as Rule 13a-1 (for annual reports), Rule 13a-11 (for current reports), or Rule 13a-13 (for quarterly reports).

102.    Unless restrained, Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams will continue to aid and abet violations of these reporting provisions.

## SIXTH CLAIM FOR RELIEF

### Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act
### (C&A)

103.    Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

104.    Pursuant to Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)], every issuer of a registered security must (i) maintain books and records  accurately and fairly reflecting its transactions and the disposition of its assets, and (ii) establish a system of internal accounting controls that provides reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

105.    C&A violated Sections 13(b)(2)(A) and 13(b)(2)(B) from the fourth quarter of 2001 through the first quarter of 2005 by failing to (i) maintain books and records accurately and fairly reflecting its transactions and the dispositions of its assets, and (ii) establish a system of internal accounting controls that provides reasonable

assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP, as described in Paragraphs 1-6, 20-53, and 70-71.

106.    Unless restrained, C&A will continue to violate Sections 13(b)(2)(A) and 13(b)(2)(B).

## SEVENTH CLAIM FOR RELIEF

### Aiding and Abetting C&A's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act (Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams)

107.    Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

108.    C&A violated Sections 13(b)(2)(A) and 13(b)(2) (B) of the Exchange Act as alleged in the Sixth Claim For Relief.

109.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] whoever "knowingly provides substantial assistance" to another person in connection with a violation of the Exchange Act, or any regulation thereunder, is deemed to be "in violation of such provision to the same extent as the person to whom such assistance is provided."

110.    As described in paragraphs 1-6, 20-48, and 70-71, Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams knowingly provided substantial assistance to C&A in connection with C&A's failure to maintain accurate books and records and C&A's failure to establish an adequate system of internal controls, and thereby violated Sections 13(b)(2)(A) and 13(b)(2)(B) to the same extent as C&A.

111.    Unless restrained, defendants Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams will continue to aid and abet C&A's violations of these record-keeping and internal control provisions.

## EIGHTH CLAIM FOR RELIEF

### Violations of Section 13(b)(5) of the Exchange Act
### (Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams)

112.    Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

113.    Pursuant to Section 13(b)(5) of the Exchange Act, no person may knowingly circumvent or fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account maintained pursuant to Section 13(b)(2) of the Exchange Act.

114.    As described in Paragraphs 1-6, 20-48, and 70-71, Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams knowingly circumvented C&A's internal accounting controls and knowingly falsified books, records, and accounts maintained by C&A pursuant to Section 13(b)(2) of the Exchange Act.

115.    By reason of the foregoing, Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams violated Section 13(b)(5), and unless restrained will continue to violate this provision.

35

## NINTH CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13b2-1
### (Stockman, Stepp, Jones, Cosgrove, McCallum,
### Barnaba, Gougherty, Galante, and Williams)

116.    Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

117.    Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1] provides that no person shall directly or indirectly falsify any book, record, or account subject to Section 13(b)(2)(A) of the Exchange Act.

118.    As described in paragraphs 1-6, 20-48, and 70-71, Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams falsified or caused the falsification of books, records, and accounts maintained by C&A and within the scope of  Section 13(b)(2)(A) of the Exchange Act.

119.    By reason of the foregoing, Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams violated Rule 13b2-1 and unless restrained will continue to violate that rule.

## TENTH CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13b2-2
### (Stockman, Stepp, Jones, Cosgrove, McCallum,
### Barnaba, and Galante)

120.    Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

121.    Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2] provides, inter alia, that no officer or director of an issuer, and no person acting under the direction of such officer or director, may directly or indirectly take any action to mislead an independent

36

public or certified public accountant engaged in an audit or review of the financial statements of that issuer if such statements are required to be filed with the Commission and the person knew or should have known that such action, if successful, could result in rendering the issuer's financial statements materially misleading.

122.    As described in Paragraphs 1-6, 20-48, and 54-72, Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, and Galante took actions to mislead C&A's public accountants in the performance of audits and reviews of financial statements required to be filed by C&A with the Commission, and knew or should have known that such actions could result in rendering these financial statements materially misleading.

123.    By reason of the foregoing, defendants Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, and Galante violated Rule 13b2-2 and, unless restrained, will continue to violate that rule.

## ELEVENTH CLAIM FOR RELIEF

### Violation of Exchange Act Rule 13a-14
### (Stockman and Stepp)

124.    Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

125.    Rule 13a-14 under the Exchange Act [17 C.F.R. § 240.13a-14] provides that each report filed with the Commission pursuant to Section 13(a) of the Exchange Act must include a certification, in a form identified by the Commission, signed by the principle executive officer and the principal financial officer of the issuer.

126.    As described in Paragraph 50, Stockman signed such certifications as part of C&A's quarterly reports (Form 10-Q) for each quarter from the second quarter of 2003

through the third quarter of 2004, and as part of C&A's annual report (Form 10-K) for

2003.  Stepp signed such certifications as part of C&A's quarterly reports for each quarter

from the third quarter of 2002 through the second quarter of 2004, and as part of C&A's

annual reports for 2002 and 2003.  The certifications by Stockman and Stepp stated that

C&A's financial statements and the other financial information in the report fairly

presented C&A's financial condition, results of operations, and cash flows for the

reporting periods.  These certifications were false or misleading, and were known by

Stockton and Stepp to be false or misleading.

     127.    By reason of the foregoing, Stockman and Stepp violated Rule 13a-14,

and unless restrained will continue to violate that rule.

## **PRAYER FOR RELIEF**

    WHEREFORE, the Commission requests that the Court enter judgment:

    (a)   permanently enjoining <u>C&A</u> from violating Section 17(a) of the Securities Act,

Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Rules 10b-5,

12b-20, 13a-1, 13a-11, and 13a-13 under the Exchange Act;

    (b)   permanently enjoining <u>Stockman</u> and <u>Stepp</u> from violating Section 17(a) of the

Securities Act, Sections 10(b) and 13(b)(5) of the Exchange Act, and Rules 10b-5, 13b2-1,

13b2-2 and 13a-14 under the Exchange Act, and from aiding and abetting violations of

Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1,

13a-11, and 13a-13 under the Exchange Act; requiring each of them to disgorge his ill-

gotten gains, with prejudgment interest; requiring each of them to pay civil penalties; and

permanently barring each of them from acting as an officer or director of any issuer that has

a class of securities registered pursuant to Section 12 of the Exchange Act or is required to

file reports pursuant to Section 15(d) of that Act;

(c)  permanently enjoining Cosgrove from violating Section 17(a) of the Securities

Act, Sections 10(b) and 13(b)(5) of the Exchange Act, and Rules 10b-5, 13b2-1 and 13b2-2

under the Exchange Act, and from aiding and abetting violations of  Sections 13(a),

13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and

13a-13 under the Exchange Act; requiring him to disgorge his ill-gotten gains, with

prejudgment interest; requiring him to pay civil penalties; and permanently barring him

from acting as an officer or director of any issuer that has a class of securities registered

pursuant to Section 12 of the Exchange Act or is required to file reports pursuant to Section

15(d) of that Act;

(d)  permanently enjoining Jones, Barnaba, and Gougherty from violating  Sections

10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13b2-1, and 13b2-2  under the

Exchange Act, and from aiding and abetting violations of Sections 10(b), 13(a),

13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-11,

and 13a-13 under the Exchange Act; requiring each of them to disgorge his ill-gotten gains,

with prejudgment interest; requiring each of them to pay civil penalties; and permanently

barring each of them from acting as an officer or director of any issuer that has a class of

securities registered pursuant to Section 12 of the Exchange Act or is required to file

reports pursuant to Section 15(d) of that Act;

(e) permanently enjoining Galante and McCallum from violating Sections 10(b)

and 13(b)(5) of the Exchange Act, and Rules 10b-5, 13b2-1,  and 13b2-2  under the

Exchange Act, and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and

39

13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 under the Exchange Act; requiring each of them to disgorge his ill-gotten gains, with prejudgment interest; requiring each of them to pay civil penalties; and permanently barring each of them from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or is required to file reports pursuant to Section 15(d) of that Act;

(f)   permanently enjoining <u>Williams</u> from violating Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5 and 13b2-1 under the Exchange Act, and from aiding and abetting violations of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, and 13a-11 under the Exchange Act; requiring him to disgorge his ill-gotten gains, with prejudgment interest; requiring him to pay civil penalties; and permanently barring him from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or is required to file reports pursuant to Section 15(d) of that Act; and

(g)   providing such other relief as may be appropriate.

Date: March **23**, 2007

John D. Worland, Jr. (JW1962)

Of Counsel
Christopher Conte
Mark Kreitman
David Fielder
James Eichner
Securities and Exchange Commission

Robert B. Blackburn
Associate Regional Director
Securities and Exchange Commission
Room 437
3 World Financial Center
New York, New York 10281-1022

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
Tel: 202-551-4438
Fax: 202-772-9246
WorlandJ@sec.gov

H. Michael Semler (HS2943)
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
Tel: 202-551-4429
Fax: 202-772-9246
Attorneys for Plaintiff