## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

Collins & Aikman Corporation and      :
Collins & Aikman Products Co., as      :
Debtors in Possession,      :
     :
            Plaintiffs,      :
       v.      :
     :    Civ. No. 07-265-SLR-LPS
David A. Stockman, et al.,      :
     :
            Defendants.      :
     :

## REPORT AND RECOMMENDATION

Plaintiff Collins & Aikman Litigation Trust (the "Trust"), as successor to Collins &

Aikman Corporation ("Collins & Aikman" or the "Company") and its subsidiary debtors, brings

this action against various defendants alleging violations of: (i) Section 10(b) of the Securities

Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder,

17 C.F.R. § 240.10b-5 ("Rule 10b-55"); (ii) Section 14(a) of the Act, 15 U.S.C. § 78n(a), and

Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9; (iii) breach of fiduciary duty;

(iv) unjust enrichment; (v) common law fraud; (vi) breach of express and implied contractual

obligations; (vii) negligence/malpractice; (viii) breach of contract; and (ix) aiding and abetting.

Presently pending before the Court are thirteen motions to dismiss the First Amended

Complaint ("Complaint" or "FAC," D.I. 90) for failure to state a claim filed by the following

defendants: David A. Stockman ("Stockman") (D.I. 115); J. Michael Stepp ("Stepp") (D.I. 104);

David R. Cosgrove ("Cosgrove") (D.I. 97); Paul C. Barnaba ("Barnaba") (D.I. 128); Robert A.

Krause ("Krause") and Bryce M. Koth ("Koth") (D.I. 119); Charles E. Becker ("Becker") (D.I.

124); Elkin B. McCallum ("McCallum") (D.I. 99); Thomas E. Evans ("Evans") (D.I. 101);

Cynthia Hess ("Hess") (D.I. 131); Daniel P. Tredwell ("Tredwell"), W. Gerald McConnell

("McConnell") and Samuel Valenti, III ("Valenti") (D.I. 106); Heartland Industrial Partners, L.P.,

Heartland Industrial Associates, L.L.C., and Heartland Industrial Group, L.L.C. (collectively, the

"Heartland Entities") (D.I. 110); PricewaterhouseCoopers LLP ("PwC") (D.I. 107); and KPMG

LLP ("KPMG") (D.I. 120).

## **BACKGROUND**[1]

I.  The Parties

    A.  The Plaintiffs

Collins & Aikman and Collins & Aikman Products Co. (collectively, "C&A" or the

"Plaintiffs") were Delaware corporations.[2]  (FAC ¶6)  Collins & Aikman, through its

subsidiaries, was formerly engaged in the design, manufacture, and supply of automotive interior

components to automobile manufacturers such as General Motors, Ford, and Chrysler.  (*Id.* at

¶¶6, 35)

On May 17, 2005, C&A, together with thirty-six of its subsidiaries, filed petitions for

---

[1]For purposes of the instant motions, the Court accepts all well-pleaded factual
allegations set forth in the Complaint as true, and views them, as it must, in the light most
favorable to Plaintiffs. *See Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000).

[2]While the caption and preliminary paragraph of the Complaint identify C&A as the
plaintiff, paragraph five identifies the Trust as the plaintiff.  In any event, the litigation Trust, as
successor to Collins & Aikman and its debtor subsidiaries (FAC ¶5; D.I. 173 (Transcript of Feb.
12, 2009 Hearing ("Tr.") at 17-18)), stands in the shoes of the debtors.  Consequently, as used
hereinafter, unless otherwise noted, the term "Plaintiff" or "Plaintiffs" refers to C&A and its
subsidiaries as well as the litigation Trust.

relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy

Court for the Eastern District of Michigan, Southern Division (the "Bankruptcy Court"). (*Id.* at

¶6) Subsequently, C&A determined that the best course for its creditors and employees would be

the sale and liquidation of all of its businesses. (*Id.* at ¶¶6, 43) On July 18, 2007, the Bankruptcy

Court confirmed a Chapter 11 plan of reorganization (the "Plan") and, subsequently, C&A has

sold all of its businesses, transferred any remaining assets to two trusts, and ceased to exist. (*Id.*)

Under the Plan, all claims and causes of action of C&A and its debtor subsidiaries against third

parties, whether pending as of the confirmation of the Plan or available to be brought in the

future, were assigned to the Trust, to be administered by a Litigation Trust Administrator for the

benefit of the creditors of the debtors' estates. (*Id.* at ¶6) The proceeds thereof are to be

distributed to the creditors of the debtors' estates according to the terms of the Plan, the

Litigation Trust Agreement, and the orders of the Bankruptcy Court. (*Id.*)

Hence, the Trust by this action seeks to press claims that C&A would have had if it were

still in existence. The Trust, as successor to C&A, is only pursuing claims that belonged to

C&A. Because C&A no longer exists, any financial recovery will be for the benefit of the estate

and, ultimately, C&A's creditors. (*See* Tr. at 17-18.)

B. The Defendants

1. The Individual Defendants[3]

a. Stockman served as a Director of Collins & Aikman as well as

Chairman of the Board and CEO as follows: Director from February 2001 to May 12, 2005;

---

[3]Throughout the Complaint, Plaintiffs collectively refer to the Individual Defendants as
the "Director and Officer Defendants." (FAC ¶¶7-21)

3

Chairman of the Board from August 2002 to May 12, 2005; and CEO from August 2003 to May 12, 2005. (FAC ¶7) Stockman was also a Managing Member of Heartland Industrial Associates, L.L.C., and was a founding partner and a Senior Managing Director of Heartland Industrial Partners, L.P. (*Id.*)

        b.     Stepp served as Collins & Aikman's Vice President and Chief Financial Officer ("CFO") from January 2002 to October 2004, when he resigned as CFO. (*Id.* at ¶8) Stepp also served as a Director of Collins & Aikman and Vice Chairman of its Board of Directors from 2000 until his resignation. Stepp was also a Senior Managing Partner of Heartland Industrial Partners, L.P. (*Id.*)

        c.     Koth served as Collins & Aikman's CFO starting on October 13, 2004. (*Id.* at ¶9) Prior to serving as CFO, Koth served as the Company's Vice President, Tax from December 2002 to May 2004 when he was elevated to Vice President, Finance, Controller, and Collins & Aikman's head of Tax.[4] (*Id.*)

        d.     Cosgrove served as Collins & Aikman's Vice President of Finance from February to August 2002, Vice President for Financial Planning and Analysis from August 2002 until October 2004, and Corporate Controller until approximately May 2005. (*Id.* at ¶10)

        e.     Barnaba served as the Director of Financial Analysis for Collins & Aikman's purchasing department from April 2002 to December 2004 when he became a Vice President and the Director of Purchasing for the Plastics Division, a position he held until April 2005. (*Id.* at ¶11)

---

[4]On February 20, 2009, Plaintiffs and Defendant Koth filed a Stipulation of Dismissal Without Prejudice (D.I. 172), agreeing to dismiss all claims without prejudice as to Koth and dismissing him from the matter, which was so ordered by Judge Robinson on February 27, 2009.

4

f.       Krause served as Vice President and Treasurer of Collins &
Aikman from October 2002 to October 2004, when he assumed the position of Senior Vice
President, Finance and Administration. (*Id*. at ¶12)

g.       Defendant John A. Galante ("Galante") served as Director of
Strategic Planning from October 2002 to October 2004 and Vice President, Treasurer and
Executive Officer of Collins & Aikman from October 2004 to termination of his employment on
July 29, 2005. (*Id*. at ¶13) Galante was also a Vice President of Heartland Industrial Partners,
L.P.[5] (*Id*.)

h.       Becker served as Vice Chairman of the Board and a Director from
July 2001 to his resignation on May 6, 2004. (*Id*. at ¶14) Becker owned Becker Group LLC
which was sold to Collins & Aikman in July, 2001. (*Id*.) Becker served as interim-CEO for a
period after Stockman resigned in May 2005. (*Id*.) Becker was also a limited partner in
Heartland Industrial Partners, L.P. (*Id*.)

i.       McCallum served as a Director of Collins & Aikman from
September 2001 until his resignation on May 6, 2004. (FAC ¶15) McCallum was the Chairman
of the Board and CEO of Joan Fabrics Corporation, which sold Joan Automotive Fabrics to
Collins & Aikman in September 2001. (*Id*.)

j.       Evans served as President and CEO of Collins & Aikman from
April 1999 to August 2002, when he resigned his positions.[6] (*Id*. at ¶16)

_____

[5]Defendant Galante has not has not entered an appearance in this case.

[6]Evans contends that he never served as Collins & Aikman's President, but only as
C&A's CEO and Chairman of the Board. (D.I. 102 at 5 n.1) He further asserts that he resigned
in June, not August, 2002. (*Id*.) For purposes of evaluating a motion to dismiss, however, I must

5

k.    Hess served as a Director of Collins & Aikman from 2001 to 2003.

(*Id.* at ¶17) Hess was also a Senior Managing Partner of Heartland Industrial Partners, L.P. (*Id.*)

l.    Tredwell served as a director of Collins & Aikman from February

2001 to May 10, 2006, when he resigned his position. (*Id.* at ¶18) Tredwell was also a

co-founder of Heartland Industrial Partners, L.P. and a Member of Heartland Industrial

Associates, L.L.C. (*Id.*)

m.    McConnell served as a director of Collins & Aikman from

February 2001 to May 10, 2006, when he resigned his position. (*Id.* at ¶19) McConnell was a

Senior Managing Director of Heartland Industrial Partners, L.P. and was also a Member of

Heartland Industrial Associates, L.L.C. (*Id.*)

n.    Valenti served as a director of Collins & Aikman from February

2001 to September 30, 2004, and was a Senior Managing Director of Heartland Industrial

Partners, L.P. (*Id.* at ¶20)

2.    The Entity Defendants

a.    Heartland Entities

(1)    Heartland Industrial Partners, L.P. ("Heartland LP"), a

Delaware limited partnership, is a $1 billion private equity firm. (*Id.* at ¶27) Collins & Aikman

was one of Heartland LP's largest investments, representing at least 30% of Heartland LP's total

investments. (*Id.*) Heartland LP and Collins & Aikman entered into a Services Agreement,

dated February 23, 2001 and subsequently amended on August 7, 2001 (the "Services

Agreement"). (*Id.* at ¶31) Pursuant to the Services Agreement, C&A was required to pay

take the Complaint's allegations of titles and dates as true.

Heartland LP millions of dollars in fees for its expenses incurred in purchasing C&A stock and other advisory services relating to the consummation of acquisitions or divestitures by C&A. (*See id.* at ¶¶31, 32, 45, 46.)

(2) Heartland Industrial Associates, L.L.C. ("Heartland LLC"), a Delaware limited liability company, is the managing general partner of Heartland LP. (*Id.* at ¶27) At some point in 2001, "Heartland owned at least 59.7% of the outstanding common stock of Collins & Aikman and by January 1, 2005, owned 41% of the outstanding common stock." (*Id.* at ¶28) Also, "[a]s the managing general partner, Heartland LLC exercised complete control over Heartland LP and, accordingly, beneficially owns and exercises control over all the Collins & Aikman common stock held by Heartland LP." (*Id.* at ¶30)[7]

(3) Heartland Industrial Group, LLC ("Heartland Industrial") is a Delaware limited liability company. (*Id.* at ¶29)

    b.  Auditor Defendants

(1) PwC was engaged by Collins & Aikman to provide independent auditing, accounting and/or consulting services, including the exam and review of consolidated financial statements for FY 2001 and 2002. (*Id.* at ¶33) PwC issued unqualified audit opinions on Collins & Aikman's 2001 and 2002 financial statements. (*Id.*)

(2) KPMG was engaged by Collins & Aikman to provide independent auditing, accounting and/or consulting services, including the exam and review of

---

[7]It is not clear which one or more of the Heartland Entities owned the shares. In the Complaint, Plaintiffs often collectively refer to Heartland LP, Heartland LLC, and Heartland Industrial as "Heartland" or the "Heartland Defendants." (FAC ¶30) In their briefing, the Heartland Entities state their belief that the Complaint is referring to Heartland LLC's stock ownership. (D.I. 127 at 6 and n.5)

its consolidated financial statements for FY 2003 and 2004 (the latter never having been completed). (*Id.* at ¶34) KPMG issued unqualified audit reports on Collins & Aikman's 2003 financial statements. (*Id.*)

## II. The Alleged Fraud

Plaintiffs allege that following a series of unsuccessful acquisitions, beginning in the fourth quarter of 2001 and continuing through the time of Plaintiffs' bankruptcy filings, the defendants employed a variety of fraudulent schemes designed to artificially inflate Collins & Aikman's reported financial results, avoid triggering debt covenants, and enable Collins & Aikman to borrow additional funds. (*See* FAC ¶39; D.I. 139 (Omnibus Memorandum of Law in Support of Plaintiffs' Opposition to Defendants' (Other Than Auditor Defendants) Motion to Dismiss ("Opp. Br.") at 8-9.)) In furtherance of such deception, the defendants made repeated public statements that falsely and fraudulently described Collins & Aikman's financial results and caused Collins & Aikman to file materially false and misleading financial statements with the Securities and Exchange Commission ("SEC"). (FAC ¶39) In addition, the Director and Officer Defendants made false and misleading statements to Collins & Aikman's creditors in order to fraudulently induce them into lending money to Collins & Aikman. (*Id.*)

One example of the fraud is something the Plaintiffs call a "round-trip transaction scheme." (*See generally* FAC ¶¶53-57, 116-24; Opp. Br. at 10-11.) Between the fourth quarter of 2001 and the first quarter of 2003, Stockman, Stepp, and McCallum, among others, engaged in a series of "round-trip" transactions that artificially inflated C&A's financial results. (*See* FAC ¶¶53-57, 116-24; Opp. Br. at 10.) For example, after C&A acquired Joan Automotive Fabrics, Stepp, under the direction of Stockman, requested that McCallum – then Joan Fabric's CEO and

8

Chairman of the Board – provide C&A with a $3 million loan that C&A agreed to repay in the subsequent quarter. (*See* FAC ¶¶54, 116; Opp. Br. at 10.) Rather than properly record this payment on the Company's books as a short-term loan, the defendants falsely characterized the payment as a supplier rebate for past purchases, thereby reducing C&A's operating expenses. (*See* FAC ¶¶54, 116-17; Opp. Br. at 10.) In this way, Stockman and Stepp caused the Company to understate its operating loss for the fourth quarter of 2001 and overstate its annual 2001 operating income. (*See* FAC ¶117; Opp. Br. at 10.) Completing the "round-trip" for this transaction, defendant Stockman arranged for repayment of the loan, in or around March 2002, by transferring certain looms to Joan Fabrics. (*See* FAC ¶¶56, 116; Opp. Br. at 10-11.) Additional short-term loans were later received from Joan Fabrics, which C&A recorded as rebates for nonexistent past purchases or services, thereby allowing C&A's quarterly financial results to continue to be artificially inflated. (*See* FAC ¶¶55-57, 118-21; Opp. Br. at 11.) On each occasion, McCallum and Joan Fabrics provided documentation falsely characterizing the loan payments as rebates on a supply contract between C&A and Joan Fabrics. (*See* FAC ¶¶55-56; Opp. Br. at 11.) Defendants Stockman and Stepp subsequently caused the Company to repay Joan Fabrics for these loans through various "obscure" transactions. (*See* FAC ¶¶56, 119-21; Opp. Br. at 11.) Each of these round-trip transactions rendered C&A's financial statements false and misleading. (*See* FAC ¶¶123-24; Opp. Br. at 11.)

Plaintiffs also allege a "supplier rebate scheme." (*See generally* FAC ¶¶58-69, 125-26; Opp. Br. at 11-13.) The Company would regularly enter into supply contracts through which it would receive rebates from suppliers for purchasing a specified volume or type of future goods or services. (*See* FAC ¶59; Opp. Br. at 11.) Although such rebates would normally be recorded as

9

a reduction in cost only when the future purchases actually occurred, starting in early 2002 Stockman, Stepp, Cosgrove, and Barnaba, in an alleged effort to inflate C&A's reported earnings, began manipulating the accounting for these vendor rebates by improperly recognizing the rebates before they had actually been earned. (*See* FAC ¶¶60-62, 125; Opp. Br. at 11-12.) Plaintiffs claim that by obtaining side letters from numerous suppliers that falsely represented the terms of the rebate arrangements, these defendants caused C&A to falsely account for these rebates as though they had been earned on past purchases. (*See* FAC ¶¶60-65; Opp. Br. at 12.) During 2002 and 2003, the supplier rebate scheme generated millions of dollars of prematurely-recognized rebates, falsely boosting C&A's reported income. (*See* Opp. Br. at 12.) According to Plaintiffs, Stockman, Stepp, Cosgrove, and Barnaba expanded the scope of the scheme in 2004 to include rebates on capital equipment expenditures. (*See* FAC ¶¶65-67, 126; Opp. Br. at 12.) In essence, then, these defendants caused the Company to intentionally overpay for equipment and related maintenance services in exchange for a "rebate" equal to the amount of the overpayment, and, with the use of such side letters, these "rebates" were treated as if they were earned on past purchases of spare parts and/or maintenance (allowing the rebates to be booked as income in the current quarter rather than as a reduction in the cost basis of the equipment and/or maintenance purchased).[8] (*See* FAC ¶¶66-68, 126; Opp. Br. at 12-13.)

The Complaint further alleges that in August 2004 various defendants, based on materially misleading statements, caused C&A to sell $415 million of 12.875% Senior Subordinated Notes due in 2012 (the "Notes"). (*See* Opp. Brief at 21.) The August 2004 Senior

---

[8]Plaintiff also describes in the Complaint a scheme to defraud General Electric Capital Corporation ("GECC"), in or around January 2005, whereby C&A overstated its borrowing base to avoid a repayment obligation it owed to GECC. (*See* FAC ¶¶74-79; *see also* Opp. Brief at 15.)

Note Offering materials were false and misleading and concealed the true financial condition of C&A because they contained financial results from 2001 through 2004 that were "tainted" by the defendants' fraudulent schemes and accounting improprieties, including the Joan Fabrics "round-trip" transaction and "supplier rebate" schemes. (*See* FAC ¶¶71, 93; Opp. Brief at 22.) Stockman, Stepp, and Cosgrove participated in these schemes and in drafting the marketing materials relating to the offering of the Notes. (*See* FAC at ¶¶53-68, 71; Opp. Brief at 22.) While the Complaint does not allege that McCallum personally drafted C&A's financial disclosures, it does allege that he participated in some of the underlying fraudulent schemes and signed numerous false financial statements that were incorporated by reference into the August 2004 Offering Memorandum. (*See* FAC at ¶93; Opp. Brief at 22-23.)

According to the Trust, at the time of the August 2004 Senior Note Offering, C&A was "hemorrhaging cash" and on the brink of financial collapse. (*See* FAC at ¶¶70, 92, 184; Opp. Brief at 29.) The schemes perpetrated by these defendants, however, deceptively portrayed C&A as healthy and viable. (*See* Opp. Br. at 29.) But for defendants' fraud, C&A would not have been able to successfully sell the Notes – which would have held down C&A's debt load at approximately $884 million (its December 2000 level), and not allowed it to nearly double to approximately $1.6 billion (C&A's debt level on December 31, 2004). (*See* Opp. Brief at 29; FAC ¶143.)

III. The Complaint

C&A filed its original complaint on May 16, 2007. After the defendants filed motions to dismiss the original complaint, C&A on January 28, 2008 filed its first amended complaint. This now operative Complaint contains nine claims against one or more of the 19 defendants. In the

course of litigating the 13 motions to dismiss, C&A has withdrawn certain claims against some
or all of the defendants.[9] (*See* Tr. at 12-14.)

The claims C&A is still pressing are: (i) federal securities fraud in violation of Section
10(b) and Rule 10b-5 against defendants Stockman, Stepp, Cosgrove, and McCallum;
(ii) common law breach of fiduciary duty against defendants Stockman, Stepp, Krause,
Cosgrove, Barnaba, Becker, McCallum, Evans, Hess, Tredwell, McConnell, Valenti, and the
Heartland Entities; (iii) unjust enrichment against defendants Stockman, Stepp, Krause,
Cosgrove, Barnaba, Becker, McCallum, Evans, Hess, Tredwell, McConnell, Valenti, and the
Heartland Entities; (iv) common law fraud against defendants Stockman, Stepp, Cosgrove,
Barnaba, McCallum, PwC, and KPMG; (v) breach of express and implied contractual
obligations, including the implied covenant of good faith and fair dealing, against the Heartland
Entities; (vi) negligence and malpractice against PwC and KPMG; (vii) breach of contract
against PwC and KPMG; and (viii) aiding and abetting a breach of fiduciary duty against PwC
and KPMG.

---

[9]Plaintiffs have abandoned their Section 10(b) claim against Barnaba, Krause, Becker,
Evans, Hess, Tredwell, McConnell, Valenti, Galante, and Koth. (*See* Tr. at 12-14.) Accordingly,
I will recommend dismissal of this claim against these defendants. Plaintiffs have also entirely
abandoned their Section 14(a) claims. (*See id.* at 12.) I will therefore recommend dismissal of
this claim as well. As already noted, Defendant Koth has been dismissed from the action, so no
claims survive as to him. While Defendant Galante has not entered an appearance in this action,
and while originally Counts I through V were pled against him, Plaintiffs have since abandoned
Counts I and II (Sections 10(b) and 14(a)) as to him. Plaintiffs have not decided which other
claims, if any, to pursue against Galante, so I will recommend only the dismissal of Counts I and
II as to Galante. (*See id.* at 13.) Finally, Plaintiffs are no longer pursuing claims of common law
fraud against Krause, Becker, Evans, Hess, Tredwell, McConnell, and Valenti. (*See id.*) Thus I
will recommend dismissal of these claims against these defendants.

12

IV.     Procedural Background

        This case was initially assigned to the judicial vacancy and referred to Magistrate Judge

Mary Pat Thynge. It was then reassigned to the Honorable Sue L. Robinson. On February 11,

2008, Judge Robinson referred the case to me for all pretrial proceedings through and including

the pretrial conference. (D.I. 92) Briefing on the motions to dismiss the Complaint was

completed in November 2008. I held oral argument on the motions on February 12, 2009.

V.      Other Civil Actions

        The SEC and two groups of C&A investors have charged that certain defendants

knowingly issued false and misleading statements regarding C&A's financial condition. (*See*

FAC ¶44; Opp. Brief at 6-7.) Motions to dismiss have been largely denied in each of these

actions.

        A.      The SEC Action

        On March 26, 2007, the SEC filed a civil complaint in the U.S. District Court for the

Southern District of New York charging Stockman, Stepp, Cosgrove, McCallum, Barnaba,

Galante, and other former C&A directors and officers with numerous violations of the federal

securities laws relating to essentially the same misconduct alleged in the Complaint here. *See*

*SEC v. Collins & Aikman Corp.*, No. 1:07-CV-02419 (S.D.N.Y.); Opp. Brief at 6. On December

21, 2007, U.S. District Court Judge Shira A. Scheindlin issued an expansive opinion denying all

pending motions to dismiss the SEC's complaint (motions that had been filed by defendants

Stockman, Stepp, Cosgrove, McCallum, and Barnaba). *See S.E.C. v. Collins & Aikman Corp.*,

524 F. Supp. 2d 477, 479 (S.D.N.Y. 2007); Opp. Brief at 6. In particular, as to the claims

brought pursuant to Section 10(b) of the Exchange Act, Judge Scheindlin concluded that the SEC

13

had sufficiently pled, with the particularity required by Federal Rule of Civil Procedure 9(b), that the defendants made materially false and misleading statements with the requisite scienter. *See id.* at 491-95; Opp. Brief at 6.

      B.     The Private Securities Fraud Actions

Two private class actions alleging violations of the Exchange Act are pending before U.S. District Court Judge Arthur J. Tarnow in the Eastern District of Michigan based on the same core allegations contained in the Complaint. (Opp. Brief at 6)

      1.     *Egleston v. Heartland Indus. Partners, L.P., et al.,* No. 2:06-cv-13555-AJT-SDP (E.D. Mich.). Several shareholder class action lawsuits were consolidated and transferred to the Eastern District of Michigan. (*See* D.I. 125 at 12.) These suits, brought on behalf of investors who purchased C&A stocks and bonds between August 6, 2002 and May 17, 2005, seek damages from former C&A officers and directors, including defendants Stockman, Stepp, Koth, and the Heartland Entities. (Opp. Brief at 6) The suits allege these defendants violated federal securities laws (specifically, Sections 10(b) and 20(a) of the Exchange Act) by participating in a scheme to misrepresent C&A's financial position. (*See id.* at 6-7; D.I. 125 at 12.)

      2.     *Mainstay High Yield Corporate Bond Fund* v. *Heartland Indus. Partners, L.P., et al.,* No. 2:07-cv-l0542-AJT-SDP (E.D. Mich.). This class action has been brought on behalf of investors who purchased C&A's 12.875% Notes and 10.75% Notes through their duly authorized investment advisor between August 11, 2004 and May 17, 2005. (Opp. Brief at 6-7) It alleges violations of Sections 10(b) and 20(a) of the Exchange Act by several former C&A officers and directors in connection with the company's allegedly fraudulent

14

issuance of the August 2004 Notes. (*See id.*; D.I. 125 at 12.)

In each of these actions, the defendants moved for dismissal, contending that the plaintiffs failed to state claims for securities fraud in accordance with the heightened pleading standards established by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Federal Rule of Civil Procedure 9(b). (Opp. Brief at 7.) After briefing and oral argument, Judge Tarnow issued a summary Order denying, with limited exceptions, the various dismissal motions. (*Id.*)

## LEGAL STANDARDS

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted). Thus, the Court may grant such a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)). While heightened fact pleading is not required, "enough facts to state a claim to relief

that is plausible on its face" must be alleged. *Twombly,* 127 S. Ct. at 1974. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted). "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 127 S. Ct. at 1966 (internal quotation marks omitted). Nor is the Court obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

In reviewing a motion to dismiss, "[c]ourts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Certain additional materials may also be considered without converting a motion to dismiss into a motion for summary judgment (which generally cannot be ruled upon without providing a plaintiff a reasonable opportunity for discovery). For instance, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document . . . ." *Pension Benefit*, 998 F.2d at 1196 (internal citations omitted); *see also* 5B C. Wright & A. Miller, Federal Practice and Procedure § 1357 (2009) ("The court is not limited to the four corners of the complaint, however.

16

Numerous cases . . . have allowed consideration of matters incorporated by reference or integral

to the claim, items subject to judicial notice, matters of public record, orders, items appearing in

the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;

these items may be considered by the district judge without converting the motion into one for

summary judgment.").

## **DISCUSSION**

I.      The Claim Under § 10(b) Of The Exchange Act And Rule 10b-5[10]

Section 10(b) of the Exchange Act forbids one to "use or employ, in connection with the

purchase or sale of any security . . . any manipulative or deceptive device or contrivance in

contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b). SEC Rule 10b-5 makes it

unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading" in connection with the purchase or sale of any security. 17

C.F.R. § 240.10b-5(b).

In order to state a claim of securities fraud in violation of § 10(b), a private plaintiff must

allege the following elements: (i) a material misrepresentation or omission; (ii) scienter; (iii) a

connection with the purchase or sale of a security; (iv) reliance; (v) economic loss; and (vi) "loss

causation." *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *see also McCabe v.*

*Ernst & Young, LLP,* 494 F.3d 418, 424-25 (3d Cir. 2007). Defendants challenge the sufficiency

---

[10]My references to Plaintiffs' claim under Section 10(b) of the Exchange Act and Rule
10b-5 shall sometimes be referred to as the "Section 10(b) claim" or the "§ 10(b) claim."

17

of the Complaint's allegations with respect to each of these essential elements. They also point

to the recent dismissal of related criminal charges against some of the defendants here. I am not

persuaded by the defendants' arguments and conclude that C&A has stated a § 10(b) claim on

which relief may be granted against defendants Stockman, Stepp, Cosgrove, and McCallum.

A.    Applicable Pleading Standards

Federal Rule of Civil Procedure 8 requires a complaint to contain "a short and plain

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Although Rule 8 "encourages brevity, the complaint must say enough to give the defendant fair

notice of what the plaintiff's claim is and the grounds upon which it rests." *Tellabs, Inc. v.*

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2507, 168 L. Ed. 2d 179 (2007)

(internal quotation marks omitted). "Rule 8 is fashioned in the interest of fair and reasonable

notice, not technicality, and therefore is 'not meant to impose a great burden upon a plaintiff.'"

*Rahman v. Fisher*, 2009 WL 970942, at *2 (S.D.N.Y. Apr. 10, 2009) (quoting *Dura*, 544 U.S. at

347).

Private civil suits alleging federal securities fraud must also comply with the heightened

pleading requirements of Federal Rule of Civil Procedure 9(b) as well as the PSLRA, 15 U.S.C.

§ 78u-4. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 530-31 (3d Cir. 1999). Rule 9(b)

imposes heightened pleading requirements on plaintiffs in § 10(b) actions. Pursuant to Rule 9(b),

"[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud

. . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged

generally." As applied to § 10(b) claims, "Rule 9(b) requires a plaintiff to plead (1) a specific

false representation [or omission] of material fact; (2) knowledge by the person who made it of

18

its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006) (internal quotation marks omitted).

The PSLRA "imposes another layer of factual particularity to allegations of securities fraud." *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002). The PSLRA requires that a complaint asserting a § 10(b) claim specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," as well as "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (2). Essentially, a complainant alleging securities fraud must plead "the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue." *Suprema*, 438 F.3d at 276 (internal quotation marks omitted). Accordingly, "fraud allegations should be analyzed individually to determine whether each alleged incident of fraud has been pleaded with particularity." *Rockefeller*, 311 F.3d at 224.

Dismissal is mandatory if a complaint fails to comply with the PSLRA's pleading requirements. *See* 15 U.S.C. § 78u-4(b)(3)(A). Stated differently, "unless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations – inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis." *Rockefeller*, 311 F.3d at 224.

B.      Impact Of *Nolle Prosequi*

Plaintiffs acknowledge that the allegations in the Complaint are "derived from, in large

part," a criminal indictment that was returned by a federal grand jury in the Southern District of

New York against defendants Stockman, Stepp, Barnaba, and Cosgrove. (Opp. Br. at 2;*see*

*generally* D.I. 90; *see also* Opp. Brief at 5 & Ex. A; Tr. at 15-16, 21.) The indictment charged

these four defendants with conspiracy, securities fraud, bank fraud, wire fraud, and obstruction of

justice arising from allegations they orchestrated a fraudulent scheme to hide C&A's true

operating performance and financial results, fraudulently manipulated the financial results C&A

reported to the SEC and the investing public, made false statements in the sale of securities, and

defrauded C&A's lenders. *See United States v. David A. Stockman*, No. 1:07-CR-0020

(S.D.N.Y.); Opp. Br. at Ex. A. The indictment allegations overlap many of the allegations in the

Complaint's § 10(b) count against these same individuals. In their briefing on the pending

motions, Plaintiffs argued that by tracking the indictment – which was necessarily based on a

finding by the grand jury that probable cause existed to believe that the indicted defendants

engaged in securities fraud – the Complaint *per se* satisfied the pleading standards of Federal

Rule of Civil Procedure 9(b). (*See* Opp. Br. at 5-6 & Ex. A; *see also* Tr. at 16.)

Subsequently, on January 9, 2009, the United States Attorney for the Southern District of

New York moved to dismiss the indictment, and his motion was granted. (*See* D.I. 163, 164.) In

requesting this *nolle prosequi*, the United States Attorney's Office stated:

> After a renewed assessment of the evidence, including evidence and information
> acquired after the filing of the Indictment, it has been concluded that further
> prosecution of David A. Stockman, J. Michael Stepp, David R. Cosgrove, and
> Paul C. Barnaba would not be in the interests of justice.

(*Id.*)

Defendants argue that the *nolle prosequi* is damaging, if not fatal, to the Complaint. (*See id.*; Tr. 20-23.) I do not agree. Rather, I conclude that the dismissal of the indictment is almost entirely irrelevant to evaluating the pending motions. The grand jury's finding of probable cause to believe that certain of the defendants here engaged in securities fraud remains the finding of the grand jury. Nothing about the U.S. Attorney's statement disturbs the grand jury's finding. Moreover, it is unclear why the U.S. Attorney sought to dismiss the indictment. While his statement refers to a "renewed assessment of the evidence," the statement ultimately concludes that it "would not be in the interests of justice" to pursue the criminal case. Hence, the U.S. Attorney may have decided there was probable cause for believing a crime occurred but not proof beyond a reasonable doubt – which tells one nothing of the U.S. Attorney's opinion (if he has one) as to whether the applicable burden of proof here (preponderance of the evidence) could be satisfied.[11] It may, alternatively, be that despite the existence of proof sufficient to establish guilt the U.S. Attorney concluded there were non-evidentiary reasons to forego the prosecution. Regardless of the disposition of the criminal case, the sufficiency of the Complaint's allegations must be measured on its own.

## C.  Damages To C&A As Seller Of Notes

Defendants argue that the Complaint lacks a sufficient allegation of the essential element that C&A suffered damages as a result of its sale of approximately $400 million in Notes in

---

[11]Although also not particularly relevant, it is nonetheless noteworthy that, notwithstanding dismissal of the criminal case, the SEC has persisted with its civil securities fraud action against Stockman, Stepp, Cosgrove, McCallum, Barnaba, and other former C&A officers and directors. (*See* D.I. 90 at ¶44; Opp. Br. at 6; Tr. at 16, 30, 48.)

August 2004. According to defendants, C&A benefitted from the purported fraud: the company was able to raise more money at a lower cost than it would have been able to do had its financial statements been less positive and more accurate. With the approximate $400 million it collected, C&A paid off its obligations on approximately $400 million of Notes that were due to expire in 2006, replacing them with new Notes that did not expire until 2012. Defendants cite several cases in support of their argument that, because it received one hundred cents on the dollar for the Notes it issued, C&A was not injured in a manner cognizable under Section 10(b). *See, e.g., Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61-62 (2d Cir. 1985); *Rochelle v. Marine Midland Grace Trust Co. of New York,* 535 F.2d 523, 527-29 (9th Cir. 1976); *see also In re CitX Corp., Inc.,* 448 F.3d 672, 677 (3d Cir. 2006); Tr. at 26-27.

C&A responds that it was damaged because the August 2004 Notes issuance unnaturally prolonged the Company's life and made its ultimate bankruptcy more painful, and more expensive, than it otherwise would have been. This is the theory of "deepening insolvency." (*See* FAC ¶¶184-85; Opp. Br. at 32-36; Tr. at 33-34.)

Under Delaware law, deepening insolvency is not viable as a stand-alone claim. *See Trenwick America Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 205-07 (Del. Ch. 2006), *aff'd,* 931 A.2d 438 (Del. 2007); *see also In re Teleglobe Commc'ns Corp.,* 493 F.3d 345, 385 n.36 (3d Cir. 2007) ("In *Trenwick,* the Vice Chancellor put to rest the notion that there is such a thing as a cause of action for so-called deepening insolvency in Delaware law.") (internal quotation marks omitted). This, however, is not how C&A is seeking to use the theory of deepening insolvency. Instead, C&A relies on deepening insolvency merely as the basis for showing that C&A, as a seller of securities, did suffer the requisite "injury."

22

Federal courts have held that, so used, deepening insolvency is a cognizable harm for purposes of federal claims. *See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 347, 349, 354 (3d Cir. 2001) (defining "deepening insolvency" as "an injury to [a debtor's] corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life," which is "type of injury" and "theory of injury" that is "generally a valid theory for federal law claims"); *In re Greater Southeast Cmty. Hosp. Corp. I*, 353 B.R. 324, 337 (Bankr. D.D.C. 2006) ("[T]here is no way to make sense of *Lafferty* without concluding that the deepening of a company's insolvency can be harmful; otherwise, the *Lafferty* court could not have concluded that fraudulent conduct leading to the deepening of a company's insolvency constitutes tortious activity" ); *see also In re The Brown Schools*, 386 B.R. 37, 48 (Bankr. D. Del. 2008) (agreeing that "deepening insolvency [i]s a valid theory of damages for the breach of fiduciary duty claim"); *Official Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v. PricewaterhouseCoopers, LLP*, 2007 WL 141059, at *7 (W.D. Pa. Jan. 17, 2007) ("In the instant action, the Committee alleges independent caus[es] of action in the form of professional negligence, breach of contract, and aiding and abetting breach of fiduciary duty, which, if viable, give AHERF a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits.") (internal quotation marks omitted); *see also generally Thabault* v. *Chait,* 541 F.3d 512, 520, 523 (3d Cir. 2008) ("When a plaintiff brings an action for professional negligence and proves that the defendant's negligent conduct was the proximate cause of a corporation's increased liabilities, decreased fair market value, or lost profits, the plaintiff may recover damages in accordance with state law, . . .[because] traditional damages, stemming from actual harm of a defendant's negligence, do not become invalid merely because they have the

23

effect of increasing a corporation's insolvency."). Although I am not aware of any court that has expressly applied the theory of deepening insolvency to a § 10(b) case, neither am I aware that any court has rejected such application, and I see no reason to do so.

Accordingly, I conclude that Plaintiffs have adequately alleged they were damaged by the securities fraud.

D.     Loss Causation

To recover damages under § 10(b), a plaintiff must also adequately plead loss causation. *See Dura*, 544 U.S. at 338. The Court must evaluate loss causation allegations by the standards of Rule 8, which requires only that defendants have notice of the Plaintiffs' theory of loss. *See id.* at 346 ("[N]either the [Federal] Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss;" rather, the "short and plain statement" required by Rule 8(a)(2) "must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests.") (internal quotation marks omitted); *see also* Tr. at 46-47. Here, defendants have been provided appropriate notice of Plaintiffs' theory of loss causation: namely that the fraudulent financial statements deepened C&A's eventual insolvency.

Defendants contend the fraudulent financial statements are not alleged to have caused C&A's bankruptcy and, even if they were, they did not, because C&A's bankruptcy was the result of negative economic conditions, especially in the market for automobile parts. *See McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 431 (3d Cir. 2007) ("[T]he injury averred must proceed directly from the wrong alleged and must not be attributable to some supervening cause."). However, defendants seek to place a greater burden on Plaintiffs than the law requires.

24

Plaintiffs do not have to allege (or prove) that defendants' fraud was a "but-for cause" of Plaintiffs' insolvency; instead, they may, as here, rely on the theory of deepening insolvency. The Complaint adequately alleges that the accounting misstatements directly caused C&A's insolvency to be greater than it otherwise would have been. (*See* FAC ¶¶71, 92-93, 184-85.) While the Complaint also references the negative economic conditions confronted by C&A (*see id.* at ¶¶37-38, 70), nowhere does it allege that these supervening forces were the sole and exclusive reason C&A ended up in bankruptcy. At this stage of the proceedings the Court must take as true the allegations of the Complaint, including its allegations as to the multiple reasons for C&A's bankruptcy – and, more importantly, its allegations as to the fraudulent reasons for C&A's insolvency having been deeper than it should have been.

E.   Reliance

The Complaint alleges that C&A relied on its own false financial statements. (*See* FAC ¶184 ("Collins & Aikman sold securities in reliance on Director and Officer Defendants' materially false and misleading statements."); *see also* FAC ¶¶71, 92.) However, the Complaint also alleges that it was the Director and Officer Defendants (and others acting at their direction) who "caused Collins & Aikman to issue materially false and misleading statements." (FAC ¶182; *see also* FAC ¶¶25, 70-71, 92-93, 181-85.) From this, defendants argue that the § 10(b) claim must be dismissed because, as a matter of law, the directors' knowledge is imputed to C&A. That is, C&A as the seller of securities cannot have been defrauded by false statements it (through its directors) knew were false.

In making this argument, defendants rely principally on *Trenwick America Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007). In

25

*Trenwick,* the Court of Chancery dismissed a Delaware common law fraud claim, brought by the

trust litigating on behalf of the bankrupt Trenwick America against the company's directors, due

to (among other things) a failure to plead reliance. 906 A.2d at 207, 211. The trust alleged that

Trenwick America's "directors knew the true facts about all the issues said to have been

misrepresented." *Id.* at 211. Under Delaware law, the directors' knowledge was imputed to the

corporation and, consequently, "the entity would not have been relying to its detriment on the

fraudulent statement because its controllers were aware of the actual state of affairs." *Id.* at 212

& n.128. The *Trenwick* court explained:

> By the Litigation Trust's own admission, Trenwick America's board of directors
> knew the true facts about all the issues said to have been misrepresented. As a
> result, Trenwick America – as an entity – did not rely to its detriment on any of
> the misstatements. . . . To the extent the Litigation Trust is referring to Trenwick
> America, its statement makes no sense because the complaint alleges that those
> who controlled Trenwick America knew the statements were inaccurate.

*Id.* at 211-12.

As Plaintiffs observe, *Trenwick* did not involve a § 10(b) claim, but instead addressed a

claim for common law fraud. While similar, "§ 10(b) does not incorporate common law fraud

into federal [securities] law." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,* ___

U.S.___, 128 S. Ct. 761, 764 (2008). Moreover, as the Third Circuit has remarked with respect

to federal securities fraud, while state law may play a role, "Reasonable reliance is an element of

a federal law claim and what constitutes such reliance is a matter of federal law. Federal law

calls for the determination of reasonableness to be made on a case-by-case basis based on all of

the surrounding circumstances." *AES Corp. v. Dow Chemical Co.*, 325 F.3d 174, 179 (3d Cir.

2003). Thus, the Court is not bound by *Trenwick*.

26

Furthermore, several federal courts have addressed situations like those presented here and have concluded that a § 10(b) claim was sufficiently alleged.  For example, in *Estate of Soler v. Rodriguez*, 63 F.3d 45, 54 (1st Cir. 1995), the First Circuit held "[i]t is by now well established that a corporation has a claim under § 10(b) if the corporation was defrauded in respect to the sale of its own securities by some or even all of its directors."  In *Soler*, two interested directors withheld material information from other disinterested corporate directors and shareholders in connection with the sale of the corporation's stock, and suit was subsequently brought on behalf of the corporation.  *See id.* at 55.  The court noted:

> The allegations here are precisely of a lack of full disclosure to [the company], the seller of the securities.  They go beyond mismanagement to the calculated and deliberate concealment, by interested directors, of information that a substantial block of the company's stock was being sold at an improperly low price to another company with whom the interested directors were linked.  The sale of [the company's] securities, and the price and terms of the sale, were deliberately withheld to prevent the disinterested members of [the company's] board of directors, who were also its controlling shareholders, from taking action prior to the completed sale.  Hence those sharing in the legal responsibility to manage [the company's] affairs were kept in the dark until the time had passed when they might still have acted to safeguard [the company's] interests.  As there was no "full and fair disclosure" to those legally empowered to act for the corporation, there was no full and fair disclosure to [the company] itself. . . . [These] facts alleged go well beyond mere corporate mismanagement.

*Id.* at 55-56.  In such a situation, "[w]here corporate fiduciaries deceive other board members and stockholders by withholding key information pertinent to the corporation's sale of its own securities, the corporation may have redress through § 10(b)."  *Id.* at 56.

Analogously, in the instant case the Complaint alleges that C&A relied on the false statements of directors Stockman, Stepp, Cosgrove, and McCallum in the sale of its 12.875% Senior Subordinated Notes.  (*See* FAC ¶¶70, 92, 184; Opp. Brief at 29.)  The Complaint further

27

alleges that, at the time of the August 2004 Senior Notes Offering, C&A was hemorrhaging cash and on the brink of financial ruin. (*See* FAC ¶¶70, 92, 184; Opp. Brief at 29.) The alleged fraudulent schemes perpetrated by the above-referenced defendants falsely portrayed C&A as a healthy and sustainable enterprise when, in actuality, it was not. (*See* Opp. Brief at 29.) But for these defendants' fraud, the Company would not have been able to successfully sell its securities and, in turn, secure more debt and artificially prolong its corporate life. (*Id.*) In this way, C&A relied to its detriment on its own false financial statements, in connection with the sale of securities.

In *Ruckle v. Roto American Corp.*, 339 F.2d 24 (2d Cir. 1964), the Second Circuit rejected the argument defendants attempt to revive here. In *Ruckle*, a director pressed § 10(b) and Rule 10b-5 claims seeking to enjoin other directors and the corporation from consummating the issuance of treasury shares, alleging the defendant directors fraudulently withheld from the board the most recent financial statements and other information necessary to properly evaluate the proposed transaction. *See id.* at 26. Reversing a district court order that had dismissed the complaint, the Second Circuit held that "federal courts have jurisdiction over actions in which the complaint alleges that a corporation has been or may be defrauded into issuing or selling securities through the failure or refusal of some of its directors fully to disclose to the remaining directors material facts concerning the transactions or the financial condition of the corporation." *Id.*; *see also id.* at 27 (holding that "failure or refusal of a majority of a board of directors to disclose to the remaining directors information pertinent to a proposed stock issuance" may "constitute a 'fraud' upon the corporation within the meaning" of § 10(b) and SEC Rule 10b-5).

The Second Circuit went on to say that a corporation may, within the meaning of § 10(b),

28

be defrauded by a majority of its directors "or even the entire board." *Id.* at 29; *see also*

*Superintendent of Ins. of New York v. Bankers Life & Casualty Co.*, 404 U.S. 6, 10 (1971)

(recognizing that § 10(b) "protects corporations as well as individuals who are sellers of a

security"). It continued:

> If, in this case, the board defrauded the corporation into issuing shares either to its
> members or others, we can think of no reason to say that redress under Rule
> 10B-5 is precluded, though it would have been available had anyone else
> committed the fraud. There can be no more effective way to emasculate the
> policies of the federal securities law than to deny relief solely because a fraud was
> committed by a director rather than an outsider. Denial of relief on this basis
> would surely undercut the congressional determination to prevent the public
> distribution of worthless securities.

*Ruckle,* 339 F.2d at 29.

Defendants have tried to distinguish these federal authorities by claiming that the alleged

false statements identified in the Complaint were made to "third parties outside of the company,"

while *Ruckle* (for instance) "involved . . . a distinct situation . . . where certain directors

misrepresented to other directors and fraudulently induced the company to issue stock, which

benefitted them. It was not a misrepresentation that was made outside the company to a third

party." (Tr. at 53-54) But defendants have not accurately described the fraud alleged here. I

read the Complaint as alleging that the misrepresentations of certain directors were made to – and

relied on to their detriment by – the Company, other directors, and third parties. (*See generally*

FAC ¶¶ 25, 71, 92-93, 182-84; Tr. at 61-62.) Moreover, defendants' proposed distinction has

been expressly and persuasively rejected by other courts. *See, e.g., Ruckle*, 339 F.2d at 27-28

(discussing and distinguishing *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir. 1952),

and *Howard v. Furst,* 238 F.2d 790 (2d Cir. 1956), and commenting that neither of those cases

"presented a situation in which suit was instituted on behalf of a defrauded corporation" and that

there was "no support in either of those opinions for the proposition that when a corporation is

actually defrauded into issuing securities . . . [that] it still cannot sue under Section 10(b) or Rule

10B-5;" "[b]arring suit by a corporation defrauded under those circumstances would, as a legal

and practical matter, destroy any remedy against the perpetrator of the fraud"); *Weitzen v.*

*Kearns*, 271 F. Supp. 616, 620-22 (S.D.N.Y. 1967) (rejecting, based on *Ruckle*, defense

argument that because all of company's directors were allegedly aware of undisclosed inside

information, company could not have been deceived); *Globus, Inc. v. Jaroff*, 266 F. Supp. 524,

530-31 (S.D.N.Y. 1967) ("[I]n *Ruckle*, where only a minority of the board of directors was

alleged to have been deceived by the majority, and in view of the observation in . . . *Ruckle* . . .

that a corporation 'may be defrauded by all its directors' . . . it would seem ill-advised to assert

that allegations of strict causality, in terms of deception of more than 50% [o]f those voting, or of

a sufficient number to effect the intended result, are required in all cases to establish a cause of

action under § 10(b)."); *Heilbrunn v. Hanover Equities Corp.*, 259 F. Supp. 936, 938 (S.D.N.Y.

1966) (permitting derivative cause of action under § 10(b) and Rule 10b-5, relying on *Ruckle,*

and stating, "it is clear that the corporation, as seller of stock . . . may be defrauded by all its

directors, and is not barred from relief by the notion of imputed knowledge") (internal quotation

marks omitted).

It is also worth noting that here Plaintiffs have not alleged that all of C&A's directors

participated in the fraud. (*See* Tr. at 62.) While the Complaint could be clearer on this point – by

identifying all of the directors and indicating which are not sued – taking the allegations in the

light most favorable to Plaintiffs and understanding Plaintiffs' explanation at the hearing, it is

clear that Plaintiffs do not allege that the directors who sat on C&A's Audit Committee knew C&A's financial statements were false. Therefore, even if *Ruckle* were limited to situations in which some directors deceived other directors – which it is not – that is, in part, what is alleged here.

Although I am bound neither by *Trenwick* nor the federal cases exemplified by *Ruckle*, I find *Ruckle* and its related cases persuasive. Therefore, consistent with *Ruckle*, I do not believe at this stage of the proceedings on these federal securities fraud claims that the knowledge of the fraud of certain of C&A's directors and officers can be imputed to C&A such that the Company cannot possibly be proven to have relied on its false financial statements. Accordingly, I conclude that the element of reliance is sufficiently alleged.

F.    Individual-Specific Defenses

Each of the securities fraud defendants raises additional defenses specific to him. None of these, however, compel dismissal of the § 10(b) claim.

1.    Stockman

Stockman argues that the Complaint suffers from a host of infirmities, one of them being that Plaintiffs' allegations of scienter as to him are insufficient. He complains that the Plaintiffs have pled no facts or circumstances demonstrating a motive for engaging in securities fraud or that would otherwise give rise to a strong inference of scienter. Stockman asserts it is "not disputed" that "he made no money from this" (Tr. at 23); he argues further that, as a buyer and not a seller of C&A stock, it makes no sense to allege that he would engage in fraud to harm his investment in C&A (*id.*; D.I. 116 at 23-25). Stockman adds that the Complaint is devoid of facts creating a strong inference that he "knowingly or recklessly: (i) inflated the prices of acquisitions

31

from Mr. McCallum in exchange for rebates from another McCallum entity; (ii) booked rebate transactions incorrectly, or directed anyone to do so; (iii) inflated any receivables in January 2005, or ordered anyone to do so; (iv) overstated goodwill and deferred tax assets; (v) or made inaccurate statements in March and April 2005." (D.I. 116 at 26; *see also* D.I. 116 at 27-34.)

In the Third Circuit, "[t]he requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 148 (3d Cir. 2004) (internal quotation marks omitted). The U.S. Supreme Court recently held that "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2510 (2007).

The Complaint meets these standards. It alleges Stockman participated in several fraudulent transactions: he intentionally caused C&A to book false rebates from Joan Fabrics by means of "round-trip" transactions, he intentionally caused C&A to book supplier rebates improperly, and he participated in drafting the marketing materials relating to the August 2004 Notes Offering. (*See, e.g.,* FAC ¶¶53, 57-69, 70-71, 92-93, 181-85; *see also generally* D.I. 139.) It further alleges that Stockman's company, Heartland LP, during 2001, 2002, 2003, and 2004, received total advisory fees from C&A of $24.5 million, $5.7 million, $4.0 million, and $10.6 million, respectively. (FAC ¶32; *see also* Tr. at 31-33.) Of this more than $44 million, nearly half – $22 million – is alleged to have gone to Stockman personally. (FAC ¶32; *see also* Tr. at 31-33.) While Stockman disputes Plaintiffs' allegation that he was motivated by large payments

from C&A to the Heartland Entities, I am persuaded that a strong inference of fraud is present.[12]
The facts alleged, taken as true, create an inference that Stockman acted deliberately to defraud
investors, and this inference is at least as strong as any other inference that could be deduced
from these factual allegations. *See Tellabs,* 127 S. Ct. at 2509 ("The inquiry . . . is whether *all* of
the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any
individual allegation, scrutinized in isolation, meets that standard.").

Finally, Stockman asserts that the Complaint fails to establish materiality because the
financial impact of the challenged transactions was minimal when compared to C&A's overall
financial condition. (D.I. 116 at 16-19) However, materiality is a mixed question of law and fact
and is not generally amenable to resolution on a motion to dismiss. *See, e.g., ECA, Local 134
IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)
("[T]he determination of whether an alleged misrepresentation is material necessarily depends on
all relevant circumstances. Because materiality is a mixed question of law and fact, in the
context of a Fed. R. Civ. P. 12(b)(6) motion, a complaint may not properly be dismissed . . . on
the ground that the alleged misstatements or omissions are not material unless they are so
obviously unimportant to a reasonable investor that reasonable minds could not differ on the
question of their importance.") (internal quotation marks and citations omitted); *Shapiro v. UJB
Financial Corp.*, 964 F.2d 272, 281 n.11 (3d Cir. 1992) ("Materiality is a mixed question of law
and fact."). Such is the case here. I cannot find, at this stage, that the alleged deception is
immaterial as a matter of law.

---

[12]The Complaint does not allege that Stockman "made no money" from the fraud or that
he only bought – and did not sell – C&A stock. Therefore, at this stage, I cannot take
Stockman's assertions on these points as true.

33

2. Stepp

Stepp contends that he cannot be held liable for false statements made by others or made after he left C&A in October 2004, that there are no allegations he made false statements directed to the accounting for rebates, that there are no allegations he had any involvement in the accounting for rebates, and that the allegations of his knowledge of the falsity of C&A's financial statements are conclusory and lack the particularity required under Rule 9(b). (*See* Tr. at 45-46.)

However, as Plaintiffs observe (Tr. at 48-49), where a director is involved in a fraudulent scheme, he need not have uttered the false statements in order to be liable for securities fraud under Section 10(b). *See In re Bristol Myers Squibb Co. Sec. Litig.,* 2008 WL 3884384, at *20 (S.D.N.Y. Aug. 20, 2008) ("[Defendant] Bodnar's behavior is at the heart of Bristol-Myers's false and misleading conduct. It is neither implausible, nor too remote to find that the investing public relied on the announcement of the Apotex litigation settlement in deciding whether or not to invest in Bristol-Myers stock, and Bodnar was directly responsible for the settlement agreements. Bodnar made no public statements himself, but investors relied on his good faith in negotiating the Apotex settlement agreement and committing the Company to its terms. . . . Bodnar's misconduct and deceptive acts were communicated to the public here through the disclosure of the regulatory rejection of the settlement, the disclosure of the amended settlement's terms, and the revelation of the secret oral side agreements.").

The Complaint alleges with particularity Stepp's involvement in both the round-trip transactions and the rebate schemes and that Stepp also participated in drafting the marketing materials relating to the sale of the Notes. (*See, e.g.,* FAC ¶¶53-71, 92-93, 181-85; *see also generally* D.I. 139; Tr. at 48.) I agree with Plaintiffs that in light of Stepp's alleged involvement

34

in the fraudulent schemes and his knowledge of the fraudulent nature of the transactions at issue,
a strong inference can be drawn here that Stepp acted with scienter, and the Complaint
sufficiently states a § 10(b) claim.

Stepp also contends that he sold no C&A stock during the relevant time period and,
hence, cannot have been motivated by seeking to profit from sales of inflated C&A stock. (Tr. at
46; D.I. 105 at 7) But the Complaint alleges nothing with respect to Stepp's sales of C&A stock,
so at this point in the case I cannot conclude that Stepp did not sell any stock. More importantly,
the issue of Stepp's motivation is a factual issue that cannot here be a basis for dismissing a
securities fraud claim.

### 3.	Cosgrove

Cosgrove similarly challenges Plaintiffs' allegations of scienter. Cosgrove argues that
Plaintiffs have failed to allege specifically that he had knowledge of, or participated in, the rebate
scheme with an intent to inflate C&A's earnings, and that the Complaint is devoid of any specific
reference to his participation in or knowledge of the rebate scheme. (*See generally* D.I. 98, 148;
Tr. at 67.) I disagree. Plaintiffs have detailed the alleged fraud and Cosgrove's involvement in
these schemes, including his participation in drafting the marketing materials relating to the sale
of the Notes. (*See, e.g.,* FAC ¶¶60-67, 70-71, 92-93, 181-85; *see also* Tr. at 68-69; *see generally*
D.I. 139.) These detailed allegations of Cosgrove's participation are adequate to support a strong
inference of scienter.

### 4.	McCallum

McCallum contends that Plaintiffs do not allege he was involved in any way with the
August 2004 Senior Note Offering or any financial advising or related accounting and auditing.

35

(Tr. at 108-09; *see generally* D.I. 100.) Plaintiffs, however, respond by pointing to the Complaint's allegations that McCallum participated in the Joan Fabrics round-trip transactions, and that he made misstatements to the company's Audit Committee in connection with an investigation of these transactions. (*See, e.g.,* FAC ¶¶ 53-57; Tr. at 109-10; *see generally* D.I. 139.) Moreover, McCallum – like Stockman, Stepp, and Cosgrove – was allegedly a critical player in the rebate scheme to promise "future business to suppliers in exchange for immediate recognition of rebates," which resulted in the issuance of false financial statements as well as payments to McCallum. (D.I. 159 at 2; *see* FAC ¶¶53-70.) These allegations support a strong inference that McCallum acted with scienter.

Moreover, as he acknowledges (D.I. 100 at 17), McCallum signed several of C&A's public filings, including some which contained false financial information that was subsequently incorporated into the August 2004 Offering Memorandum. As Plaintiffs note, by signing these SEC filings, McCallum made false and misleading statements, on which C&A relied to its detriment, making McCallum potentially liable under Section 10(b). (*See* D.I. 139; FAC ¶93; *see also In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 419-20 (S.D.N.Y. 2003) ("The very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents.")).

II.  State Law Claims

Having found that the § 10(b) claims survive and that this case will proceed in federal court, it is in the interests of judicial economy that the closely related state law claims be litigated

36

here as well. *See* 28 U.S.C. § 1367. This exercise of judicial discretion is consistent with the

requests of Plaintiffs and the Heartland Entities. (*See* Tr. at 36, 127.) No party has argued that if,

as I recommend, this Court is to proceed with a federal claim that it should not also retain

jurisdiction over Plaintiffs' state law claims. I will therefore address the sufficiency of the state

law claims pled in the Complaint.

      A.    Breach Of Fiduciary Duty

      Delaware law imposes fiduciary duties of care and loyalty on directors and officers of

Delaware corporations. *See Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009). These

duties extend to both the corporation and its shareholders. *See Malone v. Brincat*, 722 A.2d 5, 10

(Del. 1998). The duty of due care obligates corporate directors and officers to "act on an

informed basis." *Cede & Co. v. Technicolor*, 634 A.2d 345, 367 (Del. 1993). However, "duty of

care violations are actionable only if the directors [or officers] acted with gross negligence." *See*

*In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 750 (Del. Ch. 2006). "[T]he duty of

loyalty mandates that the best interest of the corporation and its shareholders takes precedence

over any interest possessed by a director, officer or controlling shareholder and not shared by the

stockholders generally." *Cede*, 634 A.2d at 361.[13]

---

[13]Although Plaintiffs allege violations of a duty of "good faith" (*see* FAC ¶¶22, 46, 192-95, 207), "the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty. Only the latter two duties, where violated, may directly result in liability, whereas a failure to act in good faith may do so, but indirectly." *Stone*, 911 A.2d at 370 (internal quotation marks and footnote omitted). Likewise, Plaintiffs allege several defendants violated a "duty of candor," which may also be referred to as a "duty of disclosure." (*See* FAC ¶¶23-24, 192-95; *see also* FAC ¶¶39-40, 42, 57, 65, 68-89, 92-94, 97-101; Opp. Brief at 43-44.) However, "[t]he duty of disclosure is not an independent duty, but derives from the duties of care and loyalty." *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (internal quotation marks omitted). Hence, I do not separately discuss "good faith" or "duty of candor" claims but, instead, consider the "good faith" allegations as part of the duty of

The Complaint alleges that the individual defendants, each of whom were directors and/or officers of C&A, owed "fiduciary duties of loyalty, good faith and care to the Company," yet breached those duties "by orchestrating, encouraging or utilizing various accounting schemes . . . which materially misstated the financial condition of the Company." (FAC ¶¶193-94; *see also id.* ¶¶22, 192-95.) The Complaint further alleges with respect to the Heartland Entities that "[a]s the Company's controlling shareholder and by virtue of its designation of a majority of the Company's directors, Heartland owed Collins & Aikman fiduciary duties of loyalty and care not to take actions to benefit itself to the detriment of the Company." (FAC ¶193; *see also id.* ¶¶30, 192-95.) According to the Complaint, the Heartland Entities "breached these fiduciary duties by causing, permitting, enabling, acquiescing and aiding and abetting the fraudulent scheme" detailed in the Complaint. (FAC ¶193; *see also id.* ¶¶46, 192-95.) The Complaint also alleges that PwC and KPMG, the auditor defendants ("Auditor Defendants"), aided and abetted the breaches of fiduciary duties by the others. (*See* FAC ¶¶242-46.)

Below I address the Complaint's breach of fiduciary duty claims, first with respect to the individual defendants, then the Heartland Entities, and finally the Auditor Defendants.

1.   Section 102(b)(7)

With respect to the duty of care, certain of the director defendants point to an exculpatory clause in C&A's Restated Certificate of Incorporation, which the C&A board adopted pursuant to Section 102(b)(7) of Delaware's General Corporation Law. (*See* Tr. at 86; 8 Del. C. § 102(b)(7).) In reviewing a motion to dismiss, the Court may take judicial notice of provisions of C&A's Restated Certificate of Incorporation. *See, e.g., In re Baxter Int'l, Inc. Shareholders*

loyalty claims and the "candor" allegations as part of the duty of care and loyalty claims.

*Litig.,* 654 A.2d 1268, 1270 (Del. Ch. 1995); *In re Wheelabrator Techs. Inc. Shareholders Litig.,* C.A. No. 11496, 1992 WL 212595, at *11-12 (Del. Ch. Sept. 1, 1992). Here, the referenced exculpatory provision states:

> EIGHTH: To the fullest extent that the General Corporation Law of the State of
> Delaware as it exists on the date hereof or as it may hereafter be amended permits
> the limitation or elimination of the liability of directors, no director of the
> Corporation shall be liable to the Corporation or its stockholders for monetary
> damages for breach of duty as a director.

(D.I. 113 at Ex. K)

A § 102(b)(7) provision in a corporation's charter eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of a fiduciary duty as a director does not "eliminate or limit the liability of a director: (i) [f]or any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit." 8 Del. C. § 102(b)(7). Hence, Delaware law permits exculpation for breaches of the duty of care, but it does not permit exculpation for breaches of the duty of loyalty (including any duty of disclosure). *See Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001); *see also Zirn v. VLI Corp.*, 621 A.2d 773, 783 (Del. 1993).

Delaware law further provides that the protections of an exculpatory clause may properly be invoked and applied only "where the factual basis for a claim *solely* implicates a violation of the duty of care." *Emerald Partners* v. *Berlin,* 726 A.2d 1215, 1223-24 (Del. 1999); *see also In re Walt Disney Co. Derivative Litig.*, 825 A.2d 693, 286 n.29 (Del. Ch. 2003) ("[Section] 102(b)(7) bars a claim only if there is an unambiguous, residual due care claim and nothing

39

else"); *Alidina* v. *Internet.com Corp.,* 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002)

("[W]hen a duty of care breach is not the *exclusive* claim, a court may not dismiss based upon an

exculpatory provision. Because the duty of loyalty is implicated in this case, the § 102(b)(7)

provision cannot operate to negate plaintiffs' duty of care claim on a motion to dismiss.")

(footnote omitted).[14] Because, here, the Complaint alleges violations of the duty of loyalty as

well as the duty of care, the duty of care claims against the individual director defendants may

not be dismissed at this stage of the proceedings on the basis of C&A's § 102(b)(7) exculpatory

provision.

### 2. Defendants Stockman, Stepp, Cosgrove, And McCallum

Turning to the substance of Plaintiffs' allegations, the Complaint recounts various

transgressions and alleges that defendants Stockman, Stepp, Cosgrove, and McCallum violated

their fiduciary duties of care and loyalty. (*See, e.g.,* FAC ¶¶22-24, 39-40, 42, 57, 65, 68-89, 92-

94, 97-101, 192-195; Opp. Brief at 38-44; Tr. at 87.) For instance, the Complaint contains

numerous allegations describing how these defendants failed to act in a sufficiently careful and

informed manner or in good faith with respect to their stewardship of C&A, in that these

defendants engaged in a series of accounting schemes to misrepresent and otherwise conceal

C&A's true financial condition. (*See* FAC ¶¶53-69, 116-29; Opp. Brief at 42-43.) The

Complaint also sets forth how Stockman, Stepp, and McCallum directed and participated in the

improper "roundtrip" transactions involving Joan Fabrics. (*See* FAC ¶¶53-57, 116-24; Opp.

Brief at 43.) It further details how Stockman, Stepp, and Cosgrove caused C&A to prematurely

---

[14]Moreover, "the protection of an exculpatory charter provision appears to be in the nature of an affirmative defense," and "affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6)." *In re Tower Air, Inc.*, 416 F.3d 229, 242 (3d Cir. 2005).

account for supplier and other capital equipment rebates through the use of false documentation. (*See* FAC ¶¶58-69, 125-29; Opp. Brief at 43.) As a result of such activities, these defendants caused the Company to issue false and misleading financial results throughout the period 2001 to 2005. (*See* FAC ¶¶57, 66-69, 117, 123, 128; Opp. Brief at 43.) Finally, the Complaint alleges that these defendants used the false financial results to obtain millions of dollars of financing from the Company's lenders that defendants knew would never be repaid. (*See* FAC ¶¶70-89, 93; Opp. Brief at 43.)

I find that a fair reading of the myriad allegations shows that the Complaint does state claims against these four defendants for breach of the duty of care and loyalty on which relief may be granted. I thus recommend that the motions to dismiss the breach of fiduciary duty claims against Stockman, Stepp, Cosgrove, and McCallum be denied.

### 3.   Defendant Barnaba

The Complaint alleges that Barnaba was an officer of C&A who was directly involved in the rebate scheme (FAC ¶¶58-69) and other accounting improprieties (FAC ¶¶125-129). (*See* Opp. Brief at 39.) With respect to the rebate scheme, for example, the Complaint alleges that Barnaba – along with Stockman, Stepp, and Cosgrove – caused C&A to prematurely account for supplier and other capital equipment rebates through the use of false documentation, specifically alleging "Barnaba directed other Collins & Aikman employees to solicit the false documents from suppliers" and "Barnaba used the side letters to prematurely recognize the rebates in the Company's records and financial statements." (*See* FAC ¶62; *see also* FAC ¶¶58-69, 125-29; Opp. Brief at 39, 43.) The Complaint also explains that Barnaba and others lied to the Audit Committee and the market regarding the scope of the Joan Fabrics "round-trip" transactions

41

scheme and the supplier rebate scheme. (*See* FAC ¶¶42, 69, 97-101; Opp. Brief at 44.)

Defendant Barnaba claims that he cannot be liable for a breach of fiduciary duty because he was not a director or officer of C&A and, therefore, he owed the company no fiduciary duties. Barnaba maintains that he was merely the third-ranking employee in the purchasing division of C&A's plastics division. (Tr. at 54) If one looks at C&A's SEC filings, Barnaba continues, one will see that he is not identified as either a director or officer. (Tr. at 55) Moreover, the federal court in which a related securities fraud case is pending dismissed claims against Barnaba based on its finding that he was not a director or officer. (Tr. at 55-56)    Plaintiffs respond by pointing to the Complaint's allegation that Barnaba was an officer. (FAC ¶11) This allegation, Plaintiffs insist, must be taken as true at this point in the litigation.

On this point I agree with the Plaintiffs. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court may "take judicial notice of properly-authenticated public disclosure documents filed with the SEC." *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000); *see also In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 293 (3d Cir. 1999) (holding district court could properly consider authenticated copies of SEC filings submitted by defendants on a motion to dismiss); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[A] district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.") (internal quotation marks). However, while such documents may be considered for purposes of determining what statements were made, such documents may not be considered for the truth of matters asserted within them. *See Kramer*, 937 F.2d at 774 (remarking that judicial notice of SEC filings was appropriate only

because "the documents are the very documents that are alleged to contain the various misrepresentations or omissions and are relevant not to prove the truth of their contents but only to determine what the documents stated") (emphasis added). Thus, I may not do what Barnaba asks me to do.

Instead, at this point, I must take as true the Complaint's allegation that Barnaba was an officer of C&A. It follows that he owed C&A fiduciary duties. Therefore, I recommend that Barnaba's motion to dismiss the breach of fiduciary duty count be denied.

### 4.    Other Individual Defendants

Plaintiffs' attempt to allege a breach of the duty of loyalty against other director and officer defendants merits a different recommendation. Defendants Evans, Hess, Tredwell, McConnell, Valenti, Krause, and Becker are alleged to have failed to monitor C&A's operations. (*See* Tr. at 87-88.) This alleged breach of the duty of loyalty is called a *Caremark* claim, named for *In re Caremark Int'l. Inc. Derivative Litig.*, 698 A.2d 959, 968-70 (Del. Ch. 1996). Pursuant to *Caremark*, director liability "may be said to arise from an *unconsidered failure of the board to act* in circumstances in which due attention would, arguably, have prevented the loss." *Id.* at 967. A director's lack of good faith (and concomitant disloyalty) is demonstrated by a sustained or systematic failure to exercise oversight and assure adequate record keeping. *Id.* at 971.

However, as the Delaware Supreme Court has cautioned, a *Caremark* claim for "oversight" liability is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," because "the duty to act in good faith to be informed cannot be thought to require directors to possess detailed information about all aspects of the operation of the enterprise." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 368,

43

372 (Del. 2006) (internal quotation marks omitted).  Among other hurdles is that liability is

premised "on a showing that the directors were conscious of the fact that they were not doing

their jobs."  *Guttman v. Huang*, 823 A.2d 492, 506 (Del Ch. 2003).

Accordingly, Delaware's Court of Chancery set a high bar for establishing liability on a

*Caremark* claim, writing:

> Generally where a claim of directorial liability for corporate loss is predicated
> upon ignorance of liability creating activities within the corporation . . . only a
> sustained or systematic failure of the board to exercise oversight – such as an utter
> failure to attempt to assure a reasonable information and reporting system exists –
> will establish the lack of good faith that is a necessary condition to liability.  Such
> a test of liability – lack of good faith as evidenced by sustained or systematic
> failure of a director to exercise reasonable oversight – is quite high.

*Caremark*, 698 A.2d at 971.  As more recently articulated by the Delaware Supreme Court,

proving *Caremark* oversight liability requires evidence:

> (a) the directors utterly failed to implement any reporting or information system or
> controls; *or* (b) having implemented such a system or controls, consciously failed
> to monitor or oversee its operations thus disabling themselves from being
> informed of risks or problems requiring their attention.  In either case, imposition
> of liability requires a showing that the directors knew that they were not
> discharging their fiduciary obligations.

*Stone*, 911 A.2d at 370.

Here, the first potential basis for *Caremark* liability – a lack of controls – is plainly not

alleged.  The Complaint identifies such controls as Audit Committee investigations, aided by

independent counsel and auditors.  (*See, e.g.*, FAC ¶¶33-34, 41-42, 86, 95-101, 103; Tr. at 89.)

The Complaint itself also alleges, among other things, that: (i) C&A employed the services of

independent and well-respected auditors who "were frequently present" at C&A, had "continual

access" to C&A's records, "actively participated" in the review of C&A's financial information,

and were "primarily responsible" for reviewing C&A's financial results (FAC ¶¶33-34, 103); and (ii) C&A had an Audit Committee that, when questions arose, twice initiated internal investigations and retained prominent independent counsel and auditors to assist in those investigations (FAC ¶¶41-42, 86, 95-96, 99, 101).

Plaintiffs have also failed to allege that the Board knew its controls were inadequate but, yet, did nothing. This theory of *Caremark* liability requires allegations of facts to establish the existence of "red flags" that would have alerted the directors to the misconduct at issue. *See Wood* v. *Baum*, 953 A.2d 136, 143 (Del. 2008). Where red flags were not "waved in [the director's] face or displayed so that they are visible to the careful observer," a director cannot be held liable for the failure to detect wrongdoing. *Id.* Directors are not liable for failing to uncover wrongdoing that was meticulously concealed from them. *See Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007). "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so." *Id.*; *see also Canadian Commercial Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *6 (Del. Ch. Feb. 22, 2006) ("A conclusory allegation at the end of a general description of self-dealing transactions that defendants were aware of, or consciously ignored, their duties to [the company] in failing to be aware of the challenged transactions or to stop them is not sufficient to support a separate *Caremark* claim or demonstrate conscious disregard of the directors' duties.").

Here, the Complaint does not specify any reason for C&A's directors to have suspected that Stockman or any other C&A officer was deceiving them or abusing his authority. *Cf. Buckley v. O'Hanlon*, 2007 WL 956947, at *4 (D. Del. Mar. 28, 2007) (finding *Caremark* claim

adequately stated where, allegedly, audit committee received eleven warning letters over eight years from independent auditor, auditor resigned after no action was taken in response, and series of inquiries from SEC were also ignored). Although the Complaint contains conclusory allegations that C&A's directors "ignored numerous 'red flags' and failed to take any steps to establish and verify appropriate internal controls" (Opp. Brief at 46 (citing FAC ¶¶26, 41-42, 84)), it also alleges that the directors responded to the "red flags" of which they were aware. For instance, when certain questionable matters were brought to the attention of C&A's board in 2003 and 2005, the Audit Committee responded each time by retaining independent counsel and accounting experts to conduct extensive internal investigations. (FAC ¶¶41-42, 95-101) As importantly, there are extensive allegations that Stockman (among others) went to great lengths to cover up the alleged fraud (*see, e.g.,* FAC ¶¶38, 40, 61, 70, 83-85, 97), meaning that any "red flags" that otherwise should perhaps have been observed were, instead, obscured from the perception of these director-defendants.

Finally, with respect to defendants Evans and Krause, who are not alleged to have been directors, the *Caremark* theory of liability does not apply. "[U]nder Delaware law, this theory of liability typically applies to directors, and not to officers." *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 574 (Bankr. D. Del. 2008).

Therefore, I recommend that Plaintiff's *Caremark* breach of the fiduciary duty of loyalty claim against defendants Evans, Hess, Tredwell, McConnell, Valenti, Krause, and Becker be dismissed.

### 5. Heartland Entities

The Complaint states that "[a]s the Company's controlling shareholder and by virtue of

its designation of a majority of the Company's directors, Heartland owed Collins & Aikman fiduciary duties of loyalty and care not to take actions to benefit itself to the detriment of the Company." (FAC ¶193) Under Delaware law, for a shareholder to owe fiduciary duties to a corporation the shareholder must either own a majority of the corporation's outstanding stock or exert actual control of the corporation. *See Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987); *see also In re Sea-Land Corp. Shareholders Litig.*, 1987 WL 11283, at *4-6 (Del. Ch. May 22, 1987) (dismissing fiduciary duty claim where "complaint admits that [corporate defendant] was not a majority (51%) stockholder" and defendant "did not control the day-to-day affairs of the [corporation]"). Here, the Complaint fails adequately to allege either of these requisites.

To acquire a fiduciary duty solely due to the amount of stock owned, a shareholder must own a majority – 50% plus one – of the company's stock. *See Ivanhoe*, 535 A.2d at 1344. Plaintiffs have failed to allege that any of the Heartland Entities was a majority shareholder. The Complaint contains just two data points describing Heartland LLC's percentage of stock ownership: "In 2001, Heartland owned at least 59.7% of the outstanding common stock of Collins & Aikman and by January 1, 2005, owned 41% of the outstanding common stock." (FAC ¶28) According to the Complaint, then, on some unspecified date in 2001 a Heartland entity was a majority shareholder. However, the Complaint further alleges that in July, September, and December of 2001, C&A undertook certain acquisitions (the Becker Acquisition, the Joan Fabrics Acquisition, and the TAC-Trim Acquisition) that it paid for by, among other things, issuing large amounts of common stock to the sellers. (FAC ¶¶47, 51, 52) By issuing stock to the non-Heartland Entities that sold these companies to C&A, the 2001 acquisitions had

47

the consequence of diluting the Heartland Entities' percentage of ownership. (*See* Tr. at 120-22, 133.) It seems likely that by the end of 2001, and certainly well before the August 2004 Notes Offering, a Heartland entity was not a majority shareholder. More to the point, the Complaint fails to allege that a Heartland entity was a majority shareholder at any point other than an unidentified date in 2001 which, in context, is too ambiguous an allegation to establish that the Heartland Entities were subject to fiduciary duties solely as a result of the percentage of their stock ownership.[15]

Nor have Plaintiffs adequately alleged the second basis by which the Heartland Entities could have become subject to fiduciary duties: exerting actual control over C&A's operations. The Complaint's conclusory allegations concerning the Heartland Entities' stock ownership and the Heartland Entities' right to nominate a majority of C&A's directors are insufficient to plead the actual control required to impose a fiduciary duty on a non-majority stockholder. *See, e.g., Citron v. Steego Corp.*, 1988 WL 94738, at \*6-7 (Del. Ch. 1988) ("[I]t is the actual exercise of such control, not the simple potential for control, that creates the special duty."); *In re Sea-Land*, 1987 WL 11283, at \*4-5 (dismissing "conclusory allegations concerning [39.5% shareholder's] stock control" as insufficient to bestow fiduciary status) (internal quotation marks omitted). Nowhere does the Complaint indicate how many directors there were, nor when and how long a majority of the directors who served were Heartland nominees. (*See* Tr. at 123-24; s*ee also generally In re Western Nat'l Corp. Shareholders Litig.*, 2000 WL 710192, at \*15 (Del. Ch. May 22, 2000) ("Directors must be nominated and elected to the board in one fashion or another. The

---

[15]Plaintiffs have not suggested that they lack access to records of the percentage of C&A shares the Heartland Entities owned at all relevant times.

fact that a . . . large shareholder played some role in the nomination process should not, without additional evidence, automatically foreclose a director's potential independence.").) Likewise, the general allegation that "the key operating positions were Heartland people" is insufficient under Delaware law to plead actual day-to-day control. (Tr. at 131-32; *see also Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984) ("The shorthand shibboleth of dominated and controlled directors is insufficient.") (internal quotation marks omitted), *overruled in part on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *see also In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005, at *3-4 (S.D.N.Y. Aug. 8, 2005) ("[T]he mere fact that [directors] held high positions with [defendants], and were appointed to the . . . board by [defendants], cannot, standing alone, establish that they acted as agents, or acted under the control, of [defendants].").

Because I conclude that Plaintiffs have failed adequately to plead a basis for finding that the Heartland Entities owed fiduciary duties to C&A, I recommend dismissal of the breach of fiduciary duty claims against the Heartland Entities.

### 6.    Auditor Defendants

Count XII of the Complaint alleges that the Auditor Defendants, PwC and KPMG, aided and abetted C&A's officers in breaching their fiduciary duties owed to Collins & Aikman. (*See* FAC ¶¶242-46.) To prevail on such a claim under Delaware law, a plaintiff must demonstrate: "(1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary." *Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *15 (Del. Ch. Nov. 30, 2007).

Plaintiffs allege that the Auditor Defendants knowingly assisted certain C&A officers in

breaching their fiduciary duties in that the Auditor Defendants failed to disclose material misstatements and the fraudulent conduct of certain Director and Officer Defendants. (FAC ¶¶161, 167, 177)  The Complaint alleges that "[g]iven [the Auditor Defendants'] intimate knowledge of Collins & Aikman's business, PwC and KPMG knew or should have known about the numerous accounting irregularities and improprieties alleged herein, and that the Company's financial statements, and related financial information, were materially false and misleading because, among other things, they violated GAAP [Generally Accepted Accounting Principles] in numerous respects." (FAC ¶106)  It further states: "By failing to bring material misstatements and fraudulent conduct to the attention of the Board of Directors and the Audit Committee, and the public if necessary, PwC and KPMG enabled the officers to continue their breaches of fiduciary duties owed to Collins & Aikman on an ongoing basis, to the detriment of the Company." (FAC ¶244)

The Auditor Defendants respond with numerous contentions.  I focus on just one: defendants' argument that Plaintiffs have failed adequately to allege the Auditor Defendants' "knowing participation" in any breach.  I agree.

The Complaint contains merely conclusory allegations that the Auditor Defendants actually knew of Plaintiffs' alleged fraudulent schemes. (*See* FAC ¶245.)  These conclusory allegations of knowledge are contradicted by the extensive allegations that other defendants undertook extensive efforts to mislead the auditors. (*See, e.g.,* FAC ¶¶153-54 (Plaintiffs alleging directors and officers "routinely arrange[d] for third parties to create false 'side-letters' which were provided to PwC and KPMG as 'proof' that the Company properly recorded the rebates in its accounting records").)  Indeed, a case cited by Plaintiffs, *In re Winstar Commc'ns,* 2006 WL

473885, at *11 (S.D.N.Y. Feb. 27, 2006), recognizes that where a "complaint reveal[s] that . . . insiders took action to conceal the allegedly fraudulent transactions and . . . [defendants] fail to detect and disclose the fraud, scienter [is] not . . . established." Moreover, such "red flags" as are alleged are not so egregious under the circumstances as to have required additional audit procedures the Auditor Defendants recklessly failed to implement. *See Fidel v. Farley,* 392 F.3d 220, 230 (6th Cir. 2004); *In re Cardinal Health Inc. Sec. Litig.,* 426 F. Supp. 2d 688, 765-66 (S.D. Ohio 2006). Even assuming the Auditor Defendants were aware of the red flags, there are no particularized allegations that these red flags required them to undertake different or additional procedures. *See In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 218 (S.D.N.Y. 1999) ("Even if [the auditor] should have done more to attempt to uncover and disclose the alleged fraud, without factual allegations tending to establish knowledge of those practices on [the auditor's] part, an auditor's failure to do more is legally insufficient.") (internal quotation marks omitted). Plaintiffs' allegations against the Auditor Defendants are further undermined by the fact that the Complaint alleges that both of them – two independent auditors, PwC and KPMG, with access to C&A's records and personnel – reacted in the same manner. (*See* FAC ¶¶33-34, 155-56; Tr. at 82, 95-96; D.I. 114 at 34-36; D.I. 121 at 36; D.I. 154 at 17; D.I. 158 at 18; *see also In re IKON Office Solutions, Inc.*, 277 F.3d 658, 669 (3d Cir. 2002) (noting that auditor and successor auditor reached same decision, which was "highly probative" and undermined suggestions of auditor recklessness; to establish scienter, plaintiff must show "that the accounting judgments which were made were such that no reasonable accountant would have made the same

51

decisions if confronted with the same facts") (internal quotation marks omitted).[16]

Because Plaintiffs have failed to allege facts from which one might reasonably infer that

the Auditor Defendants knowingly participated in breaches of fiduciary duties, the claims against

the Auditor Defendants for aiding and abetting should be dismissed.

B.     Unjust Enrichment

Count IV of the Complaint alleges unjust enrichment against defendants Stockman,

Stepp, Krause, Cosgrove, Barnaba, Becker, McCallum, Evans, Hess, Tredwell, McConnell,

Valenti, and the Heartland Entities.[17]   Specifically, the Complaint alleges that these defendants:

> personally benefitted by engaging in the conduct described above, including but
> not limited to causing Collins & Aikman to pay inflated prices for goods, services
> and corporate acquisitions; violating the federal securities laws; making false and
> misleading statements; and causing the Company to file materially false and

---

[16]In Counts VII, VIII, IX, X, and XI, Plaintiffs have also alleged claims for common law fraud, negligence/malpractice, and breach of contract against PwC and KPMG. Each of these claims has as an essential element a requirement that Plaintiffs allege something analogous to the "knowing participation" element of Plaintiffs' aiding and abetting claim. Hence, for essentially the same reason that Plaintiffs' aiding and abetting claim fails, I recommend that these additional claims against the Auditor Defendants likewise be dismissed. More particularly, with respect to the common law fraud claim, Plaintiffs fail to adequately allege that the Auditor Defendants knew they were making false representations. Likewise, because the Complaint does not adequately allege a basis from which the Auditor Defendants knew or should have known C&A's financial statements were false, there is no sufficient allegation of a violation of the standard of care or a contractual obligation from which liability for negligence, malpractice, or breach of contract may be established.

[17]I recognize that many of the defendants have raised statute of limitations defenses against several of the claims against them, including unjust enrichment. (*See, e.g.*, D.I. 98, 100, 114, 125, 127, 149, 152, 155, 158.) Generally, if a statute of limitations "bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Robinson v. Jackson*, 313 F.3d 128, 135 (3d Cir. 2002) (internal quotation marks omitted). Because I recommend dismissal of many claims for reasons other than the statute of limitations, and because I am unpersuaded that the applicable statutes of limitation were not tolled as a result of defendants' allegedly fraudulent and deceptive conduct, the statute of limitations defenses do not merit any greater discussion at this time.

misleading press releases and documents with the SEC. [Further, these
defendants] . . . acted with the intent of concealing the true financial condition of
the Company and increasing its borrowings to a level far in excess of its ability to
pay in order to continue in their positions and personally profit therefrom.

(FAC ¶197)

"The elements of unjust enrichment are (1) an enrichment, (2) an impoverishment, (3) a

relation between the enrichment and impoverishment, (4) the absence of justification and (5) the

absence of a remedy provided by law." *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377,

393 (Del. Ch. 1999). Several defendants argue that the unjust enrichment claims must be

dismissed because the Complaint fails adequately to allege an enrichment as to them or an

impoverishment to C&A. Plaintiffs counter that the enrichments include defendants' continuing

in their positions with C&A, thereby continuing to receive compensation and benefits. (*See* FAC

¶70; Tr. at 101-02) Plaintiffs add that C&A suffered an impoverishment in that it ended up in

deeper insolvency than it otherwise would have and was forced to pay the continued

compensation and benefits to defendants (expenses it would not have incurred had the company

not been "artificially" kept alive). These general defenses, as well as others specific to individual

defendants, are addressed below.

        1.    Stockman And The Heartland Entities

I recommend dismissal of the unjust enrichment claims against Stockman and the

Heartland Entities. The Complaint alleges that the Heartland Entities received a total of $44

million in advisory fees from C&A between 2001 and 2004, and that half of these monies went

to Stockman personally. (FAC ¶¶31-32, 206-07) However, these payments are alleged to have

been paid to the Heartland Entities under the Services Agreement with C&A. (FAC ¶¶31-32,

206) Hence, Plaintiffs' allegations that the Heartland Entities were unjustly enriched by receipt

of certain fees pursuant to the Services Agreement is (potentially) a claim for breach of contract,

not a claim of unjust enrichment. *See Rossdeutscher v. Viacom, Inc.*, 768 A.2d 8, 23-24 (Del.

2001) (dismissing unjust enrichment claim under New York law where any recovery would be

based on what plaintiff should have received under contract had there not been alleged artificial

inflation of stock); *In re Crown-Simplimatic Inc.*, 299 B.R. 319, 327 (Bankr. D. Del. 2003)

(dismissing unjust enrichment claim under Delaware law where contract "adequately addresses

each party's rights and duties"); *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 153-54

(S.D.N.Y. 2007) (dismissing unjust enrichment claim where plaintiff also sought to recover

pursuant to agreement between parties). Neither Delaware nor New York law permit an unjust

enrichment claim where a legally enforceable contract governs the relationship between the

parties. *See Palese v. Delaware State Lottery Office*, 2006 WL 1875915, at *5 (Del. Ch. June 29,

2006) ("Courts developed unjust enrichment, or quasi-contract, as a theory of recovery to remedy

the absence of a formal contract. A party cannot seek recovery under an unjust enrichment

theory if a contract is the measure of the plaintiff's right."), *aff'd,* 913 A.2d 570 (Del. 2006);

*Goldman v. Metropolitan Life Ins. Co.*, 841 N.E.2d 742, 746-47 (N.Y. 2005) ("The theory of

unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence

of any agreement.").

While Plaintiffs suggest that the validity of the Services Agreement may be in doubt and,

therefore, its existence is not a basis to dismiss the unjust enrichment claims (*see* Opp. Brief at

56), the existence of the Services Agreement is expressly pled in the Complaint and relied upon

in connection with Plaintiffs' breach of contract claims against the Heartland Entities (*see* FAC

¶¶31, 205-08).  Under such circumstances, where a valid contract governs the relationship among the parties, the unjust enrichment claim should be dismissed.  *See Tolliver v. Christina Sch. Dist.*, 564 F. Supp. 2d 312, 315-17 (D. Del. 2008) (dismissing unjust enrichment claim where plaintiff conceded that valid contract existed); *ID Biomed. Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995) (dismissing unjust enrichment claim where "[i]t is undisputed the Letter Agreement governs the parties' relationship").

Accordingly, the unjust enrichment claim against the Heartland Entities fail to state a claim on which relief may be granted.  It follows that the unjust enrichment claim against Stockman should also be dismissed, as he is not alleged to have been enriched directly by C&A but only derivatively through his interest in the Heartland Entities.

### 2. Defendant Becker

I recommend that Becker's motion to dismiss the unjust enrichment claim be denied. Becker is alleged to have been unjustly enriched in connection with C&A's acquisition of his company, Becker Group L.L.C., in July 2001, which C&A purchased by issuing Becker C&A common stock.  (*See* Tr. at 98, 101; FAC ¶47.)  Thereafter, Becker joined C&A's Board and, in May 2002, he received a retroactive retainer of $300,000 for past assistance with integrating his company into C&A.  (*See* Tr. at 98, 101; FAC ¶¶48-49.)  Becker was further enriched by receipt of $18 million for what is alleged to have been an "unnecessary" noncompete agreement.  (*See* Tr. at 98, 101; FAC ¶49.)  According to the Complaint, "[u]nder applicable law, Becker was obligated to not compete with the Company and, therefore, there was no reason to enter into a non-compete with him, and he was not entitled to receive any monies from the Company for his agreement not to compete."  (FAC ¶49; *see* Tr. at 98, 101.)  The alleged impoverishment suffered

by C&A is the payment of the $300,000 and $18 million to Becker, as well as the cost of

completing the Becker Acquisition, which is alleged to have been part of an "acquisition spree"

which "positioned the Company for disaster."  (FAC ¶36; *see also* FAC ¶¶50, 197.)

### 3.  Defendant McCallum

Plaintiffs' unjust enrichment claim against McCallum should also survive.  McCallum,

like Becker, received large payments of C&A stock in connection with C&A's acquisition of his

company, Joan Automotive Fabrics, in September 2001.  (FAC ¶51)  The Complaint further

details "round-trip transactions" through which McCallum and his businesses benefitted at the

expense of C&A.  (*See* Tr. at 109-110; FAC ¶¶53-57, 70, 96, 119-21.)  The large payment

McCallum received in connection with his sale of Joan Fabrics is also alleged to have

impoverished C&A, and, as with the Becker Acquisition, the Joan Fabrics Acquisition is alleged

to have been part of the "acquisition spree" which contributed to the impoverishment of C&A.

(*See* FAC ¶¶36, 197.)[18]

### 4.  Other Directors And Officers

Unlike with respect to defendants Becker and McCallum, with respect to the remaining

director and officer defendants – Stepp, Cosgrove, Barnaba, Krause, Evans, Hess, Tredwell,

---

[18]It may be that some or all of what Plaintiffs allege to have been unjust enrichments to
Becker and McCallum are monies that were paid to Becker and McCallum pursuant to a contract.
For instance, it is most likely that C&A's acquisitions of the Becker Group L.L.C. and Joan
Automotive Fabrics were undertaken pursuant to contractual agreements.  If so, discovery may
reveal that some or all of what is alleged to have been an unjust enrichment to Becker or
McCallum cannot be viewed as such, for the same reasons already explained with respect to the
claims against the Heartland Entities.  However, unlike the C&A-Heartland Industrial Partners,
L.P. Services Agreement, any contracts existing between C&A and Becker or McCallum are not
expressly pled in the Complaint or relied on by Plaintiffs in stating other claims.  In these
circumstances, I believe it would be premature to dismiss the unjust enrichment claims against
Becker and McCallum.

McConnell, and Valenti – the Complaint is devoid of allegations demonstrating an enrichment. The closest Plaintiffs come is a general allegation that defendants "engaged in the accounting schemes detailed [in the Complaint] with the intent of concealing the financial condition of Collins & Aikman so that . . . [they] could continue in their positions and personally profit therefrom." (FAC ¶60; *see also* FAC ¶197.) Nor, correspondingly, is there any specific factual allegation as to how C&A was impoverished by any of these defendants. While Plaintiffs represented at the hearing that the benefits that are the basis for the unjust enrichment claim as to these remaining defendants are the receipt of "salaries and directors' fees and money for their performance on the Board of directors," they conceded that such allegations were "not specifically spelled out in the complaint." (Tr. at 101-02). Therefore, even assuming that salaries and director fees could be sufficient to satisfy the enrichment and impoverishment elements of Plaintiffs claim, I recommend dismissal of the unjust enrichment claims against these individual defendants.

### C.     Common Law Fraud

Count V of the Complaint alleges common law fraud against defendants Stockman, Stepp, Cosgrove, Barnaba, and McCallum. Under Delaware law, the elements of common law fraud are: "(1) the defendants falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendants knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendants intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance." *Trenwick America Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007).

In attempting to state a claim for common law fraud, the Complaint alleges: "From late 2001 to May 2005, the Director and Officer Defendants made misrepresentations of material facts to Collins & Aikman's Board of Directors and Audit Committee relating to the true financial condition of the Company." (FAC ¶200)  It further alleges that "[t]he conduct of the Director and Officer Defendants, whether intentional, reckless, grossly negligent or mistaken, constituted fraud," and that "[t]he Director and Officer Defendants knew or should have known that the Company, through its Board of Directors and Audit Committee, would rely and act on the misrepresentations." (FAC ¶¶201-02)  The Complaint continues: "Collins & Aikman, through its Board of Directors, including its Audit Committee, in electing and appointing the defendant officers, justifiably relied upon the Director and Officer Defendants' misrepresentations," thereby causing damage to the company.  (FAC ¶203)

As can be seen, Plaintiffs' theory of common-law fraud is essentially the same as its theory of federal securities fraud.  However, while I have recommended that their § 10(b) fraud claim not be dismissed, I recommend that the common law fraud claims be dismissed.  This different recommendation is due to differences between Delaware law and federal securities law with respect to the essential element of reliance in the circumstances presented here.  *See generally Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, __ U.S. __, 128 S. Ct. 761, 764 (2008) ("Section 10(b) does not incorporate common-law fraud into federal [securities] law.").

As already discussed in connection with the securities fraud claim, in *Trenwick* Vice Chancellor Strine dismissed the common-law fraud claim brought by the litigation trust of the bankrupt Trenwick America against the company's directors for, among other reasons, the trust's

failure to plead reliance, given the allegation that the trust's predecessor – i.e., the directors of Trenwick America – "knew the true facts about all the issues [now] said to have been misrepresented." 906 A.2d at 207, 211.  Under Delaware law, the directors' knowledge was imputed to the corporation; as a result "the entity would not have been relying to its detriment on the fraudulent statement because its controllers were aware of the actual state of affairs." *Id.* at 212 & n.128.  Therefore, the trust's claim "ma[de] no sense." *Id.* at 211-12.

Consistent with the reasoning in *Trenwick*, I believe that if Plaintiffs' common-law fraud claim were presented to the Delaware courts, they would find that these claims "make no sense" and would dismiss them.  Here, as in *Trenwick*, Plaintiffs essentially allege that C&A's senior management directed and controlled the various schemes and knew or should have known the Company's financial statements were false.  (*See, e.g.*, FAC ¶¶25, 61-62, 64, 67, 84.)  Plaintiffs have therefore failed to plead the element of reliance because, under Delaware law, C&A cannot have relied to its detriment on financial statements that C&A's own directors knew to be inaccurate.  Thus, I recommend that the common-law fraud claims against all of these defendants be dismissed.

D.     Breach Of Contract And Implied Covenant Of Good Faith And Fair Dealing

In Count VI, Plaintiffs allege a breach of express and implied contractual obligations, including the implied covenant of good faith and fair dealing, against the Heartland Entities.  As an initial matter, only one of the Heartland Entities – Heartland Industrial Partners, L.P. – is alleged to be a party to the Services Agreement.  (FAC ¶46)  The copy of the Services Agreement in the record before me has only two parties to it: C&A and Heartland Industrial Partners, L.P. (D.I. 112 Ex. D)  Therefore, a claim for breach of contract or of the implied covenant may, at

most, be stated against this single Heartland Entity.[19]

C&A's breach of contract claim is based on the Services Agreement, which is governed by New York law. (*See* FAC ¶206; D.I. 112 Ex. D, ¶9(d); Opp. Brief at 54.)  Under New York law, a cognizable claim for breach of contract requires that a plaintiff allege: "(1) the existence of an agreement between the plaintiff and defendant; (2) due performance of the contract by the plaintiff; (3) breach of the contract by the defendant; and (4) damages resulting from the breach." *Texas Liquids Holdings, LLC v. Key Bank N.A.*, 2007 WL 950136, at \*2 (S.D.N.Y. Mar. 27, 2007).  A well-pleaded breach of contract claim must also identify the contractual provision or, at minimum, the contractual duty that is alleged to have been violated. *See Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494-96 (S.D.N.Y. 2002), *aff'd,* 65 Fed. App'x 736 (2d Cir. 2003); *Am. Nat'l Theatre & Acad. v. Am. Nat'l Theatre Inc.*, 2006 WL 4882916, at \*4 (S.D.N.Y. Sept. 27, 2006).

As the Heartland Entities have argued, and as Plaintiffs appeared to concede at oral argument (Tr. at 133-34), at no point in their Complaint, their briefing, or their presentation at the hearing have Plaintiffs identified any particular provision of the Services Agreement that Heartland Industrial Partners, L.P. purportedly breached.  Whether or not Plaintiffs have now abandoned their claim for breach of contract, this failing is fatal to their claim.  Hence, I recommend dismissal of the breach of contract claim against all of the Heartland Entities.

C&A's related claim for breach of the implied covenant of good faith and fair dealing fails as well.  As pled by Plaintiffs, the Services Agreement provides that Heartland Industrial

---

[19]Plaintiffs conceded at oral argument that they would not press this contractual claim against the other two Heartland entities: Heartland LLC and Heartland Industrial.  (Tr. at 14-15)

Partners, L.P. will provide C&A "advisory and consulting services in relation to the affairs and strategic direction of the Company," as well as ancillary services "reasonably requested by the Company." (*See* FAC ¶206; D.I. 112, Ex. D, ¶2.) Nothing in or about the Services Agreement is alleged to have required Heartland Industrial Partners, L.P. to give C&A accounting advice or provide auditing services. To the contrary, under the Services Agreement, Heartland Industrial Partners, L.P. expressly disclaimed any responsibility for the accuracy of C&A's information. (*See* D.I. 112, Ex. D, ¶6; D.I. 127 at 21.) Instead, it was C&A which had a contractual obligation under the Services Agreement to provide Heartland Industrial Partners, L.P. with accurate financial information. (*See* D.I. 127 at 7-8; D.I. 112, Ex. D, ¶6; Tr. at 116-17.)

Under applicable New York law, the implied covenant cannot supply substantive terms that were not bargained for by the parties. *See Ari & Co., Inc. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 523 (S.D.N.Y. 2003); *see also Dalton v. Educational Testing Serv.*, 663 N.E.2d 289, 291-92 (N.Y. 1995) ("The duty of good faith and fair dealing . . . is not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship.") (internal quotation marks omitted). To read into the Services Agreement an obligation on Heartland Industrial Partners, L.P. with respect to accounting and financial statements would turn the Services Agreement on its head, something I cannot do consistent with applicable New York law. Accordingly, I will recommend dismissal of this Count for failure to state a claim.

III. Leave To Amend

Although C&A has filed no formal motion seeking leave to amend, it has suggested that if the Court finds that any of the claims in the Complaint are inadequately pled, then leave to file

a second amended complaint should be granted. (*See, e.g.*, D.I. 139, 140; Tr. at 131, 155.)  To the extent Plaintiffs have, thereby, moved for leave to amend, I deny their request.[20]

This case has been pending for more than two years.  Plaintiffs have not suggested that they have any new factual information to which they did not have access prior to filing their original complaint.  After extensive briefing was filed in support of motions to dismiss the original complaint, Plaintiffs filed the operative First Amended Complaint.  This was followed by preparation of hundreds of additional pages of briefing.  The numerous issues raised in this briefing have been thoroughly argued and, now, I have recommended resolution of each of them.  If my recommendation is adopted, some claims will survive and others will not, and this case should move forward into discovery.  In any event, Plaintiffs have already had "two bites at the apple."  I see no reason at this point to grant Plaintiffs yet another bite. *See Long v. Wilson*, 393 F.3d 390, 399 (3d Cir. 2004) (explaining that "passage of time" must factor into analysis of whether parties would be prejudiced by granting leave to amend); *Cureton v. NCAA*, 252 F.3d 267, 273-74 (3d Cir. 2001) (affirming denial of leave to amend sought three years after initial complaint based on factual information that was known much earlier).

## RECOMMENDED DISPOSITION

For the foregoing reasons, I recommend:

1.      As Plaintiff has requested, Count I of the Complaint (D.I. 90) alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5 be DISMISSED as against defendants

---

[20]Several defendants have expressly opposed leave to amend, to the extent it has been sought by Plaintiffs. (*See, e.g.*, D.I. 122, 125, 127, 132, 145, 147, 153, 155, 156; Tr. at 128, 135.)

Barnaba, Krause, Becker, Evans, Hess, Tredwell, McConnell, Valenti, Galante, and Koth.

      2.      The motions to dismiss Count I alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5 as against defendants Stockman (D.I. 115), Stepp (D.I. 104), Cosgrove (D.I. 97), and McCallum (D.I. 99) be DENIED.

      3.      As Plaintiff has requested, Count II of the Complaint (D.I. 90) alleging violations of Section 14(a) of the Exchange Act and Rule 14a-9 be DISMISSED against all Director and Officer Defendants, i.e., defendants Stockman, Stepp, Cosgrove, Barnaba, McCallum, Krause, Becker, Evans, Hess, Tredwell, McConnell, Valenti, Koth, and Galante.

      4.      The motions to dismiss Count III alleging breach of fiduciary duty against defendants Stockman (D.I. 115), Stepp (D.I. 104), Cosgrove (D.I. 97), Barnaba (D.I. 128), and McCallum (D.I. 99) be DENIED.

      5.      The motions to dismiss Count III alleging breach of fiduciary duty against defendants Evans (D.I. 101), Hess (D.I. 131), Tredwell (D.I. 106), McConnell (D.I. 106), Valenti (D.I. 106), Krause (D.I. 119), Becker (D.I. 124), and the Heartland Entities (D.I. 110) be GRANTED.

      6.      The motions to dismiss Count IV alleging unjust enrichment against defendants Becker (D.I. 124) and McCallum (D.I. 99) be DENIED.

      7.      The motions to dismiss Count IV alleging unjust enrichment against defendants Stockman (D.I. 115), Stepp (D.I. 104), Krause (D.I. 119), Cosgrove (D.I. 97), Barnaba (D.I. 128), Evans (D.I. 101), Hess (D.I. 131), Tredwell (D.I. 106), McConnell (D.I. 106), Valenti (D.I. 106), and the Heartland Entities (D.I. 110) be GRANTED.

      8.      As Plaintiff has requested, Count V of the Complaint (D.I. 90) alleging common

law fraud be DISMISSED as against defendants Krause, Becker, Evans, Hess, Tredwell, McConnell, and Valenti.

9.    The motions to dismiss Count V alleging claims for common law fraud against defendants Stockman (D.I. 115), Stepp (D.I. 104), Cosgrove (D.I. 97), Barnaba (D.I. 128), and McCallum (D.I. 99) be GRANTED.

10.    The motions to dismiss Count VI alleging breach of express and implied contractual obligations against the Heartland Entities (D.I. 110) be GRANTED.

11.    The motions to dismiss Count VII alleging claims for common law fraud against defendants PwC (D.I. 107) and KPMG (D.I. 120) be GRANTED.

12.    The motion to dismiss Count VIII alleging claims for negligence/malpractice against defendant PwC (D.I. 107) be GRANTED.

13.    The motion to dismiss Count IX alleging claims for negligence/malpractice against defendant KPMG (D.I. 120) be GRANTED.

14.    The motion to dismiss Count X alleging a claim for breach of contract against defendant PwC (D.I. 107) be GRANTED.

15.    The motion to dismiss Count XI alleging a claim for breach of contract against defendant KPMG (D.I. 120) be GRANTED.

16.    The motions to dismiss Count XII alleging claims for aiding and abetting breaches of fiduciary duty against defendants PwC (D.I. 107) and KPMG (D.I. 120) be GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within ten (10) days after being served with a copy of this Report and Recommendation. Fed. R.

Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 Fed. Appx. 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order In Non-*Pro Se* Matters For Objections Filed Under Fed. R. Civ. P. 72, dated April 7, 2008, a copy of which is available on the Court's website, www.ded.uscourts.gov/StandingOrdersMain.htm.

Dated: May 20, 2009

Honorable Leonard P. Stark
UNITED STATES MAGISTRATE JUDGE